IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| GROENEVELD TRANSPORT EFFICIENCY, INC., | ) | CASE NO. 1:10 CV 702 (DCN) |
| | ) | |
| | ) | MAGISTRATE JUDGE |
| Plaintiff, | ) | WILLIAM H. BAUGHMAN, JR. |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| LUBECORE INTERNATIONAL, INC., | ) | |
| | ) | |
| Defendant. | ) | |

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -2-

FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -4-
    I.     Preliminary Observations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -4-
    II.    Findings of Fact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -4-
         A.    Groeneveld and the Groeneveld EP-0 system/pump . . . . . . . . . . -4-
         B.    Lubecore and the Lubecore automated greasing system/pump . . -7-
    III.   Groeneveld's Claims and Lubecore's Responses . . . . . . . . . . . . . . . . . . -9-

ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -11-
    I.     Preliminary Observations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -11-
    II.    Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -11-
    III.   Preliminary Injunction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -12-
    IV.   Trade Dress Infringement, Unfair Competition and Deceptive Trade Practices
        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -13-
         A.    Applicable law – overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . -13-
             1.    Trade dress – definition . . . . . . . . . . . . . . . . . . . . . . . . . -14-
             2.    Distinctiveness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -14-
             3.    Functionality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -16-
             4.    Likelihood of confusion . . . . . . . . . . . . . . . . . . . . . . . . -18-
         B.    Application of law – findings of fact and conclusions of law . . -19-
             1.    The elements for which protection is claimed . . . . . . . . . -19-
             2.    Requisites for trade dress protection . . . . . . . . . . . . . . . -20-
                a.    Distinctiveness – secondary meaning . . . . . . . . . . -20-
                    (1)    The necessity of proving acquired secondary meaning . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-

          (2)     Intentional copying  . . . . . . . . . . . . . . . . . .  -21-
                  (a)     The presumption of secondary meaning
                          from intentional copying  . . . . . . . .  -21-
                  (b)     Rebuttal of the presumption of secondary
                          meaning from intentional copying  .  -23-
          (3)     Consumer surveys  . . . . . . . . . . . . . . . . . . .  -25-
          (4)     Exclusivity, length and manner of use  . . .  -26-
          (5)     Amount and manner of advertising  . . . . . .  -26-
          (6)     Amount of sales and number of customers  -26-
          (7)     Established place in the market . . . . . . . . .  -27-
      b.  Functionality . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -27-
      c.  Likelihood of confusion  . . . . . . . . . . . . . . . . . . .  -31-
          (1)     Strength of Groeneveld's design  . . . . . . . .  -31-
          (2)     Likely degree of purchaser care  . . . . . . . .  -32-
          (3)     Evidence of actual confusion  . . . . . . . . . .  -33-
          (4)     Lubecore's intent . . . . . . . . . . . . . . . . . . . .  -35-
   3.   Unfair competition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -35-

PRELIMINARY INJUNCTION FACTOR ANALYSIS  . . . . . . . . . . . . . . . . . . . . . . .  -38-
   I.    Irreparable Injury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -38-
   II.   Harm to Lubecore and Others and the Public Interest . . . . . . . . . . . . . .  -39-

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -40-

## INTRODUCTION

Before me[1] is a motion by plaintiff Groeneveld Transport Efficiency, Inc.

(Groeneveld) pursuant to Federal Rule of Civil Procedure 65(a) seeking a preliminary

injunction barring defendant Lubecore International, Inc. (Lubecore) from marketing and

selling an automated truck lubricating system in the United States that Groeneveld asserts

is so similar in design, features, and overall appearance to Groeneveld's system as to confuse

---

[1] The parties have consented to my exercise of jurisdiction for purposes of
adjudicating the present motion.  ECF # 72.

buyers and harm Groeneveld.[2]  Groeneveld grounds its right to relief on Lubecore's purported violations of the Lanham Act,[3] specifically citing infringement of Groeneveld's trade dress, unfair competition, and false advertising, as well as on violations of Ohio's Deceptive Trade Practices Act[4] and common law.[5]

Lubecore has denied that it has engaged in any unlawful practice concerning its automated lubrication system.[6]  Following Groeneveld's filing of its motion for injunctive relief, Lubecore opposed the motion.[7]  Groeneveld replied to the opposition and requested a hearing.[8]

After this briefing by the parties, a hearing on the motion was conducted over several days that involved witnesses from each party and the introduction of numerous exhibits.[9] The parties then filed proposed findings of fact and conclusions of law.[10]  Thus, inasmuch as briefing by the parties has been completed, relevant motions adjudicated, a hearing held,

---

[2] ECF # 4.

[3] 15 U.S.C. § 1125(a).

[4] Ohio Rev. Code § 4165.02.

[5] ECF # 4 at 3.

[6] ECF # 35.

[7] ECF # 48.

[8] ECF # 58.

[9] ECF # 81 (transcript of hearing of Oct. 4, 2010 [sealed]); # 80 (transcript of hearing of Oct. 5, 2010); # 82 (transcript of hearing of Oct. 6, 2010 [sealed]); # 83 (transcript of hearing of Oct. 12, 2010 [sealed]).

[10] ECF # 85 (Lubecore); # 86 (Groeneveld).

and proposed findings of fact and conclusions of law entered, I find the matter now ready for resolution.[11] For the reasons set forth below, Groeneveld's motion for preliminary injunction will be denied.

## FACTS

### I. Preliminary Observations

The relevant facts are not complex and mostly uncontested. Further, as will be developed later, the application of the law in this matter is also straightforward. To further simplify presentation of this matter, I have elected, where possible, to eliminate references here to multiple exhibits and transcripts in favor of citing to the parties' findings in that regard, where such findings incorporate references to the sources. A more detailed presentation of certain key facts will be undertaken below as part of the conclusions of law.

### II. Findings of Fact

#### A. Groeneveld and the Groeneveld EP-0 system/pump

Groeneveld is wholly-owned by a Dutch parent[12] and distributes automated lubrication or greasing systems designed and made by the parent company, together with attendant parts and supplies,[13] for use in a variety of applications.[14] At issue here is the pump used in a

---

[11] ECF # 87.

[12] ECF # 86 at 2.

[13] *Id*.

[14] *Id*. at 19.

single-line[15] zero-grease[16] automatic lubrication system designated by Groeneveld as its "EP-0" system.[17]  This system was developed by Groeneveld in 1980 and designed for use in over-the-road trucks.[18]  It has been on the market in the United States for 30 years.[19]  Neither the overall pump itself nor any of its component parts are protected by a patent.[20]

Physically, the Groeneveld EP-0 pump consists of a clear, covered grease reservoir fixed above a black plastic housing which contains a piston inside a compression chamber.[21]  A metal fitting on the outer front surface of the housing connects the compression chamber to a hose that distributes pumped grease throughout the system.[22]  Groeneveld's name and

---

[15] In a single-line system, grease proceeds from a reservoir to the greasing point via a single line, as modulated by a metering device that specifies the amount of grease to be applied to a particular point.  *Id*. at 20-21.

[16] *Id*. at 20.  Zero, or "0," grease indicates a thinner grease than higher numbered greases.  Thinner grease is preferred for over-the-road trucks because less grease is needed for lubrication, and thinner grease can lubricate at tighter tolerances.

[17] *Id*.

[18] *Id*.  *See also*, *id*. at 25 (noting that other electrically-driven automatic greasing systems are used in "industrial applications and construction vehicles, as opposed to [Groeneveld's EP-0] pneumatic operated system," which is "preferred in over-the-road applications....").

[19] *Id*. at 20.

[20] ECF # 85 at 15.

[21] ECF # 86 at 20, citing PX 49 (photograph of Groeneveld EP-0 pump); at 21, citing PX 3 (brochure describing EP-0 system).

[22] *Id*.

-5-

logo [the capital letter "G" appearing in its corporate color, green][23] are prominently present on the pump.[24]

Operationally, the Groeneveld EP-0 pump works when a connector between the compression chamber and the reservoir is open, allowing the chamber to fill with a certain amount of grease.[25]  Then, pneumatic pressure is used to simultaneously:  (1) close the connector between the compression chamber and the reservoir, and (2) push the piston inside the sealed chamber up so as to force chambered grease out through the hose connected to the chamber into the system.[26]

An additional feature of the Groeneveld EP-0 pump is that the grease in the reservoir is continuously covered by a spring-driven follower plate attached to the top of the reservoir and sealed along the sides.[27]  As grease is used and the level in the reservoir declines, the absence of upward pressure on the spring causes the plate to drop accordingly, thus keeping the grease constantly covered and sealed.[28]  As noted by Groeneveld in its marketing literature,[29] the above-described action of the follower plate in the clear reservoir provides

---

[23] *Id.* at 30.

[24] *Id*. at 20.

[25] ECF # 86 at 20-21; *see also*, PX 10-24, 25 (operational manual for Groeneveld single line automatic greasing systems).

[26] ECF # 86 at 20-21.

[27] *Id*.

[28] *Id*.

[29] *See*, ECF # 86 at 21 (Groeneveld explicitly cites to PX 3 as a "brochure that explains the benefits and mechanics of Groeneveld's EP-0 system.").

several "major" practical benefits:  (1) prevents oxidation of the unused grease; (2) prevents condensation from mixing with the grease; (3) ensures all grease is used up; and (4) provides a visual indication of the amount of grease remaining inside the reservoir.[30]

## B.    Lubecore and the Lubecore automated greasing system/pump

Jan Eisses, the founder and president of Lubecore, ran Groeneveld's North American operations from 2001 to early 2007.[31]  Prior to that, he had distributed Groeneveld automatic greasing systems in Canada for approximately a dozen years.[32]  Although the parties dispute how it should be characterized,[33] it is clear that in late 2007 Eisses, as part of launching Lubecore, hired a South Korean industrial design firm headed by a Dutchman, who previously worked for Groeneveld,[34] to create a Lubecore pump for an automatic lubrication system.[35]  Eisses told the designer to create a pump that incorporated the "functionality and features" of various pumps on the market, including Groeneveld's EP-0 pump, along with his "ideas for improvements" in the existing products.[36]

---

[30] PX 3-3.

[31] ECF # 86 at 35.

[32] *Id.*

[33] *See*, *e.g.*, *id.* at 36 (Groeneveld claims intentional copying); ECF # 85 at 19-20 (Lubecore denies intentional copying).

[34] ECF # 86 at 46.

[35] ECF # 85 at 19; ECF # 86 at 36.

[36] ECF # 85 at 19.

Though Eisses denied instructing the designer to copy Groeneveld's pump, the resulting pump designed for Lubecore is strikingly similar in appearance and operation to the Groeneveld pump.[37] Specifically, as with the Groeneveld pump, the Lubecore pump consists of a clear grease reservoir with a hard cap or top containing a spring-driven follower plate, which reservoir sits above a housing with a metal hose fitting on the outside and containing within an air-driven piston.[38] Operationally, the pumps work in similar fashion.[39] A vast majority of the 50 component parts of the Groeneveld pump are interchangeable with the corresponding parts in Lubecore's pump.[40]

Despite the operational and functional similarities, the Lubecore pump does clearly label itself as a Lubecore product. In that regard, the coloring on the identifying elements of its pump is red, not Groeneveld green; the Lubecore name is displayed on the side of the grease reservoir, not Groeneveld; and Lubecore's oil-drop-on-maple-leaf logo, not the Groeneveld "G", appears in three other places on the pump.[41]

---

[37] *See*, ECF # 85 at 19; ECF # 86 at 36.  *See also*, PX 49 (photo, Groeneveld pump); PX 50 (photo, Lubecore pump).

[38] *Compare*, PX 3 (Groeneveld pump image and description); PX 66 (Lubecore pump image and description).  *See also*, PX 51 (3-D drawings comparing pumps and components).

[39] *Id*.

[40] ECF # 86 at 40-41.

[41] ECF # 85 at 30.  *See also*, PX 50 (photograph of Lubecore pump).

### III.    Groeneveld's Claims and Lubecore's Responses

Nevertheless, after first seeing the Lubecore pump installed on a demonstration truck at a Toronto trade show in 2008,[42] Groeneveld began "investigating Lubecore's activities."[43] Among other things, that investigation:  (1) determined that no Groeneveld tooling had been used to make the Lubecore pump,[44] and (2) collected reports from Groeneveld employees and customers to the effect that – from a distance or when pump labels are obscured – Groeneveld and Lubecore pumps look alike, largely because the two pumps share a similar, distinctive shape.[45]

Groeneveld also contends that various marketing practices by Lubecore or its distributors support the conclusion that Lubecore is:  (1) seeking to confuse the consumer as to the true "source, origin and manufacture" of its pump, specifically by implying a relationship with Groeneveld; and (2) seeking to use the comparable appearance to create the impression that because the pumps look alike, the Lubecore pump is equal in quality to the Groeneveld.[46]

---

[42] ECF # 86 at 37.

[43] *Id*. at 38.

[44] *Id*.

[45] *Id.* at 38-40.

[46] *Id*. at 45-54.

Lubecore, in turn, argues that any similarity in appearance between both pumps is due to each element of the pump having a necessary, functional basis to be as it is.[47]  In other words, it contends that, in order to achieve the same functional benefits as the Groeneveld pump, any competing pump, including Lubecore's, it must essentially share a basic design which is *de jure* functional and thus not entitled to protection as trade dress.[48]

Lubecore further asserts that because it has prominently labeled its pump with its name, corporate color, and logo, it has not sought to confuse the consumer as to the origin of its pump.[49]  In that regard, it also notes that its sales literature strives to distinguish Lubecore's pump from Groeneveld's and to "tout the benefits" of Lubecore's pump so as to better establish its brand.[50]  In addition, it maintains that there is no evidence that actual purchasers of automated lubrication systems (which Lubecore contends are careful, sophisticated corporate buyers[51]) are, in fact, confused by the mere shape of the pump.[52]  Finally, it states that Lubecore has no control over any errant marketing efforts by independent distributors.[53]

---

[47] ECF # 85 at 12-16.

[48] *Id*. at 15-16.

[49] *Id.* at 22-23.

[50] *Id*. at 30.

[51] *Id.* at 27-29.

[52] *Id*. at 23-25.

[53] *Id*. at 26.

# ANALYSIS

## I.     Preliminary Observations

The matter before me is Groeneveld's motion for a preliminary injunction.  As the parties have acknowledged, adjudicating that motion requires, *inter alia*, that I determine whether Groeneveld has established a likelihood of success on the merits of its claims of trade dress infringement, unfair competition, and deceptive trade practices.[54]  Thus, I will first set forth the controlling law and then, by applying that law to the facts developed, discuss why Groeneveld's motion for a preliminary injunction is denied.

## II.     Jurisdiction

The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) since Groeneveld alleges violations of 15 U.S.C. § 1125(a), a federal statute.[55]  Diversity jurisdiction under 28 U.S.C. § 1332(a) also exists in that the parties are corporate citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs.[56]  Further, supplemental jurisdiction exists over the Ohio statutory and common law claims under 28 U.S.C. §§ 1367(a) and 1338(a).  Personal jurisdiction exists under the Ohio long-arm statute.[57]  Venue is proper under 28 U.S.C. § 1391(c) and Local Civil Rule 3.8(b).

---

[54] ECF # 85 at 11-12; ECF # 86 at 1.

[55] ECF # 1 at 1-2.

[56] *See*, *id*. at 1.  Groeneveld is an Ohio corporation with its principal place of business in Brunswick, Ohio.  Lubecore is a Canadian corporation with is principal place of business in Ontario, Canada.

[57] Ohio Rev. Code § 2307.382.

## III.    Preliminary Injunction

Rule 65 of the Federal Rules of Civil Procedure provides for the issuance of a preliminary injunction.  As the Supreme Court has stated:

> The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be had.  Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is often granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits.  A party thus is not required to prove his case in full at a preliminary injunction hearing[,] and the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.[58]

As outlined by the Sixth Circuit, there are four relevant factors to be considered and balanced by the court in adjudicating a motion for injunctive relief under Rule 65:

1.    Whether the movant has a strong likelihood of success on the merits;

2.    Whether the movant would suffer irreparable injury without the injunction;

3.    Whether the issuance of the injunction would cause substantial harm to others;

4.    Whether the public interest would be served by issuing the injunction.[59]

The Sixth Circuit has emphasized that these four considerations are "factors to be balanced, not prerequisites that must be met."[60]  Moreover, a district court  is not required to make a specific finding as to each of the four factors if resolving fewer issues would be

---

[58] *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (internal citations omitted).

[59] *Certified Restoration Dry Cleaning Network v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) (citation omitted).

[60] *Jones v. City of Monroe*, 341 F.3d 474, 476 (6th Cir. 2003) (citation omitted).

dispositive.[61]  However, "'it is generally useful for the district court to analyze all four of the preliminary injunction factors.'"[62]

## IV.  Trade Dress Infringement, Unfair Competition and Deceptive Trade Practices

### A.  Applicable law – overview

The Lanham Act[63] prohibits unfair competition, deceptive trade practices, and trade dress infringement as a matter of federal law.  Similarly, Ohio law prohibits deceptive trade practices.[64]  Essentially, the same analysis is employed to determine liability for claims of trade dress infringement and unfair competition under both federal and state law.[65]

To recover on a claim of trade dress infringement, as the Sixth Circuit has noted, the complaining party must ultimately show by a preponderance of the evidence:  (1) that the trade dress in question is distinctive in the marketplace and has acquired secondary meaning, thereby indicating the source of the goods; (2) that the trade dress is primarily nonfunctional; and (3) that the trade dress of the competing good is confusingly similar.[66]  The term "trade

---

[61] *Certified*, 511 F.3d at 542 (citation omitted).

[62] *Id*. (quoting *Leary v. Daeschner*, 228 F.3d 729, 739 n.3 (6th Cir. 2000)).

[63] 15 U.S.C. § 1125(a).

[64] Ohio Rev. Code § 4165.02.

[65] *General Motors Corp. and AM General, LLC v. Lanard Toys, Inc.*, 468 F.3d 405, 414 (6th Cir. 2006) (citation omitted); *Audi AG v. D'Amato*, 469 F.3d 534, 542 (6th Cir. 2006).

[66] *Abercrombie & Fitch Stores v. American Eagle Outfitters*, 280 F.3d 619, 629 (6th Cir. 2002) (citations omitted).

dress" as used in the law will be initially explained below, followed by explanations of each of the three factors that must be proved by the party claiming trade dress infringement.

### 1. *Trade dress – definition*

Trade dress is understood to mean the image or appearance of a product, either through its design or packaging, that has acquired secondary meaning sufficient to identify the product with its manufacturer and distinguish it from others.[67] While trade dress involves the overall image of the product,[68] the party seeking to protect its trade dress must identify and list separately the "elements of design and unique combinations" for which protection is sought, which enumeration then permits the district court to craft a "sufficiently specific injunction" if relief is warranted.[69]

### 2. *Distinctiveness*

As noted by the Sixth Circuit, the first step in qualifying trade dress for protection under the Lanham Act is proving distinctiveness, since without distinctiveness there can be no possibility of confusion as to origin, sponsorship, or approval of the goods, as the Act requires.[70] For purposes of the statute, distinctiveness can be established either: (1) by showing that the trade dress is inherently distinctive, such that "its intrinsic nature serves to identify a particular source" for the goods in question; or (2) by showing an acquired

---

[67] *Id*. at 629; *see also*, *Gibson Guitar Corp. v. Paul Reed Guitars, LP*, 423 F.3d 539, 547 (6th Cir. 2005) (citation omitted).

[68] *Abercrombie*, 280 F.3d at 629 (citations omitted).

[69] *Id.* at 634.

[70] *Id*. at 635 (citation omitted).

distinctiveness through attachment of a secondary meaning, which occurs when, in the mind of the consumer, the primary significance of the trade dress is to identify the source of the product and not the product itself.[71]

In general, there is a distinction between trade dress claims based on the design of the product itself and the packaging of the product.[72] In particular, product packaging is "normally taken by the consumer to indicate origin" and thus, of itself, can be inherently distinctive trade dress.[73] A product's design or configuration, by contrast, "is inextricably tied to the product itself, such that even the most unusual features of a product's design cannot automatically identify which producer crafted the product because consumers are not predisposed to treat design features as an indication of source."[74]

Accordingly, as the Sixth Circuit stated in *Abercrombie*, "no product configuration can meet the distinctiveness requirement of the Lanham Act by a showing of inherent distinctiveness, but must rely instead on acquired distinctiveness, *i.e.*, a showing of secondary meaning."[75] Therefore, as the *Abercrombie* court concluded, "only non-generic product

---

[71] *Id*. at 635 (citation omitted).

[72] *Wal-Mart Stores, Inc. v. Samara Bros., Inc*., 529 U.S. 205, 215 (2000); *see also*, *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763 (1992).

[73] *Samara Bros.*, 529 U.S. at 215.

[74] *Abercrombie*, 280 F.3d at 637.

[75] *Id*. (citing *Samara Bros*., 529 U.S. at 216).

configurations that have acquired distinctiveness through the attachment of secondary meaning satisfy the distinctiveness requirement of the Lanham Act."[76]

As regards secondary meaning, the Sixth Circuit has long-applied a seven-factor test for determining the existence of secondary meaning in trade dress.[77] That test looks to: (1) direct consumer testimony; (2) consumer surveys; (3) exclusivity, length, and manner of use; (4) amount and manner of advertising; (5) amount of sales and number of customers; (6) established place in the market; and (7) proof of intentional copying.[78]

### 3.   *Functionality*

Functional elements cannot be protected as trade dress.[79] In that regard, as the Supreme Court has held, "[t]rade dress protection must subsist with the recognition that in many instances there is no prohibition against copying goods and services."[80] In general, this means that, unless protected by patent or copyright, a product, design, or feature is subject to copying.[81] The burden is on the party seeking protection to prove its trade dress is non-functional.[82]

---

[76] *Id*. at 638.

[77] *Id*. at 639 n.14 (citations omitted).

[78] *Id.*

[79] *Id*. at 640 (citation omitted).

[80] *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 28 (2001).

[81] *Id*.

[82] *Id*. at 27.

In general terms, the Supreme Court has stated that a product feature is functional, and so ineligible for protection, if it is essential to the use or purpose of the item, or if it affects its cost or quality.[83]  In this sense, functional features are distinct from those that are purely fanciful, arbitrary, or decorative, which features can be protected as trade dress.[84]  However, aesthetic features may also in some instances be deemed functional and ineligible for protection as trade dress.[85]  Specifically, where the exclusive use of an aesthetic feature would put competitors at a "'significant, non-reputation-related disadvantage,'"such an aesthetic feature will be deemed functional and thus not protected as trade dress.[86]  As the Sixth Circuit noted in *Abercrombie*, the two common tests for aesthetic functionality under the Supreme Court's effects on competition analysis are:  (1) whether affording trade dress protection to certain features would nevertheless leave competitors with a variety of comparable alternative features (the "comparable alternatives" approach), and (2) whether providing trade dress protection for certain features would hinder or inhibit the ability of another manufacturer to compete effectively in the relevant market for that product (the "effective competition" test).[87]

---

[83] *Id.* at 32 (citation omitted).

[84] *Id.* at 33; *see also*, *Two Pesos*, 505 U.S. at 774.

[85] *Abercrombie*, 280 F.3d at 641(citing *TrafFix*, 532 U.S. at 23).

[86] *Id*. (citing *TrafFix*, 532 U.S. at 23, quoting *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 165 (1995)).

[87] *Id*. at 642 (citations omitted).

Similarly, where the claim is that a combination of functional individual elements has been configured in such a manner as to be protected trade dress, courts hold that such functional features must be configured in "an arbitrary, fanciful or distinctive way" in order to be entitled to protection.[88]  Conversely, where individual functional components are combined in a non-arbitrary way to perform an overall function, the producer cannot claim that the overall trade dress is non-functional.[89]  In this sense, "where engineering necessity influence[s] the configuration of the functional components," the resulting design is functional.[90]

### 4. *Likelihood of confusion*

Even if a product design or configuration is determined to be both distinctive and non-functional, a plaintiff seeking to prevail on a trade dress infringement claim must still establish the existence of a likelihood of confusion in the minds of consumers as to the source or origin of the two parties' products.[91]  Essentially, what the law in this instance forbids is one party passing off its goods as those of another.[92]  The law in this circuit has identified eight factors that go to establishing likelihood of confusion:  (1) strength of the plaintiff's mark or design, (2) relatedness of the goods, (3) similarity of the mark or design,

---

[88] *The Antioch Co. v. Western Trimming Corp.*, 347 F.3d 150, 158 (6th Cir. 2003) (citation omitted).

[89] *Id*.

[90] *Id.*

[91] *Abercrombie*, 280 at 645.

[92] *Id*. at 645-46 (citations omitted).

(4) evidence of actual confusion, (5) commonality or similarity of marketing channels used,

(6) likely degree of purchaser care, (7) defendant's intent in selecting the mark or design, and

(8) likely expansion of the product line.[93]

As with the other elements of establishing infringement, the burden is on the plaintiff

to show that there is a likelihood of confusion.[94]  However, once the facts are established,

likelihood of confusion is a question of law.[95]

**B.**  **Application of law – findings of fact and conclusions of law**

**1.**  ***The elements for which protection is claimed***

While the parties have not extensively addressed this requirement, I find initially that

Groeneveld claims the following particular "elements of design and unique combinations"

as entitled to trade dress protection:

(1)  "the location and placement of the pump's body and other parts;"

(2)  "the size and shape of the pump;"

(3)  "the size and shape of the reservoir;"

(4)  "the size, shape and color of the reservoir cap;

(5)  "the location of the bleeder lines, the identification plate, the bolt plate, the valves, the gauges, the injector blocks, the pressure switch, the air intake, and the grease output;"

---

[93] *Id.* at 646, citing *Frisch's Rest. Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1264 (6th Cir. 1985).

[94] *Id*. at 646.

[95] *Id*. (citations omitted).

-19-

(6)     "the mounting bolt pattern."[96]

## 2.     *Requisites for trade dress protection*

As discussed more fully above, to receive trade dress protection under the Lanham Act, the complaining party in a product configuration case must ultimately show by a preponderance of the evidence:  (1) that the trade dress in question is distinctive, having acquired in the marketplace a secondary meaning which indicates the source of the goods; (2) that the trade dress is primarily nonfunctional; and (3) that the trade dress of the competing good is confusingly similar so that there is a possibility of confusion as to origin, sponsorship, or approval of the goods, as the Act requires.[97]  I will next discuss my fact findings as applied to each of these requisite elements.

a.     Distinctiveness – secondary meaning

*(1)     The necessity of proving acquired secondary meaning*

As noted earlier, no configured product can establish distinctiveness as required by the Lanham Act by showing inherent distinctiveness; rather, in such circumstances, the product must be shown to have acquired distinctiveness by the consumer attaching a secondary meaning to the configuration or design.

In deciding whether trade dress for a configured product has secondary meaning,  the Sixth Circuit has long-applied a seven-factor test.[98]  That test looks to:  (1) direct consumer

---

[96] ECF # 5 at 3; *see also*, ECF # 1 at 4, ¶ 16.

[97] *Abercrombie*, 280 F.3d at 635-48 (citations omitted).

[98] *Id*. at 639 n.14 (citations omitted).

testimony; (2) consumer surveys; (3) exclusivity, length, and manner of use; (4) amount and manner of advertising; (5) amount of sales and number of customers; (6) established place in the market; and (7) proof of intentional copying.[99]

Here, for the reasons that follow, I find that Groeneveld has not established that its claimed trade dress is distinctive, such as would entitle it to protection, because, among other things, it has not shown that its design or configuration as detailed above has acquired secondary meaning.

*(2)    Intentional copying*

(a)    The presumption of secondary meaning from intentional copying

Groeneveld argues that secondary meaning may be presumed where a product design has been intentionally copied.[100]  It contends that when it is established that a market newcomer has intentionally copied an existing product's trade dress, courts should presume that the intent in doing so was to "'benefit from the goodwill of the competitor's customers by getting them to believe that the new product is either the same, or originates from the same source as the product whose trade dress was copied.'"[101]  In essence, Groeneveld

---

[99] *Id.*

[100] ECF # 5 at 10.

[101] *Id.*, quoting *Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc*., 270 F.3d 298, 314 (6th Cir. 2001) (quoting *Osem Food Induss., Ltd. v. Sherwood Foods, Inc*., 917 F.2d 161, 165 (4th Cir. 1960)).

maintains that because the evidence is that Lubecore intentionally copied its pump, it should then be presumed that Groeneveld's trade dress is distinctive.[102]

Even a finding of intentional copying does no more than raise a rebuttable presumption of secondary meaning.[103]  Proof of some logical reason for copying, other than to capitalize on a pre-existing reputation, is sufficient to rebut the presumption of secondary meaning.[104]  Where there is no evidence that copying was done with an intent to deceive purchasers and thus derive a benefit from another's name and reputation, but rather was done "'to avail [the copying party] of a design which is attractive and desirable, a case of unfair competition is not made out.'"[105]

Groeneveld's argument on the presumption of distinctiveness itself rests on an underlying presumption that the elements of its trade dress are non-functional.[106]  Indeed, as observed earlier, where elements are non-functional and not otherwise protected by patents, it is expected – and even deemed beneficial – that they be copied.

---

[102] ECF # 5 at 13; ECF # 86 at 11-12, 36-37.

[103] *DeGidio v. West Group Corp.*, 191 F. Supp. 2d 904, 917 (N.D. Ohio, 2001) (citation omitted).

[104] *Id.*; *see also*, *Libbey Glass, Inc. v. Oneida, Ltd.*, 61 F. Supp. 2d 700, 708 (N.D. Ohio 1999) (citation omitted).

[105] *DeGidio*, 191 F. Supp. 2d at 917 (quoting *West Point Mfg. v. Detroit Stamping Co.*, 222 F.2d 581, 586 (6th Cir. 1955).

[106] In fact, Groeneveld explicitly maintains that its trade dress is non-functional.  ECF # 5 at 4, 13.

Accordingly, as to the matter of whether Lubecore intentionally copied Groeneveld's product, I find initially that there is little doubt that Lubecore, through its designer, modeled its pump on, or copied, significant parts of the Groeneveld pump. The following facts support that finding:

    (1)    Lubecore's founder, Jan Eisses, was a former executive at Groeneveld, well-acquainted with and largely impressed by the Groeneveld pump, its features and performance;[107]

    (2)    Eisses discussed the existing Groeneveld pump and areas for potential improvement with Lubecore's pump designer as part of the design process;[108]

    (3)    the resulting Lubecore pump both looks similar to the Groeneveld pump and has similarly-sized, largely interchangeable component parts.[109]

(b)    Rebuttal of the presumption of secondary meaning from intentional copying

That said, however, this finding creates two additional inquiries that pivot on the issue of functionality. First, if it is presumed that the design elements are non-functional, as Groeneveld has consistently argued, then the proof of intentional copying merely creates a rebuttable presumption that Lubecore modeled or copied Groeneveld to the extent it did in order to deceive purchasers and thereby derive for itself the benefit of its product being thought a Groeneveld. Thus, if it is shown that Lubecore, by copying or modeling, had no intention to deceive but rather only desired to make use of a "desirable design" that was

---

[107] ECF # 86 at 36.

[108] ECF # 85 at 19.

[109] ECF # 86 at 40-41.

unprotected by patents, then a logical reason for copying can rebut a presumption of secondary meaning. Second, there exists the predicate inquiry to that analysis: whether the copied configuration is, in fact, functional. If it is, then there is no barrier to it being copied and no need for the defendant to demonstrate a reason for copying. I will address functionality below as a separate requisite for trade dress protection.

I first find that: (1) even if the design at issue here is assumed arguendo to be non-functional, and (2) it is further taken as proven that Lubecore copied it, then (3) it is likely Lubecore could meet its burden of rebutting the presumption that it copied this design so it might "palm off" its pump as being a Groeneveld pump.

Specifically, the evidence shows that in designing its pump Lubecore sought to use a desirable design that customers favored over alternative competing designs – the Groeneveld design – and chose to do so without seeking to deceive buyers into believing its pump was a Groeneveld. To that end, the following facts are relevant:

   a.    As Groeneveld's own witness testified, this design originally came about, at least in part, because then-current designs were "very ugly," prompting a desire for a new design that was visually "nice to see."[110]

   b.    As will be developed later in more detail, alternative designs without Groeneveld-developed features such as the clear reservoir with a hard cap and follower plate, such as Grease Jockey's, or those using multi-line, not single line, design, are not as efficient and not as desired by customers as the Groeneveld design.[111]

   c.    As previously noted, Lubecore, when it modeled its pump on the visually pleasing and more operationally efficient and desirable

---

[110] *Id.* at 22 (testimony of Willem van der Hulst).

[111] *Id.* at 21-23.

> Groeneveld design, did so by trimming its pump in its own signature color (red) and affixing its own logo and by marketing its pump through different distributors than Groeneveld,[112] as well as supplying those distributors with marketing "fact sheets" by which they could "sell against" Groeneveld.[113]

Thus, even if the Groeneveld design is for the present assumed to be non-functional, Lubecore demonstrated that it would likely succeed in showing that copying that design was for the purpose of utilizing an attractive, proven, commercially desirable and non-patented design, and not for the purpose of deceiving anyone that its pump was a Groeneveld.

Although the preceding analysis suffices to show that Groeneveld would be unlikely to establish distinctiveness when seeking permanent relief, a review of the remaining six factors relating to secondary meaning confirms the conclusion that Groeneveld's pump design has not acquired such meaning.

*(3)    Consumer surveys*

The Sixth Circuit has historically favored the use of consumer surveys as a method of proving that a mark or design has acquired secondary meaning as indicating the source of the goods at issue.[114]   Here, the parties do not dispute that no consumer surveys exist as to any secondary meaning of the Groeneveld pump.[115]   Thus, this factor does not support a finding of secondary meaning.

---

[112] ECF # 85 at 25.

[113] *Id.* at 26.

[114] *General Motors*, 468 F.3d at 419.

[115] *See*, ECF # 85 at 17.

-25-

(4)     *Exclusivity, length and manner of use*

It is not disputed that Groeneveld has essentially used the present design for its pump since the 1980s.[116]  This factor could support a finding of secondary meaning.

(5)     *Amount and manner of advertising*

Groeneveld did supply information as to its total advertising, trade show and promotions expenses for the past several years.[117]  However, there are no figures available as to any other pump manufacturer so as to compare with Groeneveld.  In addition, and more to the point, while virtually all the advertising and promotional material used by Groeneveld prominently employ images of the pump, they do so along with the Groeneveld logo and colors.  Groeneveld has produced no advertising whereby a customer was invited to recognize a Groeneveld pump solely or mainly by its design.  In fact, as discussed, images of the pump were frequently, if not exclusively, associated with explicit detailed descriptions of its operational benefits.  Thus, at best, this factor is inconclusive as to secondary meaning.

(6)     *Amount of sales and number of customers*

As with the advertising and promotional amounts, Groeneveld supplied sales figures for its pump over recent years but did not situate those numbers within the larger universe of all pump sales regardless of manufacturer.  As Lubecore notes, without such context it is very difficult to fully evaluate Groeneveld's sales.  However, as it is conceded by Lubecore

---

[116] ECF # 86 at 24.

[117] *See*, PX 20 (under seal).

that Groeneveld is an industry leader in automatic lubrication systems,[118] this factor could support a finding of secondary meaning.

*(7)    Established place in the market*

Again, there is no dispute that Groeneveld has a prominent place in the relevant market.  This factor could support a finding of secondary meaning.

Although some evidence exists supporting a finding of secondary meaning, the preponderance of the evidence is to the contrary.  Groeneveld would be unlikely to meet its burden when seeking permanent relief of showing that its pump design has secondary meaning.

b.    Functionality

As to the significant issue of whether the Groeneveld design is functional or not, Groeneveld has not demonstrated a likelihood of success with its argument of non-functionality.  Just as Lubecore's argument was weak as to whether it had copied Groeneveld's pump design, Groeneveld's contention that its design is non-functional is similarly strained.

From the evidence adduced here, I conclude that Groeneveld is not likely to persuade any future fact finder that its design is non-functional.[119]  In that regard, I find, as Lubecore details in its proposed findings, that the evidence in this case shows that all the elements of

---

[118] ECF # 85 at 19.

[119] "Functionality is a factual determination reversible only for clear error."  *Ferrari S.P.A. v. Roberts*, 944 F.2d 1235, 1246 (6th Cir. 1991).

Groeneveld's pump are there for some practical benefit or reason.[120]   In other words, Groeneveld has not presented its pump as in any way the equivalent of an automotive tail fin – a purely ornamental feature that contributes no demonstrable benefit to the operation or efficiency of the designed product.

Specifically, the evidence in this matter is clear that the parts in the pump at issue are what they are, and located where they are, for utilitarian, not aesthetic, reasons.  Put simply, Groeneveld's pump is designed as it is because it works better or produces more benefits configured that way rather than in alternative ways.[121]   Thus, the design here is *de jure* functional.[122]

In advancing the contrary argument, Groeneveld asserts that because Eisses conceded that the design of Lubecore's pump could be configured differently and still operate as a pump,[123] this proves that Groeneveld's pump design is not functional.[124]   In particular, Groeneveld's position appears to rest on an unsupported rigid understanding of the term "engineering necessity," as that term is used by the courts.  Essentially, Groeneveld seems

---

[120] ECF # 85 at  12-16.

[121] *Id.* at 15.

[122] As the Sixth Circuit noted in *Fuji Kogyo Co., Ltd. v. Pacific Bay Int'l, Inc.*, 461 F.3d 675 (6th Cir. 2006), *de facto* functionality means that a particular design has a necessary function, *i.e.*, a bottle is necessary to hold liquid, whereas *de jure* functionality means that the bottle has a particular shape "'because it works better in that shape.'"  *Id.* at 685, quoting *Valu Eng'g Inc. v. Rexnord Corp.*, 278 F.3d 1268, 1274 (Fed. Circ. 2002).

[123] ECF # 86 at 41-42.

[124] *Id.* at 13-14.

to contend that unless Lubecore can prove that there is absolutely no other alternative to Groeneveld's particular design that could result in an operable pump, then Groeneveld's design cannot be the result of "engineering necessity," and so must, instead, be viewed as non-functional.[125]

This argument initially does not recognize, as stated earlier, that Groeneveld has the burden to show non-functionality, not Lubecore's to establish the contrary.[126]  Moreover, as the Sixth Circuit teaches in *Fuji Kogyo Co., Ltd. v. Pacific Bay International, Inc.*,[127] "'[a] product need only have some utilitarian *advantage* to be considered functional."[128] Understood that way, a party seeking to prove non-functionality, therefore, "'must demonstrate that the product feature serves *no purpose other than identification*.'"[129]

In that regard, the Sixth Circuit has endorsed application of a four-part inquiry from the Federal Circuit for determining whether a particular product design or feature is *de jure* functional, and not purely a product identification device:

> (1)    the existence of a utility patent disclosing the utilitarian advantages of the design;
>
> (2)    advertising materials in which the originator of the design touts the design's utilitarian advantages;

---

[125] *Id.* (citations omitted).

[126] 15 U.S.C. § 1125(a)(3); *TrafFix*, 532 U.S. at 29.

[127] *Fuji Kogyo*, 461 F.3d 675.

[128] *Id.* at 685 n.1, quoting *Disc Golf Assoc., Inc. v. Champion Discs, Inc.*, 158 F.3d 1002, 1007-08 (9th Cir. 1998) (emphasis added).

[129] *Id.* (emphasis added).

(3)     the availability to competitors of functionally equivalent designs;

(4)     facts indicating that the design results in a comparatively simple or cheap method of manufacturing the product.[130]

In applying these *Morton-Norwich* factors to the present case, I note again, as to the first factor, that no patents are involved for this pump.  As to the second factor, which concerns advertising, the record contains multiple examples of advertising, marketing and user guide materials where Groeneveld emphasizes the utilitarian advantages of many features of its design that it now asserts are trade dress.[131]  Third, the record also contains evidence that alternative pump designs with different features are not functionally equivalent to the Groeneveld design.[132]  Lastly, there was no evidence relating to the relative ease of manufacturing one design of pump as against another.

Thus, with regard to the factors relevant to this matter, or for which evidence now exists in the record, I find that Groeneveld's pump design is *de jure* functional.  Accordingly, I conclude that Groeneveld is not likely to succeed in meeting its burden of showing the permanent injunction fact finder that its pump design is non-functional and so eligible for trade dress protection.

---

[130] *Fuji Kogyo*, 461 F.3d at 685 (citation omitted).

[131] ECF # 85, citing PX 3-3, 4-3, 9-3, 10-24, 11-8, 11-9, 14-43.

[132] *Id*. at 14-15, citing Tr. 157-61; *see also*, ECF # 86 at 21 (single line systems, such as Groeneveld and Lubecore, work better for automatic lubrication products than do multi-line or progressive systems such as employed by competitor Lincoln), 21-23 (single line system without clear reservoir, hard top and follower plate in competitor Grease Jockey not as efficient as Groeneveld system, not as well-received by customers, and "uglier" than Groeneveld pump, although still fully able to operate as pump for single line automatic greasing application).

c.    Likelihood of confusion

For the following reasons, I conclude that Groeneveld has not shown that it is likely to succeed in showing permanent injunction fact finders that there is a likelihood of confusion among relevant customers as to the source of the respective pumps. I focus here on the four factors relating to likelihood of confusion highlighted by the court in *Libbey Glass v. Oneida, Ltd.* as most relevant to product configuration claims.[133]

*(1)    Strength of Groeneveld's design*

While there was evidence that prior to the introduction of the Lubecore pump Groeneveld customers and those familiar with the industry had been used to quickly identifying the Groeneveld pump solely by its shape,[134] there was no evidence that any customer relied on any such initial impression to erroneously purchase a Lubecore pump believing it to be a Groeneveld. Indeed, the evidence is clear, as Groeneveld itself said in discussing the purchasing methodology of one of its main witnesses, that customers in this area only purchase after "conduct[ing] a thorough and intensive search of available automatic lubrication systems ...."[135]

This focus on purchasing only after conducting "a thorough and intensive search" among available options does not support a finding of likelihood of confusion in this case. As Judge Carr explained in *Libbey Glass*, the issue of design strength as related to likelihood

---

[133] *Libbey Glass*, 61 F. Supp. 2d at 712.

[134] *See*, ECF # 86 at 38-39.

[135] ECF # 86 at 29 (describing buying methodology of Orville White, vice president of Sentinel Transportation).

of confusion in the product configuration context ultimately rests on proof that consumers ordinarily "'*rely* on the product's configuration to identify the producer of the good.'"[136]

Here, as noted, there was no evidence that consumers of automated greasing systems "rely" on the look or appearance of the product to inform them of the identity of the producer of the product. Rather, the evidence is clear that the sales process for this product is not at all similar to an impulse buy of an inexpensive consumer item off a retail shelf but, instead, is a lengthy, deliberate process, involving (a) multiple contacts by people having expertise in the area with similarly experienced sales personnel, (b) "due diligence" reviews of product literature and demonstrator product models, (c) obtaining feedback from existing users, and (d) finally subjecting the prospective purchase to a cost/benefits analysis specific to the user's situation.[137]

### (2)    *Likely degree of purchaser care*

Similar to the above discussion, the evidence in this case is clear and non-disputed that purchasers of automatic greasing systems are exclusively operators of commercial over-the-road trucks, often in fleets, or their corporate employees charged with company-wide purchasing or fleet maintenance. In short, they are textbook examples of sophisticated buyers whose business profitability depends on them exercising great care in

---

[136] *Libbey Glass*, 61 F. Supp. 2d at 713, quoting *Versa Prods. Co. v. Bifold Co.*, 50 F.3d 189, 203 (3d Cir. 1995) (emphasis original).

[137] ECF # 85 at 17, citing Tr. 134, 352; 20-21, citing Tr. 205-06, 505; ECF # 86 at 29.

making major purchase decisions.[138]  There was simply no evidence that such businesses or their employees were fooled, or are likely to be fooled, as to the true source of relatively expensive pieces of equipment that may superficially look similar but are clearly labeled as originating from different manufacturers and are sold through different distribution channels.

*(3)  Evidence of actual confusion*

Groeneveld spent considerable effort attempting to show evidence of actual confusion in the market between its pump and Lubecore's.  The evidence here was in the following categories:  (1) Groeneveld employees or distributors expressing surprise on seeing a Lubecore pump;[139] (2) customers who had been used to being able to identify a Groeneveld pump by shape;[140] (3) Groeneveld employees or distributors who, even after seeing the Lubecore pump at close range so as to observe its Lubecore logo, still expressing confusion as to whether it was a Groeneveld pump labeled as a Lubecore;[141] (4) acts of allegedly improper marketing such as (a) Lubecore's warranty assumption program, (b) the use by Lubecore of green in replacement grease, and (c) alleged actions by Lubecore distributors

---

[138] *See*, ECF # 86 at 28-29, citing *Bijur Lubricating Corp. v. Devco Corp.*, 332 F. Supp. 2d 722, 729 (D.N.J. 2004).

[139] *See, e.g.*, *id.* at 37-39, citing Wilson, van der Hulst, Koppelman, DeCleene; 43, citing Wapenaar; 49-50, citing DeCleene.

[140] *Id.* at 38-39.

[141] *Id.* at 39-42, 49-50.

in falsely stating that they carry Groeneveld products but supply customers with Lubecore products.[142]

Initially, I note that testimony from Groeneveld employees or distributors is not direct evidence of confusion in the marketplace, since such persons are not consumers or potential customers of automatic lubrication systems.  Further, as either employees of a party to this suit or agents of that party, any testimony in this regard should be viewed as at least potentially biased.  At a minimum, such testimony as to the existence or possibility for confusion should be examined in light of whether it is consistent with factors not subject to distortion by an interest in the outcome of the litigation.

The lack of any broad-based customer surveys to indicate confusion among the customer base at large and the uncontested long sales process with sophisticated buyers all mitigate against concluding that there is any actual confusion in the relative market place as to the true source of the two pumps.

Moreover, the major thread connecting Groeneveld's arguments regarding confusion is merely Lubecore's status as a newcomer to the market.  As such, persons viewing a Lubecore pump for the first time obviously were not able to connect a wholly new, unfamiliar name or logo with any recognizable, longstanding entity previously known to them and so were "confused."

However, permitting such an understandable disorientation regarding an unknown newcomer to now form the basis for finding Lubecore legally responsible for creating market

---

[142] *Id.* at 44-50.

confusion about the origin of its product would be to stand the law on its head.  It would legitimize a strategy whereby any established company could seek to punish a new rival for creating confusion based only on evidence of the inherent disorder and disruption caused by its initial appearance in the marketplace.  If permitted, this would allow an older entity to quickly strangle a new competitor in its crib before its product and identity could become more widely known, thus naturally eliminating any confusion.  This would indeed be a perverse result for a law intended to protect free-market competition.

### (4)    Lubecore's intent

As discussed previously, the evidence is that Lubecore intended to model its pump on at least some features of Groeneveld's pump.  However, the evidence also is that Lubecore's intent here was not to appropriate Groeneveld's reputation.  Rather, the evidence is that Lubecore, from the beginning, has worked to create its own reputation and identity as a maker of automatic greasing systems.[143]  Simply put, Groeneveld has produced no clear and convincing evidence that Lubecore employed features of the Groeneveld pump with the intent to confuse or deceive the relevant consumer about the origin of Lubecore's product.[144]

### 3.    Unfair competition

There exists, as noted previously, substantial evidence that Lubecore has aggressively competed with Groeneveld.  For instance, Lubecore prepared a "fact benefit" analysis for use by its distributors, which purports to make comparative distinctions between the Lubecore

---

[143] ECF # 85 at 30.

[144] *See*, *Versa*, 50 F.3d at 207-08.

and Groeneveld pumps.[145]   Lubecore also retained former Groeneveld distributors to distribute its product,[146] many involving former Groeneveld employees.[147] Web sites for such distributors have displayed Lubecore products when a search command for Groeneveld is entered.[148]   Moreover, Lubecore identifies its pump as "the next generation" of automatic lubrication systems, arguably a reference to Groeneveld's status as the first user of this design for an automatic grease pump.[149]   Lubecore also offers a "warranty assumption program" whereby customers using Lubecore grease in an installed Groeneveld pump will have their existing Groeneveld warranty honored by Lubecore.[150]

Both the federal and state law claims of unfair or deceptive competition ultimately require a showing that Lubecore's actions created a likelihood of confusion as to the origin of it pump among relevant consumers.[151]   Since that showing was not made, the unfair competition claims must fail as well.[152]

---

[145] ECF # 86 at 55.

[146] *Id.* at 46-48, 55.

[147] *Id.* at 52.

[148] *Id.* at 53.

[149] *Id.* at 48.

[150] *Id.* at 45-46.

[151] *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 502 F.3d 504, 521 (6th Cir. 2007).

[152] *Id.*

-36-

Moreover, it is a perfectly rational strategy and not illegal for a new entity to seek to take customers from its established competitor. Nor is it irrational or unlawful to recruit distributors that are already familiar with the product category and have existing relationships with customers, provided the recruited distributors are not legally restricted from representing the new product.[153]

The assertions related to false or deceptive advertising, however, require additional analysis. While false or defamatory statements are actionable under federal and state laws prohibiting unfair competition, liability will only attach upon proof that the statements caused harm to the plaintiff.[154]

Here, even assuming that Lubecore made false or misleading statements as to its product being "the next generation of automated lubrication,"[155] or in its recitation of purported competitive differences with Groeneveld,[156] there has been no proof as to: (1) how any specific statement caused confusion, and (2) how any individual representation harmed Groeneveld. In that regard, merely asserting that additional effort and expense was required to counter misleading statements, without specific proof of those efforts or expenses, will be

---

[153] Although Groeneveld has implied that Lubecore acted improperly in seeking distributors, *see, e.g.*, ECF # 86 at 47, it has not actually alleged any tortious interference with contract.

[154] *Medison America, Inc. v. Preferred Med. Syss., LLC*, 357 F. App'x 656, 662 (6th Cir. 2009) (citations omitted).

[155] *See*, PX 59, 62, 64.

[156] *See*, PX 68.

insufficient to create liability.[157]  Moreover, simply offering evidence that Groeneveld has

lost sales since Lubecore began sales of its pump[158] is not proof that customers moved

because of any impermissible action, nor does evidence that some customers later regretted

making a switch[159] prove that the original move was the result of any deceit or prohibited

conduct.

In that same vein, while it is troubling that some evidence was presented to the effect

that individual third-party distributors, though not Lubecore itself, maintained web sites

where search commands for Groeneveld products produced results linking to Lubecore

products, there was no evidence that any episode of misdirection on a distributor's web page

– intentional or not – actually resulted in a customer being deceived into making a

non-intended purchase of a Lubecore product thus depriving Groeneveld of that sale.  As

noted, even if Lubecore could be found responsible for the acts and omissions of third-party

distributors,[160] without such proof of a causal connection between the allegedly unfair

practice and a specific harm to the plaintiff, no liability will attach.

---

[157] *Medison America*, 357 F. App'x at 662.

[158] *See*, ECF # 86 at 50.

[159] *Id.*

[160] *See*, ECF # 86 at 56 n.15.  As Groeneveld notes, a party may be liable for the
unfairly competitive acts of its distributors where it is shown to induce, cause, or materially
contribute to those acts.

## PRELIMINARY INJUNCTION FACTOR ANALYSIS

### I.      Irreparable Injury

Any claim of irreparable injury to Groeneveld must rest on proof that it has a likelihood of success regarding its claims of trade dress infringement and unfair trade practices.  In a situation where there is no such proof, the law will not shield a party from the effects, negative though they may be, of a rival continuing to lawfully compete.  As the Sixth Circuit has plainly stated, in cases alleging trade dress infringement, there is no entitlement to an injunction without a predicate finding of likelihood of confusion.[161]  That standard applies as well to unfair competition claims.[162]

Since I find that Groeneveld is not likely to prevail in its burden of showing Lubecore created confusion in the marketplace as to the origin of these respective products, whether by trade dress infringement or unfair competition, I also conclude that it has not established an entitlement to injunctive relief as to any irreparable injury.

### II.     Harm to Lubecore and Others and the Public Interest

Here, there is little doubt that an injunction in the terms sought by Groeneveld would significantly cripple Lubecore in its business.  As a relatively new entity, Lubecore had fewer than half a million dollars in sales in 2009 and projected only one million dollars in sales for

---

[161] *Citizens Banking Corp. v. Citizens Fin. Group, Inc.*, 320 F. App'x 341, 350 (6th Cir. 2009).

[162] *Frisch's Rests., Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 647 (6th Cir. 1982) (citations omitted).

2010.[163]  Enjoining its operations without showing that it infringed any protected trade dress or unlawfully engaged in unfair competition or deceptive trade practices would only serve Groeneveld's private end of shutting down a competitor.  In addition to an injunction's likely effects on Lubecore, such relief here would not serve the clear public purpose of fostering and maintaining competition.[164]

## CONCLUSION

For the foregoing reasons, I find that Groeneveld has not established that it is likely to succeed in showing that Lubecore has created confusion in the marketplace as to the origin of these respective pumps by infringing any protected trade dress or engaging in any actionable unfair competition or deceptive trade practices.  Accordingly, I conclude that Groeneveld has not shown entitlement to any injunctive relief.  Therefore, its motion for such relief is hereby denied.

IT IS SO ORDERED.


Dated:   February 28, 2011                     s/ William H. Baughman, Jr.
                                               United States Magistrate Judge


---

[163] ECF # 85 at 33-34.

[164] *Abercrombie*, 280 F.3d at 640.