1    IN THE DISTRICT COURT OF THE UNITED STATES
         FOR THE NORTHERN DISTRICT OF OHIO
2                  EASTERN DIVISION

3    GROENEVELD TRANSPORT                )
     EFFICIENCY, INC.,                   )
4                                        )    Judge Nugent
                   Plaintiff,            )    Cleveland, Ohio
5                                        )
          vs.                            )    Civil Action
6                                        )    Number 1:10CV702
     LUBECORE INTERNATIONAL,             )
7    INC.,                               )

8              Defendant.
                               - - - - -
9              TRANSCRIPT OF PROCEEDINGS HAD BEFORE

10        THE HONORABLE DONALD C. NUGENT

11             JUDGE OF SAID COURT,

12        ON MONDAY, OCTOBER 17, 2011

13                 **Volume 3**
                               - - - - -
14   APPEARANCES:
     For the Plaintiff:          DEBORAH J. MICHELSON, ESQ.,
15                               DAVID A. KUNSELMAN, ESQ.,
                                 Miller Goler Faeges
16                               27th Floor
                                 100 Erieview Plaza
17                               Cleveland, OH 44114
                                 (216) 696-3366
18
     For the Defendant:          THOMAS L. ANASTOS, ESQ.,
19                               MELISSA ZUJOWSKI, ESQ.,
                                 Ulmer & Berne - Cleveland
20                               1100 Skylight Office Tower
                                 1660 West Second Street
21                               Cleveland, OH 44113
                                 (216) 583-7184
22
     Official Court Reporter:    Shirle M. Perkins, RDR, CRR
23                               U.S. District Court
                                 801 West Superior, #7-189
24                               Cleveland, OH 44113-1829
                                 (216) 357-7106
25   Proceedings recorded by mechanical stenography; transcript
     produced by computer-aided transcription.

| | |
|---|---|
| 1 | <u>MONDAY SESSION, OCTOBER 17, 2011, AT 8:37 A.M.</u> |
| 2 | THE COURT:  Good morning, ladies and |
| 3 | gentlemen. |
| 4 | THE JURY:  Good morning. |
| 08:37:13  5 | THE COURT:  Well, are we ready to go?  I think |
| 6 | we're playing the tape.  Is that it? |
| 7 | MS. MICHELSON:  Yes, your Honor, I believe |
| 8 | they're still in the middle of that tape. |
| 9 | THE COURT:  Okay. |
| 16:00:06 10 | (Deposition of William Koppelman is played.) |
| 11 | THE COURT:  Can we get to something relevant. |
| 12 | Can you stop it for a second?  Can we get something that |
| 13 | isn't an over half hour completely irrelevant to the issues |
| 14 | in the case. |
| 09:59:14 15 | MS. ZUJKOWSKI:  Sure. |
| 16 | MR. ANASTOS:  We'll try to jump to our |
| 17 | cross-examination, your Honor. |
| 18 | THE COURT:  Okay. |
| 19 | Folks, how about if we take our morning recess?  That |
| 09:59:34 20 | might be a good idea, huh?  Is that all right with you? |
| 21 | A JUROR:  That will be great. |
| 22 | THE COURT:  Since he voted, we're all set. |
| 23 | Take about 15 minutes. |
| 24 | (Thereupon, a recess was taken.) |
| 10:38:27 25 | THE COURT:  Go ahead. |

Koppelman Depo

```
          1              (Videotape played.)

          2              MR. ANASTOS:  We jumped ahead to Ms.

          3    Zujkowski's cross-examination.

          4              THE COURT:  Thank you.

10:38:27  5              MR. KUNSELMAN:  Your Honor, and I believe

          6    we've come to an agreement to play first 159, Line 1.

          7              THE COURT:  English this time.

          8              MR. KUNSELMAN:  Excuse me?

          9              THE COURT:  I didn't hear a word you said.

10:38:35 10              MR. KUNSELMAN:  I believe we agreed to also

         11    include Pages 159, Line 9, through 161, Line 1 at the very

         12    beginning.

         13              MS. ZUJKOWSKI:  They're just going to play

         14    that clip, and we'll jump right to our cross.

10:38:35 15              THE COURT:  Great.

         16              MR. KUNSELMAN:  Switch over to Number 2.

         17              THE COURT:  Which one?  I don't know who we're

         18    on now.

         19              DEPUTY CLERK:  Defense 2.

10:38:35 20              THE COURT:  You want me to do it or you'll do

         21    it, Chris?

         22              DEPUTY CLERK:  I've got it, Judge.

         23              THE COURT:  Okay.

         24              (Videotape played.)

10:38:36 25              MS. ZUJKOWSKI:  And I guess it switches back.
```

Koppelman Depo

1          DEPUTY CLERK:  I got it.

2              (Videotape played.)

3          MS. MICHELSON:  The rest of the testimony.

4          MS. ZUJKOWSKI:  We have no problem playing the

10:38:36 5   rest of the testimony, but we don't have excerpts.

6          MS. MICHELSON:  Your Honor, our understanding

7    was that the Defense was going to play the entirety of

8    the --

9          THE COURT:  Well, I didn't know there was a

10:38:36 10  half hour of you angling on the witness with something.

11         MS. MICHELSON:  I tried to alert the Court

12   previously.  In any event, since they've now played the

13   cross, I think in fairness, they've got to listen to the

14   rest of the redirect and so --

10:38:38 15        THE COURT:  Okay.

16         MS. MICHELSON:  -- I'd ask -- you initially

17   want to play the entire --

18         MS. ZUJKOWSKI:  We have no objection playing.

19   It's relatively short, but there's probably imminent or

10:38:38 20  something we don't have a clip of a little bit of lawyer

21   discussion.  I don't have any objection just playing it.

22         THE COURT:  Go ahead and play it.  We spend

23   more time talking about it than --

24         MS. ZUJKOWSKI:  Fair enough.

16:00:06 25      (Deposition of William Koppelman is played.)

1          THE COURT:  Is there a question to this

2    witness?

3          MS. MICHELSON:  I didn't select these

4    excerpts.  Maybe we can move to the testimony part, your

10:38:41 5   Honor.

6          (Deposition of William Koppelman is played.)

7          THE COURT:  You can call your next witness.

8          MS. MICHELSON:  We call Jennifer Wolfe to the

9    stand.

10:45:53 10        MR. ANASTOS:  Your Honor, we object to Ms.

11   Wolfe.  She's being called as an expert for all reasons we

12   stated in --

13         THE COURT:  Overruled.  Yeah.  You can

14   cross-examine on that.

10:46:04 15        MS. MICHELSON:  Ms. Wolfe, please.

16         THE COURT:  Would you raise your right hand

17   for me.

18

19

20

21

22

23

24

25

Wolfe - Direct

1                        JENNIFER WOLFE,

2        of lawful age, a witness called by the PLAINTIFF,

3                being first duly sworn, was examined

4                        and testified as follows:

10:46:24  5        DIRECT EXAMINATION OF JENNIFER WOLFE

6                THE COURT:  Ma'am, could you tell us your full

7    name and spell your last name?

8                THE WITNESS:  Jennifer Christine Wolfe,

9    W-O-L-F-E.

10:46:33 10                THE COURT:  Thank you.

11   BY MS. MICHELSON:

12   **Q.**    Ms. Wolfe, good morning.  Yes, it's still morning.

13   Good morning.  Could you please introduce yourself to the

14   jury and tell them a little bit about yourself, background,

10:46:43 15   where you're from?

16   **A.**    Sure.  My name is Jennifer Wolfe.  I'm from

17   Cincinnati, Ohio.  I grew up in Cincinnati, went to the

18   University of Cincinnati Law School, also went to graduate

19   school at the University of Cincinnati, started my career in

10:46:56 20   the marketing and publishing industry, working for a number

21   of years before I went back to school to go to law school

22   and graduate school.

23        I started my own firm when I was 28 years old, started

24   building an innovation branding law firm, morphed it over

10:47:11 25   the number of years, and in the last few years, have grown

1    it to where we have offices in New York City.  We're in the

2    process of merging with the west coast firm and do business

3    with Fortune 500 companies as well as startup and merging

4    companies.

10:47:24  5    Q.    And do you have a family down in Cincinnati?

6    A.    Yes, I have an eight-year-old son and a husband.

7    Q.    So can you explain what your innovation law firm does,

8    what you do for a living, that sort of thing?

9    A.    Sure.  Most of my practice is dedicated to doing

10:47:43  10    intellectual property strategy work.  I've actually recently

11    been named one of the Top 250 intellectual strategists in

12    the world by Intellectual Asset Management Magazine.  And

13    most of what I do is work with companies to help them evolve

14    their innovation process and intersect it with thinking

10:48:00  15    about intellectual property, what creates powerful

16    intellectual assets, things like patents trademark, trade

17    dress, copyrights, trade secret and so forth.  And so a lot

18    of my advisory work is to help them intersect these

19    different disciplines in a unique way.

10:48:16  20    Q.    And innovation process, what is that?

21    A.    The innovation process is really how companies are

22    developing new products and new ideas to take to the

23    marketplace, anything from consumer products to industrial

24    products, products that solve problems for manufacturing,

10:48:32  25    that all goes into the research and development and their

1    innovation process.

2    Q.    And what role, if any, do things like branding and

3    consumer decision making behaviors and processes have to do

4    with your work, consulting work?

5    A.    Sure.  I recently wrote a book brand required covering

6    this exact issue.  I co-authored with Ann Chouse, who was

7    formerly a United States Commissioner of Trademarks, and she

8    and I spent about a year really researching how does, what's

9    happening in research and development and innovation in

10   terms of creating products, how does that cross over into

11   how you're branding, how you're meeting consumer need, how

12   you're creating an emotional connection with your customer.

13   So that what you're innovating and creating has value in the

14   marketplace.

15   Q.    And emotional connections, is that limited to consumer

16   products or does that come into play with industrial

17   products as well?

18   A.    It comes into play with industrial products, a little

19   bit different because people are buying products for a

20   different reason.  But ultimately, the decision-making

21   process is very similar.  And so the way you go about

22   innovating and developing a brand or communication campaign

23   for an industrial product will be similar in steps but

24   slightly different in strategy.

25   Q.    What kind of things when you're -- when someone's

Wolfe - Direct

1   creating a brand, when a new company with a new product is

2   trying to create a brand, what is part of the brand, what

3   can be part of a brand?

4   **A.**    Everything can be part of a brand and that's really

10:50:03  5   been the trend in recent years is to really focus and help

6   companies to understand that the actual design of the

7   product, how it looks, the way it's packaged, the way it's

8   marketed, the way it's sold, the way you communicate with

9   your customers, and your overall sales campaign, all of that

10:50:19 10   goes into creating the overall brand experience, and it

11   develops a relationship with your customer.  Whether it's a

12   business to business for service, or an industrial product,

13   or a basic consumer product, you're creating a relationship

14   with the customer.

10:50:33 15   **Q.**    And trade dress, specifically, does that have a role

16   as part of the branding process in -- that you've explained?

17   **A.**    Absolutely, and designing is actually a very critical

18   piece because we're visual creatures for the most part.  So

19   as we see things, and we identify a visual, memory of a

10:50:52 20   certain product or a certain design, that can be extremely

21   powerful over a long-term period of time.

22   **Q.**    And what kind of things or what kind of features go

23   into a product's trade dress, for example?

24   **A.**    Everything from the way it looks, actually trade dress

10:51:07 25   is even extended to smell, sounds, color.  Certainly all of

Wolfe - Direct

1    these components are part of the trade dress.

2              MR. ANASTOS:  Your Honor, we instruct the jury

3    on the law at this point.

4              THE COURT:  What?

10:51:18  5              MR. ANASTOS:  She's instructing the jury on

6    the law at this point.

7              THE COURT:  Are you objecting?

8              MR. ANASTOS:  I'm objecting.

9              THE COURT:  I'll give you the correct

10:51:25 10    definition of the law.

11    BY MS. MICHELSON:

12    Q.    And just to be clear, I'm asking you specifically not

13    for a legal definition, but when you do your consulting work

14    with companies who are developing their products, what kinds

10:51:38 15    of features do you and these companies go through to create

16    a strong brand for their new product?

17    A.    Right, and it's -- absolutely, and it's not even just

18    totally a legal term; it is how are we designing a product

19    that's going to have a greater connection with our customer.

10:51:55 20    How they're going to identify with that product, and in a

21    more powerful way.

22    Q.    In -- why did you go into this line of work?

23    A.    You know, it's -- I started my career in marketing and

24    publishing and I loved it, always loved the public relation

10:52:10 25    field and working to help companies be better at innovating,

Wolfe - Direct

1    communicating, and delivering a product in the best possible

2    way.  I went to law school because that was something that I

3    thought was a good next step, and I found it was a really

4    unique way to intersect those two disciplines.  And as

10:52:26  5    things are evolving in our global economy, companies need

6    individuals and advisors who can help them cross over these

7    disciplines.  Historically, companies operate in a silent

8    way and the work I'm doing is helping them cross over those

9    barriers and create better products.

10:52:43  10   **Q.**   And are you being compensated for your time that you

11   are giving us in this case?

12   **A.**   Yes.

13   **Q.**   And can you just tell the jury basically what the

14   compensation is and how you came up with that rate?

10:52:54  15   **A.**   Yes, I'm being compensated $350 an hour.  That is the

16   rate that I charge when I provide consulting services to

17   companies.

18   **Q.**   And about how much time do you have on the case thus

19   far?

10:53:05  20   **A.**   I think it's around 45 hours.

21   **Q.**   And have you -- have you previously testified as an

22   expert witness in a court?

23   **A.**   No, I have not testified.

24   **Q.**   Well, let's get to some of your qualifications because

10:53:17  25   I'm sure the jury is interested in that.  Can you start

1    briefly with your formal education, please?

2    **A.**    Yes.   I completed my undergraduate degree in

3    journalism at Ball State University completed, my graduate

4    degree in organizational communication and management from

10:53:31  5    the university of since Cincinnati, completed my juris

6    doctorate degree in law from the University of Cincinnati

7    and then completed some post work at Harvard in negotiation

8    and dispute resolution.

9    **Q.**    Okay.

10:53:45 10    And just explain for the jury any additional degrees

11    or certifications that you have received and obtained during

12    your career history.

13    **A.**    I have a couple of other certifications.  First, I am

14    nationally accredited in public relations by the Public

10:54:01 15    Relations Society of America.  That requires testing at a

16    certain level of experience and a peer review to be selected

17    for that designation.  I was also recently named, as I

18    mentioned, one of the top 250 global intellectual property

19    strategists.  That's also peer review requires, client

10:54:17 20    recommendations and peer review process to be selected from

21    the many applicants around the world.

22    I also have a black belt in Six Sigma process

23    improvement.  If you haven't heard of Six Sigma before, it's

24    methodology to try to improve processes which are

10:54:34 25    traditionally used in manufacturing.  The reason that I

1   pursued this is that there's a movement to apply to

2   professional services, things that are going on in people's

3   minds, like engineering work, like law, like consulting, how

4   do we improve what we're doing, continuously improve.

5   **Q.**   And how much work or what do you have to do to get

6   that certification?

7   **A.**   The certification is a 40-hour training program.  It

8   is a test, a difficult test to pass, and then it is a

9   significant project.  It's a full Six Sigma Black Belt level

10   project that requires actually sending hypothesis, testing

11   it, producing results, and showing how you can continue to

12   improve that process.

13   **Q.**   And are -- you mentioned your book.  And if you could

14   tell us other publications that you have been involved in

15   authoring over the last number of years, including

16   specifically those relating to the issues in the case.

17   **A.**   Sure.  I've contributed to consulting magazine, E-Wic

18   Technology Company magazine.  I've contributed to Pink

19   Magazine, which was focused on women in business.  I've

20   contributed to the Cincinnati Business Courier for numerous

21   years as a regular contributor.  I've been featured in

22   Business Week and MPR for the work that I've done in this

23   branding space.

24   **Q.**   And the book that you referred to, what kind of --

25   what kind of research did you do -- did you and your

Wolfe - Direct

1    co-author do to -- in connection with that project?

2    **A.**    We spent about a year conducting a two-prong research

3    approach.  We started with a traditional literature review,

4    really studying what's been done on branding consumer

5    behavior and then we studied the intellectual property piece

6    where there's cross over between the two, and then that was

7    just one piece of it.  What we wanted to know is what was

8    really happening in some of the biggest companies in the

9    world and some of the biggest advertising agencies, and also

10   wanted to understand the evaluation side.  So we spent about

11   a year interviewing executives from PNG, Kraft Foods, Harley

12   Davidson, Yahoo, General Mills, a long list of some of the

13   biggest branding companies in the world.  We talked with Jay

14   Walker Thompson, a very large advertising agency,

15   interbrands, trying to find out from the agency perspective

16   how they were looking at these issues.  And then again, we

17   talked with some renown valuation experts and we have

18   together what we saw as trends interconnecting branding,

19   creativity and intellectual property.

20   **Q.**    And just to -- just a few speaking engagements you've

21   been involved in relating to the subjects we've asked you to

22   look into?

23   **A.**    Sure.

24   **Q.**    In this case?

25   **A.**    I'm actually speaking in two weeks at a thought

1    leadership conference in Vermont, an intellectual property

2    Catholic group hosts us as a keynote speaker, along with

3    Marcia Phelps, who was previously head of intellectual

4    property and licensing for IBM and Microsoft.

10:57:33  5         I recently spoke last year at the National Association

6    of Women Lawyers to their general counsel on how to cross

7    over and work more effectively with branding.  And I've

8    spoken at the Inside Counsel, General Counsel Institute as

9    well on the same topic.

10:57:49  10   **Q.**   Specifically relating to consumer decision making

11   behavior and processes, can you tell the jury a bit about

12   your background in those areas and your qualifications in

13   those areas?

14   **A.**   Um-hum.

10:58:02  15        Well, as I said this was something that we studied

16   very closely in writing the book, but also something that

17   throughout my career over the last 18 or 19 years, that I

18   have woven into everything that I do.  Particularly in

19   working with start-up companies, I am very deeply involved

10:58:18  20   in helping them understand who their customer is, who the

21   competitors are, really understanding how the way we're

22   going to launch their product will connect with those

23   customers so we can deliver something more powerful.

24   **Q.**   On --

10:58:32  25             MS. MICHELSON:  Your Honor, if you could just

1    turn on that -- this Elmo for a second.  We will just spend

2    a minute.

3    **Q.**    Ms. Wolfe, your CV, curriculum vitae, is quite packed.

4    So I won't have you go through all your qualifications in

5    court today but I would like you to just identify this
10:58:49

6    document as your curriculum vitae, marked 138-1 through

7    138-8.

8    **A.**    Yes.

9    **Q.**    And these are the publications?

10   **A.**    Publications and speeches.
10:59:06

11   **Q.**    Thank you very much.

12              MS. MICHELSON:  Thank you, your Honor.

13   **Q.**    Ms. Wolfe, tell us or tell the jury if you would now

14   about your real life practical experience, what you do day

15   to day in your consulting work on a -- in a hands-on way.
10:59:22

16   **A.**    Sure.  In a hands-on way, the work that I do -- in

17   fact, just recently, within the last couple weeks, I have

18   been on-site at a client conducting strategic planning

19   sessions with a group of people from multiple disciplines to

20   attack a problem that the company saw -- problem
10:59:38

21   opportunity, I should say -- sort of always try to look at

22   it in both ways -- and just leading them through the

23   discussion to analyze who are the stakeholders, talk about

24   them, it's your customers, it's your shareholders,

25   employees, it's everybody who has a stake in what your
10:59:53

Wolfe - Direct

1    company is doing.  We look at competitors, who are your

2    competitors direct and indirect.  Indirect competitors are

3    also big issue and sometimes people forget about that.  So

4    we help them analyze their direct and indirect competitors.

11:00:07  5    We look at external forces, what's happening in the economy,

6    what's happening socially, culturally, politically, what's

7    happening from a regulation standpoint and all of the

8    constraints that there are in the company.

9         And we take all of that background information and

11:00:21 10    then move it into trying to solve whatever the problem is.

11    If it's -- we're looking to create an innovation pipe line

12    because they need another innovative idea, one thing

13    attacking or a specific new product launch, and how are we

14    going to move that forward more effectively.

11:00:38 15    Q.   And can you, please, describe for the jury the range

16    of your clientele in the consulting piece of your work --

17    let me ask you this first.  The nonconsulting piece of your

18    work, your firm, what -- what's -- what do you do there?

19    A.   It's about a 6040 split.  I say most work, 60 percent

11:00:57 20    is more on the advisory consulting side at this point and 40

21    percent is more on the law side and managing the law firm

22    that I did start 12 years ago, and you asked.

23    Q.   Next question was going to be your clientele in the

24    consulting work?

11:01:11 25    A.   Sure.  Sure.

Wolfe - Direct

1        Really crosses over the consulting and the law side,

2    you know, on the very large side.  Some of my clients are

3    Microsoft, Proctor and Gamble, Kraft Foods, Coca-Cola, very

4    large companies on that end, and then on the smaller side,

11:01:28  5    which is really where I get most excited is working with

6    start-ups and entrepreneurs.  I was the president of the

7    Venture Capital Association in Cincinnati.  I consider

8    myself an entrepreneur.  So I get very excited to help

9    entrepreneurs start their business and grow their business.

11:01:42 10   **Q.**   What is so exciting or interesting to you about

11   start-ups and entrepreneurial kinds of endeavors?

12   **A.**   The start-ups are fine because they have so many more

13   opportunities.  They can be very flexible.  In a very large

14   organization, decisions take a long time to be made, where

11:02:00 15   the benefit is, of course, they have resources and money

16   that they can throw at projects and take more risks than

17   start-ups in some ways.  Start-ups just have a lot more

18   nimble creative ability to sort of bob and wave and adapt,

19   land that's a very exciting environment to work in.

11:02:17 20   **Q.**   And in the -- in your clientele, among your clientele,

21   are you consulting with them about consumer products,

22   industrial products, or other products as well?  Can you

23   just --

24   **A.**   Sure.  It's crossed over.  Definitely there's an

11:02:32 25   emphasis on technology tech and new technologies, but I've

1    crossed over in working with media, new media companies,

2    traditional media companies, like publishing and television

3    and new media, all of the things that are happening in

4    social media digitally and on the industrial side, you know,

11:02:48  5    working with a company like Deere Energy, dealing with

6    completely different issues.

7    **Q.**    With the start-ups and the smaller businesses that you

8    consult with and in your law practice as well, do you come

9    into contact with engineers and people who actually design

11:03:06 10   the mechanics of the product as well as other people within

11   the organization?

12   **A.**    Yes, absolutely.  That's a critical piece of it.  And

13   again, that's where I talk about one of my skill sets is

14   helping to cross over those different disciplines.  A

11:03:22 15   barrier for a lot of companies is engineers think in a

16   certain way.  They think like engineers, which is really

17   important because you need that, but they don't necessarily

18   think like marketers or branding people.  And so we're

19   trying to help cross over that divide.  But, yes I sat in

11:03:37 20   many meetings with engineers.

21   **Q.**    And how -- who has input into what a final product

22   does and then looks like before it's -- or when released to

23   the market?

24   **A.**    That completely depends on the size of the company.

11:03:56 25   In a large company, there's going to be a lot of channels of

1    people who have to check off and say yes, this can move

2    forward in our process.  But, they definitely have very

3    clear chain of command processes on the very large side.  In

4    a smaller start up, it's the founder, or in the case where

11:04:13  5    there are investors, the investor may have a key decision

6    making factor there.

7    Q.   And how significant -- let me rephrase my question.

8    Okay?

9         What kind of consideration is given to the way the

11:04:30 10    thing looks on the outside and the marketing component, the

11    commercial component that you've described?

12                   MR. ANASTOS:  Objection.

13                   THE COURT:  Overruled.

14    Q.   You may continue?

11:04:38 15    A.   Okay.

16         The way the product looks is absolutely critical,

17    particularly from the branding side.  Engineers will work on

18    how do they make it better, how do they make it function

19    better.  But, then as the product moves through that life

11:04:52 20    cycle of just straight R&D, into we're going to launch it, a

21    lot of attention is given to how does it look, how is it

22    packaged, how will it be marketed, and all of those things.

23    It's like a big circle.  And, in fact, that's a graphic I

24    use, big intersecting circle of all those pieces, equally

11:05:09 25    important.

Wolfe - Direct

1   **Q.**   And how many companies have you worked with over the

2   years?  Can you give an estimate?

3   **A.**   Oh, I've worked with hundreds of companies over the

4   years, probably more than that.

11:05:19  5   **Q.**   And in each instance, is consideration given to the

6   commercial factors an impact that you've just described?

7   **A.**   Absolutely.  There's always a factor of how are we

8   going to market brand this, how are we going to make money

9   off of this.  That's usually when I'm talking with somebody

11:05:39  10   particularly an engineer or inventor.  One of the biggest

11   hurdles to get over, they're excited about their invention,

12   but we need to take it to market and do something with it.

13   So that's where I'm able to help from a brand new

14   perspective.

11:05:50  15   **Q.**   And when you work with entrepreneurs who are starting

16   up a new business and new start-up companies, in your

17   experience, what degree of consideration to those marketing

18   brands, features, do they give to the product before they

19   put it on market?

11:06:10  20   **A.**   It's all -- it's all very critical to how we're going

21   to launch a product because we have to understand the

22   competitive landscape.  We have to understand what is the

23   unique selling proposition of this product, why somebody is

24   going to buy this product over another one, why is there any

11:06:25  25   opportunity here.  If you can't answer those questions --

1    and many times entrepreneurs can't answer the question.  If

2    they can't answer those questions, then I say we've got a

3    lot of work to do.

4    Q.    Can you describe some general principles that apply in

11:06:41  5    consumer -- to consumer decision making, whether it's a

6    consumer product, such as something we use at home, a

7    washing machine, television, and/or industrial product?

8    A.    Sure.  Most people make buying decisions to try to

9    avoid risks.  So whether it's a tube of toothpaste or a car

11:07:00 10    or whether it's a business product for your business, an

11    industrial product, whatever it might be, most decision

12    makers are making decisions to avoid risk, avoid failing as

13    a product.

14    Q.    And do those -- did that behavior, that motivation, I

11:07:16 15    suppose, does that apply to the range of products that are

16    available or is it limited to consumer versus industrial?

17    A.    No, I don't think that I've read anything that

18    distinguishes -- typically buying behavior is similar.

19    Again, I think where things differ is how are you going to

11:07:33 20    reach a connect with that customer, reach and connect with a

21    customer for a consumer product differently than the way you

22    would with an industrial product.  And, in fact, the

23    audience will be much smaller for an industrial product than

24    a consumer product, but that basic level of how do people

11:07:47 25    make decisions, we always kind of go back to that when we're

1    doing the analysis and trying to determine what is going to

2    make the difference in getting the sale.

3    **Q.**    So what have you found, in your experience, what have

4    you found is the unique -- or the -- some of the unique

11:08:04  5    things that have to be done to make the emotional connection

6    between a -- the consumer and the -- and the industrial

7    product?

8    **A.**    Um-hum.

9        The thing that has to be done is you have to look at

11:08:17 10    the product as a whole, and how is somebody going to

11    identify with it.  How are you going to make sure they send

12    your product as a distinctive product from other products,

13    and that can be how it looks, you know, how it was marketed

14    how it's sold, you know, what jingle is played.  That used

11:08:33 15    to be a big piece, what do you hear, what -- what are you

16    thinking and feeling when you come into contact with the

17    product.

18    **Q.**    You just said, interesting to me, you said the jingle

19    use be a big piece of it, but it isn't anymore.  Why is

11:08:49 20    that?

21    **A.**    It's been an evolution because what's happening in

22    marketing, this would be more on the consumer side than the

23    industrial side, but not entirely as the consumers are more

24    in control.  They are driving what's happening in marketing.

11:09:01 25    There's a lot more emphasis on digital and social media.

1    Used to be you watch Mad Man and that show how they market

2    and advertise, you can have a catchy jingle and pretty much

3    tell people what they wanted.

4    Q.    In your experience, consumers always articulate the

11:09:20  5    reasons why they gravitate towards a particular product?

6    A.    No, no, I don't think that they typically can.  They

7    can usually rationalize it.  Most of the research you see on

8    buying behavior will be consumers make a decision based

9    upon, again, that avoidance of risk, and then they

11:09:38 10   rationalize the decision.

11   Q.    Okay.  So let's turn a little now to what you actually

12   did in this case.  Did I -- did I ask you, Ms. Wolfe, to

13   assess the likelihood of market confusion or uncertainty

14   caused by the Lubecore ALS pump and product and the

11:09:59 15   marketing process that they engage in?

16   A.    Yes.

17   Q.    And did you -- did you do that?  Did you assess that?

18   A.    Yes.

19   Q.    And did you reach any conclusions about that?

11:10:09 20   A.    Yes.

21   Q.    And what were you able to conclude?  If you could tell

22   the jury, please.

23   A.    Sure.

24                    MR. ANASTOS:  Objection.

11:10:15 25                    THE COURT:  Objection sustained.

1    **Q.**    Let's ask what you did -- you did as part of your work

2    in this case.  What did you read, what did you look at, what

3    did you review, what did you assess?

4    **A.**    Sure.  I reviewed the record that was provided to me.

11:10:34  5    It was mostly, I think, the preliminary injunction hearing

6    transcript and exhibits and some of the deposition

7    transcripts and exhibits, and certainly the pleadings that

8    were filed in the case.  That's what I reviewed from the

9    record.  And then I also conducted just some typical

11:10:47 10    competitive analysis research just doing typical online

11    research looking at who -- what is this industry, who are

12    the competitors, what do they look like, sound like, what do

13    they feel like, what are customers likely to do and how are

14    they likely to react in making purchasing decisions.

11:11:04 15    **Q.**    And what did you find?

16    **A.**    What I found is it's an interesting landscape.  Most

17    of the competitors had very poorly designed websites, didn't

18    really seem to have a clear sophisticated strategy to them;

19    whereas, when I looked at the Groeneveld and the Lubecore

11:11:23 20    website there were many, many similarities in terms of how

21    they seem to be creating an overall look, feel, design, and

22    the way that they're communicating, you know, the core

23    factors, unique selling proposition of their products.

24    **Q.**    And in addition to the marketing materials and the

11:11:37 25    websites, did you look at the pumps themselves, the

1    Defendant's and the Plaintiff's pumps themselves, competing

2    products in the market?

3    **A.**    Yes, I -- there were photographs in the record that I

4    was able to review, to compare the Lubecore and the

11:11:55  5    Groeneveld pump as well as the competitor pumps.

6    **Q.**    And what did you find?

7    **A.**    I found the Lubecore and Groeneveld pump looked nearly

8    identical, particularly in comparison to the contrast with

9    most of the other competitors.

11:12:11 10    **Q.**    And did you -- well, let me just show you some of

11    these pictures to see if these are the ones you are

12    referring to.

13             MS. MICHELSON:  Your Honor, I can't get them

14    all on the screen at once because they're on different

11:12:34 15    pieces of paper.

16    **Q.**    But, can you describe these things for the jury?

17    **A.**    Just describe each of the pumps?

18    **Q.**    Yes.  I just, I guess I want to know are these the

19    pumps, some of the pumps that you?

11:12:49 20    **A.**    Yes.  These are the pumps I looked at that were in the

21    record; the Groeneveld, the Lubecore, I'm not sure of the

22    name of the next one, and then the Lincoln in comparing

23    those.

24    **Q.**    And did you take a look at this picture as well,

11:13:00 25    Exhibit 47-1?

Wolfe - Direct

1   A.   Yes.

2   Q.   And what about this guy, 41?

3   A.   Yes.

4   Q.   And were there others as well?

11:13:08  5   A.   Yes, there were other photographs in the record.

6   Q.   And do you see on the table here, the actual exemplar

7   of the Lubecore pump and the Groeneveld pump?

8   A.   Yes.

9   Q.   And do these exemplars appear to be what's depicted in

11:13:38 10   the photographs that you had when you did your work?

11   A.   Yes.

12   Q.   Here, I'm showing you what we've marked as Exhibit

13   130-2.  And does this appear to be the pump, one of the

14   pumps that's depicted in this photograph?  Which I think we

11:14:07 15   should mark that so -- what's our next Exhibit Number, if

16   you don't mind?  We'll mark it 139.

17       Do you see?

18   A.   Yes, that looks similar -- the same as what you're

19   showing there.

11:14:20 20   Q.   This third pump here in the lineup?

21   A.   Yes.

22   Q.   And this item here that we've marked Exhibit 130-1,

23   does that appear to be the fourth pump depicted in the

24   photograph we've marked as Exhibit 139?

11:14:54 25   A.   Yes.

1    **Q.**    Okay.  Now, Ms. Wolfe, did you -- did you also -- did

2    you also do some work to understand the industry in which

3    these products are sold as well as the customers?

4    **A.**    Yes.

11:15:26  5    **Q.**    Can you describe to the jury what you did and what you

6    found?

7    **A.**    Sure.

8         I really primarily read the record, the deposition

9    transcripts and the preliminary injunction hearing to

11:15:36  10   understand from those who were actually involved in the

11   industry what their experience is, how the product is sold,

12   how it was developed, and how it's been marketed.  And then

13   I coupled that with just my looking at the marketing

14   materials and looking at the websites and what their online

11:15:53  15   presence was and how they seem to portray themselves and

16   their products.

17   **Q.**    And what did you find?

18   **A.**    What I -- what I found was similar to as I said

19   before, there were striking similarities between the

11:16:06  20   Groeneveld marketing and its positioning in the marketplace

21   and what Lubecore was doing.

22   **Q.**    And what kind of brand identifiers do you -- let me

23   rephrase this.  I'm going to read exactly the question I

24   wrote.

11:16:24  25        What are the core elements of the Groeneveld brand

1    identification and messaging?  If you can explain that,

2    please.

3    A.    Sure.  What I saw as the core element of the

4    Groeneveld messaging is its product is very prominently

11:16:40 5    displayed as part of its overall marketing messaging.  Then

6    there's a big focus on it's green, efficient technology

7    leader in the industry, and been around for generations.

8    Q.    And what about the pumps themselves, the product

9    itself?

11:16:57 10    A.    I'm sorry.  What do you mean?

11    Q.    What are the -- what are the core elements of the

12    brand identification?

13    A.    Oh, on the product itself?

14    Q.    Yes.  That is part of the product itself?

11:17:07 15    A.    The core element of the brand identification is the

16    design of the product itself and then it's labeling and the

17    green color and the identification plate.  But, there's

18    definitely a distinctive overall design in comparison with

19    other products.  If I went to other websites and was looking

11:17:24 20    to -- if I was advising a client who wanted to enter this

21    industry and I was looking at what else was out there, if

22    there was market differences between other products and this

23    one.

24    Q.    When you say the design, when you identify the design

11:17:37 25    as a core element of the Groeneveld branding, what do you

1  mean?

2  **A.**   I mean the shape of it, the -- I don't know the exact

3  terminology, but the cylinders at the bottom of it,

4  placement of the label, the placement of the plate, the

11:17:55  5  actual shaping of it looks different than the competitors.

6  **Q.**   And in your research and work in the case, did you --

7  let me think how to say this exactly right.  Did you learn

8  what's important to ALS customers when they look to identify

9  the source of the product?

11:18:29 10              MS. ZUJKOWSKI:  Objection.

11              THE COURT:  Objection sustained.

12  **Q.**   I'll move on for a second.

13       And what did you find about the Lubecore brand

14  identifiers, both on the pump itself and the marketing

11:18:45 15  approaches that you learned about during your assessment

16  here?

17  **A.**   Um-hum.

18       In my assessment in looking at the products, and

19  again, looking at the marketing materials, the product

11:18:54 20  design looks the same or similar.  It's got markings in a

21  very similar configuration.  The color has changed and the

22  name has changed.  The basic markings are in the exact place

23  on the product.  And then if you look at the marketing

24  materials, and their website, the graphic layout, the

11:19:13 25  graphic strategy used is very similar.  It's a very clean,

1    crisp look.  Got messaging very similar.  And if you compare

2    that to the other competitors in the marketplace, there was

3    just no comparison.  The -- these two sites were much more

4    sophisticated and polished than any of the others.

11:19:31  5    **Q.**    What about the products?  What about the competitor's

6    products out there?

7    **A.**    The products -- again, they look -- they look

8    distinctly different.  They don't look like this product.

9    So there's clearly a lot of differences in the way the

11:19:43 10    product can look.

11    **Q.**    Now, in your work consulting with companies, I believe

12    you said you assist startups and new companies in basically

13    designing the outside, their look of their product, correct?

14    **A.**    Well, the whole -- right, it's not just that piece.

11:20:08 15    **Q.**    And when you -- when you do that work, what -- what is

16    important?  What is important about that piece of the

17    puzzle?

18    **A.**    The most important piece is really understanding

19    clearly where your product fits the competitive landscape.

11:20:28 20    You know, usually we'll create quadrants and try to

21    determine is this going to be a higher style, lower style

22    high tech, low price.  We have these factors we look at.  So

23    if I'm consulting with a company who's looking to enter the

24    marketplace with a product, I am going to carefully study

11:20:44 25    all of the facets of other products so that I can

1    distinguish my client's product and help them and help their

2    team find ways to distinguish it in the marketplace.

3    **Q.**    And is distinguishing the product in the marketplace,

4    does that include the way the thing looks?

11:21:03  5    **A.**    Yes, of course.

6    **Q.**    Can you explain to the jury what kind of effort is

7    made to distinguish the way the thing looks from competing

8    systems?

9    **A.**    Sure.

11:21:12  10   **Q.**    And I mean when you're trying to establish your own

11   identity.

12   **A.**    Right.  And it's -- again, it's all of these pieces

13   that come together.  No one element alone is going to mean

14   success in the marketplace.  So that's why we try to look at

11:21:25  15   that, that whole continuum of how does the product itself

16   look.  Can it be designed in a unique way?  Sometimes it

17   can, sometimes it can't.  If it can be designed in a unique

18   way, we can design it to be distinguishable from

19   competitors.  What sort of packaging, what sort of color

11:21:41  20   scheme brand or logo, the name itself, what sort of imagery

21   are we going to conjure up in the mind of the customer, and

22   you move on to how are we actually going to market this, how

23   it's going to be sold, where a customer is going to find it,

24   what the experience is going to be when they buy it, what

11:21:54  25   information do they need.  We're looking at that whole

1    continuum from the product design itself to the end customer

2    experience.

3    Q.    And is -- and I mean you can see these two pumps in

4    front of you.  Is that band of red on the Lubecore at the

11:22:11   5    Lubecore at the base of the reservoir now and then, there's

6    a label there with a band of red, is that sufficiently

7    distinguishable to -- does that sufficiently distinguish the

8    Lubecore product from what you see in the Groeneveld?

9               MR. ANASTOS:  Objection.

11:22:31  10               THE COURT:  Objection sustained.

11    Q.    In your work, do you -- how would you go about that?

12    How would you go about that in your work to identify -- to

13    distinguish a new product from an existing product?

14    A.    If I was.

11:22:48  15    Q.    What's enough, what do you have to do to make it

16    sufficiently distinguishable to achieve?

17    A.    What is enough depends on what the competitive

18    landscape looks like.  If it's a heavily saturated market,

19    it's going to have to be distinguishable.  You have to look

11:23:05  20    at how are we going to design.  Again, it's all of these

21    components.  It's the product design.  It's how is it

22    marketed, how is it -- the experience with the customer.  So

23    I'm going to be advising my clients to really distinguish

24    this product.  If we're trying to enter the marketplace, we

11:23:21  25    think we have a better invention, better way of doing

1    something than out there, which is what most try to do.  We

2    have a better way to do it.  How are we going to distinguish

3    ourselves, because if we don't effectively, we're going to

4    fail.  That's something that I know and I'm trying to help

11:23:37  5    my clients see.  So I would be looking at how do we design

6    this in a way that looks completely different from what's

7    out there so that we can prove our unique selling

8    proposition in the marketplace.

9    Q.    And -- okay.  And what is the relevance of other

11:23:59 10   competing products on the market and how they look?

11    A.    It's the most relevant.  I mean once -- you know, when

12    I come in, I assume that the engineers have designed a good

13    product.  I'm making that assumption.  It's a good product.

14    It's going to work.  It is going to do what we think it's

11:24:13 15   going to do.  So when I come in, it's now how do we make it

16    look so it's different than everything else that's out

17    there.  So that's all these features, functions, and

18    benefits that we want to point out as part of the selling

19    features.  But, the way it looks is where people create that

11:24:30 20   sort of emotional connection.  That's where they'll identify

21    your product from somebody else's.  Again, we're visual

22    people.  So if we see something that's distinctive, we are

23    going to remember it differently than if it just looks like

24    everything else.

11:24:48 25   Q.    What is the significance when all the other competing

Wolfe - Direct

1    products on the markets are visually different, identifiably

2    different looking than, for instance, the Groeneveld?

3    **A.**    What does it mean?  You mean in terms of design?

4    **Q.**    Of a new product that's coming on to the market, a new

11:25:25   5    product supposedly coming into the market.

6                        MR. ANASTOS:  Objection.

7                        THE COURT:  Objection sustained.

8    **Q.**    In your experience with all the hundreds of companies

9    that you've worked with, has an engineer ever -- have you

11:25:38  10   ever encountered a situation where the outside of the

11   product of an industrial product was dictated, dictated, 99

12   percent by what was going on inside the internal mechanics?

13                       MR. ANASTOS:  Objection.

14                       THE COURT:  Sustained.

11:26:04  15   **Q.**    Does the relative size of the market currently using

16   the Groeneveld and the Lubecore and the ALS products have an

17   impact on your analysis here?

18                       MR. ANASTOS:  Objection.

19                       THE COURT:  Sustained.

11:26:16  20   **Q.**    Does it have an impact in generally on -- on the work

21   that you do in advising people branding and how to

22   differentiate their brand new product when it comes to the

23   market?

24   **A.**    Yes, the size of market certainly does impact, and how

11:26:35  25   are we looking to approach this.  Are we trying to slice,

1    you know, make the pie bigger, are we trying to slice up a

2    little piece of pie that's already existing?  That's all

3    part of the strategy and how we look at product positioning.

4    Q.   And why --

11:26:47  5    A.   Well, because if the market is already very large and

6    very saturated, we know we're going to have a greater

7    challenge to try to distinguish ourselves from other

8    competitors, and we're really going to have to, you know,

9    look at the grid and figure out where do we fit in this

11:27:01 10    landscape and can we compete.  When the market's very small,

11    if it's relatively now, then there's wide open space.  So

12    there's a lot of opportunity.  It's much easier to build a

13    real effective marketing campaign to distinguish the product

14    when there's a lot of space available in the market.

11:27:23 15    Q.   I think I did ask you a customer profile if you

16    developed one in your work here, the customer profile ALS

17    users in the United States.  Were you able to do that?

18    A.   Yes, based upon the testimony, I determined what the

19    customer was -- the profile that I could determine from what

11:27:41 20    was available.

21    Q.   Is there one profile or multiple profiles?

22    A.   My understanding is there were multiple files,

23    different types of people who might buy the product, but the

24    ultimate rationale behind buying the product was similar.

11:27:55 25    Q.   Which is?

1    **A.**     Which is it's a device that, again, when you think

2    about that risk, the customer would be looking for a device

3    that's safe, that's proven, that's been in the industry for

4    a long time, so that they know if there's a problem, it's

11:28:07  5    going to be solved.

6    **Q.**     Can you describe for the jury, please, the

7    circumstances under which putting a label on a look-a-like

8    product is going to be -- is going to distinguish from a

9    competing existing product?

11:28:23 10                    MR. ANASTOS:  Objection.

11                    THE COURT:  Sustained.

12    **Q.**     Are there circumstances under which a label -- let me

13    put it this way.

14         In your work and in your studies, have you -- have you

11:28:42 15    looked into the effects of labeling, specifically labeling

16    on products?

17    **A.**     I haven't specifically studied label as an independent

18    study.  Labeling again, you know, all of these things come

19    together.  Design is probably the -- considered the most

11:28:59 20    valuable right now.  That's why there are so many design

21    schools focused on teaching students how to design products

22    and how to design the packaging because that has proven to

23    be so powerful and how you build a long-term relationship

24    with your customer.  Labeling is certainly one piece of it.

11:29:15 25    But, if the product designs are so similar, labeling may not

1    be enough to eliminate confusion.

2    Q.    So the label is -- is a part of it, but it's not the

3    only part of it?

4    A.    Correct.

11:29:28    5    Q.    And what about when -- if competitors, if you have one

6    competitor who is a known entity and one who is in the

7    market and, therefore, relatively unknown, doesn't have an

8    independent corporate identity, does that have -- implicate

9    as well?

11:29:58   10                     MR. ANASTOS:  Objection.

11                     THE COURT:  Sustained.

12   Q.    When you do your work, are you going to take into

13   consideration who the competitors are and their longevity on

14   the market?

11:30:10   15   A.    Absolutely.

16   Q.    And go ahead.  I'm sorry.

17   A.    I was going to say, as I said, the competitive

18   analysis is a critical piece.

19   Q.    And longevity in the market, what is the -- what is

11:30:21   20   the relevance of that?  Why is that important?

21   A.    It's -- it's important particularly for a product

22   where there's safety or, again, risks because we're trying

23   to avoid risk.  So if we're trying to avoid risks for

24   products that could impact safety or functionality of a

11:30:36   25   truck going with a customer -- or with a product in a

1    company that's been in the market for a long time is

2    probably going to make us feel safer than going with a

3    product that is brand new to the marketplace.

4                    MR. ANASTOS:  Objection.  Move to strike.

11:30:48  5          THE COURT:  That's common sense.  So.

6    Q.    What about the -- what about a company's investment in

7    its product, both in terms of the research and development

8    of it, but then also in terms of the advertising and

9    promotion of it?  What kinds of impact does that have on

11:31:14 10   branding and brand strength and consumer decision making

11    that you've talked about?

12    A.    That has an enormous impact.  That's why it's easier

13    for PNG to build a billion dollar brand than a start-up

14    entrepreneur with a second mortgage on the house.  It takes

11:31:29 15   a lot of money to build a brand.  It takes time and in some

16    cases, it can take years and years and years.  It's gotten

17    faster with technology and with social media.  There are

18    some instances where people have been able to sky rocket in

19    terms of their brand potential, tends to be more definitely

11:31:45 20   on the consumer side and definitely where there's a lot of

21    great or pop culture and attention to it.  But, for the

22    typical consumer, specifically business or industrial

23    products, it takes years and years and years to earn that

24    credibility and that trust from the marketplace.

11:32:00 25   Q.    What about product pricing; is that a factor?  And

1     maybe my question is unclear.  What if the competing

2     products are relatively comparably priced so the end user is

3     going to be paying about the same for them?  Is that a

4     factor that impacts on brand strength and identification?

11:32:22  5   **A.**    It impacts how -- it definitely impacts brand

6     identification because pricing is a part of that matrix that

7     we're looking at.  You know, if this is much less expensive

8     than our competitor products, that's going to impact how we

9     market it.  If they're similarly priced, we're trying to

11:32:37 10    provide comparisons that these are similar in quality

11    features, functions, benefit.  And we're trying to convince

12    our customer to buy us because of our brand versus the

13    other.

14    **Q.**    How do negative consumer experience with a particular

11:33:05 15    product that has a particular look or a particular design

16    impact on brand strength, brand protection, brand

17    recognition and those sorts of issues?

18    **A.**    Can you say that one more time?  I'm sorry.

19    **Q.**    Yeah.  How does -- let me see if I -- how if a

11:33:20 20    consumer has a negative experience with a particular

21    product, how can that impact on brand strength and brand

22    protection, all these issues that you work and are involved

23    in?

24                 MR. ANASTOS:  Objection.

11:33:35 25                 THE WITNESS:  I follow you now.  Okay.

| | |
|---|---|
| 1 | THE COURT:  Again, this is not -- you don't |
| 2 | need expertise for this, do you? |
| 3 | MS. MICHELSON:  Well, your Honor, I think it |
| 4 | does help the jury understand because -- |
| 11:33:46  5 | THE COURT:  The objection is sustained. |
| 6 | BY MS. MICHELSON: |
| 7 | **Q.**    When you are doing your work, consulting with |
| 8 | companies, you talked about the effort that's made to |
| 9 | distinguish a new product for instance entering the |
| 11:34:19 10 | marketplace, why are you -- why are you trying to do that? |
| 11 | **A.**    Why am I trying to distinguish it from other products? |
| 12 | **Q.**    Yes.  What distinguish your product from somebody |
| 13 | else? |
| 14 | **A.**    That's how you sell a product.  Ultimately doesn't |
| 11:34:35 15 | matter what you're trying to sell if you sold anything, |
| 16 | you're trying to distinguish it from the competitors as the |
| 17 | unique selling proposition, selling statement what is it |
| 18 | that's unique and different about you from your competitors, |
| 19 | and that's a critical piece of how anything is ultimately |
| 11:34:51 20 | sold as you back into the process, how you create a powerful |
| 21 | brand. |
| 22 | **Q.**    If the product isn't sufficiently distinguished from |
| 23 | the competitors' products, visually or because of marketing |
| 24 | practices, what's that about? |
| 11:35:07 25 | MR. ANASTOS:  Objection. |

416

Wolfe - Direct

1          THE COURT:  Sustained.

2          MS. MICHELSON:  I have to think sometimes.

3   One second.

4   Q.    Based on your experience and your training, education

11:35:32  5   and everything you've been doing for the last 20 years,

6   including consumer decision making, and consumer processes

7   background, what kind -- what kind of confusion or

8   uncertainty can be caused in the marketplace if products

9   aren't sufficiently distinguishable from each other?

11:35:52 10          MR. ANASTOS:  Objection.

11          THE COURT:  Sustained.

12   Q.    Are there people who copy other people's products and

13   make look-alikes because they don't want their product to be

14   distinguishable from others?

11:36:10 15          MR. ANASTOS:  Objection.

16          THE COURT:  Sustained.

17   Q.    How would Lubecore copying or imitating Groeneveld's

18   brand identifiers confuse the marketplace or create

19   marketplace uncertainty?

11:36:26 20          MR. ANASTOS:  Objection.

21          THE COURT:  Sustained.

22   Q.    In your experience, have you encountered other

23   products besides these at issue in the case that have a

24   functional purpose that have been designed to create brand

11:36:48 25   identification that is its own?

Wolfe - Direct

1    **A.**    Yes.

2    **Q.**    In your opinion, does the Lubecore product do that?

3                    MR. ANASTOS:  Objection.

4                    THE COURT:  Sustained.

11:36:57  5    **Q.**    When you consult with a company looking to enter the

6    marketplace with a claimed improved -- with a claimed

7    improvement on an existing product, what are you advise them

8    to do?

9                    MR. ANASTOS:  Objection.

11:37:12 10                    THE COURT:  Objection sustained.

11    **Q.**    If there was a strategic business reason for such a

12    company to copy the look of an existing product?

13                    MR. ANASTOS:  Objection.

14                    THE COURT:  Sustained.

11:37:28 15                    MS. MICHELSON:  One minute, please.

16                    (Counsel conferring.)

17                    MS. MICHELSON:  I'm not going to ask you any

18    more questions right now.  Thank you very much.

19                    THE WITNESS:  Okay.

11:38:16 20                    THE COURT:  Any cross-examination?

21

22

23

24

25

Wolfe - Cross

1          CROSS-EXAMINATION OF JENNIFER WOLFE

2     BY MR. ANASTOS:

3     **Q.**   Good morning, Ms. Wolfe.  How are you doing?

4     **A.**   Good?  How are you?

11:38:56 5   **Q.**   I'm great.

6          You spent approximately 45 hours preparing your report

7     in this case; is that correct?

8     **A.**   Yes.

9     **Q.**   When did you do that?

11:39:08 10  **A.**   I believe it began in September sometime.

11    **Q.**   When did Ms. Michelson first contact you?

12    **A.**   I believe that was late August or early September.  I

13    don't recall exactly.

14    **Q.**   We're going try to pull up some web pages here, but

11:39:31 15  part of your testimony is that the Lubecore web page and the

16    Groeneveld web page are somehow similar but yet distinct

17    from the website of other competitors; is that correct?

18    **A.**   Correct.

19    **Q.**   Can you swing on to the -- I don't know if you'll be

11:39:58 20  able to see that.  Do we have wireless Internet?  We haven't

21    been able to pull it up on the computer.  We got it?

22                    THE COURT:  You can see it.

23    **Q.**   Can you see that on the monitor in front of you?

24    **A.**   Yes, I can see.  It's not completely clear, but I can

11:40:17 25  see it enough.

Q. Who's web -- keep the monitoring going dark -- whose web page is this? I'm sorry.
A. This is the Lubecore web page.
Q. And describe what you see in this web page.
11:40:32 A. Sure. What I see on this web page from an over all design perspective, very clean masthead across the top, a rotating image, I see three columns with very well spaced well designed tech. I can't read the text from here but three columns of text.
11:40:49 Q. So it's a good web page?
A. I think it's a good web page.
Q. Designed by someone who knew what they were doing?
A. Designed by somebody who knew what they were doing, yes.
11:40:57 Q. And that's a bad thing in this case?
A. I don't think it's good or bad.
Q. In doing your research in this case, did you encounter evidence of what it -- what the sales process is like for someone to purchase an automated Lubecore system?
11:41:33 A. I read the testimony preliminary from the preliminary hearing and the testimony transcript to understand what the purchase is for purchasing a product like --
Q. What's the understanding of that processes?
A. My understanding of the process is there's essentially two potential customers. One is a distributor who's buying 11:41:48

1    to redistribute it to the end customer, and there's the end

2    customer who could be an executive in a trucking company,

3    who's buying this as a line item on a truck that they're

4    purchasing as a certain, you know, performance enhancing

11:42:06  5    feature to the truck, or it could be somebody who is a

6    single truck driver who owns a single truck.

7    **Q.**    These are not impulse buys; is that correct?

8    **A.**    No, I would not say they're impulse buys.

9    **Q.**    And in -- when you were talking about consumer items,

11:42:24  10   these are not -- these are not consumer items someone would

11   be plucking off a shelf; is that correct?

12   **A.**    No.  A consumer could be used to refer to consumer

13   types of products where the -- your consumer in an

14   industrial setting.

11:42:36  15   **Q.**    Would you consider the consumers of automated

16   lubrication systems to be sophisticated consumers?

17   **A.**    I would consider them to be knowledgeable in the

18   industry, knowledgeable of the trucking industry.

19   **Q.**    So they're going to be able to distinguish between

11:42:49  20   various makers of automated lubrication system who approach

21   them with their products?

22   **A.**    I would say they would be able to understand what the

23   product's function is, yes.

24   **Q.**    But, they won't know who -- they can't differentiate

11:43:01  25   between one manufacturer or another?

Wolfe - Cross

1   **A.**    I don't know if they can under -- differentiate

2   between one manufacturer and another.

3   **Q.**    Did you speak with any customers?

4   **A.**    No, I did not.

11:43:10  5   **Q.**    Did you speak with any distributors?

6   **A.**    No.

7   **Q.**    I'd like to find some pictures.

8            MR. ANASTOS:  Deb, where are the exhibits with

9   all the pumps you showed her, the Vogel and the others?

11:44:14 10           MS. MICHELSON:  I marked that 1.  Let me -- I

11  have extra copies.

12           MR. ANASTOS:  Sure, that would be great.  I

13  mean the individual ones everybody's been seeing.

14           MS. MICHELSON:  I think they're in the 40's.

11:44:48 15  And I showed her one more, the Lubecore I think.  Here it

16  is.

17  **Q.**    You looked at these pictures of these pumps; is that

18  correct?

19  **A.**    Yes.

11:44:58 20  **Q.**    Do you know what kind of pump the Groeneveld pump is?

21  **A.**    It's my understanding it is an automated lubrication

22  system.

23  **Q.**    Do you know if it's driven by electricity or by air?

24  **A.**    I believe it's driven by air.

11:45:15 25  **Q.**    Do you know if it's a single-stroke pump?

Wolfe - Cross

1    **A.**    I believe it's a single, yes.

2    **Q.**    Okay.  What about the Lubecore?

3    **A.**    My understanding it is the same.

4    **Q.**    Same type of pump, single stroke?

11:45:26  5    **A.**    Yes.

6    **Q.**    What about the Grease Jockey that's next?

7    **A.**    I believe it's the same.

8    **Q.**    You don't know that it's driven -- that it doesn't

9    have a piston and actually works off a diaphragm?

11:45:37  10    **A.**    I don't know that with certainty.

11    **Q.**    The Lincoln pump in the picture there, what kind of

12    pump is that?

13    **A.**    It's my understanding it's the same type of pump.

14    **Q.**    Same type as what?

11:45:47  15    **A.**    As the Lubecore and the Groeneveld.

16    **Q.**    So you think that's a single-stroke pneumatic pump?

17    **A.**    That's my understanding.

18    **Q.**    You don't know it's an electric pump?

19    **A.**    I do not know that.

11:45:55  20    **Q.**    You think you should have known things like that when

21    you're making comparisons between the looks of products?

22    **A.**    Not necessarily because my opinion is related to the

23    branding component.  I'm not an engineer.  I'm not here to

24    distinguish between the features and functioning, just to

11:46:12  25    look at the sales side of this.

1   **Q.**   The pump that's on the picture there, did you look at

2   that one?

3   **A.**   I remember seeing that.  I don't think I referenced

4   that one specifically.

11:46:21  5   **Q.**   Do you know what kind of pump that is?

6   **A.**   I don't know what kind of pump that is.

7   **Q.**   Have you looked at this pump?

8   **A.**   I have seen a photograph of that pump.

9   **Q.**   Do you know what kind of pump it is?

11:46:37  10   **A.**   I do not know what type of pump that is.

11   **Q.**   Looking at the two pumps sitting in front of you, can

12   you tell the jury which one is the Lubecore pump and which

13   is the Groeneveld pump?

14   **A.**   The one from my perspective on the left is the

11:46:58  15   Lubecore pump, the one on the right is the Groeneveld pump.

16   **Q.**   How can you tell?

17   **A.**   Because the labels are facing right at me.

18   **Q.**   Okay.

19       Do you think that when someone's making a purchasing

11:47:07  20   decision, they would be able to see those labels?

21   **A.**   I think that they would be able to see those labels,

22   if they're making a purchased decision, yes.

23   **Q.**   Do you think you would be able to see the red Lubecore

24   follower plate from a distance?

11:47:24  25   **A.**   From a distance, you mean on a truck or --

424

Wolfe - Cross

1    **Q.**    Sure.

2    **A.**    I have no idea if you would be able to see it from a

3    distance on a truck.  If it was -- is that something like

4    this where I could see the two, I could see that there is

11:47:36 5    some markings that are different.

6    **Q.**    The -- understand that Lubecore has put its own

7    trademark logo on the pump?

8    **A.**    Yes.

9    **Q.**    And not only is it just there in red on the reservoir,

11:48:03 10    it's also on the identification plate, correct?

11    **A.**    I can't quite see that from here, but yes, that's

12    understanding.

13    **Q.**    Something someone would try to do to distinguish their

14    product from someone else's to put their own trademark logo

11:48:18 15    on the product?

16    **A.**    No, if I'm trying to come into the marketplace and

17    distinguish my product from another, I would look to vastly

18    distinguish it than the distinction of changing a label or

19    color.  Particularly where the designs are different.

11:48:32 20    **Q.**    So are you trying to tell the jury that having your

21    own trademark is not a way that people distinguish their

22    products one from another?

23    **A.**    Not an effective way if that's the only thing you're

24    doing, no.

11:48:46 25    **Q.**    You're familiar with registration of things,

1    registrations of trademark?

2    **A.**    Yes.

3    **Q.**    Do you know whether or not Groeneveld has registered

4    its trade dress on that pump with the US Patent and

5    Trademark Office?

6    **A.**    It's my understanding it is not registered, no.

7    **Q.**    You're aware that if a -- in order to receive trade

8    dress, a product has -- excuse me.  In order to receive

9    trade dress protection, a trade dress has to be

10   nonfunctional?

11   **A.**    Yes.

12   **Q.**    What does it say to you about the functionality of

13   Groeneveld's pump or the nonfunctionality or functionality

14   of it, they made no effort whatsoever to register the trade

15   dress?

16              MS. MICHELSON:  Objection.

17              THE COURT:  Objection sustained.

18              MR. ANASTOS:  Thank you.  I have nothing

19   further, Ms. Wolfe.

20              THE COURT:  Any redirect?

21              MS. MICHELSON:  I think just a little.

22

23

24

25

1    REDIRECT EXAMINATION OF JENNIFER WOLFE

2    BY MS. MICHELSON:

3    **Q.**    Are there multiple ways to protect -- when you advise

4    companies in your work, do you advise them about multiple

11:50:40   5    ways to protect their intellectual product property and

6    trade dress?

7    **A.**    Yes, absolutely.  There are numerous strategies that

8    we use.  We weigh the pros and cons, patent design.  Patents

9    can be useful, distinct.  We can box off competitors, but

11:50:57  10    there's limited life.  Trademark, trade dress, those types

11    of things can last forever.  So we always are weighing where

12    we get the most bang for our buck in terms of protection.

13    **Q.**    Is registration always the way to go when it comes to

14    trade dress?

11:51:10  15    **A.**    Registration is not required to maintain that

16    protection.  In fact, I usually tell most people it's a

17    technicality, it's a formality.  It's really what you do and

18    how you operate your business.  If you protect it as though

19    it is a powerful part of your brand, that's going to be much

11:51:24  20    more important.  Many companies lose their registration

21    because they fail to continue to use and protect their

22    brand.

23    **Q.**    So what is an effective way to protect your trade

24    dress other than just registering, which was brought out in

11:51:41  25    cross-examination?

Wolfe - Redirect

```
 1              MR. ANASTOS:  Objection.

 2              THE COURT:  Overruled.

 3              THE WITNESS:  I'm sorry.  Can you say that

 4    again?  I was waiting for the answer.  I apologize.

 5    Q.    I don't want to misstate it, but I think what I asked

 6    you -- because once I ask the question, I let it go -- what

 7    are more effective ways to protect -- for a company to

 8    protect its trade dress aside from this registering it that

 9    we heard about?

10    A.    The most effective way is to really use it, to

11    whatever company it is, design name, the color, the graphic

12    impact, if you use it, use it consistently, use it always,

13    and indoctrinate it into the corporate culture so everybody

14    understands that is the identification of your brand, and

15    that will ensure that it lasts.

16              And always also to protect it.  If you have something

17    and someone copies it and you don't protect it, you lose

18    that right to protect it.  So policing around the world is a

19    really big issue, particularly now in the global economy,

20    and helping customers, my clients, understand you have to

21    protect your brand.  So if you invested in building it, you

22    want to protect it.

23    Q.    And how does one do that?

24    A.    Well, one does it with things like this.  If somebody

25    infringes on something you've invested years in
```

Wolfe - Redirect

1      developing --

2                    MR. ANASTOS:  Objection.

3                    THE COURT:  Overruled.

4                    THE WITNESS:  You file a lawsuit to protect

11:53:03  5      it.  You can do things like filing different registrations,

6      not just in the U.S. but all over the world.  And that's a

7      big piece of what I do now.  We don't just talk about the

8      United States.  We talk about all of the different

9      jurisdictions, and how do we do that, you know, economically

11:53:19 10      in these times because if you go and market in another

11      country and you haven't protected it or understood how you

12      protect it in those places, you could lose the value of your

13      investment.

14      Q.    You know, you were asked questions about the

11:53:33 15      purchasing process and different target customers here, and

16      you mentioned distributors by these products and also end

17      users.  Did you find there was a variety in terms of the

18      diversity among the end users of these products in terms of

19      the kinds of fleets they run, geographical sorts of things

11:53:52 20      as well?

21      A.    In my review of the record, it is my understanding

22      there is -- there are some differences in the types of

23      customers.  There could be very large fleets, very small

24      ones.  There are distributors.  So yes, there is some

11:54:05 25      diversity in the type of customers.

| | |
|---|---|
| 1 | **Q.**    And could that affect certain sophistication levels, |
| 2 | knowledge levels, and care and attention levels given in the |
| 3 | purchasing process that you were asked about earlier? |
| 4 | **A.**    Yes, that would certainly affect all of -- all of |
| 11:54:24  5 | those factors, how much time, the level of sophistication, |
| 6 | level of understanding of one product versus another, and |
| 7 | whether it's new to the market or it's been around for a |
| 8 | generation. |
| 9 | **Q.**    You were asked did you speak about customers or |
| 11:54:37 10 | distributors in -- as part of your work.  My question to you |
| 11 | is this, did you read the testimony of Mr. DeCleene, his |
| 12 | prior testimony in this case, as part of your inquiry here? |
| 13 | **A.**    Yes. |
| 14 | **Q.**    Did you read the testimony of Mr. Bill Koppelman, the |
| 11:54:55 15 | prior testimony of Mr. Bill Koppelman in connection with |
| 16 | your work here? |
| 17 | **A.**    Yes. |
| 18 | **Q.**    Orville White? |
| 19 | **A.**    Yes. |
| 11:55:00 20 | **Q.**    Let's see who else, we had.  There was Scott Marcum? |
| 21 | **A.**    Yes I read that deposition transcript. |
| 22 | **Q.**    Kees, we had -- did you read testimony of some |
| 23 | customers who we'll hear from soon, Dean Osborn and Brendon |
| 24 | Cane? |
| 11:55:21 25 | **A.**    Yes. |

Wolfe - Redirect

1    **Q.**    In fact, were you provided with all the prior

2    testimony that the witnesses have given in this case?

3    **A.**    Yes.

4    **Q.**    And did you review that as part of your inquiry here?

11:55:31  5    **A.**    Yes.

6    **Q.**    Oh.  You were asked about the Lubecore website.  I

7    couldn't see it so well because it was a little thing, but

8    I've got -- I've got some hard copies.  I'm going to show

9    you Exhibit 63.

11:55:54  10                    MS. MICHELSON:  Thank you, your Honor.  Let me

11    see if we can read this.

12    **Q.**    I've marked here 63-1, 2, 3, 4 -- goes through Page 7

13    actually.  And are these printouts in the Lubecore website

14    that you took a look at?

11:56:18  15    **A.**    Yes.

16    **Q.**    In your work here?

17    **A.**    Yes.

18    **Q.**    And I see on the -- on the home page or the front page

19    or I think it's the home page, yeah, this is the front page,

11:56:30  20    that is the Lubecore website?

21    **A.**    Yes.

22    **Q.**    And what do you take from the prominent use of the

23    incorporation of the color green in these marketing

24    materials?

11:56:40  25    **A.**    On this -- it's -- the color green is intended to

Wolfe - Redirect

1    invoke belief in the environment that it's good for the

2    environment, which is similar to the Groeneveld signature,

3    green color, similar shade.

4    Q.    And specifically now, directing your attention to a

11:56:59 5    little thing here, Lubecore is the preeminent provider of

6    the world's best automated greasing system and air

7    filtration solutions, and specifically the word preeminent.

8    Do you recall when you were taking a look at the Groeneveld

9    materials that they likewise use that kind of language to

11:57:18 10    describe their presence?

11    A.    Yes.

12    Q.    You know, you were asked -- you were asked is it

13    good -- you said it's not good or bad that the Lubecore

14    website is well designed.  I think that's what you -- what

11:57:40 15    your testimony of cross-examination.  You -- it's not about

16    good or bad.  What's the relevance of that marketing -- that

17    kind of marketing approach in this case?

18                    MR. ANASTOS:  Objection.

19                    THE COURT:  Overruled.

11:57:55 20                    THE WITNESS:  The relevance in this case is

21    that in comparing these two websites with competitor

22    websites, there are striking similarities, which is why when

23    you start to stack all these factors as you've been saying

24    it's not just one piece.  It's all of these pieces.  When

11:58:11 25    they're striking similarities, it is more likely to create

1   some confusion or create for a product that's been in the

2   market for 30 years or more, there's already an established

3   connection with customers.  They already have a belief about

4   it.  So if a new product is entering the market and takes

11:58:28   5   and stacks up all these things that look strikingly similar,

6   they're piggy backing on that belief in this other brand

7   that took 30 years to build.

8   **Q.**   And do the Lubecore website materials -- well, I'm

9   going to withdraw that.  Okay?  But, I'm going to ask you

11:58:50   10   this.  When you review the other marketing materials here

11   and compared them, the Groeneveld and the Lubecore, did you

12   find -- did you likewise find the kinds of similarities in

13   those materials as you have now described between the

14   website?

11:59:06   15   **A.**   Yes, and that is also a very effective marketing that

16   your website is going to spill over into your marketing

17   brochures, vice versa, having everyone to look at, it's the

18   consistency of how your marketing is what makes it work.

19   **Q.**   In your work in the case, you also were provided and

11:59:53   20   took a look at this photograph of an Eco-Star, Eco-Sterk

21   pump, we've identified it as PX 47-1.  You see that?

22   **A.**   Yes.

23   **Q.**   Okay.  And do you know whether this is a pneumatic

24   single-line system exactly like the Groeneveld?

12:00:11   25   **A.**   No, I don't think -- I don't know that.

1    **Q.**    Are their brand identifiers on this particular pump

2    that are unique to it that are different than those you see

3    in the Groeneveld besides the label?  We'll concede that.

4                    MR. ANASTOS:  Objection.

12:00:26  5                    THE COURT:  Objection sustained.

6    **Q.**    Oh.  You started to talk about that you would do -- if

7    your intent was to distinguish the new product entering the

8    market to compete against an existing manufacturer, that you

9    would do more to distinguish if that is your intent than a

12:01:04 10   label.  Do you recall this testimony in cross-examination?

11   **A.**    Yes, I --

12   **Q.**    Can you just explain what you would do and why?

13   **A.**    If I were advising a client who entered into the

14   marketplace with again an improved version of a product, I

12:01:20 15   would want to distinguish it.  I wouldn't want there to be

16   any confusion it was related to a product that's maybe been

17   around for a long time.  I want this to be seen as the new

18   and improved and innovative solution that I've been in the

19   industry for years and I have the next best thing.  So if

12:01:35 20   I'm working with that client to introduce a product, I want

21   it to be very different.  I want to look at how can we take

22   what's done from an engineering perspective that is better,

23   and how can we turn it into something that's going to be

24   very unique and distinctive so when we go to sell this,

12:01:50 25   there is no comparison.  We don't ever have to explain to

Wolfe - Redirect

1    somebody this is a Lubecore, and it's just as good as a

2    Groeneveld.  Because it's so distinctive and unique and a

3    unique selling proposition is so strong, we don't have to do

4    that.  That's what I want from a marketing and branding

12:02:06  5    perspective; how do we do that so powerfully.  If I have to

6    explain to everybody it's not the same, it's a different

7    product, I have failed from a branding perspective.

8    Q.    I mean if it's an improvement, then what do you get by

9    having it look just like the existing product?

12:02:23 10                   MR. ANASTOS:  Objection.

11                   THE COURT:  Objection sustained.

12                   MR. ANASTOS:  I have no further questions of

13    the witness.  Thank you very much, Ms. Wolfe.

14                   THE WITNESS:  Thank you.

12:02:37 15                   THE COURT:  Any recross?

16                   MR. ANASTOS:  Just a little, your Honor.

17

18

19

20

21

22

23

24

25

Wolfe - Recross

1          RECROSS-EXAMINATION OF JENNIFER WOLFE

2    BY MR. ANASTOS:

3    **Q.**   Just a couple questions to follow-up, Ms. Wolfe.

4          First of all, you were talking about comparison

12:02:54  5    between the web pages.  You looked at the Groeneveld web

6    page?

7    **A.**   Yes.

8    **Q.**   Do you have the slightest idea why in the last one,

9    two, three, four, five, 15 years, that web page has been

12:03:05 10    changed?

11   **A.**   No.  I only became involved recently.  So I have -- I

12   don't have that information.

13   **Q.**   So for all you know, the web page you're talking about

14   that you know you're comparing to the Lubecore web page came

12:03:15 15    into existence sometime prior to September when you started

16   working on this case?

17   **A.**   Yes, I would assume so.

18   **Q.**   Could have been July or August of 2011?

19   **A.**   I have no information.

12:03:27 20    **Q.**   Okay.  And this is the exhibit from the Lubecore web

21   page and you agree with me the Lubecore logo is right up

22   there in the corner?

23   **A.**   Yes, it is in the corner.

24   **Q.**   Lubecore with the -- let me -- Lubecore with the small

12:03:44 25    L?

Wolfe - Recross

1    **A.**    Yes.

2    **Q.**    And you agree there's a red band on this?

3    **A.**    Yes.

4    **Q.**    And I think you testified that there's a rotating

12:03:52 5    picture in there; is that correct?

6    **A.**    Yes.

7    **Q.**    So this forum, "We protect your environment," is just

8    one of how many pictures?

9    **A.**    I think maybe four or five.

12:03:59 10    **Q.**    Okay.  So this screen shot was specifically chosen for

11    this exhibit?

12    **A.**    Yes.  I didn't choose it, but yes.

13    **Q.**    And you would agree with me, would you not, in

14    marketing considerations, green is a pretty common color to

12:04:13 15    use when you're trying to advertise your product as green in

16    the sense of environmentally friendly?

17    **A.**    Yes, green is a common color for environmentally

18    friendly.

19    **Q.**    Not really trying to suggest to these people

12:04:24 20    Mr. Eissis and Lubecore had the green moving picture in

21    their web page because they're trying to identify themselves

22    with Groeneveld, are you?

23    **A.**    I don't know what their intention was.

24    **Q.**    You said that the Groeneveld and the Lubecore web

12:04:37 25    pages look similar.  Let's page through a few of these other

Wolfe - Recross

1    ones.

2    **A.**    Um-hum.

3    **Q.**    Does the --

4    **A.**    That's actually a printout.  That's how it looks when

12:04:46 5    you print it.  It looks differently when you're actually

6    online.

7    **Q.**    That is correct.  We had trouble getting online.  But,

8    you would agree with me each page of this has the Lubecore

9    logo on it?

12:04:55 10    **A.**    Yes.

11    **Q.**    Each page is trimmed in red?

12    **A.**    Yes.

13    **Q.**    Does Green Groeneveld have a picture of Mr. Eissis on

14    their website?

12:05:03 15    **A.**    I don't believe so, no.

16    **Q.**    Okay.

17          Just for comparison sake, we want to run through or

18    show the -- you've looked at this.  This is a screen shot of

19    the Groeneveld web page?

12:05:26 20    **A.**    Yes.  Is that the -- I'm not sure if that is the home

21    page that I looked at or not.  That looks a little bit

22    different.

23    **Q.**    Because it might have changed since the time you

24    looked at it?

12:05:34 25    **A.**    I don't know.  That looks -- that looks more familiar.

Wolfe - Recross

1    I know on the Groeneveld, my recollection is there were also

2    several different images, also the masthead, very clean

3    masthead across the top.  And similar -- similar lay out and

4    overall design and also very polished.

5    **Q.**    And there's the Groeneveld products?

6    **A.**    Yes.

7    **Q.**    All with the labels on them, all in green?

8    **A.**    Yes.

9    **Q.**    There's more Groeneveld products, all with their

10   labels on it, all in green?

11   **A.**    Yes.

12                MR. ANASTOS:  Thank you very much.

13                THE WITNESS:  Okay.

14                THE COURT:  Okay.  Thank you very much, Ms.

15   Wolfe.  You're excused.  Watch your step, please.

16       All right, folks.  We'll take our luncheon recess.

17   Meet downstairs at 1:15.  Keep in mind the admonition.  Have

18   a good lunch.  See you then.

19       (Proceedings in the absence of the jury:)

20                MS. MICHELSON:  Your Honor, when we broke last

21   Friday, you said I would have an opportunity to make a

22   proffer on the record, and we'd likewise would make a

23   proffer as to Ms. Wolfe.  I will do it, how ever.

24                THE COURT:  Go ahead.

25                MS. MICHELSON:  Want to?

1       As to prior testimony that was not permitted, that if

2   permitted to testify, Mr. Orville White, Mr. DeCleene,

3   Mr. Wapenaar would have testified as to reactions and

4   statements made by customer and industry personnel,

12:07:21  5   personnel upon seeing the Lubecore pump in the market and

6   their expressions of confusion and uncertainty about the

7   products and their sources in the marketplace.

8       There is testimony on the record from these people --

9   not this trial, but in the preliminary injunction hearing

12:07:39  10   transcript and in their deposition testimony -- as to the

11   exact specifics of what that testimony would have been if

12   allowed, and the additional point here being that we filed

13   memorandum of law demonstrating that it's admissible in its

14   own right, but especially since Lubecore is eliciting and

12:08:04  15   bringing out a lack of certain customers saying certain

16   things, our position is it's unfairly prejudicial to allow

17   that testimony to come in and not allow the reciprocal or

18   parallel testimony about how these people all thought and

19   thought the two were the same thing notwithstanding the

12:08:24  20   label.

21       And as to Ms. Wolfe, I'm happy to ask the questions or

22   have her answer the questions that to which objections were

23   sustained in her own words if the Court wants that approach.

24   She is here and available in the courtroom and can be

12:08:41  25   available to do that if that's your preference to allow us

1    to do that.

2                    THE COURT:  No.  Go ahead.  Proffer whatever

3    you want.

4                    MS. MICHELSON:  Okay.

5         I will -- I will -- the complete substance, of course,

6    of her opinions is detailed in her report, which has been

7    exchanged with counsel, and I believe it's also been

8    submitted to the Court in connection with certain motions

9    and motions in limine.  Ms. Wolfe would have, if allowed to

10   answer questions, would have testified based on her

11   experience her education, her training, and all her

12   professional accomplishments, that in her opinion, the

13   Lubecore pump had -- mimics the brand identifiers on the

14   Groeneveld pump, the overall look of it, the design, the

15   configuration, and the overall appearance of it, in a way

16   that is likely to lead to consumer -- well, not just

17   consumer, but confusion and uncertainty in the relevant

18   marketplace that the emotional connection she talked about

19   that the public, the using public, the market has with the

20   Groeneveld pump is based on the shape overall configuration

21   and overall design and appearance of the pump, and that

22   Lubecore mimics and mirrors to such a degree that it is

23   indeed likely to cause the client uncertainty and confusion

24   we talked about.  And further that in her opinion, the label

25   that -- the label and the small band of red that appears on

1    his pump is not sufficient to visually distinguish it in the

2    marketplace to alleviate or reduce even the -- to affect the

3    likelihood of this kind of confusion and uncertainty.  And I

4    can't remember all the questions you sustained objections

12:10:45  5    to, but that's the gist of it.  And as I said, the totality

6    of it is indeed in her report, which is part of the Court

7    record.  Thank you, your Honor.

8              THE COURT:  Any response?

9              MR. ANASTOS:  With respect to the expert

12:10:57 10    testimony, your Honor, the types of questions that were

11    posed, just reiterated to you, are totally within the --

12    doesn't take any special knowledge, skill, or expertise for

13    somebody to reach those conclusions.  That's what the jury

14    is here for.  They just want somebody to get up there and

12:11:15 15    testify that there is a likelihood of confusion.

16        The jury can readily ascertain whether or not there's

17    a likelihood of confusion here between the brands.

18    Secondly, there was no established methodology in terms of

19    Daubert wise established methodology to get up there and say

12:11:31 20    this web page looks -- because this web page is in columns,

21    that Groeneveld -- excuse me -- is trying to piggy back off

22    of Groeneveld's brand.  That -- again, that's a jury issue.

23    There was no scientific or research base to any of the

24    opinions that were intended to be expressed in this case.

12:11:53 25             MS. MICHELSON:  I will just -- I'm sorry.  I

1    don't mean to interrupt if you're still talking.

2                    THE COURT:  Yeah, finish.  You want to address

3    the questions of DeCleene and --

4                    MR. ANASTOS:  Questions for -- there are

12:12:04  5    certain situations where hearsay could potentially be

6    admitted in this sort of situation, but there was no

7    evidence whatsoever of any actual confusion.  The type of

8    hearsay that is permitted in these cases is somebody calling

9    up Groeneveld and saying I want that red pump.

12:12:25 10                    THE COURT:  You mean maybe a customer?

11                    MR. ANASTOS:  Yeah, a customer calling up

12    Groeneveld to say hey, I like that new red pump of yours,

13    I'd like to buy it.  Then maybe a Groeneveld person from

14    customer sales can get up on the stand and say I got ten

12:12:39 15    calls.  It can't be one call.  It has to be a lot of calls.

16    The Sixth Circuit is clear one, two, three, or four

17    instances of confusion don't do it anyway.  But, the types

18    of things they want Mr. Wapenaar to testify about -- for

19    example, at the preliminary injunction hearing, Mr. Wapenaar

12:12:53 20    was permitted to testify, and Magistrate Baughman was well

21    aware of the hearsay, that people in trade shows have walked

22    down the aisle and seen the Lubecore pump, and then when

23    they got to the Groeneveld booth, they said oh, my God, I

24    just saw that pump over there.  Why is it here.  That's not

12:13:09 25    confusion.  That's just -- and it's hearsay beyond belief,

| | |
|---|---|
| 1 | but that's the kind of thing that you would get. |
| 2 | THE COURT:  It's not a customer either. |
| 3 | MR. ANASTOS:  Not a customer. |
| 4 | MS. MICHELSON:  Well, your Honor, I -- oh, I |
| 12:13:21 5 | don't mean -- |
| 6 | MR. ANASTOS:  I'm done. |
| 7 | MS. MICHELSON:  Oh.  I know -- |
| 8 | THE COURT:  Well, you're proffering, and |
| 9 | that's all you were going to do. |
| 12:13:28 10 | MS. MICHELSON:  Right.  We have -- |
| 11 | THE COURT:  You proffered it. |
| 12 | MS. MICHELSON:  I will just put on the record, |
| 13 | your Honor, that there has been absolutely no Daubert |
| 14 | challenge to any of the experts that -- |
| 12:13:36 15 | THE COURT:  No, stop, stop.  I make the |
| 16 | decisions based on the testimony as it comes out, and the |
| 17 | objections that are made.  And when you call an expert to |
| 18 | say something that's marked in red and something marked in |
| 19 | green, that's not an expert opinion.  The common man on the |
| 12:13:54 20 | jury can make that decision because that's who's supposed to |
| 21 | make the decision.  So there are a lot of reasons those |
| 22 | objections were sustained.  And when any expert testimony -- |
| 23 | where whether the witness was an expert in the field that's |
| 24 | an issue here is open to some serious question.  And so I |
| 12:14:10 25 | ruled on the objections that were made.  So see you at 1:15. |

Osborne Depo

1      MS. MICHELSON:  Thank you, your Honor.

2      (Thereupon, a luncheon recess was had.)

3      MONDAY SESSION, OCTOBER 17, 2011, AT 1:04 P.M.

4           THE COURT:  Good afternoon.

13:22:41  5           THE JURY:  Good afternoon.

6           THE COURT:  You may call your next witness.

7           MS. MICHELSON:  Your Honor, we are going to be

8  offering Brendon Cane, the trial testimony, 40-minute tape

9  of his testimony.

13:22:52 10           MR. ANASTOS:  We do have an objection.

11           THE COURT:  Will you approach the side for a

12  minute.

13      J(Discussion at side bar off the record.)

14           MS. MICHELSON:  We have Dean Osborn, and that

13:23:41 15  one is about an hour and nine minutes.

16           THE COURT:  All right.  Do we have it on

17  there, Chris?

18           (Videotape of Dean Osborne played.)

19           THE COURT:  You may call your next witness.

14:32:59 20           MS. MICHELSON:  Thank you, your Honor, your

21  Honor.  We actually have some testimony from the Defendant's

22  principal, given in the case already that we would like to

23  have read in the record.  We have a small portion that is

24  not videotaped.  We have somebody to read with us, and I've

14:33:16 25  been working --

Osborne Depo

1              THE COURT:  Okay.

2              MS. MICHELSON:  -- further.  And then we have

3      a short videotape portion.

4              THE COURT:  Okay.

14:33:22  5              MS. MICHELSON:  Okay.  So --

6              THE COURT:  Folks, you can do this in a civil

7      case.  You can call your opponent if you wish or a

8      representative of the opponent and then ask whatever

9      questions that are relevant, and then the opponent's lawyer

14:33:39 10     can't ask him any questions because they want to offer that

11     witness.  They can do it in their own case.  So they don't

12     ask any questions.  It's not because of a lack of interest;

13     it's because under the procedure that we follow, you can't

14     do it.

14:33:58 15             MS. MICHELSON:  Thank you for coming here to

16     help us out.

17             THE WITNESS:  You're welcome.

18             MS. MICHELSON:  I may skip a little.  So I'll

19     have to direct you to where in the excerpts --

14:34:04 20             THE WITNESS:  Okay.

21             MS. MICHELSON:  Because I'm trying to cut it

22     down for the Court and the jury.

23             THE WITNESS:  Sure.

24             MS. MICHELSON:  Some of it is just to place it

14:34:12 25     in its proper context so we're on the designations of

Eissis Depo

1    nonvideotaped testimony.  Are you with me?

2              THE WITNESS:  Um-hum.

3              MS. MICHELSON:  Okay.  What's your name by the

4    way?  Who are you?

14:34:24 5              THE WITNESS:  My name is Brian Shaw.

6              MS. MICHELSON:  Brian, thanks a lot.

7              THE WITNESS:  You're welcome.

8              MS. MICHELSON:  Okay.  We're just at the top

9    now.  I'll ask -- pretend I'm asking the questions, and he

14:34:35 10   will read the Defendant's answers.

11   **Q.**    Mr. Eissis, would you please state your full name for

12   the record for the Court Reporter.

13   **A.**    Yeah, I'm Jan Eissis.

14   **Q.**    Could you please tell the Court or could you tell the

14:34:47 15   Court please what CPL Systems did?

16   **A.**    I started a company called CPL Systems in 1988.  It

17   was called Canadian Precision Lubrication Systems.  We were

18   actually importing and installing and selling and servicing

19   automated lubrication system.

14:35:03 20   **Q.**    This was in Canada, correct?

21   **A.**    That's correct.

22   **Q.**    Do you recall what systems you were selling,

23   importing, and installing back then?

24   **A.**    Yes.  I was importing the Groeneveld Automatic

14:35:16 25   Greasing Systems.

Eissis Depo

1    **Q.**    At some point you sold CPL Systems to Groeneveld?

2    **A.**    I did, yes.

3    **Q.**    What year was that?

4    **A.**    In 2001, I sold 80 percent, and 2004, I sold the other

14:35:26  5    20 percent.

6    **Q.**    Did you remain an employee of CPL Systems?

7    **A.**    Correct, I did.

8    **Q.**    What was your job title in 2001?

9    **A.**    In 2001, I was president of CPL Systems.  It was not a

14:35:39 10    type -- excuse me.  It was a title I had given myself.  And

11    it just flowed into 2001.

12    **Q.**    And when did your title change?

13    **A.**    2004, they -- I was called the director of North

14    American operations.

14:35:52 15    **Q.**    What were your responsibilities as director of North

16    American operations?

17    **A.**    I would say the sales, service and installation and

18    then the managing of the Groeneveld companies and CPL, who

19    also became a Groeneveld company in North America.

14:36:09 20    **Q.**    Did there come a time when you left Groeneveld?

21    **A.**    That's correct.

22    **Q.**    And when was that?

23    **A.**    That was January, 2007.

24    **Q.**    What did you do after you left Groeneveld?

14:36:22 25    **A.**    I started a company called Orlaca Crane Cam.

Eissis Depo

1 **Q.** What was the business of Orlaca Crane Cam?

2 **A.** We focused on installing cameras on the tips of

3 cranes, typically the cranes you see like working on high

4 towers, tower cranes, luffing cranes, a luffer.

14:36:39 5 **Q.** And just to correct, I believe it says working on high

6 rises, tower cranes, luffing cranes, luffer?

7 **A.** Luffer, yes.

8 **Q.** Okay.

9   "Question:  So in the beginning the Orlaca Crane was

14:36:51 10 not in the automated lubrication system business?"

11 **A.** No, not at all.

12 **Q.** And then did there come a time when your interests

13 returned back to automated lubrication systems; is that

14 correct?

14:37:01 15 **A.** That's correct.

16 **Q.** Did you want your pump to look like the Groeneveld

17 pump?

18 **A.** It didn't really matter to me.

19 **Q.** Why not?

14:37:10 20 **A.** They all work anyway I would say.

21    MS. MICHELSON:  And there was an attorney

22 comment:  "I didn't catch that answer."

23 **A.** I said they will work.  It would work anyway.

24    MS. MICHELSON:  I'm going to just skip now --

14:37:30 25 you said your name's Brian, right?  Sorry, but --

Eissis Depo

| | |
|---|---|
| 1 | THE WITNESS:  Yes. |
| 2 | MS. MICHELSON:  To the next page where it says |
| 3 | Page 181.  Are you with me? |
| 4 | THE WITNESS:  Yes. |
| 14:37:38 5 | Q.    Okay.  And Line 17. |
| 6 | "Question:  This photo was marked as Plaintiff's |
| 7 | Exhibit 83-1.  Do you recognize that?" |
| 8 | A.    Yes. |
| 9 | Q.    What is it? |
| 14:37:51 10 | A.    That's a Grease Jockey Greco pump. |
| 11 | Q.    Next question:  What were Lubecore's approximate sales |
| 12 | in the U.S. in -- United States in 2009? |
| 13 | A.    Approximately 400,000. |
| 14 | Q.    Dollars?  You have to -- |
| 14:38:06 15 | A.    $400,000.  Excuse me. |
| 16 | Q.    Okay.  Approximately how many EP-0 systems did |
| 17 | Lubecore sell in the U.S. in 2009? |
| 18 | A.    I would say an estimated 200. |
| 19 | Q.    Do you have a projection for what Lubecore sales in |
| 14:38:20 20 | the U.S. in 2010 will be? |
| 21 | A.    Yes, I do. |
| 22 | Q.    And what is it? |
| 23 | A.    Yeah, I projected around $1 million. |
| 24 | Q.    "Question:  How does Lubecore get its products to |
| 14:38:31 25 | market in the United States? |

**A.**    We go through distributors.

**Q.**    Are any of your distributors, to your knowledge, formerly distributors of Groeneveld product?

**A.**    Yes.

14:38:40 **Q.**    How does Lubecore support its distributors?

**A.**    We basically support our distribute by providing sales tools, by giving technical training, by joining them in trade shows, to name a few things, and to deliver the product when they want it, to extend them credit.

14:38:57 **Q.**    "Question:  What kind of training do you provide your distributors?"

**A.**    Well, we showed distributors the differences between lubrication system.  We showed distributors how to sell what kind of systems in the market segments, you know, for 14:39:21 example, how do you sell lubrication system to an owner of fire trucks compared to highway tractors, compared to a piece of heavy equipment?  Which benefits of the lubrication system are more suitable for heavy equipment operator versus a truck operator versus a municipal customer.  Those are the 14:39:38 types, you know, training that we provide.

We provide them with brochures, like I say, participation in trade shows.  We will pay a portion of the show and either be there to supply signs, banners.

**Q.**    Do you provide your distributors with any literature?

14:39:55 **A.**    Yes, we do.

Eissis Depo

1    **Q.**    This is a docket marked Plaintiff's Exhibit 66.  Can

2    you identify that?

3    **A.**    Yes, this is a brochure from Lubecore.

4    **Q.**    Okay.

5         I'm going to skip now for a bit to the next page.  I'm

6    at Page 203.

7         "Question -- and Line 20, counsel -- "have you

8    participated yourself in any sales presentations?"

9    **A.**    Yes, I did.

10   **Q.**    What does Lubecore do to promote its products in the

11   United States?

12   **A.**    Well, the only thing we do is we promote our

13   distributors.

14   **Q.**    I'm sorry, sir?

15   **A.**    We are promoting our distributors and our distributors

16   are promoting the project in the United States.  So we go to

17   a trade show typically with a distributor, I would say, sell

18   them along.  We would always try to join with the local

19   distributors and then we would -- any leads that would be

20   coming from any of those trade shows.  We would then find

21   other distributors in order to get the product installed and

22   try to get them to take on the product line.  We would try

23   to, of course, you know, get their leads to the distributors

24   that are in the area.  For example, we went to the way show

25   in Atlanta with the Interlube distributor who also was

Eissis Depo

1    selling Lubecore.

2         So we had a spot in his booth and then we would get

3    leads, for example, from Wisconsin, and when I would give

4    those leads to, for example, Fuel Systems in Wisconsin in

14:41:24 5    order to follow that up.

6    Q.    Is Fuel Systems, Inc. a Lubecore distributor today?

7    A.    They sell Lubecore product, yes, they do.

8    Q.    I'm going to skip to Page 1 -- 217 to 18.  It's just

9    Line 20.

14:41:45 10        You also testified about the various differences

11   between your pump and these three other pumps that you

12   mentioned with Mr. Vermeulen?

13   A.    Yes.

14   Q.    Okay.  And I believe you said that it would work

14:41:58 15   anyway so it doesn't matter.  Do you remember saying that?

16   I wrote it down.

17   A.    Yeah.

18   Q.    So it doesn't matter how it looks because it can look

19   different and still work anyway.  I believe that's what you

14:42:11 20   said on direct exam.

21   A.    I believe I answered that question with relation to

22   whether I instructed Mr. Martin Vermeulen that his pump had

23   to look the same.

24   Q.    So are you disputing now that it would work even if it

14:42:26 25   looked different?

453

Eissis Depo

1  **A.**     I believe that these other pumps work as well.  I know

2  they also work.

3  **Q.**     Next question:  "Are the internal components in the

4  pump that you mentioned different -- I'm sorry.  Are the

14:42:38 5  internal components in the pumps that you mentioned

6  different or not because I thought you said they were

7  different and that yours is better because of that?"

8  **A.**     Yeah, there's a difference.  For example, that

9  black -- that grease piston is different.

14:42:52 10  **Q.**     And I just -- I think you misspoke, but can you reread

11  it.

12  **A.**     I can reread it.  Excuse me.  Yeah, there's

13  differences.  For example, that black, that grease piston is

14  different.

14:43:04 15  **Q.**     "Question:  Are you talking about something on the

16  outside?"

17  **A.**     No, the inside.

18  **Q.**     Okay.  So there are many differences, that's what you

19  said, right?  You can go to the answer, Line 9.

14:43:17 20  **A.**     There are differences in the pump, yes.

21  **Q.**     "Question:  The internal components inside the

22  housing?"

23  **A.**     That's correct.

24  **Q.**     Okay.

14:43:25 25        So the outside thing that contains it can be shaped

1    differently, right?

2    **A.**    The outside could be shaped differently.

3                MS. MICHELSON:  To Page 270, Line 8.

4    **Q.**    You will agree with me that Lubecore in its net worth

14:43:43 5    of distributors target Groeneveld and the Groeneveld system

6    in your Steadylube warranty assumption program, won't you?

7    **A.**    That's correct, yes.

8                MS. MICHELSON:  I'm -- I am finished with

9    these excerpts, and I'm -- we're just going to roll a quick

14:44:04 10   tape from the videotape, some testimony -- prior testimony

11   given by Mr. Eissis in the case.  Thank you very much.

12                THE COURT:  Okay.  Thank you.

13                (Videotape played of Jan Eissis.)

14                THE COURT:  That will do it?

14:52:46 15                MS. MICHELSON:  It will, your Honor.  And I --

16   I'm sorry.  We've got one more piece of videotape deposition

17   testimony to play for the jury right now, Scott Marcum.

18   This is about -- our excerpt's about 20 minutes long total.

19                THE COURT:  We'll take a break then, our

14:53:04 20   afternoon recess.  Keep in mind the admonition I've given

21   you.  About 15 minutes.

22        (Thereupon, a recess was taken.)

23                THE COURT:  Can you call the witness what you

24   are doing?

15:07:48 25                MR. KUNSELMAN:  Yes, your Honor, we will.

Marcum Video

1     We're playing the video of Scott Marcum, your Honor.

2                    THE COURT:  Thank you.

3                    MR. KUNSELMAN:  Can you change the video to

4     Number 2, please?

15:07:56  5           THE COURT:  Sure.

6                    MR. KUNSELMAN:  Thank you.

7                    (Videotape played.)

8                    THE COURT:  That's it?

9                    MS. MICHELSON:  That's it.  And I believe the

15:29:26 10   Defense is not going to be playing their cross designations.

11                   MS. ZUJKOWSKI:  Not on cross, no.

12                   THE COURT:  Okay.

13

14

15

16

17

18

19

20

21

22

23

24

25

Wilson - Direct

1      MS. MICHELSON:  Okay.  Well, we got somebody

2  here real quick.  Ms. Wilson, Gail Wilson.

3      THE COURT:  Would you raise your right hand

4  for me.

15:30:37  5                    GAIL WILSON,

6      of lawful age, a witness called by the PLAINTIFF,

7          being first duly sworn, was examined

8              and testified as follows:

9          DIRECT EXAMINATION OF GAIL WILSON

15:30:40 10      THE COURT:  Gail, would you tell us your full

11  name and spell your last name.

12      THE WITNESS:  Gail Marie Wilson, W-I-L-S-O-N.

13      THE COURT:  How do you spell Gail?

14      THE WITNESS:  G-A-I-L.

15:30:52 15      THE COURT:  Thank you.

16  BY MS. MICHELSON:

17  Q.   Ms. Wilson, good afternoon.  Can you please introduce

18  yourself to the jury?  Tell them where you come from.

19  A.   Hi, I'm Gail Wilson, I'm -- I live in Milton, Ontario

15:31:11 20  Canada.  I'm the chief financial officer for North America

21  for Groeneveld and I worked for the company since August of

22  2006.  I went to university of Toronto.

23  Q.   Can you just do me a favor.  I can hardly hear you

24  myself because I'm way back here and the ceilings are pretty

15:31:34 25  big, so.

1    So your current position at Groeneveld is what?

2  **A.**   CFO.

3  **Q.**   And of -- what entity?  Can you just describe for the

4  jury how that is laid out?

15:31:48 5  **A.**   I'm employed by CPL Systems, which is a Canadian

6  company owned by Groeneveld in Holland.  They also own the

7  company in Brunswick, Ohio, called Groeneveld Transport

8  Efficiency, and I am the chief financial officer for all

9  North American locations.  And I'm also the assistant

15:32:13 10  secretary of Groeneveld Transport Efficiency.

11  **Q.**   And Groeneveld Transport Efficiency, Inc., that's the

12  Brunswick office that's the plaintiff in the case?

13  **A.**   Yes.

14  **Q.**   And in your position, do you have access to -- pardon

15:32:30 15  me -- company records regarding employment of individuals

16  who have been involved in the company historically?

17  **A.**   Yes, I do.  I look after all of the accounting, HR.

18  **Q.**   Can you just tell quick the jury the dates of

19  employment with Groeneveld of Mr. Martin Vermeulen?  We've

15:32:51 20  had testimony about that before.  Okay?

21  **A.**   Okay.  That is not something where the records were

22  kept at North America, but I did receive from the office in

23  Holland, an employment record that showed Martin employed in

24  November of 1986 and finished in December of 1997.

15:33:17 25  **Q.**   Can you describe for the jury what exactly your job

1   entails with Groeneveld during the -- I guess what's that,

2   five years, five or so years you've been with the company?

3   **A.**    I'm -- I look after everything to do in the finance

4   and administration part of the company.  It includes

15:33:40  5   accounting, IT, HR, inventory and just overall general

6   management of the business results, including the budgeting

7   process.

8   **Q.**    And does that include the accounting records and the

9   financial information relating to the Ohio office?

15:34:06 10   **A.**    Yes, it does.

11   **Q.**    And in your position with Groeneveld, are you aware of

12   any company protocol, any corporate protocol involving the

13   incorporation of -- let me put it this way -- company

14   protocol regarding the promotional materials of the company

15:34:31 15   and marketing materials?

16   **A.**    Um-hum.  The head office in Holland is very clear

17   about how we need to advertise or promote or project our

18   corporate image.  What things go on brochures, marketing

19   literature, trade shows, even our company advance where our

15:35:01 20   technicians go out, have graphics on the side and that's --

21   that includes the graphic images, the logos, the markings

22   that are used worldwide by all of the Groeneveld

23   subsidiaries around the world.

24   **Q.**    What is the roll of the picture of the EP-0

15:35:23 25   single-line pump in those promotional materials, and in the

1    company protocol regarding the brochures, et cetera?

2    **A.**    The products themselves are really an important part

3    of all of our marketing materials.  So the EP-0 pump,

4    single-line pump is, as well as our other products, the

5    pumps for our other product lines are displayed clearly on

6    all of our promotional materials.  And as I said, on things

7    like company vans and trade shows, it is a predominant part

8    of our corporate image.

9    **Q.**    What efforts, if any, are made to nurture, I guess, an

10    association in the market between the image of the EP-0

11    single-line pump and where that product comes from?

12    **A.**    Sorry.  Can you just repeat that again?

13    **Q.**    Yeah.  What's -- is there any effort to nurture that

14    association in the market between specifically the EP-0 pump

15    and where it comes from?

16    **A.**    Okay.  The EP-0 pump is the product line that is sort

17    of our iconic or original product, targeted for the

18    transportation industry.  So trucks and on highway

19    equipment.  So that's different than some of our other

20    products, which would be more targeted to other market

21    segments and industry.  So the EP-0 pump is very

22    specifically associated with our transportation segment.

23    **Q.**    And I understand you to say that Groeneveld has a

24    number of ALS pumps and systems currently available in the

25    market, and which ones -- which ones specifically relate to

1   the transport industry?

2   **A.**    There are two main transport industry pumps.  One we

3   call a Compalube pump, and the primary pump is the EP-0

4   single-line pump.

15:37:53  5   **Q.**    Okay.

6        And just so the record's clear is that -- do you see

7   one of those EP-0 single-line pumps on the table right in

8   front of you?

9   **A.**    Yes.

15:38:02  10   **Q.**    I'm just going to read in the record what the Exhibit

11   Number or letter is so we have a record of it.  Defense

12   Exhibit A.

13   **A.**    That is exactly our EP-0 pump, yes.

14   **Q.**    And what's the difference between the Compalube versus

15:38:25  15   this EP-0 single-line pump?  If you could just explain that

16   to the jury.

17   **A.**    Compalube our Compalube product is primarily for

18   trailers and applications.  The pump is actually quite

19   smaller and condensed, and all of the -- it's compact, if

15:38:46  20   you will.  It includes some of the parts that would normally

21   be external to our pump.  The Compalube is sort of a mini

22   version for a different application.

23   **Q.**    Which one was first in time for Groeneveld; the

24   Compalube or the single line EP-0 pump, the subject of this

15:39:07  25   case?

Wilson - Direct

1    **A.**    The EP-0 pump.

2    **Q.**    And which of Groeneveld's proprietary automated

3    lubrication systems was its first?  There's a lot -- there

4    are a number of them, a twin line, a lot of them, but I'd

15:39:29 5    like you to tell the jury which was first in time for

6    Groeneveld, which was the first proprietary system on the

7    market?

8    **A.**    Absolutely the EP-0 single-line pump, this Exhibit A

9    that's on the table, was the, you know, what's been referred

15:39:46 10   to as the flagship or the first.  It was almost our bread

11   and butter.  It is where we started and what we're known

12   for.

13   **Q.**    And in terms of -- we'll get more in detail in a

14   little bit, but in terms of Groeneveld's gross sales of

15:40:06 15   products, of its ALS products and pumps in North America,

16   give an approximate percentage or the jury some idea as to

17   what's your big product and where are your big -- where your

18   sales come from.

19   **A.**    I'm okay to look at some of my notes?

15:40:32 20                  MR. ANASTOS:  Objection.

21                  THE COURT:  Overruled.  Go ahead.

22                  THE WITNESS:  I don't have all my product

23   group details with me, but -- and, of course, being an

24   accountant, I like to be very precise, but the majority of

15:41:21 25   our sales in the U.S. are EP-0, that product on the table.

1    That's our significant portion of sales.

2    Q.    Okay.

3    A.    I don't know the exact number, but it's 80 percent,

4    perhaps up to 80 percent.

15:41:49   5    Q.    You know, I didn't ask you this when we first started

6    out about your background and your education and your

7    employment history before you got to Groeneveld, and I think

8    that's -- that might be important for the jury to understand

9    who you are a little better.  Can you please --

15:42:08  10   A.    Sure.  That's what I started to sort of get into.

11   Q.    I know.  I got side tracked.  I'm really sorry.

12   A.    So I graduated from the University of Toronto in 1985.

13   I worked with PriceWaterhouse for three years.  I'm a

14   chartered accountant, and then I've worked in what we call

15:42:28  15   industry since 1987; ten years in the plastics industry, and

16   five years in Groeneveld CPL, and the other years in

17   industrial application companies.  So that's a bit of my

18   background.

19   Q.    And okay.  And so you have certification to do

15:42:59  20   accounting?

21   A.    Um-hum.

22   Q.    And when did you get that?  I might have just missed

23   it.

24   A.    1988.

15:43:08  25   Q.    Now, can you describe for the jury, please,

Wilson - Direct

1    Groeneveld's market presence and its standing in the ALS

2    industry here on this continent and also specifically in the

3    United States?

4    **A.**    Okay.  Specifically in the United States, we have a

5    combination of company owned locations.  We also have some

6    sales people working out of their homes in certain parts of

7    the United States and we have distributors.  The -- our main

8    head office is in Brunswick, Ohio, and we have a company in

9    Florida and we have a company location in Seattle

10   Washington.  Roughly, ten distributors out the U.S.  And in

11   Canada, it's -- we have seven offices throughout Canada, so.

12   **Q.**    And in the -- in the United States, can you describe

13   for the jurors whether the -- whether the Groeneveld offices

14   versus the distributors or dealers sell to which kind of end

15   users?  That's not a great question.  So if you need me to

16   rephrase it, I'm happy to do it.  But, you understand my

17   question?  How do you get your product to end users in the

18   U.S.?  Through which channel?

19   **A.**    Right.  Well, we do have three primary ways to sell to

20   customers, and our customers are either end users, the owner

21   of the truck, the piece of heavy equipment, the people that

22   own and operate the equipment, or we sell through

23   distributors who will sell on to the end customers, or we

24   can also sell directly to an equipment manufacturer, and

25   they will fit the product on at their manufacturing plant

Wilson - Direct

1    and sell it onto the customer directly.

2    Q.   And in the United States, the OEM sales and the sales

3    to national fleets, they go through which Groeneveld office?

4    A.   The entire U.S.  All of the sales except for the sales

15:45:38  5    in Florida, Seattle and Utah go through our U.S. office in

6    Brunswick, Ohio.

7    Q.   Okay.  And that's the Groeneveld Transport Efficiency?

8    A.   Inc., yes.

9    Q.   The Plaintiff in this action?

15:45:53 10    A.   Yes.

11    Q.   Can you describe for the jury what kind of trade --

12    let me say industry activities Groeneveld participates in to

13    promote itself, name, product and reach people?

14    A.   I think the favorite way to reach out to people, as

15:46:22 15    through trade shows, trade associations, and participation

16    in local maintenance associations, for instance.  We don't

17    do a lot of advertising in like magazines, but we do spend a

18    lot of time at national and local and regional trade shows k

19    and associations.  We do have things like product literature

15:46:53 20    that we do hand out and some mailing campaigns, but it's the

21    face-to-face time of customers that we spend most of our

22    promotion on.

23    Q.   Oh, I'm sorry.  I thought you were finished.  Sorry.

24    A.   I'm done.

15:47:07 25    Q.   And is Groeneveld called upon to provide information

Wilson - Direct

1    and answer questions in connection with articles that appear

2    in trade journals, relating to the ALS industry?

3    **A.**    We have in the past, yes.

4    **Q.**    And can you tell the jury a little bit about those

5    sorts of communications?

6    **A.**    Yeah.  So again, whether it be through trade magazine

7    that they've asked us to comment on about technical topic of

8    interest, or at a trade show or a local technical

9    association where maybe there's a topic about truck

10   maintenance, and we'll be invited to put on a presentation.

11   **Q.**    Do you actively -- well, does Groeneveld take an

12   active role at the trade shows as well?

13   **A.**    Absolutely.  We --

14   **Q.**    Could you just describe the visibility and what you

15   guys do to get that out there?

16   **A.**    Well, the -- every size trade show is different, but

17   we tend to have large booths that are, you know, sort of in

18   the best traffic path in the show.  We have invested quite a

19   bit of money in our actual display.  We have a show truck.

20   It's an actual truck that we put in the booth.  So it gives

21   you some idea of the size of the booth itself.  And on that

22   truck, we'll display some of our products on the shelving

23   around the booths.  We have our products display pumps,

24   always pumps, and the -- we also have a cut-away pump which

25   basically shows the customer the inner workings of the pump

Wilson - Direct

1    as well.  So it's quite a significant presence at a trade

2    show?

3                    MS. MICHELSON:  Your Honor, can we switch to

4    this machine here quickly?  Thank you so much.  Thank you.

15:49:31  5    BY MS. MICHELSON:

6    Q.    I'm just showing you a picture of what we've marked as

7    PX-19.  And can you identify that picture in the context of

8    the testimony you just gave?

9    A.    Yeah, that -- I think I'm trying to look at the

15:49:50 10    bottom, Debbie, that --

11    Q.    Oh.

12    A.    Yeah.

13    Q.    You can trust me.  It says 19, although I can bring it

14    to you because I know how careful you are but --

15:49:59 15    A.    No.  Can you throw it back up there?  So yeah, this is

16    what we call a cut-away pump.

17    Q.    There's 19.  Got it?

18    A.    No, it was the bottom part of the product I was

19    looking at.  So it's fine.

15:50:11 20    Q.    Oh, I see.

21    A.    So this is an example of what we would -- one of the

22    things we would bring to a trade show.

23    Q.    And does Groeneveld incur expenses in -- to invest in

24    its promotional activities, such as trade shows, brochures,

15:50:33 25    marketing materials, those sorts of things?

Wilson - Direct

**A.**    Yes, for sure.  This costs money.  I believe we also

have an exhibit which shows the extent of the costs.

**Q.**    I do.  I'm going to let you see it in a second.

**A.**    So in addition to the actual cost of participating in

15:50:58  the trade show, of course, we have people from, you know,

overseas for the bigger shows.  They come from our

international offices.  Our sales people attend these shows.

We also put on, you know, typically a hospitality suite or

entertainment of customers and that type of activity.

15:51:24  **Q.**    You've had an opportunity to take a look at documents.

We've previously marked Exhibits 2 through 18 and now 19,

including that disk.  There's this big stack here.  Do

you -- do you recall taking a look at these items in our

book?

15:51:50  **A.**    Yes.

**Q.**    I'm going to -- if I can approach the witness, your

Honor, I'm going to try to do this expeditiously without

going through each one.

        THE COURT:  Sure.

15:51:57  **MS. MICHELSON:**  Thank you.

**Q.**    Just leaf through them to confirm that I've picked the

right one, and this is what my question is going to be.  If

you could confirm, please, that these items are

representative of the promotional materials, brochures and

15:52:22  that sort of thing that Groeneveld disseminates regarding

1    the ALS products in the United States, including the EP-0

2    system that's the subject of the case here?

3    **A.**    Yes.  So it, you know, includes other things that we

4    spend money on, like our web site and product literature, as

15:52:48 5    I said, brochures, presentations.

6    **Q.**    And the company protocol that you described regarding

7    the incorporation of the image of the -- of the EP-0 pump,

8    do -- do -- does -- did those materials in front of you,

9    Exhibits 2 through 19, do they reflect that corporate

15:53:10 10    protocol that you described?

11    **A.**    Yes, absolutely, you know, it's -- I mean the very

12    first one that I pick up, you know, is a copy of our

13    brochure for the single-line greasing system.

14    **Q.**    Can you just read the -- just the Exhibit Number?

15:53:26 15    **A.**    The Exhibit Number, PX 3-1.

16    **Q.**    And does Groeneveld promote its other product lines as

17    well in addition to those single-line EP-0 systems?

18    **A.**    Yes.

19    **Q.**    And are images of those pumps incorporated into

15:53:44 20    relevant or appropriate materials as well?

21    **A.**    Yes.

22    **Q.**    And I'm going to give you another stack that we've

23    marked and kind of try to do this expeditiously with that as

24    well.  Exhibits 22 through 38.

15:54:03 25           MS. MICHELSON:  May I approach again, your

1    Honor?

2                    THE COURT:  Sure.

3    **Q.**    Ms. Wilson, can you confirm that the materials, the

4    exhibits that you have in front of you, are items that are

15:54:33  5    representative of information in the public domain about

6    Groeneveld, its products, the EP-0 system, Groeneveld's

7    reputation, its industry position, along the lines that you

8    previously just testified about?

9    **A.**    Yeah, this -- these are all examples of where there's

15:54:53  10    been an article or some mention of Groeneveld in the trade

11    magazines and various public magazines.

12    **Q.**    Okay.  Thanks.  You can put those aside.  I'll take

13    them.

14             So in your work, do you -- do you learn who the -- I

15:55:38  15    guess the big boy, big players are in the ALS industry in

16    terms of -- in terms of transport applications for automated

17    lubrication system?

18    **A.**    Yes, of course, as part of our regular review of

19    business and the results and in the marketplace.

15:55:57  20    **Q.**    And can you just --

21    **A.**    I'm aware that the companies that we compete with

22    primarily are Lincoln and Graco Grease Jockey.

23    **Q.**    And you said Graco Grease Jockey.  Is that two

24    different companies, one company, what's that about?

15:56:12  25    **A.**    One company, multiple products.

Wilson - Direct

1    Q.    Now, I am going to show you these documents you just
2    alluded to.  First of all, let's do Exhibit 21 first,
3    Exhibit 21.  I'm going to just leaf through it and then ask
4    you to describe what it is.  For the record, it's Exhibit
15:56:53 5    21-1 through 22-9, and I'll just -- can you see it okay?
6    It's hard to read.
7    A.    I can see it, yes.  I'm familiar with it.
8    Q.    And you're familiar with it because why?
9    A.    Well, I prepared these lists, which are taken from our
15:57:14 10   accounting and marketing records, which is a list of trade
11   shows and other trade association events that we attended
12   in, I think it was 2007 was the first year on the list,
13   2005.
14   Q.    And then I think --
15:57:38 15   A.    All the way through 2011.  And it -- it lists shows
16   that were held in Canada and shows that were held in the
17   U.S., and there's some shows that are sort of North American
18   wide, some that are international, some that are local, but
19   this is just a list of everything in North America.
15:57:56 20   Q.    Okay.  And are a number of these trade shows geared
21   towards the transport industry specifically or are all
22   applications the subject of all these trade shows?  How --
23   can you just describe that a little for us?
24   A.    The trade shows are usually geared towards a
15:58:17 25   particular market segment.  So, you know, I -- quite popular

1    one in the construction industry is Conexpo, which is

2    held --

3    **Q.**    I'm losing you.  What?

4    **A.**    Conexpo, which is a heavy equipment show in Las Vegas

15:58:34 5    that's held every few years, that is one type of show, not

6    to do with our EP-0 product specifically, but on display.

7    Then we have other shows that are very specific to

8    transportation and trucking, truck world, fleet maintenance,

9    type of trade association.  So on that list, there's all

15:58:59 10    kinds of shows for all market segments, but typically,

11    they're very focused on a particular customer base.  But, we

12    will show all of our products there.

13    **Q.**    Okay.  All of them, including that EP-0 single-line

14    pump?

15:59:17 15    **A.**    Absolutely.

16    **Q.**    Do you show that -- you bring that to all of them, all

17    the trade shows?

18    **A.**    Yes.

19    **Q.**    Even if it's not specific to the transport industry?

15:59:26 20    **A.**    Yes.

21    **Q.**    Why?

22    **A.**    Well, there's also customers that might have heavy

23    equipment.  They also operate trucks.  So -- but, it is part

24    and parcel of our total program.  So you display all your

15:59:42 25    products.

Wilson - Direct

1    **Q.**    You know, in this protocol that you mentioned about

2    putting the images on, pictures of the EP-0 and the other

3    product lines on your materials, how long has that protocol

4    been in place with Groeneveld?

5    **A.**    As far as I know, that's been at least 25 years.  I

6    couldn't say with certainty exactly when that started, but

7    that's always been from the corporate office in Holland.

8    **Q.**    Now, let's see.  Trade shows and promotional costs,

9    you mentioned that Groeneveld makes a significant investment

10   of money resources, effort time, those sorts of things in

11   promoting its products in this way, correct?

12   **A.**    Yes.

13   **Q.**    All right.

14        I'm going to show you now what we marked as Exhibit 20

15   and ask you -- oh, thank you very much.  And if you need me

16   to walk one up to you because it's hard to get everything on

17   here -- do you know what this is, Ms. Wilson?

18   **A.**    Yes.

19   **Q.**    What is it?

20   **A.**    It's a schedule that I prepared, just summarizing our

21   various, what we call commercial costs for North America.

22   From 2005 all the way to the end of September 2011.

23   **Q.**    And where did you get the information from which you

24   prepared this summary?  Let me -- you prepared it or

25   somebody else prepared it?

Wilson - Direct

1    **A.**    No, I prepared this one.

2    **Q.**    So where did you get the information?

3    **A.**    From the accounting records, the -- yeah, the

4    accounting records.

16:01:47 5    **Q.**    And the account -- it's the regular course of business

6    for Groeneveld to keep this kind of information as part of

7    its accounting records?

8    **A.**    Yes, it wasn't specially prepared.  It was extracted

9    directly from the reports that we already prepare and review

16:02:01 10    each month.

11    **Q.**    And just so that the record's clear, the exhibit that

12    we have here, Exhibit 20, that was prepared from historical

13    information that's part of your accounting records?

14    **A.**    Yes.

16:02:18 15    **Q.**    And what years are depicted in this exhibit, this

16    summary?

17    **A.**    2005, all the way up to -- for each year.  All the way

18    up to September 30 of 2011.

19    **Q.**    And now, it did -- and these are advertising promotion

16:02:41 20    trade show costs.  I see this in the title.  Are there

21    additional promotional costs and expenses that Groeneveld

22    incurs in addition to those identified in this exhibit?  And

23    if you could -- you're nodding your head, but can you tell

24    them?

16:02:59 25    **A.**    As I mentioned before, costs are the web site and

1    development of the web site, the actual development of the

2    product literature, the attendance by our colleagues

3    overseas, and at trade shows in the U.S. to meet and greet

4    customers are not included in here.  These are our pure

16:03:25  5    costs that we spent directly.  Also the cost of the show

6    track I was mentioning, that's not in here because that's a

7    capital item and these are expenses.  So there are a few

8    other costs not included on this schedule.

9    **Q.**    And did Groeneveld incur costs in connection with its

16:03:49  10    promotional activities prior to 2005?

11    **A.**    Oh, I'm sure they did, yes.

12    **Q.**    Okay.  And what since September 30, I don't know, I

13    guess it's only a couple of weeks, isn't it?

14    **A.**    Um-hum.

16:04:03  15    **Q.**    And does Groeneveld continue to incur costs and invest

16    in promotion of its product even to this day?

17    **A.**    Yes, always.

18    **Q.**    And I see it's divided into -- looks like a number of

19    categories.  And if you could just explain to the jurors why

16:04:21  20    you did it that way, why you did it that way in this

21    document, Exhibit 20?

22    **A.**    Well, honestly it was, mostly just for ease for me.

23    These categories, as I mentioned before, are already

24    highlighted in our accounting reporting package, and so the

16:04:41  25    natural costs that we look at are the advertising, company

Wilson - Direct

1    brochures, sponsoring and exhibition.  So I just use the

2    same categories that we use internally.

3    Q.    And as to -- as to the USA costs and expenses, can you

4    explain, is that for all activity throughout the United

16:05:15 5    States or is it divided up per -- for the Brunswick office,

6    the Pacific office, and the Atlantic south office?  Just

7    explain to the jurors why it appears this way together in

8    the document?

9    A.    This is total USA.  That includes all of the operating

16:05:38 10    subsidiaries in the U.S.  So as I mentioned, we have a

11    corporate entity in Florida, Groeneveld Atlantic South, we

12    have one in Seattle, Groeneveld Pacific West, and we have

13    our main operating company in Brunswick, Ohio, Groeneveld

14    Transport Efficiency, Inc.  Those are the numbers of the

16:06:00 15    total U.S., not just for Transport Efficiency, Inc.

16    Q.    And do employees from the Brunswick office attend

17    trade shows throughout the United States or are they limited

18    geographically to particular territorial location?

19    A.    The Brunswick location is responsible for sales

16:06:20 20    everywhere in the U.S., except for Florida, Utah, and sort

21    of the northwest Seattle or Washington area.  So those

22    employees, to the extent it's appropriate, that'll go to the

23    various trade shows.  Not every employee goes to every trade

24    show in the U.S.  We look at it on a case-by-case basis.

16:06:45 25    Q.    Okay.

476

1      And I see, or we can all see there's kind of a dip

2   here in the year 2009.  Can you just explain to the jury

3   what that is about, what was going on in 2009?

4   **A.**   Well, yeah, it's probably more than just a dip.  It's

16:07:21  5   quite a large number.  I can't really see the numbers on

6   here.  But, if I remember correctly, it was about $1

7   $100,000.  Thank you.

8      So in 2009, a very difficult year in the marketplace.

9   So just through regular costs control and making sure that

16:07:51 10   we do prudent decisions, we did cut back on our commercial

11   costs in 2009.  And we ramped those back up again, but

12   that's the reason for the dip.

13   **Q.**   And can you -- I think it's in the record.  I won't

14   have you read specific numbers.  The jury will have it.  So

16:08:21 15   I don't think we need to go through specifics.  Okay.  In --

16   in North America -- can you give the jurors an estimate of

17   the ALS product and specifically the EP-0 system and its

18   associated parts that you sell in North America.  Maybe a

19   lot of questions, but just an estimate, the number of

16:08:59 20   customers who have service in the United States?

21           MR. ANASTOS:  Objection.  I don't understand

22   the question.

23           THE COURT:  I don't either.

24           MS. MICHELSON:  You want me to rephrase it?

16:09:08 25           THE COURT:  We don't know what your question

Wilson - Direct

1    is.  An estimated number of questions or services?

2              MS. MICHELSON:  I will do it this way.  I'll

3    do it this way.

4    BY MS. MICHELSON:

16:09:16  5    **Q.**    Do you have an estimate -- do you know how many ALS

6    customers Groeneveld has in the United States approximately?

7    **A.**    There's roughly 2000 customers.

8    **Q.**    And how many of those customers are transport industry

9    customers estimated?

16:09:34 10    **A.**    60 percent, you know, customers range from one person

11    who owns one piece of equipment, all the way up to large

12    national fleets, own thousands of pieces of equipment.  And

13    the large fleet, for instance, may have multiple branches.

14    I count those as multiple customers.

16:10:04 15    **Q.**    Let me just -- are you able to calculate Groeneveld's

16    exact market share in the United States or in North America?

17    **A.**    It -- I'd love to be able to, but it's really not that

18    easy because not all of the information, not all of the ALS

19    suppliers are public.  Even if there is some public

16:10:39 20    information about the revenues and sales of automatic

21    greasing systems, within that, there it's usually not broken

22    down specifically by product type.  So some of our

23    competitors have a wide range of products.  It's a very

24    difficult number to estimate.

16:11:01 25    **Q.**    I'm going to show you now what we have marked as

1    Plaintiff's Exhibit 39.  And my question is if you recognize

2    this summary?

3    **A.**    Yes, I do.  Of course, I also prepared this summary

4    from the accounting records, and it's a summary in North

16:11:38 5    America of sales from 2005 to September 30, 2011 of our

6    product group category EP-0.

7    **Q.**    And I see that you have -- let me just understand what

8    this means in the notes.  Data downloaded from BAANERP

9    systems for years indicated filter to indicate group EP-0

16:12:04 10   sales only.  What does that mean?

11   **A.**    Again, as I mentioned, we have various products and

12   various market segments.  What we're talking about here are

13   the sales in EP-0 pumps and related parts for -- and that's

14   extracted from, again, the accounting system.  So it's not

16:12:29 15   our total sales in North America for those periods.  It's

16   just extracted to reflect just that product category.

17   **Q.**    The EP-0?

18   **A.**    Yes.

19   **Q.**    The item that's at issue in our case here?

16:12:42 20   **A.**    Yes.

21   **Q.**    Okay.

22          And it says here in your notes that you assume one

23   dollar U.S. equals one dollar Canadian for purposes of total

24   North America.  And can you explain to the jury why you did

16:12:55 25   it that way?

Wilson - Direct

1    **A.**    I just did it for simplicity.  This is really just

2    meant to, you know, get an idea of what the level of sales

3    are.  So, you know, since 2005, we're approaching about $100

4    million in sales in this product line.  So I just assumed

16:13:19 5    the Canadian dollars on that list are Canadian dollars.  You

6    have U.S. dollars are U.S. dollars.  I just sum them

7    together.  Although the exchange rates can change from year

8    to year.

9    **Q.**    Can you, please, give the jury an idea the -- let me

16:14:02 10   -- cost of an automated lubrication system and EP-0, an

11   automated lubrication system as a percentage of the total

12   cost of a truck, tractor trailer that a customer is going to

13   buy?  So they have some type of frame of reference in that

14   regard.

16:14:16 15                MR. ANASTOS:  Objection.

16                THE COURT:  Do you know the answer to that?

17                THE WITNESS:  I have a rough idea, yes.

18                THE COURT:  That doesn't answer my question.

19   Do you know how much a tractor trailer costs?

16:14:27 20                THE WITNESS:  Yes.

21                THE COURT:  Okay.  You can answer.

22                THE WITNESS:  Okay.

23        So an installation EP-0 single-line system, roughly

24   $2500.  And the price of a tractor trailer can range

16:14:45 25   anywhere on brand new from $125,000 up to around $200,000.

Wilson - Direct

1    So it's an option that the purchaser of the truck, tractor

2    has to consider, but it's not, you know, the biggest item in

3    his overall purchase.

4    Q.    And are the automated lubrication systems, are they --

16:15:17  5    are they disposable items or are they intended to last for

6    the duration of the ownership of a truck or -- explain this

7    a little to the jurors if you would.  I'd appreciate it.

8    A.    So typically you know, it makes best sense to get the

9    automated lubrication system or automatic greasing systems

16:15:41 10    installed when you buy the new piece of equipment, the new

11    tractor, and this is a preventive maintenance item.  It's

12    not meant, you know, after a few years, you know, you have

13    to take it off and discard it and throw it away.  It's -- it

14    has a relatively long life.  It's meant to help with the

16:16:06 15    effective operation of the vehicle itself.  So it's not a

16    disposable item.

17    Q.    And I'm going to show you something else.  I won't go

18    there yet.

19          So, do you know Mr. Jan Eissis?

16:16:29 20    A.    Yes.

21    Q.    You see him sitting here in court today?

22    A.    Yes.

23    Q.    And where do you know him from?

24    A.    Actually, he was the one who hired me at CPL Systems.

16:16:44 25    Q.    And at that time, what was his position at CPL

481

Wilson - Direct

1    Groeneveld?

2    **A.**    I believe the official title was managing -- he was in

3    effect the president or the managing director of operations,

4    I'm not sure what the official title was, but --

16:17:10  5    **Q.**    Operations.  And in what geographical region only or

6    territory?

7    **A.**    North America.

8    **Q.**    And you're aware at some point Mr. Eissis was no

9    longer with Groeneveld, correct?

16:17:26 10    **A.**    Yes.

11    **Q.**    And can you -- approximately when was that?

12    **A.**    January of 2007.

13    **Q.**    When did you first hear of a company called Lubecore

14    International or Lubecore.  If it's easier to start with

16:18:00 15    how, I can ask you how did you learn about them and hear of

16    them.

17    **A.**    Well, the -- sort of the main, the first thing that I

18    remember that was of significance was a truck show in

19    Toronto in, I believe it was April of 2008.  And Lubecore

16:18:32 20    had a booth at the truck show and had their product on a

21    trailer.

22    **Q.**    I'm going to show you some photographs we've marked as

23    Exhibit 56-1 through 56-4.  And I'll just flip through them.

24                    MR. ANASTOS:  We object.  She was not at the

16:19:05 25    trade show.  I don't think she has any basis to testify.

```
 1              THE COURT:  I don't know either.  I don't know
 2    -- what are these referring to?
 3              MS. MICHELSON:  Well, do you recognize these
 4    photographs?  Have you seen them before?
 5              THE COURT:  Not has she seen the photographs
 6    before, but is this the trade show we're talking about?
 7              MS. MICHELSON:  It is.
 8              THE COURT:  Okay.
 9              MS. ZUJKOWSKI:  She wasn't there.
10              MS. MICHELSON:  I don't even think this is in
11    dispute.  Mr. Eissis has confirmed that the --
12              THE COURT:  Toronto trade show where she saw
13    the --
14              MS. MICHELSON:  I don't think she saw them at
15    the trade show, but Mr. Eissis and others have testified.
16              THE COURT:  All right.  Move on then.  Why
17    would we ask her about it?
18    BY MS. MICHELSON:
19    Q.   Well, did there come a time when you were provided
20    with photographs of --
21              THE COURT:  No, my question is why would we
22    ask her about it if she wasn't there?
23              MS. MICHELSON:  To understand the history of
24    events and what happened.
25              THE COURT:  Okay.  Move on to something else.
```

1          MS. MICHELSON:  Okay.

2          What did -- well -- well what happened when -- what

3     happened after the trade show in connection with the

4     Lubecore pumps and product that's at issue in the case?

16:20:10   5     What did you guys do at Groeneveld after the trade show in

6     Toronto?

7                    THE WITNESS:  At CPL, which is the Canadian

8     company, we were quite surprised about the Lubecore pump.

9     We basically did some investigation because we were so

16:20:35  10     surprised about how similar the pump was to ours.

11     **Q.**    What -- why were you surprised?

12     **A.**    Well, because it looked the same.

13                    MR. ANASTOS:  Your Honor, if she could just

14     ask Ms. Wilson about what she did.

16:20:49  15                    THE COURT:  Really.

16                    MR. ANASTOS:  Objection.

17                    THE COURT:  Just ask her what she did.

18     **Q.**    So what did you do?  What did Groeneveld do?

19     **A.**    Well, I am -- you know, the senior management -- part

16:21:04  20     of the senior management team, and there was -- management's

21     decision to basically investigate whether or not this pump

22     was a copy of our pump.  So.

23     **Q.**    When you say a copy, what do you mean?

24                    MR. ANASTOS:  Objection.

16:21:31  25                    THE COURT:  Overruled.

Wilson - Direct

1    BY MS. MICHELSON:

2    **Q.**    You can answer.

3    **A.**    Well, there was suspicion that the actual pump was a

4    Groeneveld pump with a Lubecore label on it.

16:21:43   5    **Q.**    Why did you suspect that, because you saw the Lubecore

6    label?  Why did you suspect that?

7    **A.**    Because it just physically looked so much like the

8    Groeneveld pump.

9    **Q.**    Have you in your job, part of this industry for the

16:22:00 10    last number of years, seen other competing pumps used in the

11    transport industry?

12    **A.**    Yes.

13    **Q.**    Do you know what they look like?

14    **A.**    Yes.

16:22:10 15    **Q.**    Okay.  Had you ever felt personally that kind of

16    surprise before upon seeing a competing product?

17                     MR. ANASTOS:  Objection.

18                     THE COURT:  Overruled.

19                     THE WITNESS:  The other products in the

16:22:30 20    marketplace do not look like the Groeneveld product.  The

21    Lubecore pump, as was in that picture and is on that table,

22    looks like the Groeneveld pump.

23    **Q.**    And so senior management decided to have some

24    investigation.  Can you tell the jury what the results of

16:22:53 25    that investigation were?

Wilson - Direct

1    **A.**    The -- basically after looking at what our options

2    were in Canada, from a legal point of view, we had no

3    recourse in Canada about the fact that the Lubecore pump

4    looked like the Groeneveld pump.

16:23:19 5    **Q.**    Did you -- did you personally -- well, did you

6    personally ever see a Lubecore pump in real life after the

7    photos and at some period of time, I guess in -- I guess in

8    '08 or 2009?

9    **A.**    Yes.

16:23:34 10    **Q.**    Okay.  Where were you when you saw it?

11    **A.**    Okay.  I was in our shop.  A customer had asked for

12    the Lubecore pump to be removed from their piece of

13    equipment.  And so when I was walking around our shop, I saw

14    the pump there.  And I didn't even realize it was a Lubecore

16:24:00 15    pump.  I thought it was a Groeneveld pump until the

16    technician in the warehouse guy pointed out to me no, this

17    is the Lubecore pump that came off of a customer's piece of

18    equipment.  So again, you know, when it's in use, it gets a

19    bit dirty and grimy.  So it was -- it was, as I say, it

16:24:25 20    looked to me very similar.

21    **Q.**    Was the label actually on it?

22    **A.**    I don't remember seeing the label because, you know,

23    it was all dirty and grimy.

24    **Q.**    When you -- how do you -- you're part of the industry

16:24:44 25    right?  You're involved in the ALS industry, correct?

Wilson - Direct

1   A.   Um-hum, yes.

2   Q.   Okay.  How do you identify a pump?  What are the

3   features that jump out at you when you see it grimy?

4   A.   Usually the features are the fact it's got a reservoir

16:25:14 5   and some type of housing in it.

6   Q.   I think -- I think my question was unclear.  So I'm

7   going to -- I'm sorry about that.  If I ask an unclear

8   question, just tell me because I tend to do that sometimes,

9   especially late in the day.  Okay.

16:25:29 10       How do you know something's a Groeneveld -- do you

11   recognize a Groeneveld pump on sight?

12   A.   Yes.

13   Q.   How?

14   A.   By its look.  You can tell by the shape and the size

16:25:42 15   that that is a Groeneveld pump.

16   Q.   Did there come a time that you learned that Lubecore

17   was distributing its competing ALS pump and product in the

18   United States?

19   A.   In the fall of 2009 was when we first became aware

16:26:15 20   that the Lubecore pump and parts were being sold in the U.S.

21   Q.   And where were they being sold?  Where did you find

22   them?

23   A.   Well, the -- it's -- it started with our longest

24   standing, largest distributor of Groeneveld products in the

16:26:42 25   U.S.; at the time was Fuel Systems in Wisconsin, and they --

Wilson - Direct

1    they had -- they had been relabeling the Groeneveld pump.

2    And we also were aware that they were starting to buy some

3    Lubecore pumps.  So that was the first indication of the

4    Lubecore activity.

16:27:14  5    **Q.**    Now, you say the FSI was relabeling a pump.  Whose

6    pump were they relabeling?

7    **A.**    The Groeneveld pump.

8    **Q.**    Can you please describe for the jury the relationships

9    with independent distributors how those work and any kinds

16:27:47 10   of requirements that are imposed in exchange for the ability

11   to carry the Groeneveld product?

12   **A.**    So when we have a distributor, we typically will give

13   them an exclusive territory.  They agree to exclusively sell

14   Groeneveld products and not other competing automatic

16:28:22 15   greasing system products, and they then did -- we provide

16   them with technical support, sales support.  We get them

17   started up, give them a lot of training on our products, and

18   our sales techniques and help them start up in their

19   territory, and then they sell directly to customers in their

16:28:46 20   territory.

21   **Q.**    An exchange or as part of the arrangement with the

22   independent distributors, are they permitted to carry other

23   people's competing product lines or are they to be exclusive

24   to the Groeneveld ALS product line?

16:29:02 25   **A.**    No, they -- it's exclusive.  For automatic greasing

488

1    systems, they must be exclusively Groeneveld.

2    Q.    And was that the -- let me put it this way.  Was that

3    the way Groeneveld conducted its business during the time

4    that Mr. Eissis was head of North American operations of the

16:29:19  5    company?

6    A.    Yes.

7    Q.    Was he aware of that?

8                      MR. ANASTOS:  Objection.

9                      THE COURT:  Sustained.

16:29:33 10    Q.    Did you ever have any discussions with Mr. Eissis

11    about that subject if you can remember?

12    A.    I can't recall a specific discussion.  It was part of

13    our normal business.  We had discussions about distributors

14    all the time, but I can't recall a specific instance.

16:29:53 15    Q.    And -- but, you do recall discussions with Mr. Eissis

16    on that topic?

17                      MR. ANASTOS:  Objection.

18                      THE WITNESS:  On the topic of distributors,

19    yes.

16:30:05 20                      THE COURT:  Overruled.

21    Q.    Yes.  And the exclusivity expectation that accompany

22    that?

23    A.    I would have to say yes, in general, because that was

24    just you know, that was just the way business was done.

16:30:30 25    Q.    And there did come a time when Fuel Systems and

Wilson - Direct

1    Groeneveld sort of stopped doing business together?

2    **A.**    Yes.

3    **Q.**    And when was that supposed to be?

4    **A.**    In the fall of 2009.

16:31:11  5    **Q.**    Did the Canadian office of Groeneveld -- let me put it

6    this way.  What did the Canadian office of Groeneveld do

7    with the Lubecore pump that was in its facility?  Did you

8    send it to anybody or send it anywhere?

9    **A.**    We did send it back to Holland for analysis, yes.

16:31:30  10   **Q.**    And upon completion of the analysis and the

11   investigation, what did Groeneveld decide to do in

12   connection with the Lubecore product that's the subject of

13   the case?

14   **A.**    Well, we believe in the U.S. that --

16:32:10  15   **Q.**    Well, let me just -- I'm not going to ask you what the

16   law is.  I'm just going to ask you what did Groeneveld do?

17   **A.**    Okay.  So sorry.  I'm not sure if -- I mean it's quite

18   a broad question.

19   **Q.**    All right.  Let me ask it this way.  Did you file the

16:32:25  20   lawsuit then that's this lawsuit?

21   **A.**    Yes.

22   **Q.**    And do you recall the approximate date when that was

23   instituted?

24   **A.**    It was in April of 2010.

16:32:36  25   **Q.**    I'm going to show you what's been marked previously

1   and exchanged in the case as PX-521 and 52-2.  And if you

2   can tell the jury what this is.  Again, if you need a hard

3   copy of it, I can run it up there to you.  Do you need a

4   hard copy?

16:33:14  5   **A.**   No, I believe I have a hard copy already in my files.

6   The -- if you could just show the top part.  Okay.  So this

7   was a Google search where we typed in the word, "Groeneveld

8   grease system," and I believe this one was done in August of

9   2010.  Yes, about a year ago.  And this was the result of

16:33:46 10   the Google search.  And the one, two, third item down from

11   the top was autolubeparts.com by AMS.  And if you click on

12   that site, that is the web site for the Lubecore U.S.

13   distributors.

14   **Q.**   And do those U.S. distributors have -- do those -- the

16:34:24 15   businesses identified in this web site, the

16   autolubeparts.com web site, does Groeneveld have a

17   distributorship relationship with those companies or supply

18   them any products?

19   **A.**   We don't -- we do not have a relationship and have not

16:34:40 20   had a relationship with the company AMS, LLC.  And when we

21   click further on that web site, there was a listing of the

22   distributors on there.  Of course, Fuel Systems is listed,

23   Groeneveld had a previous relationship, but not -- so --

24   **Q.**   Did Groeneveld have that relationship with Fuel

16:35:10 25   Systems in 2010?

Wilson - Direct

1    A.    Absolutely not, absolutely not.

2    Q.    And I'm going to now show you what we've previously

3    used in the case.  This is Exhibit 53 -- 53-1 through 2 and

4    53-1-A and 1-B and 1-C.  Okay?  So you mentioned you clicked

16:35:50  5    on to the AMS web site, autolubeparts.com web site?

6    A.    Yes.

7    Q.    And then can you just identify for the jury what these

8    web pages show?

9    A.    Okay.  So these are the printouts of the AMS web site.

16:36:16  10    I believe these were the ones from August of 2010.

11    Q.    Click down because I know you like to be precise,

12    though.

13    A.    Okay.  September of 2010.

14    Q.    And I believe --

16:36:27  15    A.    Go on the web site, you know, recently and it's not

16    changed, but in fact on the first one that you had up

17    there --

18    Q.    I just want to direct your attention to 53-1-A and ask

19    you to identify this date here that I'm pointing to.  It's

16:36:46  20    really hard to get all this right.

21    A.    October 16, 2011.

22    Q.    What's today, what's today?

23              MR. KUNSELMAN:  October 17th.

24              MS. MICHELSON:  Okay.

16:37:06  25    Q.    So what did you find when you went on the AMS or

Wilson - Direct

1    autolubeparts.com web site, the distributors of Lubecore web

2    site?

3    **A.**    Very similar results to what I found a year ago, that

4    if -- the front page of their web site, it has a search key.

16:37:25 5   If I type in the word Groeneveld, at the top, then what

6    displays as a result are the pumps for Lubecore, the EP --

7    their single-line pump.  So that's what typing in the word

8    Groeneveld results in if you type it on that web site.

9    **Q.**    And you get the same sort of thing when you did it

16:37:59 10  yesterday?

11   **A.**    Yes.

12   **Q.**    And just so that record's clear, on 53-1-A, is that

13   the search bar I'm pointing to that you indicated?

14   **A.**    Yes.

16:38:10 15  **Q.**    I'm just going to -- I am going to circle that.

16   And what appears when you type in the Groeneveld name in the

17   Lubecore distributor web site?

18   **A.**    The various Lubecore products and a pump, specifically

19   the pump on that table.

16:38:37 20  **Q.**    I can't hear you.

21   **A.**    Specifically the pump on the table there.

22   **Q.**    Meaning the Lubecore EP-0 system pump?

23   **A.**    Yes.

24   **Q.**    And now, Ms. Wilson, when I turn to the third page of

16:38:50 25  this -- of the web site here, attach the exhibit, what --

Wilson - Direct

1    what do you see on this page?

2    A.    In fact, when I first went to the page, this is the

3    first page that popped up, and it's the list of North

4    American contacts.  So AMS is the contact in Ohio, Fuel

16:39:19 5    Systems in Wisconsin, All Points Lubrication in Texas,

6    Lubecore, Florida, LLC, Smithfield Diesel in Rhode Island,

7    and Lubecore International, and there's links to some of

8    those sites onto the contacts listed here.

9    Q.    Like hyperlinks you click on, and it takes you to the

16:39:45 10   web site of the different home pages?

11   A.    Yes.

12   Q.    And does that include a hyperlink to the Lubecore

13   International, Inc. web site, the Defendant in the case?

14   A.    Yes.

16:39:57 15   Q.    Just so we're clear, does Groeneveld supply any of

16   the -- any of these companies identified on this Lubecore

17   distributor web site?

18   A.    No, we do not sell to these companies.

19   Q.    And are they authorized to distribute your products,

16:40:24 20   Groeneveld's products in the United States or anywhere?

21   A.    No.

22   Q.    Okay.

23         And you mentioned there's a hyperlink to the --

24   hyperlink to the different distributors from the

16:40:42 25   autolubeparts.com website, Exhibit 53.  I'm going to show

Wilson - Direct

1   you these web pages we've identified or marked as PX-74-1

2   through 10.  I'm just going to page through them and ask you

3   to identify these for the jury as well.  And if you need a

4   hard copy --

16:41:17  5   **A.**    I have a hard copy.  Thank you.  Okay.  So this is the

6   web site of Fuel Systems, which was previously Groeneveld

7   distributor listed on the AMS web site as a Lubecore

8   distributor, and this was a snapshot from September of 2010.

9   I had recently gone into it, and it's substantially the

16:41:57 10   same.  On what you --

11   **Q.**    I'd like you to turn to the second page of the exhibit

12   if you don't mind.  And there are a number of vendors

13   identified -- vendors to suppliers to Fuel Systems

14   identified in this list.  Do you see that there?

16:42:16 15   **A.**    Yes.

16   **Q.**    In terms of automated lubrication system business, who

17   is identified as FSI's supplier vendor of those parts?

18   **A.**    Well, this is a link page.  This -- 74-2?

19   **Q.**    Yes.

16:42:39 20   **A.**    Right.  And it does say Groeneveld.  And in brackets,

21   automatic lube systems.

22   **Q.**    Okay.  Is that --

23   **A.**    Company's USA web site.

24   **Q.**    I'm going to just -- this one right here?

16:42:55 25   **A.**    Yes.

495

Wilson - Direct

1   **Q.**   And can you take a look at the list and tell the jury

2   whether any other manufacturer or distributor of automated

3   lubrication system is identified in FSI's vendor list?

4   **A.**   Well, not on this page, but there is -- they have

16:43:19 5   another part of their web site, which --

6   **Q.**   Well I'm going to get there in a second, but I'm not

7   sure I was clear with my question.

8   **A.**   Okay.

9   **Q.**   Is Lubecore identified in --

16:43:32 10   **A.**   No, Lubecore is not on this list, nor are any other

11   lubrication systems companies.

12   **Q.**   Just so the record is clear, that's in the vendor

13   links list.  It's marked 74-2 and 74-3?

14        And you say you've been back to this web site

16:44:01 15   recently.  Has there been any change to the vendor list as

16   you've testified about and described for the jury and as we

17   have here in the courtroom?

18   **A.**   On the vendor links, I'm not entirely sure on that

19   page because I focused more on another portion of their web

16:44:24 20   site.

21   **Q.**   Okay.

22   **A.**   So I'm not 100 percent certain if today it still has

23   Groeneveld on it, on that page.

24   **Q.**   Okay.  So you want to move on to another page and

16:44:36 25   we're going to get -- we're going to get this up now for you

1    to testify about, but let's move on right now.  What page

2    are you referring to?

3    **A.**    It starts off with Page PX-74-4.

4    **Q.**    Okay.

16:44:55  5    **A.**    Is the Exhibit, but it is their -- I believe it's

6    called the online store.  And that -- so clicking on the

7    online store brings to you this page, and it's got the

8    different product categories across the top.  And when you

9    scroll across the top to lubrication systems, there's a drop

16:45:20 10    down box, and the only company that shows up under the drop

11    down box is Groeneveld.

12    **Q.**    Now, when you recently have been back to this web

13    site, did you go to this page?

14    **A.**    I did, and it -- it's exactly the same.

16:45:36 15    **Q.**    Does it still says Groeneveld?

16    **A.**    Yes, and it does not say any other supplier of a

17    lubrication system.

18    **Q.**    And when you then click on -- when you -- well, let me

19    ask you this:  What you do next on the -- on the FSI website

16:45:49 20    back in September, and I guess within the last day or two,

21    just tell the jury what you -- what you did to find out

22    about the products identified, the ALS products identified

23    in the FSI web site?

24    **A.**    Sorry.  I'm not sure where you're going with that,

16:46:16 25    Debbie.  I --

Wilson - Direct

1    **Q.**    I can rephrase my --

2    **A.**    I think I've just taken a look at the list of parts

3    and seen that, yes, in fact these are, you know, automatic

4    greasing systems parts.

16:46:30 5    **Q.**    And who is the company identified as the supplier of

6    these parts?

7    **A.**    Groeneveld.

8    **Q.**    And these are ALS EP-0 parts, including I believe

9    somewhere in that list EP-0 pump that's the subject of the

16:46:43 10    litigation?

11    **A.**    Well, on the web site here, these part numbers that

12    are used as just as an example, Romanette, the very first

13    item that displays, it's got a part number, GRV 001008.

14    That is not -- that's Fuel Systems's part number that

16:47:06 15    they've assigned to the Groeneveld part.

16    **Q.**    Is it a Groeneveld parts?

17    **A.**    I don't know.  This is not the Groeneveld part

18    numbering system.  It's just because it comes with a prefix

19    GRV.  It would certainly imply it's a Groeneveld part, but

16:47:28 20    it -- and also from the point of view that on the

21    lubrication system tab, it says Groeneveld.

22    **Q.**    Says it again here, too, correct?  Where I'm pointing?

23    **A.**    Yep.  Sure.  Right, in big bold letters, right.

24    **Q.**    And how many parts are identified, are identified in

16:47:53 25    the FSI web site as Groeneveld's products?

498

Wilson - Direct

1    **A.**    Well, this particular search results did display

2    five -- it says there are 590 items.

3    **Q.**    And was FSI authorized to distribute Groeneveld parts

4    and service Groeneveld products in this time frame, either

16:48:21  5    September of 2010 or today?

6    **A.**    No.

7    **Q.**    Did you -- did you find Lubecore mentioned anywhere in

8    the other, you know, pictures of pumps, but did you find

9    Lubecore identified as a separate entity from Groeneveld in

16:48:41 10    either the AMS web site that we just looked at before, the

11    U.S. Lubecore distributors, or in this one, FSI web site?

12    **A.**    Okay.  Just so I understand the question --

13    **Q.**    I can rephrase it if you don't.

14    **A.**    Okay.  Please.

16:48:57 15    **Q.**    Did you find Lubecore identified as a separate

16    independent entity, separate and independent from

17    Groeneveld, anywhere in these web site searches that you

18    conducted?

19    **A.**    No, no is a simple answer.

16:49:41 20    **Q.**    I'm going to move to some numbers now since you're an

21    accountant.

22          Did you do any -- let me ask you this.  Did Groeneveld

23    take expensive, take corrective action in the wake of

24    discovering the Lubecore competing system and products in

16:50:00 25    the United States?

Wilson - Direct

1    **A.**    Well, I mean we did have to, you know, spend

2    investigation time to find out, you know, if -- was it real,

3    what was the Lubecore sale of the product in the -- in the

4    U.S.  you know, did it actually happen.  To what extent were

16:50:27  5    distributors involved.  So I -- national sales manager,

6    national fleet sales manager.

7    **Q.**    That's Mr. Wapenaar?

8    **A.**    Kess Wapenaar traveled to do the investigation in

9    Wisconsin several times.  And subsequently when Fuel Systems

16:50:48  10    and Groeneveld parted ways in terms of Groeneveld Fuel

11    Systems no longer selling Groeneveld product, we also made

12    trips back to Kees Wapenaar, made trips back to Wisconsin to

13    find a new distributor in the area.  So in -- it was a

14    period of 2009, 2010.  There was roughly a dozen trips that

16:51:14  15    were made specifically to investigate to find a new

16    distributor, have meetings with some of the key customers

17    that we were aware of because you have to remember when

18    you're dealing through a distributor, you don't always --

19    you don't have the visibility all the way through to the end

16:51:30  20    user.  So you know, it sounds a bit strange.  Don't we know

21    who the customers were in Wisconsin?  No.  Fuel Systems at

22    that time knew who the end users were that they sold to.

23        So, you know, we had to spend a lot of time to go out

24    and back and reach out to customers, find out who our

16:51:49  25    customers were, and as I say, there was about a dozen trips.

500

Wilson - Direct

1    **Q.**    I mean did you look to -- did you try and figure out

2    what kind of hard expenses, hard costs Groeneveld incurred

3    in connection with the efforts you were just describing now?

4    **A.**    We incurred costs not only inside of Groeneveld

16:52:16  5    Transport Efficiency, Inc. but, you know, costs in Canada

6    and costs in Europe, just manage the discussion, the

7    analysis, but you know, on a conservative basis.  So if I

8    look the Kess Wapenaar's costs of his travel, you know,

9    roughly for airfare and hotel and car rental, not including

16:52:41 10    his time, you know, those out of pocket costs would be about

11    $1500 per trip.  So roughly $18 -- $20,000.

12    **Q.**    You said that does not Mr. Kess's compensation for his

13    time?

14    **A.**    No, not for his time.  We pay him a salary.  That's --

16:53:03 15    **Q.**    Okay.  And did you -- before coming to court, did you

16    do anything to try to calculate Groeneveld's damages in

17    terms of its lost sales -- lost sales from the -- from the

18    sales that went to Lubecore instead of to Groeneveld?

19                    MS. ZUJKOWSKI:  Objection.

16:53:22 20                    THE COURT:  Overruled.

21    **Q.**    You may answer.

22    **A.**    Okay.  Yes.  I mean we've spent time analyzing and

23    thinking about what our lost sales were.  I certainly know

24    that the -- in my opinion, lost sales can be calculated as

16:53:48 25    the total revenues that were lost times, what I call a

501

Wilson - Direct

1  contribution margin.

2  **Q.**    Um-hum.

3  **A.**    And that, you know, those -- that number of times the

4  contribution margin would come up with a total number of

16:54:06  5  dollar value of what didn't show up on our P and L because

6  we lost the sales.

7  **Q.**    P and L meaning profit and loss --

8  **A.**    Profit and loss statement.

9  **Q.**    And we'll get to the formula.  I think you were

16:54:21 10  discussing some sort of formula.  Is that formula that's

11  recognized in your accounting field as to how you figure out

12  this information?

13  **A.**    I think it's a fairly standard practice.  To calculate

14  sort of what your margin is on a sale by taking a look at

16:54:48 15  what are your variable costs related to gaining that sale.

16  So it's -- it's a total revenue minus your various costs

17  equals your contribution margin.

18           THE COURT:  Before we get into all this, I

19  think we should break for the day.

16:55:04 20           MS. MICHELSON:  Okay.

21           THE COURT:  Okay?  So folks, thank you for

22  your patience.

23       Again, keep in mind you've heard some of the evidence.

24  You haven't heard it all.  So continue with an open mind,

16:55:12 25  and have a good evening.  We'll see you same time, same

Wilson - Direct

1      place, 8:15 tomorrow morning.

2              (Proceedings adjourned at 4:55 p.m.)

3       DIRECT EXAMINATION OF GAIL WILSON

4

5                        C E R T I F I C A T E

6              I certify that the foregoing is a correct

7       transcript from the record of proceedings in the

8       above-entitled matter.

9

10

11

12      s/Shirle Perkins
        Shirle M. Perkins, RDR, CRR
13      U.S. District Court - Room 7-189
        801 West Superior Avenue
14      Cleveland, Ohio 44113
        (216) 357-7106
15

16

17

18

19

20

21

22

23

24

25