1                IN THE DISTRICT COURT OF THE UNITED STATES
                      FOR THE NORTHERN DISTRICT OF OHIO
2                             EASTERN DIVISION

3    GROENEVELD TRANSPORT            )
     EFFICIENY, INC.,                )
4                                    )      Judge Nugent
                    Plaintiff,       )      Cleveland, Ohio
5                                    )
            vs.                      )      Civil Action
6                                    )      Number 1:10CV702
     LUBECORE INTERNATIONAL,         )
7    INC.,                           )

8              Defendant.
                                   - - - - -
9                 TRANSCRIPT OF PROCEEDINGS HAD BEFORE

10              THE HONORABLE DONALD C. NUGENT

11                   JUDGE OF SAID COURT,

12              ON TUESDAY, OCTOBER 18, 2011

13                        **Volume 4**
                                   - - - - -
14   APPEARANCES:
       For the Plaintiff:              DEBORAH J. MICHELSON, ESQ.,
15                                     DAVID A. KUNSELMAN, ESQ.,
                                       Miller Goler Faeges
16                                     27th Floor
                                       100 Erieview Plaza
17                                     Cleveland, OH 44114
                                       (216) 696-3366
18
       For the Defendant:              THOMAS L. ANASTOS, ESQ.,
19                                     MELISSA ZUJOWSKI, ESQ.,
                                       Ulmer & Berne - Cleveland
20                                     1100 Skylight Office Tower
                                       1660 West Second Street
21                                     Cleveland, OH 44113
                                       (216) 583-7184
22
       Official Court Reporter:        Shirle M. Perkins, RDR, CRR
23                                     U.S. District Court
                                       801 West Superior, #7-189
24                                     Cleveland, OH 44113-1829
                                       (216) 357-7106
25   Proceedings recorded by mechanical stenography; transcript
     produced by computer-aided transcription.

|       |                                                                           |
|-------|---------------------------------------------------------------------------|
| 1     | TUESDAY SESSION, OCTOBER 18, 2011, AT 8:56 A.M.                            |
| 2     | THE COURT:  Good morning, ladies and                                      |
| 3     | gentlemen.                                                                 |
| 4     | THE JURY:  Good morning.                                                   |
| 5     | MS. MICHELSON:  Thank you, your Honor.                                     |
| 6     | DIRECT EXAMINATION OF GAIL WILSON                                          |
| 7     | BY MS. MICHELSON:                                                          |
| 8     | Q.    Ms. Wilson, good morning.  How are you today?                       |
| 9     | A.    Good.  Thank you.                                                    |
| 10    | Q.    Before we get to your damages calculation, we started               |
| 11    | on that yesterday before we broke.  I'd like to ask you a                 |
| 12    | few other questions, and specifically about Exhibit 39.                   |
| 13    | Ms. Wilson, first of all, Fuel Systems, I believe the                     |
| 14    | testimony's been, was a Groeneveld dealer or distributor                  |
| 15    | until the third quarter of 2009.  Do you recall testifying                |
| 16    | to that effect?                                                           |
| 17    | A.    Yes, that's correct.                                                |
| 18    | Q.    And what -- how many -- how much -- how large a volume              |
| 19    | of a distributor were they for Groeneveld historically prior             |
| 20    | to September 2009?                                                        |
| 21    | A.    In recent history, going back to 2006, it was                       |
| 22    | $975,000, and the 2009 sales were roughly $326,000.                       |
| 23    | Q.    So there -- so like a $600,000 dip attributable to                  |
| 24    | the -- to the loss of FSI in that fourth quarter?                         |
| 25    | A.    Sorry.  Can you repeat that?                                        |

Wilson - Direct

**Q.**    Yes, I will.  So let me just understand.  In 2008, what were gross sales to FSI?

**A.**    Okay.  So I'll just summarize to give a bit of an idea.

In 2007, it was $725,000; 2008, $425,000 approximately; in 2009, $326,000.

**Q.**    Okay.  And were there any sales at all to FSI from Groeneveld in 2010 or beyond?

**A.**    No.  There were no sales roughly in the fourth quarter of 2009 onward.

**Q.**    And about how many independent distributors or dealers did -- does Groeneveld have in the United States in the -- in -- up until Lubecore's entry to the scene?

**A.**    The distributor level, there were approximately eight distributors.

**Q.**    And in terms of sales volume, where did FSI rank among those eight?

**A.**    In the years, say, for instance, 2006, 2007, they were Number 1.

**Q.**    In 2008?

**A.**    Number 2.

**Q.**    And who was Number 1?

**A.**    A distributor in Utah.

**Q.**    And about what ranking were they on track to be in 2009 but for the loss in that September time period?

Wilson - Direct

**A.**    I don't have my full data in front of me, but my best
recollection is that they were second, yes.

**Q.**    Okay.  Were other independent distributors lost to
Fuel Systems in this late 2009, 2010 time period?  If I need
to rephrase my questions, you just let me know.  Okay?

**A.**    So you ask are there other distributors lost to --

**Q.**    That Groeneveld lost to Lubecore other than Fuel
Systems during this time frame?

**A.**    There were other distributors that -- or yes, there
were.  There were other distributors that are now Lubecore
distributors.

**Q.**    Okay.

And I'd like to show you what you testified to about
yesterday was this Exhibit 39.  Thank you.  And I believe
you testified that this was -- just to get us all back on
the same page literally, Groeneveld's sales data for EP-0
sales into the U.S., '05 through current, correct?

**A.**    Yes, yes.

**Q.**    And there -- and looking in the USA column
specifically, really across the board, there is a dip from
'08 to 2009.  Do you see this here?

**A.**    Yes.

**Q.**    And what factors are those attributable to, that dip?
What is that attributable to?

                MR. ANASTOS:  Objection.

1          THE COURT:  Overruled.

2          THE WITNESS:  There are many influences that

3    go into that dip.  For certain, for sure, part of it is just

4    the drop in the marketplace with the hit of the lack of

5    financing, and the tightness in the capital markets meant

6    that some of our customers were unable to purchase systems

7    or lack of confidence, you know, just the general economic

8    downturn, and as well, missing a full quarter of the sales

9    that would have otherwise gone through our distributor Fuel

10   Systems and other customers that may have purchased

11   competitive product.

12   **Q.**   Approximately what percentage of Groeneveld's total

13   EP-0 sales are attributable to the pump specifically and

14   what percentage are -- is attributable to the loose parts or

15   other parts and supplies, you know, the timers or the

16   metering blocks, those sorts of things?

17   **A.**   I think the best way to sort of describe it is if we

18   sell to a distributor, a total system, which is the pump and

19   all the component parts to do the installation on the

20   customer's vehicle, roughly 35 percent of the total value is

21   for the pump.  The rest are for the other parts, the

22   manifolds, the lines, the complete system.

23        But, on top of that, there are also sales of parts to

24   customers for regular service items.

25   **Q.**   And approximately what percentage of your gross sales

1    are attributable to those sorts of things in the course of

2    business?

3    **A.**    To -- sorry.  Which part, what sorts of things do you

4    mean?

08:57:41  5    **Q.**    Okay.  The noncomplete system sales, the parts, the

6    fittings, that sort of thing, about how much of the gross

7    sales on the EP-0 parts and pumps in -- on your Exhibit 39,

8    what is not for complete systems, but for fittings and

9    components, outside of the pump?

08:57:41 10    **A.**    Okay.

11          Just to sort of clarify, because I'm not sure if I'm

12    going to be able to tell you, you know, with precision, the

13    split of sales.  So we sell complete systems, and we sell

14    parts.  Within a complete system, there are parts.

08:57:41 15          So roughly within an EP-0 product group, 70 percent of

16    what we sell relates to complete -- the complete solution,

17    and the rest for parts.  So --

18    **Q.**    Got it.  I got it.  Thank you.  Thank you very much.

19          Now, there are -- we've obviously heard a lot about

08:57:41 20    Fuel Systems and its former relationship with Groeneveld.

21    Was that relationship still in effect, this distributorship

22    relationship with Fuel Systems still in effect when Fuel

23    Systems also started dealing with Lubecore?  Were they

24    handling your product at the same time they were handling

08:57:41 25    the Lubecore?

1          MS. ZUJKOWSKI:  Objection.

2          THE COURT:  Overruled.

3          THE WITNESS:  Yes.

4    Q.    Okay.

08:57:41 5          And now, one of -- another independent distributor

6    that works with Lubecore these days, Lubecore Florida, there

7    are some gentlemen affiliated with that distributorship that

8    also had relationships -- business relationships with

9    Groeneveld?

08:57:41 10   A.    Yes, there was what we call the relationship in

11   installing dealers, that individual and his group of people.

12         Lou Boronco was an installing dealer for Groeneveld in

13   Florida, and I believe he is part of the Lubecore Florida

14   group.

08:57:41 15   Q.    Okay.

16         And that belief is derived from information on the AMS

17   autolubeparts.com web site?

18   A.    Yes.

19   Q.    And a gentleman named Chad Cole, are you familiar with

08:57:41 20   that name?

21   A.    Yes, Chad Cole was previously Groeneveld's service

22   manager in Florida.

23   Q.    And I -- on another distributorship, Lubecore

24   distributorship we heard about and appears on that website,

08:57:41 25   Automated Solutions in Ohio.  You've heard of that before?

Wilson - Direct

1    **A.**    Yes.  That was the website that we looked at

2    yesterday.

3    **Q.**    And are there people involved in that distributorship,

4    Lubecore distributorship that also have connections

08:57:41  5    historically to Groeneveld?

6    **A.**    The AMS is -- AMS is a former Groeneveld employee,

7    Jerome DeWeaver, listed on the AMS website.  There are

8    other -- I'm not sure if they're employees or if they're

9    independent sales reps, but on the website -- for instance,

08:57:41 10    AMS has a person, Dave Fotica, in the sales department from

11    Akron, Ohio.  He was previously a Groeneveld Transport

12    Efficiency employee, Butch Jennings from -- again the

13    address in Akron, Ohio, previous Groeneveld employee.  And I

14    also believe that an administrative assistant that was a

08:57:41 15    former Groeneveld employee works or has worked at AMS.

16    **Q.**    We've also -- there is also an additional

17    distributorship identified on this website called All Points

18    Lubrication, a gentleman Tim Anthony out of Texas.  Can you

19    tell the jury the connection there, please, as well?

08:57:41 20    **A.**    Yeah, Tim Anthony was a Groeneveld distributor

21    operating out of the company called Groeneveld North Texas.

22    **Q.**    I'm going to show you now what we've marked as Exhibit

23    PX-103.  There are some additional distributors that

24    Lubecore identifies on this list, and I'd like to take a

08:57:41 25    look and go through it and see if you recognize any names or

Wilson - Direct

1    relationships with these people as well.  We talked about

2    Automated Solutions, Frank's Quality Service here in

3    Lexington, South Carolina.

4    **A.**    Yeah, that is -- that is -- the company goes by a

08:57:41 5    different name.  FQS is a Groeneveld distributor.

6    **Q.**    Currently?

7    **A.**    Currently, yes.

8    **Q.**    We've talked about Fuel Systems already.  Global Bound

9    out of Indian Trail, North Carolina.  Is that something you

08:57:41 10    recognize?

11    **A.**    I'm not familiar with that, no.

12    **Q.**    And you said some of these companies go by different

13    names.  What -- it goes by a different name.  Can you

14    explain to the jury what you mean by this?

08:57:41 15    **A.**    Well, I -- a company or a proprietor could have

16    multiple business -- businesses, business names, different

17    lines of business that they may choose to set up in

18    different legal entities or doing business as names.  So

19    that's what I mean by it.

08:57:41 20    **Q.**    Okay.

21          We're on this, Lubecore as Van Buren Arkansas.  Does

22    that have any familiarity to you?

23    **A.**    Not to me, no.

24    **Q.**    Lubecore Florida, we talked about Midwest Lube out of

08:58:16 25    Elk Grove Village, Illinois.  You guys have done business

Wilson - Direct

1    with anybody out of there?

2    **A.**    It's familiar, but I can't put my finger on it.  So I

3    couldn't say with absolute certainty.

4    **Q.**    Okay.  Could you know possibly the names of the people

08:58:16  5    affiliated with these companies as opposed to the business

6    names themselves?

7    **A.**    Absolutely.

8    **Q.**    Okay.

9    Modern Corporation, Model City, New York, does that

08:58:16 10    ring anything for you?

11    **A.**    Similar to the last one, it is familiar, but I

12    can't -- unless I know the underlying people, I couldn't

13    tell you with certainty?

14    **Q.**    Okay.  For the next one we have here is North River

08:58:16 15    Truck, and I also have some names of some people we were

16    able to find on their website associated with that, Pamela

17    Bruchie, John Lumby?

18                MR. ANASTOS:  Objection, leading.

19                MS. MICHELSON:  I'm just reading some names

08:58:16 20    and asking if she --

21                THE COURT:  Yeah, go ahead.

22    **Q.**    A guy name Daniel Schmuck, and David -- David Schmuck.

23    Any of this familiar in terms of relationship current or

24    prior with Groeneveld?

08:58:22 25    **A.**    Well currently, we have and have had for several years

Wilson - Direct

1    a relationship, distributorship with Groeneveld of Michigan,

2    and that is operated and owned by the Schmuck family.

3    **Q.**    Okay.  Smithfield Diesel?

4    **A.**    That's in Rhode Island, and I believe that because

08:58:26  5    it's on the AMS website as well, the contact is Tony

6    Fratinelli or Anthony Fratinelli, and he was previously a

7    Groeneveld distributor as well.

8    **Q.**    Until when about?

9    **A.**    2009.

08:58:26  10    **Q.**    I'm going to -- we pulled up Midwest Lube.  I'm just

11    going to read you some names and see if you recognize any of

12    these names.  Doug Kolas, C-O-L-A-S or K-O-L-A-S, somebody

13    named Kruppe or K-R-U-P-P-E.  Does that -- is that familiar

14    in terms of relationship with Groeneveld?

08:58:27  15    **A.**    Not that I'm aware of.

16    **Q.**    Okay.

17    **A.**    No.

18    **Q.**    And we talked about All Points Lubrication already,

19    and then the last on this list is Germany Terry Dooley out

08:58:30  20    of North Brook, Illinois.  Is that somebody who has or had a

21    business relationship with Groeneveld?

22    **A.**    He was an employee several years ago.

23    **Q.**    So if you could just tell the jury -- I mean off the

24    top of your head, I know you can't keep everybody's name in

08:58:30  25    your head, but who -- who -- who of these people or entities

1    had ongoing business relationships with Groeneveld up

2    through Lubecore's entry onto the scene?  And my next

3    question after that is going to be and who currently has

4    ongoing business relationship with Groeneveld.  So the first

08:58:33 5    one is up through I guess 2009.

6    **A.**    If I refer specifically to this list, we -- FQS.

7    **Q.**    And that's Frank --

8    **A.**    Still currently doing business with Fuel Systems,

9    which we no longer do business with.  Lubecore Florida is --

08:58:36 10   we don't do any business with those owners or affiliates

11   now.

12        Smithfield Diesel, up to around 2009.  I -- perhaps a

13   few small sales in 2010 but not very significant.

14   **Q.**    Okay.

08:58:36 15   **A.**    But, they were Groeneveld on record, Groeneveld

16   Distributor.

17        All Points Lubrication, previously Groeneveld North

18   Texas, up to 2009, but not since.  So I'm not sure if I

19   answered your question.

08:58:38 20   **Q.**    I think you -- I was looking for exact, but I think

21   you gave us a good idea.  So thanks very much.

22        Of the businesses, distributorships on this list which

23   is a summary prepared by a Lubecore International, Inc.

24   regarding its 2010 USA actual sales in 2011, sales

08:58:42 25   projections, what sales to people and businesses listed here

Wilson - Direct

1    would have gone through the Brunswick office if Groeneveld

2    made those sales rather than Lubecore as opposed to one of

3    the other Groeneveld offices?

4                    MR. ANASTOS:  Objection.

08:58:45  5                    THE COURT:  Overruled.

6                    THE WITNESS:  As I explained a little bit

7    yesterday, we have a legal entity that operates out of

8    Florida, Groeneveld Atlantic South, and one that operates

9    out of the northwest called Groeneveld Pacific West, and

08:59:05 10   they're responsible primarily for the Washington, Oregon,

11   Utah area.  Everywhere else in the U.S. goes through the

12   corporate office located in Brunswick, Ohio.  And that's

13   through Groeneveld Transport Efficiency, Inc.  So any sales

14   other than in Florida and those north, west states and Utah

08:59:37 15   would go through the books of Groeneveld in Ohio.

16   Q.   Okay.  Just so I'm clear, the only -- there's no Utah

17   or --

18   A.   There is Florida, Lubecore Florida.  That would not go

19   through Groeneveld Transport Efficiency books.

08:59:54 20   Q.   So that the only one on this list, Exhibit 103 that

21   would be going elsewhere rather than through Brunswick?

22   A.   Yes, that's correct.

23   Q.   Who -- are you familiar with the name John Tark?

24   A.   Yes.

09:00:41 25   Q.   Okay.  And can you just tell the jury who he was,

1   please?

2   **A.**    John Tark was a Groeneveld Transport Efficiency

3   employee in the capacity of branch manager of the office in

4   Brunswick, Ohio.

09:01:02  5   **Q.**    Do you recall approximately when the relationship

6   between Lubecore Florida and Groeneveld was terminated?  I

7   mean if you don't, I'll have something that might refresh

8   your memory, but I don't want to jump the gun there.

9                MS. MICHELSON:  Your Honor, can I approach the

09:01:45 10   witness and see if this refreshes her recollection?

11                THE COURT:  Sure.

12                THE WITNESS:  Thank you.

13   **Q.**    Just read it and don't say anything about it, so.

14   **A.**    Yeah, my hesitation was because I couldn't remember if

09:02:11 15   it was in early 2010 but --

16   **Q.**    Well, that's my question.  This is my question.

17   **A.**    December, 2009.

18   **Q.**    Okay.  My question is -- see we have to do these with

19   technical evidentiary precision, precise wise.

09:02:25 20        Does the document I handed you refresh your

21   recollection as to when the relationship between Groeneveld

22   and Lubecore Florida terminated?

23   **A.**    We didn't terminate anything with Lubecore Florida to

24   be a little more precise.

09:02:45 25   **Q.**    Okay.

1   **A.**    We ended the relationship with Lou Boronco, who was an

2   installing dealer in Florida for Groeneveld, December 1,

3   2009.

4   **Q.**    And did Groeneveld do that in writing?

5   **A.**    Yes.

6   **Q.**    And can you just tell the jury what the reasons were

7   for that, please, as they relate to the case here today?

8   **A.**    Well, it came to our attention that he was, in

9   addition to doing Groeneveld installations, he was also

10   doing work with for Lubecore.

11   **Q.**    I just need to run a few additional names by you to

12   see if that rings any bell, and I'll just read them.  And if

13   it does, great.

14       All Points Lubrication, that's Scott Marcum's

15   facility.  That's not going to be on any list you have

16   because I could not show this to you previously.

17   **A.**    Well, I believe All Points Lubrication is a Tim

18   Anthony company in Texas.

19   **Q.**    I'm sorry.  Okay.

20       Ms. Wilson, we did start yesterday talking about

21   calculations that you made to figure out Groeneveld's loss

22   here from the lost sales.  So I'm kind of directing your

23   attention back to that topic.

24       And I'd like to understand and have you explain to the

25   jury how accountants and CFO's, such as yourself, determine

1    that amount.

2    **A.**    Well, the approach is to take -- apply a factor

3    against the lost sales, the lost revenues, to determine what

4    the contribution to profit would have otherwise been, and

09:06:28  5    that approach, you have to take a look at, fixed versus

6    variable costs because in other words, if you didn't have

7    the sale, then you wouldn't have had the variable cost and,

8    therefore, you want to make sure that you're applying the

9    cost of that sale so that you get to a correct contribution.

09:06:54  10    So if you sold -- it if you lost $1 in sale, it

11    doesn't mean you'll get $1 in profit.  You have to deduct

12    the variable costs that you incur to make that $1 in sales,

13    like materials and the cost if you pay your salesperson the

14    Commission, those kinds of things.

09:07:16  15    **Q.**    Yeah.

16    Can you just explain a little bit for us the

17    difference between a fixed cost and a variable cost because

18    I guess that has an impact on the amount and the

19    calculation?

09:07:30  20    **A.**    Well, a fixed cost, very typical example is, you know,

21    you have a building, pay rent, that rent and obligation

22    to -- for that building is there regardless of what your

23    sales level is.  So, you know, the monthly rent would be a

24    fixed cost regardless of your sales level.

09:07:53  25    **Q.**    And why do the variable costs get deducted from the

1    gross revenues?  I need to understand that better.

2    **A.**    Okay.

3          Let's see if I can make it simple.  It's because you

4    have costs associated directly with those sales.

09:08:16  5    **Q.**    With the additional products that you would have sold?

6    **A.**    Yeah.

7    **Q.**    But, for the loss?  Okay.  Go ahead.

8    **A.**    So -- and very simple terms, as I mentioned, you know,

9    to sell that product, you would be incurring costs of the

09:08:33 10    materials, the transportation, the commissions, the -- all

11    the extra costs associated with making that sell.  You're

12    not going to incur any extra rent costs on your building.

13    So those are why those types of costs are excluded.

14    **Q.**    And we actually have a little visual aid here if I can

09:08:58 15    get this switched.  So it sounds complicated, but I'd like

16    you to take a look at this formula and ask you if this

17    represents what you just described in terms of how you

18    actually make the calculation, lost sales damages equals

19    this contribution margin?

09:09:22 20    **A.**    Right, yes.

21          So the only element that's sort of missing from here

22    is the time, but you know, the -- in the simplest form, yes,

23    to calculate a contribution margin percentage which can be

24    applied to gross revenues, this is the basic calculation.

09:09:44 25    **Q.**    Okay.

1        And so just so we read this into the record, so the

2    lost sales damages, that would be in dollar amounts?

3    **A.**    Yes.

4    **Q.**    And then --

09:09:58  5    **A.**    Or it could be expressed as a percentage.

6    **Q.**    And that's what the contribution margin is?

7    **A.**    Yes.  So gross revenues minus variable expenses equals

8    the actual lost dollars, and that can be expressed as a

9    percentage of the gross revenues.  So in the example on

09:10:23 10    here, this is just an example.  If there was $1 million of

11    gross revenues and your contribution margin, I'm going to

12    work it a little bit backwards, it might help to explain it,

13    but on sales, after deducting your variable expenses, maybe

14    your contribution margin in this example is 40 percent, that

09:10:48 15    means that your variable expenses were 60 percent, which

16    equal $600,000.  So in this example, $1 million minus

17    variable expenses of $600,000 equals $400,000.  So

18    contribution margin percentage of 40 percent.

19    **Q.**    Ms. Wilson, to prepare for the case for the jury

09:11:11 20    today, did you make calculations of Groeneveld's

21    contribution margin during a time -- particular time period?

22    **A.**    Yes, I did.

23    **Q.**    Okay.

24        And where -- let's -- we'll just -- well, tell the

09:11:29 25    jury what you did and then we'll use a piece of paper to

1    help offer it.

2    **A.**    You know, costs and structures and things change year

3    over year.  So you don't want to just take one year in

4    particular.  What I did was I looked at the most recent

09:11:49  5    history, rather than going way back.  So I looked at the

6    2008, 2009, and 2010 profit and loss accounts of Groeneveld

7    USA, and I calculated what the -- of the average of those

8    three years of costs of materials, and the average variable

9    costs, I analyzed each of my costs and determined in my

09:12:26  10    opinion whether or not it was a variable or fixed cost, and

11    if -- and I calculated out what the total contribution

12    margin percentage would be for the lost sales.  So there's a

13    lot of numbers on this page coming up, but --

14    **Q.**    And this page being Exhibit 135, and it's hard to get

09:12:53  15    all of it on the screen.  So if you need me to walk that up

16    to you, I'm happy -- I'm happy to do that.  I have an extra

17    copy.

18    **A.**    All right.

19         So this is a breakdown of some of the major costs in

09:13:08  20    our profit and loss account for Groeneveld USA.  And as I

21    said, I looked at whether for purposes of this calculation,

22    an item was a fixed cost or a variable cost, and so

23    commissions over time, bonus payments, those vary, depending

24    on what the sales level is.  So I calculate -- I identified

09:13:38  25    that as a variable cost.

1  **Q.**   Is that what this VC means?

2  **A.**   Variable costs, yes.

3  **Q.**   And does the FC, does that refer to fixed costs?

4  **A.**   Fixed costs, yes.

09:13:50  5  **Q.**   And so that's what this column is right here?

6  **A.**   Yes.

7  **Q.**   This second column.  And I also see something, this

8  says MC.  Can you tell the jury what you mean by that?

9  **A.**   A mixed cost is -- on this schedule, I identify

09:14:06 10  traveling and representation, which is basically meals and

11  entertainment, as a mixed cost item because there's -- it

12  doesn't entirely vary with the sales of them, you know, when

13  you have a sales force that are traveling out on the road

14  and management people, you have sort of a constant level of

09:14:37 15  traveling and entertainment costs, and some of it does vary

16  but because some of it is a bit discretionary.

17  **Q.**   And who prepared this document, this chart that's

18  Exhibit 135?

19  **A.**   I prepared it.

09:14:54 20  **Q.**   And what is the source of the information that you

21  used to prepare this information, this chart?

22  **A.**   This was prepared from our accounting records.

23  **Q.**   And are those historical accounting records, are

24  they -- let me withdraw the question and ask it a different

09:15:19 25  way.

Wilson - Direct

1    What kind of accounting records -- describe the

2    accounting records for the jury so they get a sense of what

3    the data was that you used to create this chart and then to

4    do the calculation that you described?

09:15:33  5    **A.**    Okay.

6    Without going back to the -- in too much detail, we

7    have what we call a ERP system.  So that's basically a

8    software where we can process our sales orders, purchase

9    orders, our expenses and do all the recording of the

09:15:56 10    transactions of the company inside this software package.

11    From there, we produce a set of financial statements,

12    which includes a profit and loss account, which is

13    extracting in total, not just a partial extraction, it is

14    the sum total of all of the financial transactions that we

09:16:21 15    recorded in the books, in each of those years.

16    **Q.**    And the -- and when is the data input into this

17    accounting system that you described?

18    **A.**    Well, everyday as the transactions happen.

19    **Q.**    Okay.

09:16:36 20    And then the financial statements and the profit and

21    loss statements that you described, when are those prepared?

22    **A.**    Well, we've -- we prepare our financial statements

23    every month, and we have -- you know, business review units

24    to review the results against our action plans.  And then

09:16:57 25    finally, at the end of the year, there's a final set of

Wilson - Direct

1    statements that are used also for tax purposes.

2    Q.    Okay.  And that is done --

3    A.    Exactly the same database, the same financial

4    statements.

09:17:09 5    Q.    And so some of that is done daily.  Some of it's

6    monthly and some of that sounds annually for tax returns and

7    that sort of thing?

8    A.    Correct.

9    Q.    So the 2008 data would have been completed in what

09:17:25 10    year?  It would have been input in full in what year?

11    A.    Well, the transactions would have been all for the

12    2008 up to December 31, 2008.  But, then, you know, you do

13    certain journal entries, and in the month of January to

14    close out your books for approvals and other accounting

09:17:48 15    estimates to make sure that they're in accordance with

16    accounting standards.

17    Q.    And do -- when does Groeneveld then close out its

18    annual books?  That's a good question.

19    A.    It's the 12 months ending December 31st.

09:18:08 20    Q.    And you picked three years.  Why these three years,

21    for what reason?

22    A.    For me, I believe those are the most relevant years.

23    To go back any earlier, I don't believe it's relevant.  It

24    would have been extra work for no relevant purpose.

09:18:35 25    Q.    And when did you -- did you determine a contribution

1    margin or the contribution percentage for each year?

2    **A.**    No.  As I mentioned, I average things together.  So if

3    you move the schedule over --

4    **Q.**    Oh, I will.

09:18:51  5    **A.**    -- so that I see the right-hand side.  So I did a sum

6    of those three years together to take a look at what the

7    averages were, and I I you used those costs elements that I

8    identified as variable.

9    **Q.**    I think if you point on that screen, if you touch it,

09:19:12  10    it lights up.  And instead of me trying to fumble around --

11    there you go.

12    **A.**    Okay.

13    **Q.**    And I can clear it here.  So that this way we can

14    follow exactly which numbers and columns you're talking

09:19:24  15    about.  Continue, please.

16    **A.**    So this column here is where I extracted from the

17    previous columns, the averages of the variable costs.  I

18    believe I've taken a conservative approach.  You'll notice

19    that the one item that I said was a variable cost, which is

09:19:52  20    our cost of sales.  I have it at 52.5 percent.  That's

21    correct, although our actual financial statements that are

22    variable costs were actually lower, but the reason why I

23    overrode that number, and if you could move the schedule to

24    the note section.

09:20:18  25    **Q.**    I can.

Wilson - Direct

1    **A.**     Thank you.  As I had mentioned yesterday, we have

2    different product lines and different ways that we

3    accumulate our sales information and so in the financial

4    statements, that's the total of all of our types of sales,

09:20:40   5    and so I did a different analysis looking at what the

6    variable costs just for the EP-0 sales are, and it's -- it's

7    a little bit higher as a percentage of our total revenue

8    than some of the other product lines that we sell.

9         So if you could move back, please, to that far right

09:21:07  10    column.

11    **Q.**     I sure can.

12    **A.**     Thank you.

13         So again, I didn't -- I tried to, based on my

14    knowledge of the underlying data, make sure that I picked

09:21:19  15    something that was conservative and, therefore, that's why I

16    chose to put in the 52.5 percent, a higher cost base for the

17    EP-0 products than what our total average is on the

18    financial statements.

19         And then I went through and allocated some of the

09:21:43  20    variable costs, the one and a half percent, the 1.4 percent,

21    the travel, and is 2.8 percent.  I'll talk about the special

22    exception there.  .4 percent for technical costs, and that

23    totals up a total variable cost for our EP-0 sales of 58.7

24    percent or almost 59 percent.  So for every dollar we sell,

09:22:18  25    59 percent is variable, extra costs we incur for that sale.

**Q.**    Why don't you talk a little bit now about this Note 2

that you describe as attributable to the traveling and

representation costs and how you categorized those.

**A.**    In this cost bucket, accountants like to call them

09:22:46    cost buckets, called traveling and representation, it

includes all kinds of traveling expenses, whether it's an

airfare, car allowance, car operating expenses, hotels,

meals, entertainment, and with all of those elements in

there, my estimate is that 70 percent of those costs are

09:23:13    fixed.  So if I was to look out at them over time, you know,

they're very consistent costs, and 30 percent are variable.

And so rather -- and that's why I said that this particular

item was a mixed cost.  And so the number got smaller all of

a sudden here.

09:23:42    **Q.**    Yeah, trying to get so the jury can see the whole

thing.

**A.**    If I added up all the traveling and entertainment

costs in those three years, as a percentage of the total

sales, it's 9.3 percent, and I took 30 percent of that to be

09:23:59    variable, and again stated another way, we don't have the

sale, then you don't have the variable costs.  If you do

have the sale, you incur an additional cost.  So ultimately,

I estimate that the -- for every dollar, our contribution

margin is 41.3 percent, which is what's left over.

09:24:39    **Q.**    Does the down turn in the economy affect the

1    contribution margin calculation as you've described it?

2    A.    Generally, I would say no, from an expense point of

3    view.  Again, it's a -- usually, if you are concerned about

4    your cost levels, your -- what's going on in the

09:25:15  5    marketplace, you tend -- you would be reducing fixed costs.

6    That's why companies have layoffs, or, you know, maybe

7    they'll dispose of certain assets or places.  They'll

8    eliminate their fixed costs.  The variable costs are the

9    things that happen when sales happen and don't happen.

09:25:39 10    So --

11    Q.    So if -- so if sales go down on a particular year,

12    then how does that affect the variable costs in that

13    particular year?

14    A.    It's -- again, generally does not affect your variable

09:25:50 15    costs.  The only exception I would say to that is --

16    Q.    It doesn't affect your variable costs or your fixed

17    costs?

18    A.    Doesn't affect the variable cost percentage.

19    Q.    Oh, okay.  Thank you.

09:26:04 20    A.    It doesn't affect my 41.3 percent or the contribution

21    margin.  The only exception I would say to that is if, in

22    fact, you really wanted to aggressively price your product

23    and try to sell more through selling it for, you know, a

24    lower selling price, then, of course, your percentage of

09:26:34 25    your material costs would go up.  And so if you have again,

1    trying to use some very simple math, if something costs you

2    50 cents in materials to make and you sell it for a dollar,

3    then your variable cost is 50 percent.  If you sell that

4    same item for 75 cents instead of a dollar, the material

09:27:10 5    cost is still 50 cents, but as a percentage, this is where I

6    have to get my calculator, all of a sudden, your variable

7    costs go up to 67 percent.  So you have to be a bit careful

8    when you're talking about percentages.

9    **Q.**    And were you careful when you put together these --

09:27:37 10   this chart and these numbers to figure out and the average

11   contribution margin and variable costs for Groeneveld in the

12   last number of years?

13   **A.**    Yes.

14   **Q.**    Okay.  And I mean -- you have an average on this chart

09:27:53 15   of the 41.3 percent, but you actually could figure out the

16   contribution margin in each year from the data in this

17   document, Exhibit 135, correct?

18   **A.**    I could, yes.

19   **Q.**    And which -- so for 2008, as an example, what -- what

09:28:17 20   would be -- what would be the gross revenues that would be

21   in this first part of the formula that you'd stick in there?

22   **A.**    $8,921,231.

23   **Q.**    And the variable costs, that would be, one, two,

24   three, four, and then a -- that 30 percent, that's 70

09:28:52 25   percent of this figure?

1    **A.**    Correct.

2    **Q.**    And the total of that would be here?

3    **A.**    Correct.

4    **Q.**    Was there any --

09:29:02  5    **A.**    I do want to --

6    **Q.**    Sorry.  Go ahead.

7    **A.**    I want to clarify one thing though because for

8    purposes of this calculation, the lost sales, the sales that

9    we lost through Lubecore is -- how can I say this?  To me,

09:29:38 10    those are incremental or in addition.  Wouldn't have had --

11    it wouldn't have had an impact in itself by itself on the

12    fixed costs.  The reason why I say that is the -- we

13    wouldn't have hired extra accountants.  We wouldn't have had

14    a bigger building.  We wouldn't have hired extra sales

09:30:08 15    people for those sales that we had the capacity to make.  So

16    the reason why I bring that up is when you ask me about

17    specifically 2008, and what that had to plug the numbers in,

18    the -- let's see.  How can I explain this?  I think you have

19    to look at things within a relevant range and a relevant

09:30:45 20    time period.  So to go through and calculate it out in 2008

21    and 2009 and 2010, there is going to be some minor variation

22    between those years.

23    **Q.**    Yes.

24    **A.**    But, for purposes of -- specifically of calculating

09:31:04 25    the lost sales, the damages that we incurred, I looked at it

1    on a three-year basis.  So I'm not sure that it's relevant

2    to go through each of these years and calculate it out that

3    way.

4    Q.    I understand and I guess my question is that you --

09:31:22  5    you could do it annually to see if there was any kind of

6    wide swing in any particular -- in any particular one of the

7    three years that is way out of whack with the 41.3 percent

8    that you come up with as the average contribution margin,

9    correct?

09:31:43  10    A.    Sure, yes.

11    Q.    Okay.

12          And is any one of those years widely out of whack with

13    that average contribution margin?  If you need to go use

14    your calculator and -- to answer that question, that's fine.

09:32:05  15    A.    I didn't hear a question.  Sorry.

16    Q.    Is it -- is the contribution margin in any one year

17    significantly different from the three-year average that you

18    have here on this piece of paper, Exhibit 135?

19    A.    It would be helpful if I could have the whole piece of

09:32:28  20    paper in front of me.  If that's possible.

21    Q.    It is possible.

22    A.    Thank you.

23          Well, if we want to go through these one by one, if it

24    helps, I don't know if we -- I'll look at the variable costs

09:33:10  25    for commissions, overtime bonus, the average is 1.5, and the

Wilson - Direct

1    range in 2009 was 14 up to 2008 of 1.7 -- a reason for that

2    is not all sales have the same percentage of commission for

3    instance.  So that can really depend on what your sales mix

4    is.  The staff costs an average 1.4, a big range, .5 in 2009

09:33:47  5    up to a high of 2.2 in 2010, and that staff cost include

6    things like uniforms and temporary workers, that kind of

7    thing.  So it's a little bit discretionary or, you know, we

8    have some influence of how much we would spend there.  And

9    that's why there's a range.  Technical costs, fair -- very

09:34:19  10   consistent.  Those are the -- the costs, tools, and things

11   that we use.  Let's see.

12   Q.   I'm sorry.  I didn't know you still -- I was reading

13   the document.  Okay.  I also see that your calculation of

14   the contribution margin of the 41.3 percent, that that is

09:35:00  15   for Groeneveld USA.  Is there -- is there -- is that

16   consistent across -- is that contribution margin consistent

17   for the -- all the U.S. offices as opposed to the

18   Plaintiff's offices, or can you just explain to the jury a

19   little bit about that?  Maybe I could ask my question a

09:35:30  20   little better.  Is there a significant difference between a

21   contribution margin, specifically for the Brunswick office

22   as opposed to the U.S. offices?

23   A.   No significant difference.  No significant

24   differences.

09:35:51  25   Q.   Okay.  So to calculate -- and I want to understand

1    this.  So is contribution margin net profit or what -- what

2    is -- what are you -- what are those lost sales damages?

3                    MR. ANASTOS:  Objection.

4                    THE COURT:  Overruled.

09:36:12  5          THE WITNESS:  I kind of feel like you asked me

6    two questions.

7    Q.    I probably did, which shows my noviceness at the

8    subject, but I want to understand what amount -- why these

9    are lost sale damages, and if they include only net profit

09:36:38 10   or if it's broader than that?

11   A.    Well, this looked at our costs.  There's no -- nothing

12   in here which is kind of an opportunity costs.  There are no

13   other costs that have been added.

14   Q.    Um-hum.

09:37:06 15   A.    Or included in here to influence the percentage.  So

16   that --

17   Q.    I think my question wasn't so good because you look a

18   little confused.  So let me think of how I can restate it.

19   Okay?

09:37:29 20          After you have your gross revenues and after you take

21   your variable costs out of it, and once you actually do the

22   calculation of what the number amount is, is that number

23   only net profit or is that money used to do other things?

24   A.    Well, I think in this example, that was at the bottom

09:38:00 25   of the page here, if -- if we lost -- if we did not get $1

1    million of sales, then we would have had $400,000 less cash

2    in the bank.  I don't know if that helps to make it more

3    clear.

4    Q.    It does for me.  Thank you.

09:38:20  5          So what -- so to determine and calculate Groeneveld's

6    lost sales damages using this 41.3 percent contribution

7    margin on the lost sales to Lubecore, what information do

8    you need for each category here, the gross sales revenues.

9    Let's start there.  What number do you need to plug in to

09:38:51 10    figure out Groeneveld's lost sales damages?

11   A.    Well, I would use the Lubecore revenue as -- with the

12   exception of anything that they had in Florida, Seattle,

13   Oregon, Utah, which I believe on the list, we only

14   identified Florida.  So those sales would have otherwise

09:39:17 15   been sales that went through Groeneveld Transport

16   Efficiency, and times 41.3 percent would be our lost

17   contribution margin in dollars, lost cash.

18   Q.    And the money you would have put in Groeneveld's

19   pocket but for the loss of those sales?

09:39:42 20   A.    Correct.

21   Q.    So let's -- you'll notice that we don't -- we don't

22   have the 2009 information on the U.S. -- the U.S. Lubecore

23   EP-0 sales on this document, Exhibit 103, but we -- I'd like

24   you -- there's been testimony that there were 200 ALS EP-0

09:40:17 25   systems that was sold in the U.S. by Lubecore.  Can you

1    determine what Groeneveld's lost sales damages are based on

2    those 200 systems, those 200 sales?

3                    MR. ANASTOS:  Objection.

4                    THE COURT:  Overruled.

5                    THE WITNESS:  The sales going through a

6    distributor, 200 units, the average selling price of those

7    units would be approximately $1500 per.  So the total

8    revenue of 200 times $1500 each would be $300,000 of revenue

9    that we would have otherwise had, times the contribution

10   margin of 41.3 is $123,900.

11   Q.    Now, let me ask you this.  You just said if -- the

12   $1500 per unit price is what is approximately what

13   Groeneveld earns when you sell the product to the

14   distributor?

15   A.    Yes.

16   Q.    Is there a different selling price when Groeneveld

17   sells it directly to an end user?

18   A.    Yes, and I think the simplest way to explain that is

19   the notion of a wholesale versus retail price.  So, you

20   know, if I'm going to -- the ultimate end customer is going

21   to pay $1, then if I'm selling that through a partner like a

22   distributor, and he is then selling it on to the end user,

23   then I'm going to sell it to the distributor for less and

24   then the distributor sells it on to the end user.  If I have

25   a relationship with that end user directly, I'm going to

1    charge him more, maybe $1.25.

2    **Q.**    And so what's the average selling price of a unit of

3    an EP-0 single-line system to the end user?

4    **A.**    I'm not sure if -- it can -- it can vary, depending on

09:42:49 5    the application.  So say it's roughly a 30 to 35 greasing

6    point system sold for a tractor.

7    **Q.**    Well, I'm going to -- and I'm going to not ask -- a

8    tractor meaning a tractor like in a --

9    **A.**    A truck.  Would be, sorry, to the end user, roughly

09:43:14 10    $2500.

11    **Q.**    Is it different for a trailer if you sell a

12    single-line to put on a trailer, or do you charge different

13    for the same system?

14    **A.**    Yes.  Again, it's about how that system is configured.

09:43:29 15    **Q.**    Um-hum.

16    **A.**    How many points, how many material -- like in addition

17    to the pump, there are all the other things that carry the

18    grease to the greasing point.

19    **Q.**    Right.

09:43:41 20    **A.**    So if there is, you know, fewer greasing points,

21    there's less material to put the total system together.  So

22    naturally, it's going to be cheaper if it's fewer things to

23    grease.

24    **Q.**    So it's -- it's a bit cheap -- it's less expensive

09:44:00 25    with the trailer than it is with the truck?

Wilson - Direct

1    **A.**    Yes.

2    **Q.**    The truck is about a 2500-unit and what's a trailer

3    about?

4    **A.**    I can't give you, you know, a good example of that.

09:44:17  5    There's such a wide variety of trailers.  So --

6    **Q.**    Is it less than 2000?

7    **A.**    Yes.

8    **Q.**    How much less?  What's a fair enough --

9    **A.**    It really -- because we have other products like the

09:44:36  10   Compalube product I mentioned yesterday, that may be a more

11   appropriate product.  We wouldn't necessarily put an EP-0

12   pump on a trailer.  So I'm not sure that I'm making myself

13   clear.

14   **Q.**    Oh, you are.  I think is your point basically that the

09:44:57  15   sales price to the end user is going to be higher than the

16   1500 per unit price you mentioned to the distributor?

17   **A.**    Yes.

18   **Q.**    Okay.

19         So moving now to 2010, we have Lubecore projections

09:45:18  20   here of a total sale of the $1,042 -- $1,042,088.01.  Are

21   you with me?

22   **A.**    Yes.

23   **Q.**    And now if we take out Lubecore Florida, $657.67, what

24   are we -- what are you left with?

09:45:54  25   **A.**    $890,000 roughly.

1    **Q.**    $890,000, an estimate.  And so what -- what are

2    Groeneveld's lost sales on that number, applying 41.3

3    percent contribution margin?

4    **A.**    $367,000.

09:46:16 5    **Q.**    $367,000.

6        And now on this Lubecore document, we have 2011 sales

7    of the $2,084,176.01, and again, if we take out the Lubecore

8    Florida, what are you left with there, approximately, as to

9    gross sales?

09:46:45 10    **A.**    $1,779,000.

11    **Q.**    $1,779,000.  And then you apply your contribution

12    margin that you've described and you've got a loss in 2011

13    of how much?

14    **A.**    $734,727.

09:47:08 15    **Q.**    727.

16        And why -- why are Lubecore's sales numbers, meaning

17    their gross revenues attributable to those sales, the

18    relevant number to figure out what Groeneveld's gross

19    revenues on those sales would have been if Groeneveld was

09:47:40 20    selling, if Groeneveld got the sale?

21    **A.**    Pardon?  I didn't hear the last part.  I didn't hear

22    your last comment.

23    **Q.**    If Groeneveld got the sale instead of it going to

24    Lubecore --

09:47:57 25    **A.**    Okay.

1  **Q.**    Why -- why do you -- why do we plug in, why do you

2  plug in Lubecore's gross revenues on those sales as part of

3  the lost damages calculation?

4  **A.**    Right.

09:48:10  5              MR. ANASTOS:  Objection.

6              THE COURT:  Overruled.

7              THE WITNESS:  Okay.  So you know, there's a

8  few things that I can comment on with that question.  I'd

9  like to start with generally, the price that we would charge

09:48:31 10  to customers would be, you know, relatively similar to what

11  I believe Lubecore would charge to customers.  So it's

12  not -- so I would use their number because they're selling

13  prices to their distributors from what's very likely to be

14  similar to what the market price is in the marketplace.

09:49:00 15  That's -- so those numbers would be -- I forget about the

16  number of units.  The total revenues would be similar to

17  those same customers.  And those are -- so I'm not sure if

18  that answers part of the question or --

19  **Q.**    I think it does.  I was seeing if you have more to

09:49:25 20  add.

21          Now, we obviously don't have figures for 2012 and

22  moving into the future on this chart.  What period of time

23  in the future is Groeneveld no longer going to be harmed,

24  going to be damaged if Lubecore continues to sell its

09:49:56 25  product?  When does the market recover for Groeneveld?

1          MR. ANASTOS:  Objection.

2          THE COURT:  Overruled.

3  BY MS. MICHELSON:

4  Q.    You can answer.

5  A.    What I can tell you as our own experience in -- when

6  you hire a new distributor to sell your products, there is a

7  learning curve for that distributor, Number 1.  And then

8  that distributor has to go out into their territory and make

9  sales propositions to customers that -- to customers.  And

10  so when you appoint a new distributor, you know, they're

11  going to start slowly and probably be fully sort of

12  competent to work on their own in their exclusive territory,

13  dealing directly with the end user customers, being totally

14  comfortable with the Groeneveld selling proposition in

15  approximately five years.

16  Q.    And, Ms. Wilson, do you -- do you base that -- base

17  that estimate on your experience in this industry?

18  A.    Yes, it would only be this industry.

19  Q.    Now, you were asked to gather up some -- Groeneveld's

20  financial information to provide to an economist.  Do you

21  recall being asked to do that?

22  A.    Yes.

23  Q.    Okay.

24          And what kind of information did you gather to provide

25  to the economist, John Burke?

**A.**    I just provided all of the financial statement

reports, financial reports for all of the U.S. entities for

2005 onward.  So including the Groeneveld Atlantic South,

Groeneveld Pacific West, Groeneveld Transport Efficiency,

total USA, everything that I have, I gave them included all

kinds of details on expenses and sales.

**Q.**    Okay.  And I'm just going to show you this and ask you

to tell the jury -- we've marked this disk and it takes a

while to focus this CD, Exhibit 125, PX-125.  And can you

just explain what's on here, and why it's in this format?

**A.**    Well, it's in this format because there is a lot of

data, for all these years, all the legal entities.  So

it's -- Excel spread sheets and saved to the CD.

**Q.**    Okay.  And that's what this Exhibit is, PX-125, all

that data you just described?

**A.**    Yes.

**Q.**    Just give -- oh, you know, you said something.  You

said way back when, that your figures were conservative,

that you were trying to be conservative in some way.  Can

you just explain how you were conservative and why you were

being conservative?

**A.**    Well, as I mentioned before, maybe conservative in

trying to be a bit precise and looking at to what I believe

to be relevant, and that's why as an example, I didn't think

it was -- although the average variable selling costs or

Wilson - Direct

1  cost of sales in 2008 through to 2010 was 49 percent, which

2  was sort of right there, you know, I did look deeper into

3  the details and I made sure that I -- you know was very

4  specific about the EP-0 product group.  That's what I mean

09:54:54 5  by conservative.  I think, you know, looking at a range of

6  data, averaging it out instead of just sort of cherry

7  picking what the best number is, I guess, and our variable

8  costs, you know, were only a half percent in 2009 for staff

9  costs and if I had to just pick that, this number would have

09:55:29 10  been more favorable for me, but that's why I took the three

11  years and I averaged it out.  So that's what I mean by

12  conservative.

13  Q.   And I'd just like you finally to add up these three

14  numbers for -- that you've calculated with us, while on the

09:55:50 15  stand for the lost sales in 2009, 2010, and then 2011.  I

16  believe the number you came up with in 2009, based on those

17  200 units, is the $123,900?

18  A.   Correct.

19  Q.   And that's reflected on Exhibit 135 here, correct?

09:56:16 20  A.   Yes.

21  Q.   And then I was kind of taking notes on these things as

22  we went along.  On Exhibit 103, your calculations for 2010

23  led to a $367,000 loss to Groeneveld.  And then finally, in

24  2011, your number is $734,727.  And can you just tell the

09:56:44 25  jury, please, what that total number is in terms of the lost

1    sales damages to Groeneveld?

2    **A.**    The contribution margin on the sales lost was over the

3    three-year period is $1,225,627.

4    **Q.**    627?

09:57:05  5    **A.**    Correct.

6                    MS. MICHELSON:  I have no further questions of

7    this witness.  Thank you very much.

8                    THE COURT:  Thank you.  You may cross-examine.

9                    CROSS-EXAMINATION OF GAIL WILSON

09:57:23 10   BY MS. ZUJKOWSKI:

11   **Q.**    Good morning, Ms. Wilson.  I just want to start by

12   quickly verifying a few matters with respect to Groeneveld's

13   corporate structure here in North America.  Several

14   different entities have come up through the course of your

09:58:06 15   testimony, and there really is only one Plaintiff here.

16           First, there's CPL Systems Canada, Groeneveld CPL

17   which serves Canada, right?

18   **A.**    Correct.

19   **Q.**    And that's the entity for which you're the chief

09:58:19 20   financial officer?

21   **A.**    Yes.

22   **Q.**    Okay.  CPL sells Groeneveld products to three entities

23   in the U.S.; is that correct?

24   **A.**    Yes.

09:58:28 25   **Q.**    Okay.  One of them is the Plaintiff in this case,

1    Groeneveld Transport Efficiency, right?

2    **A.**    Yes.

3    **Q.**    And then there's Groeneveld Pacific West?

4    **A.**    Correct.

09:58:39  5    **Q.**    And the third is Groeneveld Atlantic South?

6    **A.**    Correct.

7    **Q.**    Essentially all three of these subsidiaries do the

8    same thing, except that Groeneveld Transport Efficiency is

9    responsible for sales to fleets and national accounts; is

09:58:51 10    that correct?

11    **A.**    Yes.

12    **Q.**    Okay.  All right.

13          Let's take a look at Groeneveld's website.  If you

14    could pull that up, please, David.

09:59:10 15          And I think -- your Honor, is it -- there's been some

16    testimony about the pump that's at issue in this lawsuit

17    being Groeneveld flagship pump.  I think you even referred

18    to it as iconic yesterday.

19          There's been some suggestion that this pump somehow

09:59:35 20    embodies Groeneveld's brand or image; is that correct?

21    **A.**    Sorry.  I didn't hear what you -- it somehow --

22    **Q.**    Embodies Groeneveld's brand or image?

23    **A.**    Yes.

24    **Q.**    But, just to be clear, there's no picture of this pump

09:59:49 25    on Groeneveld's current home page, is there, what you've got

1    up here on the screen?

2    **A.**    Yes, I'm just watching all the flashes.  On the -- on

3    one flash, there was -- you could tell there were pumps on

4    the table or on the display, but a single shot on that home

5    page, no.

6    **Q.**    So there's a flashing display of photographs of

7    products.  And somewhere in there, there's at least some of

8    your pumps?

9    **A.**    Correct.

10   **Q.**    Iconic flagship pump is not iconically displayed on

11   the home page, though, is it?

12   **A.**    Correct.

13   **Q.**    David, if you could click on products and solutions,

14   please, and then on automated greasing systems.

15         Even when you do that, go through Groeneveld's website

16   to the page where its automated greasing systems are

17   featured, we still don't see this so-called iconic or

18   flagship pump particularly prominently displayed, do we?

19   **A.**    Well, I believe it's that one right there.

20   **Q.**    Sure, it's one of six pumps that are listed that

21   Groeneveld carries, right?

22   **A.**    Correct.

23   **Q.**    And up at the top, actually the more prominently

24   featured pumps are actually these square shaped -- are they

25   TW-34 pumps?  It's a different pump, though, that's

|    |    |
|----|----|
| 1 | displayed in a larger featured space on that page? |
| 2 | **A.**    In the banner on that page, yes.  It's different |
| 3 | products shown, below which also comes up on the main page. |
| 4 | I mean you didn't have to click anything extra.  Our |
| 10:01:47  5 | single-line pump, you know, was positioned first, in the |
| 6 | lineup. |
| 7 | **Q.**    The six pumps? |
| 8 | **A.**    Pardon? |
| 9 | **Q.**    Thank you.  I see it there with the other six pumps, |
| 10:01:57 10 | right? |
| 11 | **A.**    Correct. |
| 12 | **Q.**    There's been testimony from you and your colleagues |
| 13 | that Groeneveld sold this EP-0 pump, has been trying to |
| 14 | build an image around it for 30 years.  I think Mr. Van der |
| 10:02:08 15 | Hulst testified he was part of the team that engineered it |
| 16 | in 1981 or at least the early 80's; is that correct? |
| 17 | **A.**    Yes. |
| 18 | **Q.**    That's not really, is it? |
| 19 | **A.**    Not really what? |
| 10:02:19 20 | **Q.**    Not really correct, is it?  Do you recognize this |
| 21 | version -- |
| 22 | THE COURT:  Excuse me. |
| 23 | **Q.**    Do you recognize this version of the Groeneveld EP-0 |
| 24 | pump? |
| 10:03:14 25 | **A.**    Pardon.  Sorry? |

Wilson - Cross

1    **Q.**    Do you recognize this version of the Groeneveld EP-0

2    pump?

3    **A.**    Do I recognize it?  I -- you know, I know that it was

4    the Groeneveld pump.  You're going to ask me what era or,

10:03:34  5    you know, the dates, I'm not able to answer that.

6    **Q.**    Well, isn't it true that this is the version of the

7    pump that Groeneveld was actually selling in the 80's and

8    even into the early 90's?

9                    MS. MICHELSON:  Objection.

10:03:46  10                    THE COURT:  Overruled.

11                    THE WITNESS:  I believe you'd have to ask one

12    of the technical colleagues about that.

13    **Q.**    You testified earlier about the employment history of

14    Martin Vermeulen.  You had records that showed that he came

10:04:03  15    to Groeneveld in approximately November, precisely I guess

16    November of 1986; is that correct?

17    **A.**    Correct.

18    **Q.**    Wasn't it actually Martin Vermeulen who engineered

19    this new version at that time in the late 80's and van der

10:04:21  20    Hulst who engineered this older version that Groeneveld was

21    selling in the 80's and into the 90?

22    **A.**    I believe you would have to pose that question to them

23    specifically.

24    **Q.**    Do you deny Martin Vermeulen was the head of research

10:04:38  25    and development in the late 80's at Groeneveld?

Wilson - Cross

1    **A.**    Yes.

2    **Q.**    You checked his employment records, you had him, I

3    think, in front of you the other day.  What did they show

4    you?  What do they say his job title was?

10:04:50  5    **A.**    Pardon?  The employment record?

6    **Q.**    Yeah.  You referenced it yesterday.  Isn't that what

7    you consulted to read off his specific dates of employment?

8    **A.**    Yes.

9    **Q.**    Do you have that record?  Does it happen to show a job

10:05:12 10    title?

11    **A.**    I don't recall if that particular record had a job

12    title or if it was just an employee listing.

13    **Q.**    Do you still have it?

14    **A.**    I do not have it with me here.

10:05:27 15    **Q.**    Okay.  All right.  Fair enough.

16        By the way, could we switch to the Elmo from the

17    website link?  Doesn't this version of Groeneveld's pump

18    that was being sold throughout the 80's and into the early

19    90's by Groeneveld look a whole lot more like the Bijur pump

10:05:54 20    we've been looking at the last couple days?

21                    MS. MICHELSON:  Objection.

22                    THE COURT:  Overruled.

23                    MS. MICHELSON:  It's in the --

24                    THE COURT:  Overruled.

10:06:01 25                    THE WITNESS:  I mean I -- it's got a housing

Wilson - Cross

1    and has a reservoir, but you know, I can't tell from that

2    picture about the, you know, the dimensions.  If it's that

3    big or that big.  So I'm not quite sure, you know, what you

4    want me to say.  I don't think they're exactly the same, no.

10:06:21  5    **Q.**    Certainly the pump you're looking at up there on the

6    witness stand is more similar to the Bijur pump than the

7    Groeneveld pump, the subject of this litigation?

8    **A.**    I don't know what vintage that Bijur pump is and as I

9    said, I'm not -- I wasn't familiar with what vintage this

10:06:39 10    pump is.

11    **Q.**    We can all draw our own inferences from the images, I

12    guess.

13          I'm going to take a look now at PX-20 and I just want

14    to be conscientious.  I'm not sure that this has been waived

10:06:52 15    or something.  It was used yesterday, but it was marked

16    highly confidential.  I don't want to get in trouble for

17    using it.

18                MS. MICHELSON:  It's her document, so.

19                MS. ZUJKOWSKI:  Okay, because of the presence.

10:07:01 20                MS. MICHELSON:  We're using these documents in

21    court.  I guess we can talk about your concern.

22                MS. ZUJKOWSKI:  I just wanted to make sure you

23    wouldn't be mad before I put it up here, Debbie.  Thank you.

24    Appreciate that.

10:07:15 25                MS. MICHELSON:  Did you say 20?

1          MS. ZUJOWSKI:  Yeah.

2          MS. MICHELSON:  Thanks.

3     **Q.**     This is a table of Groeneveld's advertising promotion

4     trade show cost and you went through this briefly yesterday.

10:07:35  5     I'll try to be quick with it.

6          Does this summary cost relate to all products that

7     Groeneveld sells in North America or just EP-0 pumps at

8     issue in this case?

9     **A.**     No, it's all products.

10:07:49  10    **Q.**     All of them?

11    **A.**     Yes.

12    **Q.**     Okay.

13         And in the top left-hand corner, we talked about this

14    yesterday, but you're assuming that one Canadian dollar

10:07:58  15    equals one U.S. dollar, right?

16    **A.**     Correct.

17    **Q.**     You acknowledged that yesterday, that the exchange

18    rates fluctuated, but I think you said it was in a

19    nonmaterial way.  That's not really true either, is it?

10:08:47  20         This chart I'm showing you I pulled it off the

21    Internet, just showing foreign currency compared to the

22    Canadian dollars since 1948.  And if I could draw your

23    attention to the bottom left-hand corner.  We're talking

24    about the years that are in question here.  It's really not

10:09:10  25    that close one-to-one if you look at it.  The numbers are

1    kind of a bit off, aren't they?

2    **A.**    Right.  If you go back to the Exhibit, the -- this was

3    really for illustrative purposes over time, what the total

4    spending in North America was, if -- let me see if I have --

10:09:49 5    I do have that schedule here, too, which would be easier to

6    read.  So the -- so where some of the costs were incurred in

7    Canada, yes, a different exchange rate could be applied to

8    come up with a total number so that the numbers aren't

9    mixed.  But, really, this is just -- to get a sense for the

10:10:21 10    spending.  So in the U.S., in Canada, there's significant

11    spending over that period of time.

12    **Q.**    Sure.  Okay.  I just wanted to make sure we were --

13    knew the significance behind the numbers that we're looking

14    at here.  You know, you said there's significant spending,

10:10:39 15    but again, you agree the numbers in this document reflect

16    advertising promotion and trade show costs incurred by all

17    three of the U.S. subsidiaries, right?

18    **A.**    Correct.

19    **Q.**    Not just the one that's the Plaintiff in this lawsuit?

10:10:52 20    **A.**    Correct.  This is to illustrate that we're serious

21    about advertising in North America.

22    **Q.**    Actually, none of these numbers relate directly just

23    to Groeneveld Transport Efficiency, Inc.?

24    **A.**    Well, the number is the total of U.S. spending, yes.

10:11:11 25    That includes all of our locations and the total in Canada.

Wilson - Cross

1   So yes, you're correct.  There's no specific line that shows

2   just Groeneveld Transport Efficiency.

3   **Q.**   Am I also correct to say that none of these costs are

4   limited to the EP-0 pump that's at issue in this litigation?

10:11:31 5   **A.**   Correct.  As you've already asked, this is the total

6   spending for all promotional advertising commercial costs,

7   as we call it.  So for all our product lines, for all of our

8   U.S. locations.

9   **Q.**   Thank you.

10:11:51 10   You acknowledge yesterday that Groeneveld cut

11   promotional and advertising costs in 2009, right?

12   **A.**   Correct.

13   **Q.**   And that was because Groeneveld was basically watching

14   costs like everyone else as a result of the economic turn

10:12:04 15   down?

16   **A.**   Correct.

17   **Q.**   The drops weren't very small, though.  They were -- in

18   fact the exhibition costs fell almost 90 percent from 2008

19   to 2009?

10:12:15 20   **A.**   Correct.

21   **Q.**   And is it your testimony that these drops in

22   promotional costs had no impact whatsoever on Groeneveld's

23   subsequent sales numbers that year or in the years that

24   followed?

10:12:29 25   **A.**   No.  I don't believe I said that.

1    **Q.**    I think that's what you testified at the preliminary

2    injunction hearing but -- so are you acknowledging today

3    then that the Groeneveld decision to invest less money in

4    advertising and promotional costs probably did have an

5    impact on its sales numbers?

6    **A.**    I mean there's always a possibility.  It has an

7    impact.

8    I believe at the preliminary injunction when I was

9    asked was isn't that the reason why your sales were down in

10    2009 specifically.  And I don't think with a program which

11    spans many years as worldwide as -- you know, where you can

12    take some efforts and one particular year and specifically

13    attribute it to another specific year, I think, you know, in

14    cumulative effect, we've been predominant at trade shows

15    over the years, and one -- you know, reduction in those

16    shows in 2009 may not have a direct impact on the immediate

17    sales thereafter.

18    **Q.**    But, it very well may, and if not that year in 2010,

19    in 2011, it's common sense that it -- it may?

20    **A.**    Sure, I can agree with that.  It may.

21    **Q.**    Thank you very much.

22    Let's now look at PX-39.  You agree with me the sales

23    revenue figures in the column are sum again of all U.S.

24    business not Groeneveld broken down between the three

25    entities, not focused on the Plaintiff at issue in this

1    litigation?

2    **A.**    That's correct.

3    **Q.**    And here again, sales decline from '07 to '08 by $1

4    million?

10:14:33  5    **A.**    Yes.

6    **Q.**    By about $1.6 million from '08 to 2009?

7    **A.**    Correct.

8    **Q.**    And I think I've acknowledged these declines were

9    really impacted or heavily influenced by economic conditions

10:14:48 10   in the U.S. and specifically the transportation industry?

11   **A.**    Yes.

12   **Q.**    Okay.  You certainly would have no way to really know

13   or to suggest the way you've been doing in the last two days

14   that Lubecore's presence in the market has any causal

10:15:04 15   relationship with these sales declines, do you?

16                    MS. MICHELSON:  Objection.

17                    THE COURT:  Overruled.

18                    THE WITNESS:  Well, I certainly believe that

19   when we had sales to Fuel Systems, as a distributor of

10:15:21 20   Groeneveld products since 1985, and we no longer sell to

21   them, then that is directly attributable to Lubecore.

22   **Q.**    Let's talk about Fuel Systems specifically in a

23   minute, but --

24   **A.**    Um-hum.

10:15:34 25   **Q.**    -- at the end of the day, in addition to the economy

1    and your decreased advertising cost, several factors could

2    have played a role in sales decreases, right?  I think you

3    even acknowledged that this morning.  What about other

4    competitors?  Could some of these sales have gone to other

10:15:53  5    competitors?

6    **A.**    It is possible, but not likely.

7    **Q.**    Do you even have any way to know whether Groeneveld

8    was specifically competing for any of the customers that

9    Lubecore sold its products to during these years?  Were they

10:16:17 10    out there, fighting for that sale?

11    **A.**    Who was -- who's they?

12    **Q.**    Your sales force, whether it be through your

13    distributor --

14    **A.**    Well, you do have to remember that our sales force in

10:16:29 15    the territory of Wisconsin, for example, was Fuel Systems,

16    you know.  They represented us exclusively in their area,

17    and so that -- that would be a totally different scenario

18    than if we were going head to head with the end customer,

19    with our direct sales force.

10:16:54 20    **Q.**    Well, you got another distributor in Wisconsin pretty

21    quickly, right?  Mr. DeCleene is your distributor up there?

22    **A.**    Um-hum, yes.

23    **Q.**    And do you know with respect to every sale that every

24    call that Fuel Systems is making on a customer that Mike

10:17:08 25    DeCleene's right there next to him fighting for that sale?

1    Do you even know if he's competing?  I mean we've heard

2    testimony that 5 to 10 percent of the trucking industry uses

3    these products.  How do you know he wasn't out there

4    soliciting new customers that you guys weren't even

10:17:22  5    competing for?

6                MS. MICHELSON:  I'm going to object to the

7    compound question.

8                THE COURT:  Overruled, overruled.  If she

9    doesn't understand the question, she can say so.

10:17:30 10                MS. MICHELSON:  I know it was a lot in there

11    and lots of questions.  That's my objection, but I

12    understand.

13                THE COURT:  Seems to be the rule of thumb for

14    this trial, doesn't it?

10:17:39 15                (Laughter.)

16                THE WITNESS:  Okay.  So now with, you know,

17    the recent discussion, I really lost track, so.

18    Q.    That's all right.  You placed -- unfortunately, it'll

19    probably require a compound sentence to restate everything I

10:17:53 20    just did, but you replaced Fuel Systems with Mike DeCleene,

21    correct, as a distributor in Wisconsin, and that didn't take

22    long, right?

23    A.    Correct.

24    Q.    And we know from prior testimony that not a whole lot

10:18:08 25    of people in this industry even know about these products.

Wilson - Cross

1    So how do you know -- my question is how do you know that

2    Mike DeCleene was out there making sales calls on every

3    single one of Fuel Systems' customers trying to fight for

4    those sales?  You don't, do you?

5    **A.**    I --

6    **Q.**    Well, yes or no, is -- shouldn't be that complicated

7    at the end of the day.

8    **A.**    It is complicated because you added in a few ideas

9    there and implying that DeCleene may or may not have been as

10   actively promoting our product as Fuel Systems, and whether

11   or not I know, you know, what his sales activities are

12   versus Fuel Systems'.  I can certainly tell that Fuel

13   Systems, having been a distributor of Groeneveld products

14   and sort of the very first representation of Groeneveld in

15   the USA, with many, many years of experience, would be on a

16   different plain -- level playing field than Mr. DeCleene

17   that, you know, we have to, you know, train and start up,

18   and assist, and help.  So does -- do did he have the same

19   sales capability, the same network of customers?  I think

20   that's unlikely.

21   **Q.**    Thank you very much.  That's -- that's exactly my

22   point here.  You really don't know that some of these other

23   factors aren't the reason you lost these sales, the

24   motivation of your own sales force, the skill of your own

25   distributors and sales force, that could have played a role

1    in whether or not you got these sales that you're saying you

2    lost to Lubecore, right?

3    **A.**    We're talking about a territory that was being

4    represented by a skilled distributor on an exclusive basis.

5                    THE COURT:  Okay.  Listen.  We'll break now if

6    that's okay with you.

7                    MS. ZUJKOWSKI:  Thank you.

8                    THE COURT:  All right, folks.  We'll be in

9    recess.  I've got -- you can see the crowd gathering in the

10   back.  We've got a couple things to do, and so I will say

11   we'll be in recess until 11:00.  All right?  And so you can

12   refresh yourself, relax, and once I do a couple of our short

13   hearings here, Shirle is entitled to a break, don't you

14   think?  That's Shirle.  And so that's why we'll take a

15   little bit of extra time.  So keep in mind the admonition.

16   See you about 11:00.

17       (Thereupon, a recess was taken.)

18                    THE COURT:  Now, when you're at work and the

19   boss says you get a 15 or half hour break and you have one

20   like this, you'd like that, wouldn't you?

21       (Laughter.)

22                    THE COURT:  All the lawyers and everybody has

23   been here ready to go except for me.  We had a criminal

24   matter where the poor guy -- right,  Shirle -- had the last

25   time he was here, he had both of his girlfriends, and since

1      the kids with each girlfriend, now one in the hospital

2      having another baby and living with the other one, and he

3      just can't go to jail because he's got too many

4      responsibilities.

11:42:26   5                    MS. MICHELSON:  And your Honor, how many of

6      his wives were here as well?

7                    THE COURT:  That's hard to say.  A different

8      world we live in today.  And the next was a civil case, and

9      I told the lawyers be like higher court; the Court of

11:42:44  10      Appeals is 15 minutes a side to argue their motions.  What

11      time is it, quarter to 12:00?

12                    (Laughter.)

13                    THE COURT:  You give a lawyer 15 minutes, what

14      do they take?  As much as they can, right?  So I apologize

11:42:56  15      for the delay, having you sitting around, but we'll go until

16      12:30 and break for lunch if that's okay with everybody, and

17      we'll work the schedule that way.  Melissa, are you ready?

18      No longer quizzical.

19                    MS. ZUJKOWSKI:  Thank you.  I hope not.

11:43:13  20                    THE COURT:  She has been standing at the

21      podium for ten minutes ready to go.

22      BY MS. ZUJKOWSKI:

23      Q.    Gail, before we took the break, we were talking about

24      Mike DeCleene up in Wisconsin, and I think we established

11:43:25  25      pretty clearly that he took over from Fuel Systems as your

1    distributor there as Groeneveld's distributor there.  And I

2    think you acknowledge he may not have had the same contact

3    networks as Fuel Systems did, as Bill Koppelman did, right?

4    **A.**    Correct.

11:43:41  5    **Q.**    Okay.

6         He may have, though, for all we know.  I mean he was

7    -- it's true he was actually a partner with Fuel Systems and

8    involved in a partnership through which he did actually

9    distribute Groeneveld's products prior to becoming its

11:43:56 10    exclusive distributor in Wisconsin, though, right?

11    **A.**    The extent of their relationship, I'm not sure.  Fuel

12    Systems did use or partnered with DeCleene.  I'm not sure of

13    the period of time, and I'm not sure of the extent.

14    **Q.**    Okay.

11:44:15 15         You know, he had some experience and that there was a

16    relationship there and enough to know that he probably

17    didn't have as much of a learning curve getting up to speed

18    as distributor as someone starting from scratch would have,

19    right?

11:44:27 20    **A.**    Right.  But, he also had the challenges of, you know,

21    customers that are confused about who's selling what, and,

22    you know, so there are additional challenges for a new

23    distributor.

24    **Q.**    Okay.

11:44:49 25         We'll talk about that in a second, but just to

1    continue covering some of these other factors that may have

2    played a role in Groeneveld's sales decline, what about

3    price, product pricing?  Would that have played a role in

4    your competing for some of these customers against Lubecore

11:44:58  5    and others?  All I'm asking is whether it could have, you

6    know, whether as he --

7    **A.**    There's always, you know, marketing 101, a long list

8    of things that can influence the sales levels.

9    **Q.**    Sure.

11:45:20 10    Somebody could have had a poor experience with

11    Groeneveld or with a servicer or with an installer

12    potentially, right?

13    **A.**    Absolutely.

14    **Q.**    There could have been a change in demand.  I

11:45:33 15    understand that there was apparently change in the

16    Government's regulations with respect to something called

17    dis-brakes, which apparently means that there's less

18    greasing points on new trucks that need to be serviced.

19    Have you heard about this?

11:45:46 20    **A.**    Yes, there's -- in the regular marketplace, there's

21    technological factors that influence it as well, yes.

22    **Q.**    So change in demand for these products altogether?

23    **A.**    Pardon?

24    **Q.**    Change potentially at least demand for the proceeds

11:46:01 25    altogether?

Wilson - Cross

1   **A.**    Not sure I like that choice altogether, but again,

2   there will be a long list of influences on sales volumes.

3   **Q.**    Okay.

4         With all of that in mind, to even suggest that the

11:46:17  5   sales decline or any portion of it is attributable to

6   competition from Lubecore as a new market is pretty

7   speculative, isn't it?

8   **A.**    Not in my opinion.

9   **Q.**    Even a step more speculative to determine a sale was

11:46:35 10   lost due to a confused customer; isn't that true?

11   **A.**    Are you asking me if that's what I said?  It's not

12   what I said.

13   **Q.**    Well, a couple minutes ago.  You said Mike DeCleene

14   had to worry about potentially confused customers up in

11:46:55 15   Wisconsin, and your case is about whether or not customers

16   in this industry are confused about the source of these two

17   products.  So to show some sort of causation here, we need

18   to talk  about whether or not a confused customer buying

19   Lubecore's pump instead of the Groeneveld pump is actually

11:47:13 20   the reason why Groeneveld lost the sale.  Do you now

21   understand the context in which I'm going to ask you a

22   couple other questions on that point?

23   **A.**    Yes, I understand the context.

24   **Q.**    Okay.  So you don't know the specific circumstances of

11:47:26 25   any sale made by Lubecore to one of its customers?  You

1    don't know the sophistication of the customer that Lubecore

2    is dealing with, do you?

3                    MS. MICHELSON:  Objection, compound question.

4                    THE COURT:  Overruled.

5                    THE WITNESS:  You know, I think when perhaps

6    you may have had an opportunity to ask my colleague,

7    Mr. Kees Wapenaar those specific questions.

8    Q.    Just asking if you know right now, do you know the

9    answer to the -- you know, if you don't know, that's okay.

10   A.    But, you asked a general question.  I'm sorry, not

11   trying to be difficult.  I --

12   Q.    Do you know the specific sophistication level of

13   any of the end user customers that are buying Lubecore

14   products from its distributors, the ones that are basically

15   forming these numbers, we're going to talk about in a little

16   bit that you're basing your so-called damages analysis on?

17   A.    The sophistication of the Lubecore customers or the

18   sophistication of customers that buy automatic greasing

19   systems?  I know that, you know, there's a thoughtfulness by

20   the purchaser of a greasing system, but I, you know,

21   specifically about the Lubecore customers, no.

22   Q.    So thoughtfulness, actually that suggests to you,

23   doesn't it, that these people are not likely to be confused

24   by the source of the product that they're buying; they're

25   not walking into a store and picking something off the shelf

1    that's sitting next to something else on the shelf the way

2    they would at a drugstore, are they?

3              MS. MICHELSON:  That's objectionable and

4    misleading.

11:49:09  5              THE COURT:  Overruled.  I don't need a speech

6    after the objection.

7              THE WITNESS:  The decision that a purchaser of

8    a large piece of equipment like a tractor trailer is not

9    taken lightly.  I'm sure.  But, I just -- I can't even

11:49:32 10   understand -- I can't relate to your analogy of picking two

11   things off of a shelf.  There's -- the fact that they

12   understand the concept of automatic lubrication system and

13   will -- they appreciate or understand how that will help

14   their maintenance costs is what I was referring to about

11:50:01 15   thoughtfulness.

16        So the fact we've had relationships and a product and

17   image and leadership in the marketplace, they may very well

18   have been confused that seeing the Lubecore pump was being

19   distributed by the same people that had previously

11:50:29 20   distributed the Groeneveld product.

21   **Q.**   But, you don't know that they were confused, do you?

22   You don't have any evidence of any customer being actually

23   confused about the source of these products?

24   **A.**   Well, I did not testify about that confusion, but I

11:50:42 25   believe there were other witnesses that would have.

1    Q.    I'm not sure that there were actually.  And does it

2    even make sense to you that someone who is as thoughtful as

3    you describe them doesn't understand the distributor who

4    they're dealing with or the manual that they're being given

11:51:02  5    is identifying the source of the product that they're

6    buying?

7    A.    Well, the manual that's given is probably done by

8    the -- looked at by the technician or mechanics, which they

9    may very well be different than the purchaser, than the

11:51:20 10    engineer.  So I -- you know.

11    Q.    What about a sales brochure that says Lubecore on it?

12    You think these thoughtful people are not smart enough to

13    know that a guy who says I'm  the Lubecore distributor,

14    who's handing them a brochure that says Lubecore and selling

11:51:35 15    a pump with Lubecore on it is selling a Lubecore product?

16    Are you seriously suggesting that?

17    A.    Well, I'm serious about everything that I do, yes.

18    Q.    Fair enough.  I'd like to -- I'm going to move on here

19    and I don't mean to cut you off.

11:51:49 20              MS. MICHELSON:  Can she answer the question?

21              THE COURT:  She did answer the question.

22    BY MS. ZUJKOWSKI:

23    Q.    You don't even know if a customer who's buying a

24    Lubecore product is switching over from a different

11:52:01 25    competitor like Grease Jockey or Lincoln or one of the other

1   competitors that we've talked about, do you?

2   **A.**   Yeah, fair enough.  They might have been switching to

3   Lubecore thinking it was Groeneveld.  I -- you know, I don't

4   know.

11:52:15 5   **Q.**   They might have been.  We just don't know.  It's -- we

6   just don't know, right?

7   **A.**   Right.

8   **Q.**   All of this is speculative; isn't that right?

9   **A.**   No, I don't -- I do not believe it's speculative.

11:52:27 10   **Q.**   Okay.  Let's move on.  Let's talk about the former

11   Groeneveld employees and distributors that you've testified

12   about.  There's been a lot of talk about Fuel Systems and

13   everyone I think is aware by now Fuel Systems is a former

14   Groeneveld distributor, now they're a Lubecore distributor,

11:52:43 15   right?

16   **A.**   Correct.

17   **Q.**   Do you know which party terminated the relationship

18   between Fuel Systems and Groeneveld?

19   **A.**   At the end of the day legally, I am not sure who

11:52:58 20   terminated whom.  It was a parting of the ways.

21   **Q.**   Let's talk about it a little more.  You mentioned they

22   were your exclusively distributor in Wisconsin, but that's

23   not really true.  Did Fuel Systems ever have a written

24   exclusive distributorship contract with Groeneveld?

11:53:20 25   **A.**   Did they ever have a written contract?  No.  Do they

1    have a verbal contract?  Yes, since 1985, I believe.

2    **Q.**    Do you know if it's even enforceable to have a verbal

3    exclusive distributorship contract dating back to 1985?  Is

4    there even such a thing?

11:53:39  5    **A.**    I'm sorry.  I'm not a lawyer.  So I couldn't comment

6    on that, but --

7    **Q.**    There wasn't a written contract, though, right?  You

8    know that, don't you?

9    **A.**    I know that, but there was many years of history and

11:53:52 10   ways of doing business and understandings and agreements.

11    **Q.**    Did there come a time when Fuel Systems became unhappy

12    with the speed at which it was getting its parts and

13    supplies from Groeneveld?

14    **A.**    They did claim in a nonspecific way that they were

11:54:11 15   disappointed with the supply of delivery of parts from

16    Groeneveld.

17    **Q.**    Thank you.  And then at some point, Groeneveld

18    actually did ask Fuel Systems to sign over a written

19    exclusive distributorship contract, didn't they?

11:54:25 20   **A.**    Yes.

21    **Q.**    They refused, didn't they?

22    **A.**    Yes.

23    **Q.**    And that's when Groeneveld terminated Fuel Systems as

24    a distributor, right?

11:54:32 25   **A.**    Well, I would say they didn't refuse.  In fact, they

Wilson - Cross

1    said sure.  We're open to, you know, looking at an

2    agreement, send us a draft, and we'll get back to you, and

3    we'll have our lawyers look at it and give you feedback.

4    And this was the nature of the discussion about okay, yes,

11:54:53  5    ,maybe we should put something in writing, and then that

6    disappeared, so.

7    Q.    Why would Fuel Systems need to look at a draft about

8    it or have their lawyers consider it if they were already

9    bound by some sort of exclusive distributorship agreement

11:55:09  10   orally?

11   A.    Perhaps we wanted to make some changes or clarify each

12   party's roles and responsibilities because it had been a

13   good many years that we'd been doing business together.

14   Q.    Groeneveld has not sued Fuel Systems, have they?

11:55:31  15   A.    No.

16   Q.    And that's because Fuel Systems did not breach any

17   agreement with Groeneveld, did they?

18              MS. MICHELSON:  Objection.

19              THE COURT:  Overruled.

11:55:39  20              MS. MICHELSON:  Legal conclusion.

21              THE COURT:  Overruled.

22              THE WITNESS:  You know, we -- just -- we're in

23   the business for trying to sort things out, and we had a

24   long standing relationship with Fuel Systems, and I really

11:55:58  25   don't -- I don't know really the extent that we may have had

1    legal recourse, but for certain, it was not the route we

2    wanted to go.

3    Q.    We also talked about a distributor called All Points

4    in Texas and until this past, I guess it was a year ago last

11:56:17  5    summer, it was a distributor of Groeneveld products under

6    the name of Groeneveld North Texas, right?

7    A.    Correct.

8    Q.    Okay.

9          Would you agree Groeneveld terminated that distributor

11:56:30  10   in 2010 due to poor sales performance?

11   A.    Yes, that's correct.

12   Q.    So they didn't leave voluntarily, you terminated them?

13   What about the distributor AMS here in Ohio, who is a former

14   employer of Groeneveld?  That's Jerry DeWeaver, right?

11:56:51  15   A.    Jerome DeWeaver.

16   Q.    And he left Groeneveld around 2008, right?

17   A.    Correct.

18   Q.    Mr. DeWeaver, he's legally blind, isn't he?

19   A.    I believe so, yes.

11:57:04  20   Q.    And isn't it true he's got a claim pending against

21   Groeneveld relating to failure to accommodate that

22   disability?

23              MS. MICHELSON:  I'm going to object.

24              THE COURT:  The objection is sustained.

11:57:15  25   Q.    What about any of Mr. DeWeaver's other employees?  I

1    think Debbie ran a few names by you.  Any of them get fired

2    by Groeneveld?

3    **A.**    Did any of them -- pardon?

4    **Q.**    Mr. DeWeaver's lower level employees that you

11:57:28 5    mentioned a few during?

6    **A.**    Yeah, I didn't hear what the question was.

7    **Q.**    Were any of them fired by Groeneveld?

8    **A.**    There was terminations of all of those people.  I am

9    not at all suggesting that these were people that were under

11:57:46 10    our employ, and then went to Lubecore.  They were

11    terminated, and yes, I've never suggested otherwise.

12    **Q.**    Thank you.  Every single one of them had a right to go

13    get another job, seek out another opportunity?

14    **A.**    Absolutely, absolutely.  No problem with that.

11:58:02 15    **Q.**    Thank you.  Lubecore's distributor in Florida consists

16    of one former Groeneveld employee, Chad Cole, right?

17    **A.**    Correct.

18    **Q.**    And a former installing dealer, Louis Boronco, right?

19    **A.**    Correct.

11:58:13 20    **Q.**    The former employee was Chad?

21    **A.**    Chad Cole, yes.

22    **Q.**    And his relationship with Groeneveld ended in 2009

23    because he was also terminated, right?

24    **A.**    Yes, through our downsizing.

11:58:26 25    **Q.**    Okay.  The installer, Lou Boronco, I think he left on

1    his own, but he wasn't getting paid on his invoice; is that

2    right?

3    **A.**    Absolutely incorrect.

4    **Q.**    Okay.  So if he said so, he'd be lying?

11:58:40  5    **A.**    I don't -- that's pretty strong words.  So I don't --

6    I don't believe that there's any dispute about invoice

7    payments.

8    **Q.**    Was there at any time?

9    **A.**    Was there at any time?

11:58:59  10    **Q.**    Right.  Did Mr. Boronco ever complain his invoices

11    were getting paid too slow?

12    **A.**    He had complained about that, yes.

13    **Q.**    Okay.  Thank you.

14    **A.**    I will add, though, that you know in the grand scheme

11:59:12  15    of things, this wasn't a constant discussion between Boronco

16    and ourselves.  He submits invoices quite late and expects

17    immediate payment, even though it was for work or services

18    rendered previously.  So, you know, there's always -- it was

19    not about an intentional withholding or late payment.

11:59:36  20    **Q.**    In any case, he was dissatisfied with the relationship

21    and he had a right to leave and get a new job, and that's

22    what he did, right?

23                  MS. MICHELSON:  Objection, speculation.

24                  THE COURT:  Overruled.  And I don't need a

11:59:47  25    reason for the objection.

Wilson - Cross

1          MS. MICHELSON:  Oh, I'm sorry, your Honor.

2          MS. ZUJKOWSKI:  Correct.

3          THE WITNESS:  I believe we've already looked

4     at one of the documents.

5     BY MS. ZUJKOWSKI:

6     Q.    Where a Groeneveld Transport Efficiency terminated the

7     relationship with Mr. Boronco?  Thank you.

8          All these people we just talked about -- Mr. Cole,

9     Mr. DeWeaver, Mr. Koppelman, Fuel Systems, Inc. -- in case,

10    anyone doesn't remember, Mr. Boronco, all of these people

11    appear to be affiliated with the autolubeparts.com website

12    which we've talked about a fair amount during your

13    testimony, right?  Their distributors?  And you knew about

14    the auto lube parts website that those distributors set up

15    last fall when you testified at the PI hearing, didn't you?

16    A.    Sorry.  Didn't -- I know about those distributors were

17    set up last fall?

18    Q.    Yeah.

19    A.    Is that the question?

20    Q.    Autolubeparts.com they had set up that website?

21    A.    Correct.

22    Q.    And that same website was looked at as an exhibit

23    during the preliminary injunction hearing, right?

24    A.    Correct.

25    Q.    Groeneveld send any kind of cease and desist letters

1    asking them to shut it down since then?

2    **A.**    No, we haven't.

3    **Q.**    Sued any distributors in connection in connection with

4    their website discussion?

12:01:07 5    **A.**    No, we haven't.

6    **Q.**    What about Fuel Systems in connection with its

7    website; sued them?  We looked at that earlier yesterday.

8    **A.**    No, we haven't.

9    **Q.**    I'm sorry.

12:01:22 10        It didn't sue them because these people aren't doing

11    anything illegal, are they?

12                    MS. MICHELSON:  I'm going to object.

13                    THE COURT:  Overruled.

14                    THE WITNESS:  Illegal?  I don't know.  Part of

12:01:41 15    our discussion and our strategy, we weren't talking about

16    the legalities of what they were or were not doing.  It's

17    just the presentation of what they're representing, just

18    doesn't -- is not correct.

19    **Q.**    Do you have any actual knowledge that Lubecore itself

12:02:05 20    owns or operates or controls that website in any way?

21    **A.**    The AMS website?

22    **Q.**    Yes, whether Lubecore controls the website, that's

23    called AMS, Autolube Parts' website, yes?

24    **A.**    I mean I have no -- I do not know that Lubecore has

12:02:27 25    any direct control or authorship of that website.

Wilson - Cross

1    Q.    Does Groeneveld have control or authorship over its

2    independent distributors' web sites?

3    A.    No, I think the company website is the company's

4    website.

12:02:53  5    Q.    Thank you.  So Groeneveld fires or creates a poor

6    working environment for these people and then tries to imply

7    here today that there's something wrong with them finding

8    new opportunities in the field that they know in setting up

9    a website to sell their products?

12:03:08 10    A.    A poor working environment?  I really am confused by

11    what you're wanting me to agree with.  There's some pretty

12    strong words in there.

13    Q.    I apologize.  I'll withdraw the question.

14          Let's move on.  I want to take a quick look at the

12:03:25 15    search page that was introduced yesterday.

16          You had conducted, I think you testified, a Google

17    search with the term Groeneveld Grease System and

18    autolubeparts.com comes up as one of the hits, right?

19    A.    Correct.

12:03:43 20                 MS. ZUJKOWSKI:  Can we switch to the Elmo?

21    Q.    Why does that say debbiemichelson@miller.com at the

22    top of this page after you conduct this search?

23    A.    So the document that was submitted was printed from

24    Debbie Michelson's computer.

12:04:09 25    Q.    Okay.  So you did conduct this search yourself; is

1   that your testimony?

2   **A.**   I also conducted the search, yes.

3   **Q.**   Okay.  So she just recreated it to make the exhibit

4   then?

12:04:19  5   **A.**   Well, are you asking me who conducted it first or

6   second?  I -- you know --

7   **Q.**   I'm just asking whether or not the exhibit was

8   conducted by you as I thought you had testified yesterday

9   came as a result of a search you conducted?

12:04:38 10   **A.**   Well, I conducted the search.  Did I print this piece

11   of paper?  No.

12   **Q.**   Thank you very much.  Let's turn to Page 2 of this

13   exhibit.  See this over here in the right, where it says

14   sponsored links?

12:04:54 15   **A.**   Correct, yes.

16   **Q.**   Autolube Parts website is not off to the right under a

17   sponsored link column, it's in the middle where the organic

18   search results come up, isn't it?

19   **A.**   Sorry.  You said it was in the middle?

12:05:14 20   **Q.**   I change.  I apologize.  Maybe I'm going too quick.

21   Let's stick here for a second.  In the right hand column of

22   the page, which prints the Google search, you see a couple

23   of sponsored links on the right, do you see that to the

24   right?

12:05:27 25   **A.**   Yes, yes.

Wilson - Cross

1    **Q.**    Okay.  Doesn't that mean that the site owner of the

2    sites under the sponsored links paid some sort of money to

3    Google to try to get their name to come up?  Is that your

4    interpretation of what a sponsor link is?

12:05:40  5    **A.**    Yes.

6    **Q.**    Okay.  So when your result comes up, in the

7    nonsponsored links catalog, I'm using the word organic

8    search to describe how that comes up, and I just wanted to

9    confirm with you, doesn't that mean to you that the site

12:05:55 10    owner doesn't do anything special to get their hit to come

11    up?

12                    MS. MICHELSON:  Objection.

13                    THE COURT:  Overruled.

14                    THE WITNESS:  I am not an expert in how you

12:06:07 15    tag or design your website pages to move them up and down

16    the regular organic database searches.

17    **Q.**    You certainly aren't trying to suggest that Autolube

18    Parts somehow controls Google search algorithm, are you?

19    **A.**    As I said, I am not technically knowledgeable enough

12:06:39 20    to know how a company directly influences that.  And so all

21    I'm presenting is the fact that when I call it up automatic,

22    the AMS website comes up, also because of the use of the

23    word Groeneveld in their text.

24    **Q.**    All right.  Thanks.

12:07:05 25            Lubecore, if you accept as your testimony about

1    Lubecore doesn't have any control whatsoever over this
2    website, you certainly wouldn't expect them to have anything
3    to do with how they come up in response to a Google search,
4    would you?
5                    MS. MICHELSON:  Objection.
6                    THE COURT:  Overruled.
7                    THE WITNESS:  Yeah, I don't think to me this
8    is about necessarily who did, why they did it, how it comes
9    up.  It's again just showing that there is confusion about
10   some of the companies out there that have Groeneveld's name
11   and association with Lubecore's name.
12   Q.    Once you start looking at the website itself, even if
13   you do plug in the name Groeneveld, the name of an ALS pump,
14   pops up some ALS pumps.  They're all with clearly labeled
15   Lubecore pumps on the website, aren't they?
16   A.    Yes.
17   Q.    The pictures don't say Groeneveld?
18   A.    Yes, correct.
19   Q.    Why would Autolube Parts show pictures of Groeneveld
20   Lubecore's pump if they were trying to confuse anyone into
21   thinking it was a Groeneveld product?
22   A.    You'll have to ask Mr. DeWeaver what his intention
23   was, but the --
24   Q.    Does it make sense to you that's something someone
25   would do to  try to cause confusion, put a picture of a

Wilson - Cross

1    labeled pump on the website?

2    **A.**    Well, if they didn't want to cause confusion, they

3    didn't have to have the pump looking exactly like ours,

4    combined with all the other things, that means that perhaps

12:08:59  5    they're banking on the reputation of Groeneveld's market

6    presence to date.

7    **Q.**    Well, let's talk about trying to bank on someone

8    else's reputation for a second actually.  Are you aware that

9    Groeneveld recently registered the trade name Lubecore in

12:09:14 10    three European companies?

11    **A.**    No, I was not.

12    **Q.**    Take a look at another exhibit.

13              MS. MICHELSON:  Do I get a copy of this?  Can

14    I have a copy?

12:09:29 15              MS. ZUJKOWSKI:  Sure.  I'll bring one up to

16    you.

17              MS. MICHELSON:  Thanks so much.

18              MS. ZUJKOWSKI:  I guess we'll be marking this

19    TXZ.

12:09:57 20    **Q.**    Does this refresh your recollection at all as to

21    whether or not Groeneveld gone out there recently and tried

22    to register Lube core's company name as a trade name?

23              MS. MICHELSON:  Objection.

24              THE COURT:  Overruled.

12:10:10 25              THE WITNESS:  Doesn't refresh my recollection

1   because I was not aware of this.  This is not something that

2   came from my office, any office in North America.  It's

3   clearly in a different language.  So I was not aware of

4   this.

12:10:24  5   **Q.**   Thanks.  We'll talk to another witness who can

6   interpret it, I think later then.  But, is that really fair?

7   If Groeneveld's registering Lubecore's trade name, is that a

8   fair way for them to compete?

9   **A.**   A fair way of who, Groeneveld to compete?

12:10:45  10   **Q.**   Right, to try to race to the Register's Office in

11   every country in the world and claim a company name as its

12   trade name?

13   **A.**   I am not aware of what the purpose is, the reason for

14   this.  So I can't comment on -- about what you say is fair.

12:11:02  15   **Q.**   Do you know if there's any other countries -- by the

16   way, I think it's Belgium Luxenberg, three small European

17   companies countries, any other countries in place in the

18   world where Groeneveld got a strategy of trying to go out

19   there and register Lubecore's trade name for its trade

12:11:23  20   address anywhere, you know of it?

21   **A.**   No, I'm not aware of it.

22   **Q.**   Okay.

23        Let's talk specifically for a couple minutes about

24   these damages, claims that you made earlier.

12:11:53  25        First, you identified when we looked at Lubecore's

Wilson - Cross

1    2010 natural USA sales projections that contains a list of

2    its distributors, a couple of those distributors that

3    actually I think one or two actually still buybuying from

4    Groeneveld; is that right?

12:12:16  5    A.    Well, Frank's Quality Service is a Groeneveld

6    distributor.  Could you just sharpen it a bit?  It's very

7    difficult to read the names for me.  Thank you.

8    Q.    If you're having more trouble, I'm happy to bring it

9    up.

12:12:47  10    A.    No, no, that's fine.  So the question is what people

11    do we still sell to?

12    Q.    Right.  Which one of them is a dual distributor, I

13    guess.

14    A.    Well, I don't know if the sale to Franks Quality

12:13:05  15    Service was a distributor of Lubecore or if it was just a

16    projected sale, did it actually happen, but that company is

17    a Groeneveld distributor as well.

18    Q.    Okay.  So there's two that are in some form still

19    buying products from Groeneveld; is that correct?

12:13:22  20    A.    The other one, I'm not sure exactly which company it

21    was, that would have been the one owned by the Schmucks.  I

22    don't recognize their company name, North River Truck.

23    Q.    Up to three now or four?

24    A.    Pardon?

12:13:53  25    Q.    Is it three now or four?  I lost count?

Wilson - Cross

1          MS. MICHELSON:  Objection.

2          THE COURT:  Overruled.

3    Q.    I'm sorry.  Not trying to be confusing here.  I

4    just -- on this list of distributors, what -- you said a

12:14:07  5    couple names and you're rattling them off and I'm not trying

6    to unfairly summarize you.  What's the total number of these

7    folks that are still buying Groeneveld parts, products?

8    A.    Under those company names, Frank's Quality Services.

9    Q.    Okay.

12:14:26 10   A.    And as I said, you were the one who said I previously

11   said two.  So all I was confirming was that we have a

12   distributor whose last name is Schmuck and it was mentioned

13   that they are also the people with North River Truck.

14   Q.    So there's two of them, the -- that the people have

12:14:50 15   sum relationship with.  I guess they operate under a new

16   name now, but essentially two?

17   A.    Today.

18   Q.    Okay.  And that's okay, right?  There's nothing

19   unusual in particular about a distributor carrying more than

12:15:04 20   one product line, is there?

21   A.    What do you mean unusual?

22   Q.    There's lots of folks out there that are sales people

23   that go around and they sell more than one product line.

24   They offer choices to their customers.  Scott Marcum does

12:15:17 25   it.  We've heard from him.  He represents three or four ALS

Wilson - Cross

1    manufactures.  That's not that unusual is my question to

2    you?  Does that strike you as unusual?

3    A.    In the way Groeneveld operates, we do not -- when

4    there's a distributor agreement, although they can each be a

12:15:37  5    little bit different, our standard agreement calls for the

6    company to have an exclusive area if they exclusively sell

7    Groeneveld product.  And so we do not normally have -- use a

8    distribution channel where there are multi car lines, if you

9    want to call it that.

12:16:04 10    Q.    Okay.  But, at the end of the day, here we have got

11    two known Lubecore distributors that Groeneveld is still

12    selling product to?

13    A.    I don't think -- I don't know that Frank's Quality

14    Services is a distributor.

12:16:20 15    Q.    Maybe they're an end user.  This is a list of Lubecore

16    distributors?

17    A.    Well, $10,000 in 2010, I've never seen these numbers,

18    so.

19    Q.    Well these exhibits were introduced a year and a half

12:16:35 20    ago or were a year ago at the preliminary injunction

21    hearing, and no one -- everyone noticed then these guys were

22    on Lubecore's list.  Have you terminated them?

23    A.    Terminated Franks Quality Service?

24    Q.    Yeah, are you still selling the product?

12:16:50 25    A.    No, we sell lots of product through them.

1   Q.    Okay.  You've gone on at length about Groeneveld's

2   purported financial analysis, and rather than go back

3   through all of the number, I want to go to the bottom here.

4         You testified you're claiming that $123,900 of

5   Groeneveld's lost sales in 2009 are supposed to be -- is

6   that the number?

7   A.    Supposed to be.

8   Q.    You're blaming Lubecore for the amount of sales lost,

9   $123,900; is that right?  Just trying to go to the summary

10  numbers here?

11  A.    Yes, that's what I testified.  I don't know if I use

12  the word blame, but --

13  Q.    And then the lost profit in 2010 is $367,000, and

14  you're trying to blame that lost profit on Lubecore, right?

15  A.    Those are the damages we sustained, yes.

16  Q.    And in 2011, you're trying to blame $734,727

17  approximately of lost profits on Lubecore, right?

18  A.    That was my calculation, yes.

19  Q.    All right.

20        So the total amount you're trying to blame lost

21  profits on Lubecore is about $1.2 million?

22  A.    Correct.

23  Q.    Okay.

24  A.    For those three years.

25            MS. ZUJOWSKI:  I'm not sure where my copy of

1    PX-103 is, Tom.  Do you have an extra one?  Debbie got it,

2    Tom, thanks.  Thank you.

3              MS. MICHELSON:  No problem.

4    Q.    I guess I did have it up here, but we'll use hers

12:18:57 5    because it's got some calculations on it that may be

6    helpful.  This document shows all USA actual sales numbers,

7    right, the top of it?  Nothing about this suggests that

8    these numbers are limited to Lubecore's sales in connection

9    with its EP-0 pump?

12:19:22 10    A.    That's correct.

11    Q.    If you take a look at Exhibit DX-X --

12              MS. MICHELSON:  Your Honor, I have to place an

13    objection on the record.

14              THE COURT:  Overruled.

12:19:38 15              MS. MICHELSON:  Thank you.

16    Q.    Let's just, before we go to it, let's just remember

17    the numbers we're dealing with here.  For 2009, we'll go one

18    year at a time.  Lubecore's actual sales of all products in

19    the U.S. are represented as $384,000 approximately.  Now, if

12:19:57 20    you look at the document --

21    A.    That says -- you said 2009.  It's not on there.

22    Q.    I'm sorry.  I meant to say 2010, although I'm

23    little --

24              MS. MICHELSON:  I have -- Ms. Zujkowski, I

12:20:13 25    have 2009 on this because you didn't previously give us any

1    2009 numbers.  So I have this if this helps you for the 2009

2    numbers.

3                   MS. ZUJKOWSKI:  Thanks.

4                   MS. MICHELSON:  Sure.

5                   (Counsel conferring.)

6    BY MS. ZUJKOWSKI:

7    Q.    We'll just go with this document.  I didn't realize it

8    didn't have 2009 on there.

9          If we look at the document that only shows numbers

10   related to the sale of Lubecore's EP-0 pump, the numbers in

11   2009 are how many?

12   A.    I don't know.  I'm sorry.  I've never seen this

13   document before, so.

14   Q.    Well, based on the document?

15   A.    But, I can't even see the heading.  Sorry.

16   Q.    I'm just going to move it so you can hopefully.  Total

17   revenue column here is the one i'M trying to direct your

18   attention to.

19   A.    Okay.

20   Q.    So for 2009, what was Lubecore's according to this

21   document, I understand you haven't seen it before?

22   A.    I'm just asking is the first line 2009 because I can't

23   see it on the screen.

24   Q.    It is.  I'll help you further.  So for 2009 -- in

25   fact, let's do this.  For 2009, it's the only item I'm

Wilson - Cross

1    showing --

2    **A.**    Okay.

3    **Q.**    -- line I'm showing.  What number does this document

4    reflect for total revenue column?

12:22:03  5    **A.**    $315,232 is what the column says under the column

6    total revenue.

7    **Q.**    Okay.  And what about for 2010?

8    **A.**    Well, I have to assume the second line is 2010, and I

9    would trust --

12:22:17  10    **Q.**    I was trying to help out with this guide here.

11    **A.**    Yeah, it is truncated on my screen.  You do understand

12    that, right, so -- okay, perfect.  $474,985.

13    **Q.**    Thanks.  And for 2011 so far?

14    **A.**    $757,870.

12:22:39  15    **Q.**    Okay.  Let's remember that number for a second.

16    That's actually quite a bit less than the projected sales

17    numbers than you were using to run your analysis, isn't it?

18    **A.**    Yes, it is.

19    **Q.**    Now, I understand that Lubecore's the one that made

12:23:03  20    these projections, but it appears they were a bit

21    optimistic.  And at the end of the day, don't you think your

22    analysis should have incorporated the real numbers?

23    **A.**    I believe I personally did not have the real numbers

24    for two reasons.  I think the primary reason is that they

12:23:26  25    were labeled as highly confidential, and I was not permitted

1 to look at those.

2 **Q.** Well, let's do -- I mean we got them now and it

3 shouldn't be that complicated of an analysis.

4 **A.** Okay.

12:23:37 5 **Q.** You called your analysis conservative, but it's really

6 not.  If you're using the real numbers --

7    MS. MICHELSON:  I'm going to object to the

8 reference to this is real numbers.  There's no testimony

9 that they are what it is.

12:23:49 10    MS. ZUJKOWSKI:  There will be testimony about

11 this document and its foundation.

12    THE COURT:  Okay.  Go ahead.  Go ahead.

13 **Q.** And I'm sorry to everyone with some math, but you

14 still have your calculator, Gail?

12:24:05 15 **A.** I sure do.

16 **Q.** Okay, good.

17   Can we apply your margin contributor or whatever it

18 was you were calling to these numbers relatively quickly,

19 sum up the sales numbers for the same years that you looked

12:24:22 20 at in your analysis, and is it --

21 **A.** Sure.

22 **Q.** 53 percent?

23 **A.** I'll just talk out loud here.  315232 plus 474985,

24 757,870, times .413, $639,560.

12:24:45 25 **Q.** Okay.  So that's about half the number that you were

Wilson - Cross

1    trying to blame on Lubecore when you were using the

2    projected numbers instead of actual numbers?

3    **A.**    The 2011 number is only to September.  So you know we

4    would have to see -- naturalize that for a full year.  I

12:25:01  5    think the previous number might have been a full year.

6    Could you put your other schedule up, please?

7    **Q.**    Sure.  Let's see 2011 projected sells?

8    **A.**    2084, and, the -- I don't know exactly on this

9    schedule again, it was highly confidential.  So I

12:25:25 10   couldn't -- I was not permitted to look at the numbers, and

11   that's why I came with my calculation based on a percentage.

12   So this schedule said that at a certain point in 2010, the

13   sales, actual sales were $384,000 with a forecast of 1042,

14   and your actual numbers are saying they were 415.  Is

12:25:56 15   that -- is that the point you're trying to make?

16   **Q.**    Right, that the actual numbers are significantly less

17   than the projected numbers that you used in your analysis?

18   **A.**    Fair enough.  I understand that.

19   **Q.**    And I understand that the -- that the 757,000 number

12:26:10 20   for 2011 only goes through the end of September, and that

21   there's another couple months left in the year after that.

22   I understand that.  Did you seasonalize -- does your number

23   then in your other analysis include some sort of projection

24   through the end of the year or did it get cut off at the

12:26:28 25   same time?

1    **A.**    My other number, the only number was when we were

2    actually sitting here.  I calculated it based on the numbers

3    that --

4    **Q.**    2011 projection here for the full year?

12:26:42  5    **A.**    Correct.

6    **Q.**    Meant to be a full projection for the full year?

7    **A.**    I believe it was a 12-month period, so.

8    **Q.**    So we add a couple more months in fairness to the

9    sales of the $757,000 number.  We don't want to speculate

12:26:54 10    about that, but at the end of the day, we're looking at a

11    number that's 50 percent approximately of what you're

12    talking about?

13    **A.**    Correct.

14    **Q.**    In your analysis?

12:27:01 15    **A.**    Correct.

16    **Q.**    Thank you.

17        You testified earlier that the first time you saw the

18    Lubecore pump, it was dirty and grimy and you had trouble

19    seeing the label, right?

12:27:19 20    **A.**    The first time I saw Lubecore pump via the picture, it

21    wasn't dirty, grimy, but one of the times I saw the pump in

22    our shop, it was a used pump,  yes.

23    **Q.**    An actual pump, it was used.  I mean it was dirty.

24    **A.**    Well, I have gone to trade shows, so I'm just trying

12:27:41 25    to recall if I actually saw a pump prior to the work shop

1    incident.

2    **Q.**    We're not trying -- we don't have a picture of you

3    looking at a pump in a trade show.  I was just trying to

4    refer back to your testimony.

12:27:59  5    **A.**    It wasn't necessarily the first time I saw the pump is

6    my only point, but --

7    **Q.**    Fair enough.  I just thought you said something to the

8    effect you -- you did see the picture, but later you saw a

9    real pump, and it was dirty and you couldn't tell if it

12:28:10  10    was -- couldn't see the Lubecore sticker?

11    **A.**    Correct.

12    **Q.**    But, when you first saw these products, they are

13    reasonably clean?

14    **A.**    Absolutely, yes.

12:28:17  15    **Q.**    In fact, we got on the table here Defendant's Exhibit.

16    Lubecore's pump exhibit is brand new?

17    **A.**    Correct.

18    **Q.**    By the time any customer's pump becomes dirty and

19    grimy, typically he already owns it, right?

12:28:32  20    **A.**    Yes.

21    **Q.**    So he's not going to be confused about its source just

22    because now there's some dirt on his pump?

23    **A.**    About its source, yes.  I'm not -- I mean if you look

24    at it in use on a truck that's moving, perhaps you might

12:28:56  25    think the Lubecore pump's a Groeneveld.

1           THE COURT:  That wasn't the question, but

2     we'll break here for lunch.  Okay?  Lunch.

3           MS. ZUJKOWSKI:  Your Honor, I had one more

4     line.  I don't know if that makes -- I don't mind.  I'm

5     happy to say it after lunch,

6           THE COURT:  We'll let you say it after lunch.

7           MS. ZUJKOWSKI:  Pardon?

8           THE COURT:  We'll let you say it after lunch.

9           MS. ZUJKOWSKI:  All right.

10          THE COURT:  Folks, 1:45 downstairs.

11    Mr. Yarger, does that sound good?

12          A JUROR:  Yes, sir.

13          THE COURT:  Have a good lunch.  See you then.

14       (Thereupon, a luncheon recess was had.)

Wilson - Redirect

1          Tuesday Session, October 18, 2011, at 1:45 P.M.

2                    THE COURT:  Good afternoon, ladies and

3      gentlemen.

4                    THE JURY:  Good afternoon.

13:51:29  5          MS. ZUJKOWSKI:  Lubecore has no further

6      questions.  Thank you.

7                    THE COURT:  There you go.  See what a break

8      does?

9                    (Laughter.)

13:51:37 10          MS. MICHELSON:  I'm sorry, but I do have some

11     redirect then.

12                    THE COURT:  We're not surprised.

13                    (Laughter.)

14                    THE COURT:  I couldn't help it.

13:51:49 15          REDIRECT EXAMINATION OF GAIL WILSON

16     BY MS. MICHELSON:

17     Q.    I do need to clear up a few things.  One second,

18     please.  Just have to find it in my stack.

19                    MS. MICHELSON:  I'm so sorry about that.

13:52:45 20          THE COURT:  No problem.  I'll start anyway

21     because I know where I'm going to start.

22     Q.    Ms. Wilson, we were talking about -- we were talking

23     about --

24     A.    Lots of things.

13:53:33 25     Q.    Yes, but I'm going to start with your damages

1    calculations.  First, on what is Exhibit 103, I just would

2    like you to confirm that the handwriting on that document

3    accurately reflects the testimony that you gave about the

4    calculations, the math that you did on the stand that I

5    wrote down as you testified.

6    **A.**    If you want me to recheck it to see if you wrote it

7    down correctly, but --

8    **Q.**    I was writing it down as you spoke, but I want to make

9    sure.

10   **A.**    Well, I'll just -- it was calculation as -- I'll need

11   you to make it more crisp for me, please.

12   **Q.**    No problem.  And if you want me to bring it and hand

13   it to you, I can do that as well.

14   **A.**    No, I'm almost done.  Thank you.  The numbers that are

15   written here are the calculations that we did, yes.

16   **Q.**    Okay.

17        And -- I found it.  Okay.  And I'm going to ask you to

18   do the same thing on this other exhibit, just confirm that

19   the handwritten calculations accurately reflect the

20   testimony that you gave, and I'm reading from now what's

21   Exhibit 135 as to the amount you calculated of $123,900 on

22   sales of 200 ALS EP-0 systems in 2009.  If those would have

23   gone to Groeneveld.

24   **A.**    Yes, that's correct.

25   **Q.**    And I think we need to clarify this for the jury.  Did

1    you have access to this document -- did I share this

2    document with you before you got on the stand here in court

3    today?

4    **A.**    No.

13:56:51  5    **Q.**    Okay.  And why not?  Why couldn't I just give that to

6    you so that you could do all your work on this before coming

7    into court?

8    **A.**    Well, what I understood during some of the previous

9    sessions and process in this eventual trial were that some

13:57:14 10    items were highly confidential and that meant although the

11    attorney could look at it, I -- because of the sensitive

12    nature, I was not permitted to look at the details.

13    **Q.**    And reading down -- reading down here, there's a

14    Bates, what's called a Bates number, lube, and there are a

13:57:36 15    bunch of zeros , 296, and can you confirm that that

16    indicates that the source of this document in and the

17    information was Lubecore itself, and that this was -- these

18    were items that were presented to your lawyers in discovery

19    during the discovery process?

13:57:54 20    **A.**    It wasn't a schedule that was prepared by me and so I

21    will assume it was prepared by Lubecore and given to you,

22    yes.

23    **Q.**    And so when you sat here in court and did your

24    calculations, excepting these numbers on the document 103,

13:58:18 25    whose numbers were you accepting and relying on to do these

1    calculations in court?

2    **A.**    I'm relying on the Lubecore numbers to do the call --

3    to be the starting point in that formula for the calculation

4    for the total dollar damage.

13:58:44  5    **Q.**    And were you provided with any numbers, other than

6    those on this document that I -- that I referenced during

7    your direct examination, other than what they said their

8    true and accurate numbers were a year ago when they gave

9    this to me?

13:59:06 10    **A.**    Well, I believe the 200 units from 2009 was an

11    additional number that was not part of the confidential

12    information, and that was one of the calculations we did on

13    the other sheet, yes.

14    **Q.**    And that information actually came from Mr. Eissis

13:59:25 15    testimony under oath in the case?

16    **A.**    Correct.

17    **Q.**    And you relied on that when you did your calculations

18    here in court as to Groeneveld's lost sales damages?

19    **A.**    Correct.

13:59:34 20    **Q.**    There was some suggestion in cross-examination that

21    somehow, it was unfair or it is unfair to rely on Lubecore's

22    representations as to its numbers here.

23         Did you have any other numbers to rely on?

24    **A.**    No, other than -- sorry, other than what I had

14:00:22 25    mentioned about the known numbers that I have where I knew,

1    for instance, what we sold to Fuel Systems in previous years

2    and when those numbers stopped.

3    Q.    Yeah.  And this new Defendant's Exhibit X, you were

4    asked questions about that.  I wrote on -- they marked these

14:01:09 5    documents highly confidential as well?

6    A.    Correct.

7    Q.    You never had any opportunity before seeing them for

8    the first time in court here to take a look at those

9    numbers?

14:01:25 10   A.    Not at all.

11   Q.    Is there anything, is there supporting information or

12   documentation included in this exhibit that corroborates the

13   accuracy or the veracity or the reliability of any of the

14   numbers that they now are saying are the actual numbers?

14:01:50 15   Maybe you want to -- I should hand it to you because there

16   are a few pages and you've never seen this before?

17   A.    Yeah, it was difficult to read because of the size of

18   the monitor.

19        So sorry.  What was the question?

14:02:10 20   Q.    Is there any supporting documentation included in

21   those five pages that corroborate where the information came

22   from, whether it's accurate or reliable or not, anything

23   along those lines?

24   A.    Well, I mean I have to trust if somebody put something

14:02:32 25   on paper that it's accurate.  It doesn't have an auditor's

1    stamp on it saying it was, you know, saying it was filed for

2    tax purposes, but --

3    Q.    So actually tax returns or audited financial

4    statements, those would accurately tell us what the true

14:02:52 5   numbers indeed are from Lubecore, would they not?

6              MR. ANASTOS:  Objection.

7              THE COURT:  Overruled.

8              THE WITNESS:  Well, if -- a set of financial

9    statements has some type of auditor's report.  Then

14:03:06 10  depending on the style of the report, it does -- it's more

11   of that independent verification, but it's not necessary for

12   all companies to have audited reports, so.

13   Q.    But, an audited financial report would be an

14   independent assessment of the accuracy, reliability, and

14:03:24 15  veracity of the numbers that the company is at least

16   reporting?

17   A.    Correct.

18   Q.    Okay.  Do you see anything along those lines in this

19   piece of paper?  They've written numbers on --

14:03:39 20  A.    No, I don't.

21   Q.    Does anything in here even identify the source of the

22   information where they supposedly got these numbers?

23   A.    No, it doesn't say where they came from, specifically.

24   Q.    And --

14:03:58 25  A.    Says financial results, activity in the USA.

1   **Q.**   Okay.

2        And are you aware that that highly confidential

3   document that I couldn't even share with you because of the

4   confidentiality restrictions, that wasn't even handed to me

14:04:16 5   until the Tuesday late afternoon, a day and a half before

6   the trial was supposed to start, are you aware of that or --

7   **A.**   I was in your office on --

8   **Q.**   You don't want to tell what lawyers and clients are

9   talking about.

14:04:33 10   **A.**   On Tuesday, and that was when the binder was

11   delivered.  So sorry if I've -- I wasn't supposed to say

12   that.

13   **Q.**   No, that's okay.  This is the first time I even got it

14   was when they presented this exhibit binder a day and a half

14:04:47 15   before trial, right?

16   **A.**   Correct.  It also is -- with information up to

17   September 31st, which I think is just a small typo, but

18   September 30th.  So it would have been prepared some time in

19   October.  So it definitely is recent.

14:05:11 20   **Q.**   I see.  Oh, yeah because there are only 30 days in

21   September, right?

22   **A.**   It feels longer some Septembers, depending upon --

23   **Q.**   October is sure feeling long this year, but I'll tell

24   you that much.

14:05:25 25        I have a question for you about this document.  I'm

Wilson - Redirect

1      turning to page X-2.  I need another one.  You had testified

2      in direct basically about the percentage of Groeneveld's

3      sales attributable to certain EP-0 ALS products.  Do you

4      recall that testimony?

14:06:05  5   **A.**    Yes.

6      **Q.**    I had asked you what's the percentage for the --

7      versus the loose parts, the systems versus the loose parts,

8      and if you could turn to Page X-2?

9      **A.**    Yes.

14:06:21 10   **Q.**    Is there a way for you to -- up there, I know for the

11     first time, calculate Mr. Eissis's percentages?

12     **A.**    Every company separates their product information

13     differently.  So this is a little bit unusual.  So there's

14     revenue from the column -- revenue EP-0 single-line pump,

14:07:01 15   and I'm looking at the 2009 sheet, $43,666, and that as a

16     percentage of their total revenue says that it's 13.9

17     percent.

18     **Q.**    And so the percentage of the other ALS product sales,

19     under this loose part revenue, loose parts?

14:07:32 20   **A.**    Yes, okay.  So I would assume, but perhaps Lubecore

21     can answer themselves, that this is only the revenue for

22     just the pump.

23     **Q.**    When you say this, you're talking about the revenue

24     under the column revenue EP-0 single-line pump?

14:07:55 25   **A.**    Just for that pump, which is not a system.  You have

1   to attach line and inject Orlacos and manifold blocks and

2   other things.  That's just the mechanism that pumps the

3   grease to the lubrication points on the piece of equipment.

4        So I assume those other things are under revenue loose

14:08:19  5   parts.  And that percentage is 86, 86.1 percent.

6   **Q.**   Based on your experience handling numbers and in the

7   industry, and Groeneveld's own percentages on its gross

8   revenues, is there anything -- you have any comment or

9   observation about these reported figures of the -- I think

14:08:58 10   you said 13.9 percent and then the 86 --

11  **A.**   I mean it certainly seems low, the percentage of just

12  the pump sale to the total, but I'm --

13  **Q.**   Why?

14  **A.**   Why?  I'm not sure.

14:09:19 15  **Q.**   Oh, no.  Why does it seem low?

16  **A.**   As I said, from Groeneveld's point of view, a full

17  system when we sell it, the portion of the pump to the total

18  selling price is more around 35 percent.

19  **Q.**   What item in the complete system is the most expensive

14:09:42 20  item?  Because you're talking about the manifold blocks or

21  distribution blocks and the timer and some additional

22  outside components, and then the pump?

23  **A.**   Boy, that's a good question, and I wish I could answer

24  it.  Generally, the pump is, you know, the most expensive

14:10:12 25  item, but as I say, it's not necessarily the --  it's not

1    the way I look at it.  I look at it a complete system.

2    Q.    You said there's something unusual about the way

3    they're recording this information, and I -- I'm just

4    wondering what it is.  You and I haven't had a chance to

5    talk about this document before, but --

6    A.    I'm saying it's unusual because they've got it in

7    categories.  They have the pump separated from loose parts.

8    I'm not -- I'm not sure why I would take that out and

9    separately highlight it.  That's the only thing that I said

10   was unusual.

11   Q.    Okay.

12         Oh, yes, they calculated that percentage figure in

13   here.  Okay.  On cross-examination, there was questions

14   about the distributors and the cross over, whether

15   they're -- who of those identified distributors on this

16   document, 103, still handles Groeneveld products?  Do you

17   recall those questions on cross-examination?

18   A.    Yes.

19   Q.    Okay.

20         So if you could just refresh my memory because it was

21   a little confusing for me.

22         I know you said Frank's Quality Services?

23   A.    Can you put the list under --

24   Q.    Yes, I can.  Sorry.

25   A.    Okay.  The ones that I recognize that we currently

1    sell to Groeneveld currently sells to in the United States,

2    Frank's Quality Service also goes by FQS, and I think the

3    other confusion --

4    **Q.**    The Michigan company I thought you said?

14:12:29 5    **A.**    Well, North River Truck, which probably is a trucking

6    company, but owned by the Schmuck company, at least they

7    have an interest in that.  They actually own Groeneveld

8    Michigan, our distributor, and we currently do business with

9    them.

14:12:54 10    **Q.**    Okay.  So now that we have this Lubecore supposed

11    actual number, I'm going show you X-2, Defendant's Exhibit

12    X-2, and show you in 2010, 2010 -- in 2010, how much did

13    they sell to Frank's Quality Service, Lubecore?

14    **A.**    It appears they provided that company with something

14:13:45 15    but didn't charge them for it, but it was only $208.

16    **Q.**    Okay.  Is that -- is that a full charge for a complete

17    ALS system?

18    **A.**    Oh, no, no -- unless they're in the -- not that I'm

19    familiar with.

14:13:59 20    **Q.**    Okay.

21            And here going back to 2009, I don't see -- I don't --

22    can you just confirm -- and for the record, it's Exhibit

23    DX-2 -- confirm Frank's Quality Service doesn't appear on

24    this new spread sheet they just gave us, correct?

14:14:18 25    **A.**    That's correct.

1   **Q.**   And here's 2011, which is DX-4.  And can you just look

2   through this list and confirm that?

3         Frank's Quality Service isn't on here, so that isn't

4   that dual dealership thing you were asked questions about in

14:14:39 5   cross exam, correct?

6   **A.**   Not between Lubecore and Groeneveld.

7   **Q.**   Sorry.  Not between?

8   **A.**   Not between Lubecore and Groeneveld, no.

9   **Q.**   So Franks's Quality Service isn't -- at least doesn't

14:15:04 10   appear on this list as buying any ALS products from in 2011,

11   according to Lubecore?

12   **A.**   Not that's on this list, that's correct.

13   **Q.**   Yeah, there are a few of them.  And here's the other

14   company you described that was North River Truck?

14:15:29 15   **A.**   Correct.

16   **Q.**   So they got one there?

17   **A.**   Correct, $2362.

18   **Q.**   Anything for North River Truck identified in 2010 as

19   per DX-3?

14:15:46 20   **A.**   No.

21   **Q.**   Okay.

22         Does Groeneveld permit and authorize its dealers, its

23   distributors to carry competing ALS products?

24   **A.**   Our standard distribution agreement does not.

14:16:28 25   **Q.**   There were -- there were a lot of questions about

1    other factors, other variables that could have had an impact

2    on Groeneveld's gross sales revenues from the ALS products,

3    other than Lubecore.  You recall those questions on

4    cross-examination?  Is Groeneveld asking for Lubecore to be

14:16:53  5    responsible for the entirety of its sales -- sales

6    difference between 2009 and '10 or 2011 for the entirety of

7    it?

8    **A.**    No, I think it's -- we're taking sort of a

9    conservative approach.  We don't want to -- we don't have

14:17:12  10    enough information to say our entire sales drop is due to

11    Lubecore.  There are many variables.

12    **Q.**    And in your direct examination -- in your testimony,

13    were you attempting to somehow convey the impression that

14    Groeneveld is entitled to every dollar in diminished sales

14:17:34  15    between 2009 and 2010 because Mr. Eissis entered the market

16    with Lubecore product?

17    **A.**    No, the purpose of the schedules that I previously

18    provided was to get a general idea about the size of our

19    business over the years, and it wasn't meant to give the

14:17:58  20    impression that the reason -- the entire reason that our

21    sales have dropped is because of Lubecore, that -- that was

22    never --

23    **Q.**    Just to kind of make this final point, the gross

24    revenues figure that you plugged into your contribution

14:18:21  25    margin calculation, where does that number come from?  Where

Wilson - Redirect

1    did you get that number?

2    **A.**    That is -- those numbers are the total USA -- I don't

3    think I have a hard copy of that.  Just want to make sure

4    again.

14:18:42 5    **Q.**    Well, let me --

6    **A.**    Yeah.  It's the total USA profit and loss statement

7    according to our books and records, which have been reviewed

8    by our auditors.  I didn't say it was reviewed by the

9    auditors on here, but --

14:19:02 10    **Q.**    Okay.  That's on the contribution margin and the gross

11    revenues that you -- the gross revenue numbers that you plug

12    into this calculation to this formula, in order to calculate

13    the sales that Groeneveld said it would have had but for

14    Lubecore taking those sales, where did those numbers come

14:19:30 15    from?

16    **A.**    It -- the purpose of this analysis was to a

17    contribution margin percentage so that it could be applied

18    against a number which was the Lubecore sales.

19    **Q.**    So those numbers came from Lubecore sales figures

14:19:54 20    provided in the course of this lawsuit, correct?

21    **A.**    On the other schedule.

22    **Q.**    This one?

23    **A.**    Sorry?

24    **Q.**    103?

14:20:03 25    **A.**    The sample formula, the gross revenue, to be used to

1    calculate the loss sales damages would be the revenue from

2    Lubecore.

3    **Q.**    And so these -- these numbers that appear on Exhibit

4    103, contribution margin that you apply is applied to whose

14:20:32  5    sales figures?

6    **A.**    Our costs structure to Lubecore's sales figures

7    provided on that sheet.

8    **Q.**    That sheet meaning the Lubecore document Exhibit 103?

9    **A.**    Exhibit 103, yes.

14:20:47 10    **Q.**    You were asked about the situation with Mr. Boronco?

11    **A.**    Yes.

12    **Q.**    And can you just tell the jury what happened with

13    Mr. Boronco?

14         I'm going to show you what we've marked as Plaintiff's

14:21:22 15    Exhibit 105-3 and ask if you recognize this as a termination

16    letter that -- that Groeneveld sent to Mr. Boronco?

17    **A.**    Yes.

18    **Q.**    And it's signed by whom?

19    **A.**    Brian Covella.

14:21:40 20    **Q.**    Who was he?

21    **A.**    He was Transport Efficiency at that time, the director

22    of North American operations and chief operating officer.

23    **Q.**    And did you see this letter and were you aware of it

24    in the course of Groeneveld's business?

14:21:53 25    **A.**    Yes.

Wilson - Redirect

1    **Q.**    And it's directed to whom?

2    **A.**    To Louis Boronco.

3    **Q.**    What's the date on that document?

4    **A.**    December 1, 2009.

5    **Q.**    And his -- is this one -- is this a Groeneveld

6    business record?

7    **A.**    Yes, it is.

8    **Q.**    Can you please read the narrative at least in the

9    first paragraph to the jury, please?  Can you see it?  Maybe

10   I'll make it bigger.

11   **A.**    I don't know if I should take my glasses off or keep

12   them on.  That's perfect.  "Re: Termination of installer

13   agreement.   Dear Lou, it's come to our attention that a

14   breach of your agreements with Groeneveld, you are now in

15   business with Lubecore.  After treating you well for many

16   years and even arranging our business together so that you

17   were able to clear your old delinquencies, we were very

18   surprised to learn of your present actions.  Given the

19   circumstances, effective immediately your third party

20   installer agreement is terminated, and we will no longer

21   accept your purchase orders.  You may not hold yourself out

22   as being a Groeneveld dealer or installer or as having any

23   other relationship with Groeneveld.  You are no longer

24   authorized to provide any services for us under Groeneveld's

25   warranties, and we will not consider any services you

1    provide for payment.  We demand that you immediately return

2    to us all Groeneveld property in your possession --

3    position -- possession, sorry, including all kits, parts,

4    and sales literature.  Finally, we must remind you of the

14:23:31  5    confidentiality noncompetition and other obligations that

6    survive your various agreements which will be enforced.

7    Based on agreement, the foregoing applies to you and your

8    entities.  We will pursue all available remedies in the

9    event of any breaches."

14:23:59  10    Q.    Thank you.

11          You were asked questions suggesting that there was

12    customer -- there were customer -- poor -- customers had

13    poor experiences with Groeneveld, and I like to ask you to

14    tell the jury about warranty claims on Groeneveld ALS

14:24:25  15    products.  And if you could just explain to them?

16                MS. ZUJKOWSKI:  I think this is outside the

17    scope of my cross.  But --

18                THE COURT:  Is there an objection?

19                MS. ZUJKOWSKI:  Objection.

14:24:36  20                THE COURT:  Sustained.

21    BY MS. MICHELSON:

22    Q.    Are you aware of any evidence that there has been

23    expression of dissatisfaction or complaints or experience

24    with Groeneveld's by the end users of these products?

14:24:50  25    A.    Well, I -- no company is ever perfect.  I'm sure

1    somewhere out there will be examples, you know, where we can

2    meet everybody's expectation but I absolutely assure you

3    from a warranty cost point of view, it's such a small number

4    in our day-to-day operations that we don't create even a

14:25:11  5    separate cost for it because the product reliability and

6    quality is there, and there's not that many dollars spent

7    with correcting a customer dissatisfaction with our product.

8    Q.    The -- there were questions on cross-examination about

9    the fact that Groeneveld isn't suing distributors or third

14:25:48 10    party installers, and I'd like to direct your attention to

11    that area of inquiry.  And my question is that's true,

12    right, Groeneveld isn't suing those people, is it?

13    A.    No, we are not.

14    Q.    So why are you going after the manufacturer of the

14:26:08 15    product, the Lubecore product, the guy who brings it into

16    North America and distributes it here in North America?

17    A.    This claim is about trade dress, and unfair trade

18    practices, and it's not the distributor who has manufactured

19    that product and the program.  It's Lubecore International,

14:26:52 20    and that's why our dispute is with Lubecore.

21    Q.    There were questions about the website, the

22    autolubeparts.com website and the Fuel Systems website on

23    cross-examination.  I'm just directing your attention to

24    that area of inquiry.  And you start -- you didn't get a

14:27:19 25    chance to fully explain what the point of that -- of that --

1    what the point of that is in connection with the issues

2    here.

3          Can you finish your answer for the jury, please?

4    **A.**    I -- I'm not sure honestly, unless you read it back to

14:27:46  5    me, exactly what the question was and where I sort of

6    stopped.  So.

7    **Q.**    All right.  Well, let me -- let me try and phrase my

8    question better for you because that could be my fault.

9          What's the relevance of the information on the

14:28:13 10    Lubecore distributor web sites where you put the word

11    Groeneveld into a search bar and a picture of a Lubecore

12    pump comes up?

13    **A.**    The relevance is that it's damned confusing.

14    **Q.**    Similarly, if you type into a Google search bar, or

14:28:35 15    beginning search bar I suppose or any other search engines,

16    Groeneveld, or Groeneveld grease systems or Groeneveld

17    greasing systems and distributor website comes up.  What's

18    the relevance of that?

19    **A.**    Again, if somebody probably like me who doesn't know

14:28:54 20    how you get your name to the front page and to the sponsored

21    list types in it because they're looking for Groeneveld and

22    it comes there, then you know they're going to say, Okay,

23    there, I'm -- hey, must be in the right spot.  I'm in Ohio.

24    **Q.**    You know, and I -- close to done actually.  This pump

14:29:16 25    that's in front of you on the table, let -- when did you

1    start with Groeneveld?

2    **A.**    In August of 2006.

3    **Q.**    Okay.  And were you ever asked questions about this

4    particular pump before being on the stand here today?

14:29:36  5    **A.**    No, I wasn't.

6    **Q.**    Were you ever shown a picture of it in any of the

7    other proceedings in the case?

8    **A.**    No, I wasn't.

9    **Q.**    Okay.  Do you know why they would show this to you

14:29:48 10    instead of Willem VanderHulst until after he goes back to

11    Italy and can't explain where in the Groeneveld history this

12    thing fits in?

13        Let me rephrase my question.  Will Willem have had

14    more information about this particular item than you do?

14:30:04 15    **A.**    Oh, absolutely.

16    **Q.**    And what about Martin Vermeulen, their own witness,

17    whose trial testimony has already been committed to video.

18    Do you think he might have some more information about this

19    particular pump and where it fits in in the history of the

14:30:20 20    company than you?

21    **A.**    Yes, I do.

22            MS. MICHELSON:  I don't have any further

23    questions.

24            THE COURT:  Anything further?

14:31:04 25            MS. ZUJKOWSKI:  Unfortunately yes, but I'll be

1    brief.

2                    THE COURT:  The jury's beginning to understand

3    after a week when the lawyer says I'll be brief, they should

4    sit back and get a cup of coffee.

14:31:15  5                    MS. ZUJKOWSKI:  I think I stuck to my word on

6    it.

7                    THE COURT:  Okay.  You have.  This was the

8    witness who was going to take 20 minutes, remember?

9                    (Laughter.)

14:31:25 10                    THE COURT:  That was 24 hours ago.

11                    (Laughter.)

12                    RECROSS-EXAMINATION OF GAIL WILSON

13    BY MR. ZUJKOWSKI:

14    **Q.**    Gail, you just testified you're not trying to

14:31:32 15    attribute all of Groeneveld's loss sales to Lubecore, right?

16    **A.**    Correct.

17    **Q.**    Let's just look at 2009 to 2010 on **began document

18    your counsel's been using.  Not an exhibit in this matter,

19    but is that in focus enough for you in the upper right-hand

14:31:48 20    corner?

21    **A.**    Yep, that's clear.

22    **Q.**    Approximately, and we've helped you with the math

23    here.  What are Groeneveld's last sales from 2009 to 2010?

24    **A.**    This is -- these are the total sales for the U.S.,

14:32:21 25    including all of our U.S. entities and all of our products.

1    And the sales in 2010 were $6,486,000, and the sales in

2    2009, $6,586,000.  So the math on that is roughly $100,000

3    difference.

4    Q.    All right.  So the total for -- you just said on

14:32:51  5    everything, too, all three entities in the U.S. and all

6    products, too, is it?

7    A.    Yes.

8    Q.    Is $100,000?

9    A.    Yes.

14:32:57 10    Q.    That same year, Mr. Eissis sold four times that much

11    in Lubecore pumps, ALS products alone, right, associated

12    parts?

13    A.    Yes.

14    Q.    So you're actually, every last dollar and then some,

14:33:25 15    you're putting right on here?

16    A.    As I mentioned, the total sales on that previous

17    schedule that you showed me is for all of the U.S., for all

18    of our products, and there are market fluctuations in the

19    various industry sectors.  I believe there was another

14:33:52 20    schedule which was just the EP-0 sales, and it -- it will

21    show a little bit of a different trend than the total sales.

22    Q.    Will it give us a lower number?  You want to help me

23    find that page if you want to look at that number?

24    A.    Yeah, it's the -- at the previous -- it was deposition

14:34:19 25    Exhibit 47.

Wilson - Redirect

1    **Q.**    Rather than try to pull up the document, what number

2    you think is a fair number for the sales decline for that

3    year, EP-0 pumps?  We'll use whatever number you want.

4    **A.**    Could you show the left-hand side of your schedule on

14:34:45  5    the monitor, please?

6    **Q.**    The same page we were on?

7    **A.**    Yeah, that page that you had up.  Sorry, just wanted

8    to see the headings.  No, the Lubecore document.  That's the

9    one.

14:35:00 10        So as I previously mentioned, if there's anything

11    that's in sort of Florida, the northwest, United States,

12    Utah, which are not part of the selling territories, unless

13    it's a national account for trans -- Groeneveld Transport

14    Efficiency, Inc., then I believe what's fair is that all of

14:35:28 15    those sales of $474,985, if that's the full extent of the

16    Lubecore sales, minus $45,925 for Florida, would be lost

17    sales for Groeneveld Transport Efficiency, Inc.

18    **Q.**    You're still talking about a number that's four times

19    Groeneveld's total loss sales for that year?

14:35:53 20    **A.**    No, it is not.  Sorry if I -- I will wait if you want

21    to find that exhibit.  It -- I'm not --

22    **Q.**    I guess I am trying to understand where is it at

23    the -- I'm sorry, where are the discount, where is the

24    discount coming from?  How is your approach conservative?

14:36:14 25    **A.**    Sorry.  I didn't hear what you said.

Q.    Where -- when you say that you're not trying to
attribute all of your lost sales to Lubecore's entry into
the market, and that rather you're taking into consideration
all of the other things we talked about, the possibility of
downturn in the economy, other competitors, price
competition, you know, everything else, where is it in this
analysis that those things are given some kind of discount
factor when coming up with your damages number?

A.    I don't think Lubecore can impact the downturn in the
economy, so maybe I'm not understanding the question, but if
you pull up this exhibit.

            THE COURT:  Look, can you answer her question?
Where is the discount?

            THE WITNESS:  The discount to?

            THE COURT:  For all the things she just said.

BY MS. ZUJKOWSKI:

Q.    How are you factoring those concepts into your
analysis rather than just putting every last dollar of your
last sales on the Lubecore?  How are you being conservative
to take those factors into account?

A.    Because I didn't take into account sales that we make
to others that may have been decreased due to confusion
where the customer just simply doesn't purchase anything,
but I haven't discounted the Lubecore sales for those other
factors.  I've discounted my own sales for those factors.

616

Wilson - Redirect

1    Q.    Thank you very much.  Thank you.

2              THE COURT:  Is that it, Melissa?

3              MS. ZUJKOWSKI:  Thank you.  Yes, your Honor.

4              THE COURT:  Thank you.  You're excused.  You

14:37:57  5   may call your next witness.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Burke - Direct

1    * * * * *

2                    MS. MICHELSON:  Yes, we call John Burke.

3                    MR. ANASTOS:  Objection, your Honor.

4                    THE COURT:  Come on up here.  Stand up and

14:38:07 5    stretch, folks.

6          (Discussion at side bar off the record.)

7                    THE COURT:  Dr. Burke, raise your right hand,

8    will you, sir.

9                            JOHN BURKE,

14:41:03 10       of lawful age, a witness called by the PLAINTIFF,

11                 being first duly sworn, was examined

12                    and testified as follows:

13                    DIRECT EXAMINATION OF JOHN BURKE

14                    THE COURT:  Last time he was here, he was

14:41:08 15   Santa Claus.  What did you do?

16                    THE WITNESS:  I will be again this year.

17                    THE COURT:  Doctor, tell us who you are.

18                    THE WITNESS:  Good afternoon.  My name is John

19   F. Burke, Junior.

14:41:28 20   BY MS. MICHELSON:

21   Q.   Dr. Burke, can you tell the jury where you live, what

22   you do for a living, where you're from?

23   A.    Yes.  A lot of questions.  I live in Cleveland

24   Heights, Ohio.  What I do is I am an economist, and I

14:41:42 25   practice that in a couple ways.  I teach economics currently

1    at John Carroll University.  And where am I from?  I'm from

2    all over the place.  I was born in Maine, I grew up in

3    Massachusetts.  I went to school in South Bend, Indiana.

4    I've been married in Michigan, the first time.  I taught

14:42:01 5    economics in Illinois.  I taught economics in Indiana.  Most

6    of my teaching career has been teaching economics in

7    Cleveland.  First at Cleveland State University, and now at

8    John Carroll University.

9    **Q.**    And, sir, can you just describe for the jury please

14:42:20 10    your educational background and -- thank you.

11    **A.**    Yes, as I mentioned I grew up in the Boston,

12    Massachusetts area, went to primary and secondary schools.

13    Right after high school, I served a tour of duty in the

14    United States Navy, and that's where I got my best

14:42:36 15    education.

16        After the Navy, I attended Boston College, graduating

17    from BC in 1961 with an undergraduate degree in economics,

18    awarded a full scholarship to attend the University of Notre

19    Dame in South Bend, Indiana.  Masters Degree in Notre Dame

14:42:53 20    in 1963 in economics.  Continued working at Notre Dame and

21    was awarded a Ph.D., Doctor of philosophy in economics in

22    1967.  Did some postdoctoral work at the University of

23    Chicago in the summer of 1967, but there was no degree

24    associated with that program in Chicago.  That's my formal

14:43:12 25    education.  But I'm still a student of economics still

1    reading, still trying to learn, still trying to work my way

2    up the curve.

3    Q.    And do you also, as well as learning, do you also

4    teach?

14:43:24  5    A.    I do.  I've taught economics for a long time.  First

6    at Notre Dame as a teaching assistant while I worked on my

7    own degree, and then at Indiana University as an instructor

8    in economics, and then at Eastern Illinois University in

9    Charleston, Illinois, as Assistant Professor of Economics.

14:43:44  10    And then the late 1960's, I was off on a job with a

11    brand new school in Cleveland, Ohio, the Cleveland State

12    University.  When I arrived on that campus, we were teaching

13    in temporary buildings.  I'm amazed what has happened to

14    that place.  I taught there for 27 years, retired from

14:44:03  15    full-time teaching in the 1990s, with 37 years of public

16    service.  They let you buy your military time and other

17    stuff like that.  I was out of the classroom for a couple of

18    years, and then in the late 1990s John Carroll University

19    called, and I now teach one course a semester if the

14:44:23  20    university needs it.

21    Q.    And, sir, can -- I know you've written a lot, but can

22    you just describe for the jury some of the articles or

23    publications you've authored that relate to the work that we

24    asked you to do in this matter?

14:44:38  25    A.    Yes.

1      Most of my writing was done when I was a younger man.

2   Writing is a younger man's job in the academic life although

3   I did get something published last year.  But a lot of it

4   was on state and local taxes, impact on the citizens when

5   the Government taxes us, impact on our citizen when the

6   Government spend that taxpayers' money, I also have

7   published in the matters area of how to evaluate a business,

8   published in the area of the economic relationship between

9   law and economics.  I've also done a lot of work in how

10   families spend their money, but as I said, most of those

11   publications were done when I was a younger guy.  I

12   published something in the 1990s and published something

13   last year.  But, most of it was done when you're a young

14   man.  As a young man's job.

15   Q.   And instead of going through more of your professional

16   achievements and associations, I'm going to just slow you

17   what we've marked PX 140.  Thank you.  140-1 through 140-8.

18   And can you confirm please for the jurors that this is a

19   copy of your curriculum vitae?

20   A.   It is it's my resumé.

21   Q.   Thanks.

22      So, Dr. Burke, what did we ask you to do in this case?

23   A.   The assignment you gave me was to look at a company,

24   and determine the relationship between its costs, how much

25   of its costs to fix, how much of its cost is variable and

1    you want to determine that so you would know that if you add

2    an additional dollar of sales or $1 million additional sales

3    at the top of this company, how much flows out of the

4    company, that would be variable costs, how much stays with

14:46:41  5    the company, that's profit and the contribution to fix cost

6    that was part of my assignment.  My other assignment was to

7    look at sales of alternative company, and to say if the

8    first company had been able to make the sales of the second

9    company, what impact would that have on the bottom line of

14:47:02  10    the first company.

11    Q.    And the first company just so we're all clear, the

12    first company being Groeneveld, the plaintiff in the case,

13    the second company being Lubecore the Defendant in this

14    case?

14:47:12  15    A.    Yes, ma'am.

16    Q.    And were you able to do that work?

17    A.    Yes, ma'am.

18    Q.    Now, the first -- before we get to what exactly what

19    you did in this case, can you just explain to the jurors

14:47:27  20    what an economist does and how an economist is able to do

21    the assignment that you have just described?

22    A.    Yes, sir.

23    Q.    Thanks.

24    A.    An economist is a social scientist, an economist -- we

14:47:40  25    look at people and businesses and entities and say how does

1    this business earn its income.  If you're a person, do you

2    put your time out for a wage or a salary or a commission?

3    How do you earn a living.  If you're a building, how do you

4    earn your rents?  If you're a business how do you earn your

14:48:01  5    profits?  And on the other side of that, once you have

6    earned your living, once you've earned your money, how do

7    you turn around and spend that.  If you're a person spending

8    it on food clothing shelter transportation recreation

9    medicine.  If you're a business, how much do you spend to

14:48:18 10    run the business, what it should cost of goods sold, what

11    are your inventories, what are -- where does your money go

12    and how much is left over and by the way, it all goes

13    somewhere because there is only one thing to do with money.

14    You spend it.  That's the only thing you can do with money.

14:48:39 15    Even if you use it to buy assets, you got to spend it.  If

16    you tuck it under the mattress, does you no good at all.

17    I've got to buy something with your Monday I so whether

18    you're a person or a business or a partnership or

19    corporation, you take in monies from your economic activity

14:48:56 20    and turn around and you disburse those monies for your

21    economic activity economist is a social scientist that look

22    at that and see what are the relationships, what are the

23    determining factors in that.

24    Q.   And are you prepared today to explain to the jury what

14:49:12 25    you did and tell us what your economic loss calculation was

1    in terms of dollars lost to Groeneveld in connection with

2    the sales that went to Lubecore instead of Groeneveld in the

3    past and then going forward?

4    **A.**   Yes, ma'am.

14:49:27   5    **Q.**   Now, have you testified in court on these sorts of

6    matters before?

7    **A.**   Yes, I have, on many occasions.

8    **Q.**   And any particular side you usually show up for or how

9    does that work?

14:49:42  10    **A.**   I -- usually I testify on behalf of the plaintiff.

11    They're the ones who have the responsibility of showing that

12    there's been a loss.  However, frequently, I will testify

13    for the Defendant also, and on several occasions, I've also

14    testified for the Court.  I've been appointed as a

14:50:02  15    court-appointed expert.  One case involved -- there was a

16    night club down in Kentucky called the Beverly Hills supper

17    club, burned down about 30 years ago, and 286 people were

18    killed or injured.  Federal Judge Rubin in Cincinnati asked

19    my partner and myself if we would undertake an economics

14:50:25  20    analysis how much the 286 people could have earned had they

21    not been killed or injured.  In another instance, another

22    federal Judge in bankruptcy court in Cincinnati, there was a

23    business called eagle pitch which was one of the asbestos

24    type companies, the Judge asked us to look at the -- what he

14:50:44  25    called the futures, these were the people who would come

Burke - Direct

1    down with one of the asbestos diseases, ten, 20, 30 years

2    into the future and what would be the cost associated with

3    helping them.

4         Another case involved a train that tipped over, a

14:51:02  5    train tipped over and a lot of gases of some kind came out

6    of the train and they evacuated a couple counties in south

7    Western Ohio, Miami County and I forget the other one.

8    Putnam maybe, I forget and again, these businesses were

9    closed down for about three days, and the Judge asked us to

14:51:20 10    look at the economic impact so I worked for the courts and

11    several occasions also.  But economics is economics, I mean

12    if you ask me how much is two and two or if you are

13    colleague asked me how much is two or two or the Judge asked

14    me two or two the answer is the same.

14:51:35 15    Q.    And sir, when you do this kind of work, this expert

16    work that you described, are you compensated for the time

17    that you spend?

18    A.    That's the first law of economics, nothing's free.

19    Yes, I am compensated.  And very nicely by the way.

14:51:51 20    Q.    And are you being compensated in connection with this

21    case as well?

22    A.    Yes, ma'am.

23    Q.    And?

24    A.    I will send you a bill.

14:51:58 25    Q.    I'll send -- I'll tell you who to send it to, not me.

1    And what -- what rate are you being charging here?

2  **A.**    For testimony for courtroom testimony, I sent you a

3  letter I believe and I said I'd charge you $1200 to come to

4  court and testify on your behalf.  Also in that letter, I

14:52:19 5  said when I back in my office working on my reports I'm

6  going to charge you $475 an hour.

7  **Q.**    Okay.  And about how many hours do you have of work

8  into this matter up until coming to court today?

9  **A.**    I don't know, and I don't know how many hours my

14:52:34 10  assistants had in it either.

11  **Q.**    Sir, so can you just explain to the jury what you did

12  to calculate the economic losses in this matter?

13  **A.**    Yes.

14  **Q.**    Groeneveld's economic losses in this matter?

14:52:53 15  **A.**    I noticed an easel here.  Can I use that ease will.

16  **Q.**    Yes we brought it for you.

17                    THE WITNESS:  May I, your Honor.

18                    THE COURT:  Sure.

19  **Q.**    Okay, Doctor?

14:53:48 20  **A.**    Thank you.

21    The assignment is to figure out how much of

22  Groeneveld's revenues, I go through an impact the bottom

23  line.  And impact their costs.  Well, there's a couple of

24  simple formulas you want to look at.  It is a definition

14:54:09 25  that total revenue is equal to total costs plus or minus

1    profit, and I put plus or minus because it doesn't always

2    work out the way you want it to.  Sometimes profits are

3    negative.

4         That's a formula that has to hold true.

5              MS. MICHELSON:  Help is on the way.

6              THE WITNESS:  That has to be true.  It's a

7    definition.

8         Now, the question I don't look at is if there's a

9    change in revenue, if there's a dollar more of sales,

10   $10,000 or $100,000 or $1 million or $10 million more in

11   sales, what impact will it have on this company.  Well, so

12   it's a change in revenue is going to be a change in total

13   costs plus or minus a change in profit.  Well, it cost here,

14   there are two components every cost.  There are fixed costs,

15   and there are variable costs.  Fixed costs are costs that

16   you shot run don't change.  If you own a building, and your

17   accountant told you it appreciates by $60,000 per year, then

18   whether you produce one item in that building, or a million

19   items in that building, the appreciation is $60,000, that's

20   a fixed cost.

21        There are other costs that are variable costs.  If you

22   run the plant 24 hours a day, your electrical bill is

23   probably going to go up.  If you have more laborers, then

24   the labor bill will go up and the payroll taxes associated

25   with that.

1    If -- so I want to divide the cost right here into two

2    types, fixed costs and variable costs.  So now my formula is

3    total revenue is equal to fixed costs plus variable costs

4    plus or minus profit.

5    That's all I have to figure out because now, I have to

6    collect data.  I have to collect data on what this total

7    revenue has been, and so you look back historical look at

8    profit areas profit and loss statement, a profit and loss

9    statement will tell you the revenue and you look at that for

10   over a period of years, the profit and loss statement is

11   also going to tell you all of the costs associated with this

12   company, and that profit and loss statement is going to tell

13   you the profit.  Positive, negative, zero.

14   I need help right here.  Some fixed costs are all as I

15   mentioned appreciation is August if you had borrowed a

16   $million at the bank at 10 percent you open $100,000 a year

17   and you produce one are a million, that's a fixed costs.

18   (Fixed) some fixed costs are obvious, some fixed costs are

19   not obvious.  I need help from the company to make this

20   determining and what you do is take all these numbers, you

21   put it in, my next step is I want to find out what is the

22   relationship between this total revenue, fixed costs is

23   going to be constant, so I really want to find out what is

24   the relationship between fixed costs, and variable costs.

25   Variable costs doesn't stay with the company, variable

Burke - Direct

1    flows right out the door you don't get to keep the variable

2    costs so I go back and I collect data on the company, I

3    collected five or six years of information on revenue,

4    collect the information on five or six years of all of the

14:57:46  5    costs associated with this company, and then I take all that

6    information and I put it into statistical regression.  I try

7    to determine what is the relationship, in a regression is a

8    mathematical formula that tells me what the relationship is.

9        Just for example, you may put on this axis a number of

14:58:09 10    cigarettes smoked you may put on this axis the rate of lung

11    cancer or something else, and when you go out and collect

12    the data, you're going to find that the data looks like

13    this.  It's all over the place, the data here there

14    everywhere, it is -- you've got -- you know, you got

14:58:28 15    somebody smoked one pack of cigarettes, cancer, and almost

16    everybody who smoked camels and lived until 86.  But, when

17    you collect all of the data, put it through a mathematical

18    relation ship, called the regression analysis you find that

19    here is a trend line and that trend line will say for each

14:58:53 20    one more pack of cigarettes you smoke on average, the cancer

21    rate jumps from here to here and it's -- by the way that's a

22    mathematical relationship, it's not a causal relationship

23    just math.

24        This line has to fit two categories, one you notice

14:59:15 25    there are numbers above the line numbers below the lines

Burke - Direct

1    numbers below, if I sum all of those deviations from the

2    trend line, some of that has to be zero.  That's what an

3    average is, isn't it?  An average -- you have some above,

4    some below, all deviation s are zero.  This line has enough

14:59:38  5    characteristics in which -- because some of the deviations

6    are above the line, some of the deviations are below the

7    line, negative.  If I square them, get rid of the negative

8    so the second characteristic, this has to be the least or

9    the smallest of the squared numbers and that's why this line

15:00:01 10    is called the line of least.  I put that through my

11    regression.  I did that for this company, and I found when I

12    put through all the numbers that the relationship it turned

13    out to be that it changed in total revenue most of it was

14    going to disappear in the form of fixed costs.  Aim going

15:00:25 15    round this out roughly 65 percent is going to disappear in

16    fixed costs -- excuse me in variable costs and approximately

17    35 percent was going to stay in the form of contribution to

18    the bottom line profit and to help pay for fixed costs.

19    Actually the number I got from my regression was 36.53

15:00:54 20    percent.  So put a dollar in at the top of the company to a

21    revenue, then the company is going to benefit to the tune of

22    36 and a half cents.  A billion dollars in and it's going to

23    benefit to the tune of 365,000 and some odd pen nice.

24         So that's the first half of my assignment.  The other

15:01:20 25    half of my assignment was to look at a variety of sales that

1    had been undertaken by a different company, in this case

2    Lubecore.  I had information sent to me from the attorneys

3    that in the year of 2010, that the portion of the sales that

4    would have affected the Groeneveld was $816,617, and in

5    2011, the annual projected amount was $1.6 -- $1,633,235 I

6    then applied my 36.5 percent, and I got the damages at

7    Groeneveld had suffered for the first couple of years, were

8    about $298,000 for this year and about $894,000 in the

9    second year.  That brought plea up to now.  I then turned my

10   attention to the future.  In the future I've got three other

11   problems I have to deal with.  One problem I had I have to

12   deal with is growth.  Sales of Groeneveld going to grow in

13   the future?  Well, I looked back at the producer price index

14   for this type of industry, and I thought that the growth of

15   prices, assuming though growth in form, the growth of prices

16   was going to be about 3.6 percent per annum so I assumed

17   that Groeneveld's gross revenues was going to grow by that

18   change in prices.  Change in prices by the way comes out of

19   the producer price index, I looked at the producer price

20   index between 2003 and up through August of 2011, and this

21   averaged 3.6 percent, some more, some less as to average.

22        The second problem I have is if there is money due and

23   payable in the future, like if I owe you $1 million, next

24   year.

25   Q.    You can send that to me along with the bill?

Burke - Direct

1        (Laughter.)

2    Q.    But if I owe you -- $1 million next year, and I went

3    up to her today and said I'd like to get out of my debt

4    today, I don't want to offer her a $1 million because I'm

15:04:11 5    overpaying her.  She can take my million and just out of any

6    bank and earn a small amount in today's world but earn 1

7    percent on that.

8        Now, 1 percent on a million is what, $10,000, so I

9    think I'll say to her would you like to have $990,000 today

15:04:31 10    or do you want to wait a year and I'll give you the $1

11    million.  The economist is going to say those two amounts

12    one year time period at 1 percent interest are the same

13    amount.

14        If the debt is owed two years from now and there's two

15:04:50 15    years, not only $10,000 a year but compounding in there too

16    and if it's three years, if it's four years, five years, so

17    for each year in the future, I have to bring it back to

18    present value.  What it's worth today.

19        Now, usually when you look at present value for a debt

15:05:09 20    between two people like you and me, you look at a safe

21    investment, you look at a safe investment like the United

22    States Government, that's the safe investment (bond) and

23    that interest rate today is very low, .6 of 1 percent, even

24    for two or three or four years, it only gets up to 2 or 3 or

15:05:28 25    4 percent.  However, we're looking at a business.  A

Burke - Direct

1    business is subject to a lot more risk than the United

2    States Government is.  It's just not as safe an investment.

3    So the rate of interest that I use to bring 2012 back to

4    today, 2013 back today 2014 back to today I use 20 percent

15:05:52  5    and that accounts not only for that rate of interest, it

6    accounts for risk, risk of bankruptcy, risk of recession,

7    all kinds of risks.  All used very high rate.

8        Third thing I have to look at is is this problem that

9    Groeneveld has encountered, is it going to go on forever, or

15:06:14 10    is it going to end today or is it going to end a year or

11    two, three, four five years from now, well, I looked at

12    several years in the future, and I was in have had that the

13    problem would probably disappear in about the fifth year.

14    So for the next several years, I have to say how much is

15:06:35 15    Groeneveld going to lose in the future before the problem

16    totally goes away.  So as I mentioned, maybe if you just put

17    up Page 10 of my report?

18                    MS. MICHELSON:  I got it here, sir.  10 or.

19                    THE WITNESS:  Ten, Page 10.

15:07:22 20        There we are, so in the -- I started in 2010, I did

21    not have Lubecore's figures for 2009, so I made no judgment

22    on that.

23        But in 2010, I thought the lost sales would be

24    $816,000, the contribution margin would be 36.53 therefore,

15:07:46 25    Groeneveld has lost $298,000 to pay profits and other fixed

1    costs.  The next year I thought Groeneveld would have lost

2    about $1,633,000 in sales, applied the 35 percent, and you

3    get $596,000 in lost contribution margin, add those two

4    together and the problem ends right now in 2011, the losses

5    would be $894,000.

6        If it continues for five years, you could see the year

7    figure, first of all, in the first column, you can see sales

8    dropping very rapidly.  I have them dropping very rapidly

9    because I grew them by the small amount, only price

10   increases of 3.6 percent.  No -- no additional quantity.

11   And I discounted them at a very high rate of interest.

12       And that's what you get for result of those figures

13   dropping 1.4, 1.2, 1.0, 9, 7, 6, and drop very rapidly

14   mostly because of the high discount rate, and if you add

15   them up until the fifth year, I have cumulative chart off to

16   the very far right here, there, accumulator, if you -- if

17   the problem ends in fifth year, the total losses $2

18   ,856,326.  I put all of this in a report.  And I sent it off

19   to you.

20   Q.   Okay, Doctor.  Thanks.  You are here' my question for

21   you.  The first question when you did your first part of

22   your Saturdays call regression analysis, what is the data

23   that you need and did you get it?

24   A.   Yes, if I didn't get it I could not have done that.

25       I asked for statistical data for at least five years.

1    I like to have five years.

2    **Q.**   How much did you get?

3    **A.**   I got 6, 2005, 6, 7, 8, 9 and 10, and I have the

4    revenue data, and I had all the cost data.

15:09:57  5    **Q.**   And that data was whose data?

6    **A.**   Groeneveld's data.

7    **Q.**   And do you recall it being provided to you in a CD?

8    **A.**   Yes.  I got it in an electronic form, I got a couple

9    of disks here, I got it in electronic form, the easiest way

15:10:17 10    to transmit it but it's standard accounting stuff.  A profit

11    and loss statement from a company.

12    **Q.**   And were you provided with all the information from

13    Groeneveld that you felt you needed to reasonably calculate

14    the -- to do your regression analysis?

15:10:33 15            THE COURT:  Doctor, you can sit back down if

16    you want, you can sit back down.

17            THE WITNESS:  Thank you.

18            THE COURT:  If you're more comfortable

19    whichever way you want to do.

15:10:44 20            THE WITNESS:  Thank you, your Honor.

21        I did get all the information I need, you provided me

22    with an opportunity to talk to -- on the phone to people

23    from Groeneveld, and I especially needed some help as I

24    always do in that area, separating out what is fixed costs,

15:10:58 25    what is variable costs, not always easy to identify.

Burke - Direct

1    **Q.**    Why -- why do you need input from the business people

2    on that specific topic?

3    **A.**    I will never know their business as well as they know

4    their business.  So I need help in having some things

15:11:17 5    explained to me.

6         The relationship between economics and business, the

7    economist is kind of a business person scientist.  It's kind

8    of analogous to the relationship between engineering and

9    physics.  And so now we're into the practical nitty-gritty,

15:11:37 10   I need help from somebody in the company to explain to me

11   just -- as I said some fixed costs are obvious, some are

12   not.

13   **Q.**    Was there anything in the Groeneveld financial data

14   and information that was delivered to you that raise any

15:11:56 15   concerns about reliability or accuracy or anything along

16   those lines?

17   **A.**    I'm not a CPA, I'm not an accountant and aim certainly

18   not an auditor.  I accepted what you told me as truthful.

19   I'm -- I'm one of those people who believes lawyers.

15:12:14 20   **Q.**    And?

21                   THE COURT:  You should.  His wife is a lawyer.

22                   (Laughter.)

23                   THE WITNESS:  Yeah, I better.

24   **Q.**    And then when you did your other part of the

15:12:24 25   calculation, did you accept as accurate the information that

1    the Lubecore lawyers provided concerning Lubecore's sales

2    numbers?

3    **A.**    Yes, ma'am.  You provided me with a document that has

4    got a reference number of Lubecore 0000, five zeroes, 296

15:12:50  5    and I relied on that document.

6    **Q.**    And just so -- just so the record is clear, that's --

7    is that this item that we have here, is it 103?  If you need

8    me to walk you up a copy, I can.

9    **A.**    Yes.

15:13:15 10    **Q.**    Now, were there any 2009 numbers identified here?

11    **A.**    No, ma'am.  This at the top says 2010 actual, and 2011

12    projected.

13    **Q.**    Okay.  And -- oh, that's here.  And when you -- and

14    when you inserted the Lubecore sales figures into your

15:13:39 15    analysis to come out with a numbers that you've testified

16    to, the damage numbers that you've testified to, did you

17    include all of the figures here in Exhibit 103 or was there

18    a selection?

19    **A.**    It was a selection.  I was informed by you and your

15:13:59 20    colleagues that there were just four items to look at.  As

21    you noticed, the total sales in 2010 listed as a million 42.

22    I only used 816,000 of those one million, 42, about 80

23    percent and I used the company c, the company identified

24    here as C, I used the company that was identified as I, J

15:14:28 25    and K, I used four companies.

Burke - Direct

**Q.**    And, sir, so if in fact additional companies should
have been included, your final calculations would be greater
in terms of the actual lost profit damages, lost sales
damages?

**A.**    Yes, a company that I didn't include by the way was
the first one, and that had sales of about 26,000.  If you
added that to my figure, you should then take .365 of that,
and about a third of that would be about eight and a half
thousand and add that to the losses, yes.

**Q.**    And why did you -- what part of your calculation
includes Lubecore's reported gross revenues for the selected
companies that you've identified in court here?

**A.**    That would be in my report where I talk about there's
a footnote on Page 9 where I say I have added $816,000 and
$1,633,000.  The four companies for 2010 and 2011, that's on
Page 9 of my report.

**Q.**    I'm trying to get to that.  That's marked PX 117- 1.
It's so hard to see.

**A.**    Kind of hard to see but if you can pull up footnote C
says I've added $816,000 for the first year, and $1,633,000
respectively for the second year.  So that would be 2010 and
2011.

**Q.**    I'm not sure if I have the right table.  Can you tell
me which table?

**A.**    I think you were right.

Burke - Direct

1   **Q.**   Oh, I was -- okay?

2   **A.**   Yeah.  Look at Note C.

3   **Q.**   Oh, I see here.  Okay.  Thank you.

4   **A.**   I added $816,000 for 2010 and $1,633,000 for 2011.

15:16:39 5   You had the right one.

6   **Q.**   Okay, great.

7           What other information did you use, one other data did

8   you use in doing all these calculations that you've

9   described to come up with the numbers that you're presenting

15:16:53 10   here in court?

11   **A.**   I think we talked about all the data I used.  I

12   brought everything -- I brought my complete file with me,

13   and that's all the data I used.

14   **Q.**   And, sir, did you have access before today to this

15:17:12 15   document marked Defendant's Exhibit X?  Let me find it in my

16   stacks.  Maybe somebody over there has got some -- got that

17   handy for me?  Thank you.

18           Is this something you were provided access to before

19   today?

15:17:38 20   **A.**   I saw that earlier today.  I don't believe I was

21   provided access to that first sheet you had.  I was provided

22   with a second disc of information on Friday of last week,

23   Thursday or Friday of last week and I started going through

24   that.  Perhaps that document is in there.

15:18:01 25   **Q.**   Okay.  And you got that disk when?  I missed it?

1    **A.**    Today, I got -- I saw the document today.  I got the

2    disk late last week and that document may be in had a disk.

3    I haven't seen it yet from that disk.

4    **Q.**    How much information is on that -- provided that disk

15:18:17  5    that you got, I guess, Friday?

6    **A.**    Say again.

7    **Q.**    What's the volume of the data in that new disk that

8    you were provided?

9    **A.**    A disk full.

15:18:30  10    (Laughter.)

11    **Q.**    And, sir, I'm going to show you this page from your

12    report that we've marked Exhibit 10 9, and can you just tell

13    the jury what this slows?

14    **A.**    Yes.  Until today I did not know how long in the

15:18:52  15    future this problem might exist for Groeneveld so on the

16    next page, 2-A, I show every year, and on this page, I kind

17    of show a summary.

18    So if the problem ends this year, if by the end of

19    December, no more problem than then the loss toss Groeneveld

15:19:13  20    would be the top figure $894,000.

21    **Q.**    Plus whatever numbers are relevant to the 2009 sales?

22    **A.**    Right, I did not have 2009.  So this is 2010 and 2011.

23    If the problem continues on for another three years, then

24    the amount of damages over that period of time, I believe,

15:19:34  25    would be $2.2 million and if the problem continues for a

1    five-year time period, it would be $2.8 million.

2    Q.    And I want to make sure this is clear.  In your

3    calculations, you are -- your economic analysis and re

4    regression analysis and statistical formulas, do you account

15:20:04 5    for variables, certain variables?

6    A.    Oh, yes, that's -- that's why you use those

7    statistical regression because accounts for all of that.

8    Sales don't go up perfectly in a straight line.  They go up

9    and down up and down and up and down and cost.

15:20:19 10    Costs don't rise or false.  They go up and down and up

11    and down and that's what the regression does.  It takes into

12    consideration all of those ups and downs and ups and downs

13    and gives us the line.

14    Q.    And from this page in your report, this figure or

15:20:38 15    summary sheet, we've marked it Exhibit 110.  I saw that

16    flying around up there in your hand and I thought maybe you

17    could describe for the jury what this particular figure

18    shows?

19    A.    Yes.

15:20:50 20    On the upper pad if you could pull that up a little

21    (part).

22    Q.    I can.  I can try.  Is this good enough or you want me

23    to --

24    A.    That's nice.  First off in the first column, the left

15:21:02 25    I show the years that I looked at it.  I started in 2010,

Burke - Direct

1    and 2011, that's the data I had from Lubecore.

2            So 2012, 13, 14, are forecasts I made of Groeneveld's

3    additional sales because the second column says lost gross

4    sales.  The third column I look at the variable costs.  And

15:21:25  5    I'm going to round that off to two-thirds, 67 percent.  And

6    then the next column has got the contribution margin at

7    about 35 percent.  And the next column has the lost sales

8    accumulated so it takes year one, it adds year 2, years 3,

9    adds year 4, second to the last column is the variable costs

15:21:50 10    accumulator and the last column is the contribution margin

11    accumulator so if the problem ends right now in 2011, you

12    would add 2010 and 2011 together, and get the figure that we

13    just looked at.

14    **Q.**    894?

15:22:07 15    **A.**    894, yes.  If.

16    **Q.**    Plus the 2009 sales, I want to make sure we're

17    accurate on that?

18    **A.**    Yes.

19    **Q.**    Okay.

15:22:16 20            And continue on.  I interrupted.

21    **A.**    No, that is -- yeah, plus the 2009, which I didn't do

22    anything with.

23    **Q.**    Right?

24    **A.**    And then we Justin on the line.  If we go on for

15:22:29 25    another year, another year, another year, another year, it

1    all adds up.

2    **Q.**    And this --

3    **A.**    Oh, and at the bottom.  Page if you can keep that same

4    page there, that just kind of shows it in a graphic form

15:22:44  5    over a period of time.  Same data, same information, but now

6    a picture.

7    **Q.**    And now this table that was in your report, table 1,

8    what is-- what is this data?

9    **A.**    This is the profit and loss sales grown for the period

15:23:09 10    of time 2005 to 2010, up at the top it shows the gross

11    sales, gross profit, it shows all of the costs associated

12    with that so, therefore we get down to the total operating

13    costs and the net sales margin, and then we get into the

14    management fees, and income from other things, and then we

15:23:25 15    get into net result after tax in the first several years

16    they were profitable, in the last few years, they turned

17    negative.

18    **Q.**    Here, this table 4, we marked it PX-114, if you could

19    identify and describe the meaning of this item?

15:23:47 20    **A.**    Yes, there takes the figures we just looked at in the

21    first column, gross sales for 05, '06, 2007 et cetera and I

22    report them, and I say, there comes back to that formula,

23    total revenue is equal to costs, plus, and so here I have in

24    the next column the fixed expenses of the costs of running

15:24:09 25    this company, how much of those costs got fixed?

1        By the way fixed is kind of a in the short run, this

2   instant, everything's fixed.  You can't change a thing right

3   now.  So by definition, everything is fixed.  But, in the

4   long run, everything is variable because the long run is the

15:24:36  5   long enough period of time to change everything.  So I'm

6   looking here at the short run.  So in the short run, the

7   next column, I have those fixed expenses.  That -- and I

8   also have the ordinary income.  Those statements come right

9   off the statements of profit and loss that we just looked at

15:24:57 10   on the previous page.  Therefore, the last column is the

11   residual mixed and variable expense because some expenses

12   are clearly fixed, some expenses are clearly variable, and

13   some expenses you're not quite sure about.  So I put them

14   into this category column, mixed.

15:25:18 15   Q.   And those -- those contingencies and those variations,

16   are three all worked into your economic and statistical

17   assessments and calculations?

18   A.   Yes.  And the reason I'm doing this is to put them

19   into my regression.  I have to make one other change, which

15:25:34 20   is on the next page, Page 7.

21   Q.   Do you have a table number?

22   A.   Table 5, Page 7.

23   Q.   And that is Exhibit 1 (15) Plaintiff's Exhibit 115?

24   A.   Yes, right there.  To get my regression to work

15:25:58 25   mathematically and give us a good figure, you got to take

Burke - Direct

1    inflation out of the equation, you don't want to be having

2    the variation, just do the prices.

3        So here, I put in the consumer price index, to stand

4    measure of inflation and I adjust all of my figures.  So

5    they're now in constant dollars.  That's a step I must take

6    in order to run the regression, which is on the next page,

7    Page 8?

8    **Q.**   Table 6.  I'm organized by table numbers?

9    **A.**   Table 6.

10   **Q.**   Here we go.  We've marked that PX 116-1?

11   **A.**   Could you bring it up a little, please?

12   **Q.**   I can.  I can try anyway.

13   **A.**   There's my regression analysis.  You can look at that

14   first number where it says multiple R and R square.  If it

15   was a perfect fit, the number there would be 100 or 1.  But

16   it isn't a perfect fit so the number is only .98.  That's a

17   pretty good fit though and there I have the other

18   regressions.  Down below I have my co-efficient, that line I

19   puts on the board is going to cross the Y axis at some point

20   and it's going to have a slope, and there they are right

21   there.  The last two things, the T statistics and the P

22   value tell me if my data is statistically significant, and

23   it is.

24       And then right in the middle of that page, you can see

25   there is the contribution margin 36.53.

1    **Q.**    Now, would have we've heard testimony from Ms. Wilson.

2    She's the CFO of the company, and she did her own

3    calculations and came up with the contribution margin of

4    around 40 percent.  I don't know the exact figure right now.

15:27:57  5    Can you explain the reasons for that variation?

6    **A.**    Perhaps.  Did we look at the same years?  Did she have

7    the same six years that I looked at?

8    **Q.**    I believe that she testified about three years.

9    **A.**    Well, right there, you would expect a difference

15:28:13 10   because we looked at different data.

11        And also you could expect a difference because I went

12   through this process of separating out the variable, the

13   fixed and the mixed.  I don't know if she used that same

14   procedure or not.  But, if you came in and said to me Burke,

15:28:32 15  I heard from Albert Einstein and he said that the number you

16   used was 36, and it really should have been 40, aid say I'll

17   accept what Albert says.  It's within the range.  My

18   number's not perfect.  Could it be 37, could it be 35, could

19   it be 38?  Yes, it could be.  It's an average.  And average

15:28:52 20  is before, and averages have below.

21   **Q.**    And so it is the difference between say 36.53 percent

22   and the 40 percent statistically meaningful?

23   **A.**    I don't think so, but I'd like to run it through a

24   statistical test to see it.  It doesn't seem to me, but

15:29:11 25  again, I'd like to run it through a statistical test.  There

1    are statistical tests that compare this number with that

2    number and see is the difference between them significant.

3    You know how all the polls come out on the president and

4    they say the president's approval rating is what 2?  It's 20

15:29:29  5    plus or minus 3, that means it could be 23, could be 17.  My

6    numbers are the same way.  Statistics are not perfect,

7    they're above and they're below.  40 is close enough.  But,

8    I know what I did, I don't know what she did.  And I like my

9    method.

15:29:49 10    Q.    I'm going to show you now --

11              THE COURT:  Here let's take a short recess.

12    Okay?  Take about ten or fifteen minutes, folks.  Keep in

13    mind the admonition.

14              (Thereupon, a recess was taken.)

15:45:25 15    Q.    Hi, Doctor Burke, I'm going to be done pretty quickly.

16    I'm going to just show you now as we move through this, as I

17    said fairly quickly, if we could switch our to this Elmo.

18              THE COURT:  Let's see here.

19              MS. MICHELSON:  Thank you, your Honor.

15:45:51 20    Q.    Figure 4 of your report that we marked as PX-124, and

21    if you can just explain what this -- what this graph

22    depicts?

23    A.    Yes.  That is in units, that's not in dollars.  That

24    the -- left hand axis is in units and that's truck sales,

15:46:17 25    audit, audits for trucks.

Burke - Direct

Q.    On an annual basis?

A.    On an annual bases, starting in 2008, they dipped in

'082009, that's the impact of a recession, recovered in

2010, and they're expect today recover very nicely in 2011.

Q.    And this -- this Figure 1 that appears in your report,

we marked this Plaintiff's Exhibit 121.  If you can explain

to the jury what this depicts and where this fits in to your

opinion?

A.    Yes, these are Groeneveld's actual sales for the time

period 2005 to 2010, and they show both the total U.S.,

which is the red figure, and they show Ohio.

Q.    And then finally, Doctor Burke, finally, as to these

figures, in any event, figure 2 that we've marked as PX-122,

can you tell the jury what this figure depicts, and what the

relevance is of this item?

A.    Yes.  These show what would have happened to

Groeneveld sales if we had added the Lubecore sales to

Groeneveld.  So here, we see Groeneveld sales, and then

adding in 2010, and 2011, the Groeneveld sales to the

Lubecore in both the United States as a whole, and the Ohio

component.

Q.    And this Figure 2, it depicts what period of time?

A.    2005 to 2011, although the Groeneveld sales plus the

Lubecore sales are only for 2010 and 2011.  I didn't have

2009, we don't know what 2012 is going to be.

Burke - Direct

1    **Q.**    I see.  I see and just so the record is clear, the

2    pink line, that is the Groeneveld -- that's the Groeneveld

3    sales in Ohio?

4    **A.**    In Ohio, yes.

15:48:27  5    **Q.**    And the yellow line adds in the Lubecore sales for

6    total Groeneveld USA?

7    **A.**    Yes, so the yellow line is USA, the first part of it,

8    the first four or five dots, just Groeneveld, the second two

9    dots, 2010, and 2011 add Lubecore to Groeneveld.

15:48:47 10        In the red line, it's just Groeneveld.  In Ohio, and

11    that's the first four or five red dots, and then in the last

12    two dots for 2010 and 2011, I add those portions of Lubecore

13    sales which were applicable.  Not total Lubecore sales, just

14    the four companies that I looked at which I showed the jury

15:49:11 15    already.

16    **Q.**    Just so I'm clear, the figure 2, it includes the

17    Lubecore sales as Lubecore reports for 2010 and 2011, but

18    not 2009 and before that because you didn't have that

19    information?

15:49:25 20    **A.**    You are correct.

21    **Q.**    Okay.  Now, Doctor, I'd like you to assume, as to

22    these 2009 sales I'd like you to assume please the

23    Groeneveld has sales of an additional 200 units, meaning an

24    additional 200 ALS EP-0 systems, as reported by the

15:50:01 25    Defendant, and that each one of those additional units would

Burke - Direct

1     have brought in a 1500 price I would like you to then tell

2     us first what the additional gross revenue to Groeneveld

3     would have been if it had had those sales in 2009.

4     **A.**    Well, 200 units times $1500 is $300,000.

5     **Q.**    And then if you apply your contribution margin as you

6     determine the contribution margin to be based on the

7     statistical regression analysis that you described, what

8     loss sales damages you calculate in 2009?

9     **A.**    If you had additional sales of $300,000 and the

10    contribution margin was .3653, then the amount that would

11    have been added to your bottom line and to help you pay the

12    fixed costs would be $109,590.

13    **Q.**    Okay.

14            And that -- let me see if I can find it.  I can use

15    this one.  And that is in addition to -- I'm looking now at

16    PX-118-1.  That would be in addition to the $894,904, that

17    you calculated as present value, incurred loss net sales in

18    2009, 2010, and through today, 2011?

19    **A.**    Yes, if you added that 109 to the 894,904, you'd get

20    $1,004,494, 1,004,494.

21    **Q.**    Okay.

22            MS. MICHELSON:  Thank you, Doctor.  I don't

23    have any further questions of the witness at this time.

24            THE COURT:  Thank you.  Cross-examination.

25

Burke - Cross

1           CROSS-EXAMINATION OF JOHN BURKE

2     BY MR. ANASTOS:

3     **Q.**    Good afternoon, Dr. Burke.  How are you?

4     **A.**    I'm well today.  And yourself?

15:52:59 5    **Q.**    Very well.

6     **A.**    Good.  Nice to see you.

7     **Q.**    I've been practicing in Ohio for over 20 years and

8     have heard of you for those 20 years and actually pleased to

9     have a chance to meets you?

15:53:09 10   **A.**    Aim pleased to meet you too.

11    **Q.**    I'm Tom Anastos?

12    **A.**    Yes you're with Ulmer and Berne, correct.

13    **Q.**    Yes?

14    **A.**    I am I've known your firm for a long, long time.

15:53:16 15   **Q.**    Now I was confused about how much you're getting paid

16    to sit up there right now, per hour?

17    **A.**    Well to testify, I send people a letter and I say for

18    testimony, for that day of testimony, I will charge you

19    $1200 to appear in court.  When I'm back at my office

15:53:32 20   working, I will charge for my time $475 per hour, and then I

21    have a lot of help from very able bodied people and I charge

22    them at appropriate amounts too.

23    **Q.**    Speaking of which, how many people helped you on

24    this -- up on this -- preparing this report, preparing this

15:53:51 25   data?

Burke - Cross

**A.**    Well, in a narrow sense, there are six people at my firm and I think four of them maybe five had input at some point in time.  That's the narrow answer.  The big answer is all of those teachers who taught me in the first grade and the second grade and in college I oh, all of them.

**Q.**    I didn't ask about them I was asking about the people?

**A.**

(Laughter.)

**Q.**    Because you don't charge the client for the --

**A.**    No, I don't, but those -- those the people that I really owe.

**Q.**    And how much have you charged the plaintiff in this case?

**A.**    I don't think we've sent them a bill yet.  As a matter of fact, I was looking through my report this past weekend, and I have a green sheet, I stand corrected.  We billed them $24,150 the end of September.

**Q.**    And that was for time through the end of September or through the end of August?

**A.**    Through the end of September, I think that bill has a date on it of 9-27.

**Q.**    Great.  What I'm asking is a lot of bill 30 days in advance.  So is that bill that was for 30 days after the work has been completed, if that bill is dated 9-27, is that for work done through August 31st or through sometime in

Burke - Cross

1    September?

2    **A.**    That is through 9-27.  That's the way I bill.

3    **Q.**    And how much was that again?

4    **A.**    $24,150.

15:55:16  5    **Q.**    How many hours would you estimate you put in since

6    September 27th?

7    **A.**    Maybe another ten, I worked a couple of hours this

8    past Sunday.  I met with the attorneys on Sunday, met a

9    couple of hours then, math and rose an and I worked on this

15:55:39 10    case Thursday and Friday of last year.

11    **Q.**    So you personally put in about ten?

12    **A.**    That's a guess.  I have to go back and look at my

13    records.

14    **Q.**    Is that would add another $5,000 on?

15:55:48 15    **A.**    Approximately, yes, sir.

16    **Q.**    So now we're up to close to $30,000?

17    **A.**    Yes, sir.

18    **Q.**    Okay.

19         You testified that you have testified many, many times

15:55:59 20    as I think you said, or many times, was there only one many?

21    **A.**    Say again.

22    **Q.**    How many times did you say many when you testified?

23    **A.**    I don't think I said but I will say, I didn't keep any

24    records for the first 25 years I did this but I would

15:56:16 25    estimate I testified in court 1800, 19001700 sometimes.

Burke - Cross

1    First time a lawyer called me it was 1966.  I've been doing

2    this work for a long time.

3    **Q.**    So you've been a damages expert for a living pretty

4    much?

15:56:32  5    **A.**    That's how I earn most of my living.  I charge John

6    Carroll a dollar a year.  So most of my living is earned

7    working for lawyers.

8    **Q.**    Let's broaden that a little bit.  If you testified 17

9    or 1800 times on the stand, surely you've been deposed more

15:56:48 10    times than that?

11    **A.**    About that, about another 17 or 1800 times.  I tell

12    people I've told the truth more times than an eye Irish man

13    should have to.

14    **Q.**    That's lovely colloquy doctor but can you just answer

15:57:03 15    my questions?

16    **A.**    Yes, sir.

17    **Q.**    Did you say that you were deposed another 17 or 1800

18    times in addition to the 17 or 1800 times you have testified

19    in trial?

15:57:14 20    **A.**    I did, and as you probably aware, counselor, several

21    courts require to you keep a four-year average and I'll be

22    happy to send you a copy of that four-year testimony if

23    you'd like.

24    **Q.**    No, I'm just -- just trying to understand apparently

15:57:29 25    you've been retained as an expert witness in terms of having

Burke - Cross

1    been deposed, X number of times and testified in trial X

2    number of times.  What, at -- 3500 times in your career?

3    **A.**    Testifying in court or in arbitrations or in hearings,

4    someplace where I've been put under oath, yes, sir.

15:57:48  5    **Q.**    Approximately 3500?

6    **A.**    That's a good guess, yes, sir.  I didn't keep any

7    records for the first many years I did this.

8                    MR. ANASTOS:  Can we switch to the --

9    **Q.**    Do you recognize this, Dr. Burke?

15:58:20  10    **A.**    I do.

11    **Q.**    What is it?

12    **A.**    It's a letter I sent.

13    **Q.**    First page of your report?

14    **A.**    Yes, sir.

15:58:25  15    **Q.**    And see this line in yellow here that says our

16    assumption included that but for Lubecore's action, all

17    relevant sales by Lubecore would have accrued to the

18    accounts of Groeneveld Ohio?

19    **A.**    I see that.

15:58:43  20    **Q.**    Is that the assumption you made in this?

21    **A.**    I was asked to make that assumption, yes, sir are, for

22    the four companies, not all of Lubecore sales but for four

23    companies.

24    **Q.**    Right.

15:58:53  25    **A.**    Yes, sir.

Burke - Cross

1    **Q.**    For everyone of those companies, you have assumed that

2    but for Lubecore's existence, but for its very existence,

3    those sales would have accrued to Groeneveld?

4    **A.**    Yes, sir, I would phrase it -- I was asked to assume

15:59:06 5    that.

6    **Q.**    You did assume it, didn't you?

7    **A.**    Well, I was -- there's a slight difference.

8    **Q.**    You were asked to assume it?

9    **A.**    I was asked to assume it, and I accepted that

15:59:15 10    assumption.

11    **Q.**    Okay?

12    **A.**    Yes, sir.

13    **Q.**    Do you know -- do you have any reason to believe that

14    that assumption is true?

15:59:21 15    **A.**    Well, I took it as a possible.  That's why I said I

16    was asked to assume.  I wasn't there when these things

17    happened.  So somebody had to tell me.  I was asked to

18    assume it, I accepted it.

19    **Q.**    So you don't know one way or another if any of those

15:59:37 20    sales -- any sale that was made by Lubecore was made as a

21    result of any customer being confused between a Lubecore

22    brand and a Groeneveld brand?

23    **A.**    You're right.  I wasn't there, I wasn't there in any

24    one of these sales.  I don't know what happened, I didn't

15:59:52 25    testify about that.

Burke - Cross

| | |
|---|---|
| 1 | **Q.**    Okay.  So if -- do you know what this case is about? |
| 2 | **A.**    In general but I'm not an engineer, I'm not a |
| 3 | lubrication expert.  I in general I know, but -- |
| 4 | **Q.**    Give us the general? |
| 16:00:05  5 | **A.**    The general is that there was a product that |
| 6 | lubricates, heavy trucks, big trucks, and it does it |
| 7 | automatically, lubricates) and you install this on the truck |
| 8 | and don't have to worry about lubricating it again not like |
| 9 | the old days I used to get under a car with that lube begun |
| 16:00:24 10 | gun. |
| 11 | **Q.**    Colloquy again what's the case about please? |
| 12 | **A.**    I understand that somebody took their product, and ran |
| 13 | with it. |
| 14 | **Q.**    So you understand that in order for there to be -- to |
| 16:00:36 15 | be any damages here, the sales that Lubecore has made have |
| 16 | to be as a result of the alleged infringing activity, |
| 17 | correct? |
| 18 | **A.**    That's not my job. |
| 19 | MS. MICHELSON:  Objection. |
| 16:00:48 20 | THE COURT:  Overruled. |
| 21 | **Q.**    That's not your job? |
| 22 | **A.**    I am not a cause expert.  I am not a fact expert on |
| 23 | those matters.  I'm a numbers guy, I wasn't there when these |
| 24 | things happened.  I can't testify about that. |
| 16:01:00 25 | **Q.**    If there is zero evidence in this case that even one |

1    of Lubecore's sales was made as a result of confusion

2    between the Lubecore product and the Groeneveld product,

3    assume that, that there's no evidence of that?

4    **A.**    If you assume there's no damages, then there's in

16:01:21 5    damages.

6    **Q.**    I didn't say assume no damages because your number

7    assumes everything.  I'm saying assume that there's in

8    evidence that even one of Lubecore's sales was made as a

9    result of any confusion between Lubecore and Groeneveld.  If

16:01:36 10    that's your assumption, what's your damages number?

11    **A.**    Probably zero, but that's not my job.  I can't measure

12    confusion.

13    **Q.**    I didn't ask you to.

14    **A.**    I thought you were confusing me.

16:01:50 15    **Q.**    Now, all of the figures that you -- with respect to

16    Lubecore, can we have the -- Elmo again.  With respect to?

17    **A.**    Hard to see that way, counselor.

18    **Q.**    I'm trying to show you the numbers.

19    **A.**    Hard to see that way.  I can't see the number.  Thank

16:02:28 20    you.

21    **Q.**    This is what's marked as Plaintiff's Exhibit 103,

22    correct?

23    **A.**    Yes, sir, down here in the left hand corner, that's

24    what it says.

16:02:41 25    **Q.**    And this document serves as the basis for all of the

Burke - Cross

1  sales information that you used with respect to Lubecore,

2  correct?

3  **A.**   My document was not labeled that way.

4  **Q.**   Is it the same document?

16:02:58 5  **A.**   Let me check.  Same number of companies.

6  **Q.**   I'm sorry?

7  **A.**   Where did you go?

8  **Q.**   Oh, that's right you need to be able to see that.

9  Sorry about that.

16:03:23 10  **A.**   And if you'd move it over a little, please.

11  **Q.**   Certainly.

12  **A.**   My document is a little different up here at the top

13  of this column right here.

14  **Q.**   Oh, yeah, that's -- yeah, we unfortunately just did

16:03:46 15  that ourselves because that was a misprint in the document

16  from the beginning that was supposed to be 2009?

17  **A.**   Okay.  Otherwise this looks like the document I

18  referenced.

19  **Q.**   Okay.  So this is the document from which all of your

16:03:59 20  Lubecore sales data comes?

21          MS. MICHELSON:  May I see a copy of that,

22  counselor?  I haven't seen that.

23          MS. ZUJKOWSKI:  I just marked it in pen.

24          MS. MICHELSON:  When.

16:04:08 25          MS. ZUJKOWSKI:  When I was.

Burke - Cross

1          MR. ANASTOS:  When you were sitting there.

2          MS. ZUJKOWSKI:  That we had a typo, we

3    testified about with our witness.  It wasn't intending to do

4    it.  It there's not guilty changed.

16:04:18  5          MS. MICHELSON:  Oh, okay.

6    BY MR. ANASTOS:

7    **Q.**    Now, I want you to assume hypothetically speaking that

8    the sales for Lubecore for the years 2009, 2010 and 2011

9    were $1,548,087.

16:04:51 10   **A.**    Is that the total for the three years.

11   **Q.**    Total -- just assume that number.

12   **A.**    For -- for the three years or for a year?

13   **Q.**    For three years?

14   **A.**    For three years?  So that's 2009, 10 and 11.  Yes, sir

16:05:06 15   I will assume that.

16   **Q.**    Now you testified before that you first reduced

17   Lubecore's sales by -- or you took 80 percent of it

18   approximately to take away certain distributors that you

19   didn't count in the mix; is that correct?

16:05:22 20   **A.**    Yes, sir.

21   **Q.**    So what's 80 percent times $1,548,087?

22   **A.**    80 percent of that is -- I get $1,238,470 rounding

23   off.

24   **Q.**    Now, would you apply your contribution margin to that

16:05:47 25   number, please?

Burke - Cross

1    **A.**    I will.  .3653 of that number is $452,413.

2                    MR. ANASTOS:  Thank you very much.

3                    THE WITNESS:  You're welcome.

4                    THE COURT:  Any redirect?

16:06:35  5          MS. MICHELSON:  No, thank you.

6                    THE COURT:  Thank you, Doctor.  Watch your

7    step going down.

8                    THE WITNESS:  Thank you, your Honor.

9                    THE COURT:  You may call your next witness.

16:06:43 10          MS. MICHELSON:  Your Honor, we're going to

11   just read to the jury the stipulations that were entered

12   into by the parties in the case.

13                   THE COURT:  Go ahead.

14                   MS. MICHELSON:  And then we have a -- a

16:06:53 15   proffer that we'd like to offer to the court.

16                   THE COURT:  What do you mean a proffer?

17                   MS. MICHELSON:  Of a witness, Brendan cane.

18                   THE COURT:  Oh, all right.

19                   MS. MICHELSON:  May I proceed?

16:07:10 20       These are stipulations that both parties defense and

21   plaintiff answered into in this matter.  I'm going to just

22   read them to you.  Number 1, Groeneveld Transport

23   Efficiency, Inc., Groeneveld Pacific West and Groeneveld

24   Atlantic south, the Groeneveld USA companies are owned by

16:07:34 25   Groeneveld, the USA Holding, Inc. which is in turn is owned

1    by Groeneveld group BV, B, period, V, period.  Groeneveld

2    Group is a Dutch company.

3        3.  The Plaintiff in the case in this case is

4    Groeneveld Transport Efficiency, Inc., also known as

16:07:53  5    Groeneveld.

6        4.  Groeneveld Group and its affiliates manufacture

7    and distribute automatic lubrication systems -- I might do

8    this over here might be better to read along.

9        I'm actually on Number 4 now.  Groeneveld Group and

16:08:26 10    its affiliates manufacture and distribute automatic

11    lubrication system referred to as ALS, automatic greasing

12    systems or greasing systems, and their components supplies

13    and parts.

14        5.  Groeneveld Group sells its ALS products worldwide.

16:08:45 15        6.  Jan Eissis founded CPL Systems, Canada CBH or CPL

16    Groeneveld in 1988.

17        7.  Since its formation in 1988, CPL has been the

18    Canadian distributor of Groeneveld Group's ALS products.

19        8.  In 2001, Mr. Eissis sold 80 percent of CPL to

16:09:12 20    Groeneveld Group.

21        9.  In 2004, Mr. Eissis sold the remaining 20 percent

22    of CPL to Groeneveld Group.

23        10.  CPL is now owned by Groeneveld Group.

24        11.  -- oh, thanks.  Thanks, Steve.

16:09:33 25        11.  Mr. Eissis was president of the CPL from 1988

Burke - Cross

until January, 2007.

12.   In January, 2007, Mr. Eissis' affiliations with Groeneveld ended.

13.   From 1988 until 2007 CPL sold exclusively Groeneveld groups ALS products.

14.   Since 2007, CPL has continued to sell exclusively Groeneveld groups ALS products.

15.   In 2007, Mr. Eissis formed Orlaco Crane Cam, Inc. Orlaco.

16.   Orlaco changed its name to Lubecore international Lubecore on July 25, 2008.

17.   Lubecore sells ALS products through a network of distributors.

18.   Lubecore began to sell its ALS products in Canada in 2008.

19.   Lubecore began to sell its ALS products in the United States in 2009.

20.   ALSs are used in a variety of applications, including on over-the-road commercial trucks, sometimes called transport or mobile applications.

21.   In those applications, an ALS regularly and automatically delivers to specific moving parts of large trucks, trailers, and similar vehicles, grease/lubrication, at preselected time intervals.

22.   ALSs are also used in, "Off road," applications.

23.   Some ALSs operate by air pressure and are known as pneumatic systems.  Some ALSs operate by electricity.

24.   Groeneveld sells its ALS products for transport applications.

25.   One product Groeneveld sells for transport applications is an automatic single-line zero grease lubrication system known as its EP-0 system or EP-0 product. The quote zero closed quote refers to the viscosity or density of the grease.

26.   A, "Zero grease is thinner than a Number 1 grease which in turn is thinner than a Number 2 grease.

27.   Groeneveld EP-0 system has been sold in the United States since its creation by Groeneveld Group in 1980.

28.   Lubecore sells its ALS products through its network of distributors for transport applications.

29.   One product that Lubecore sells for transport applications is an automatic single-line zero grease lubrication system.

30.   Groeneveld conducts its business in the United States and interstate commerce.

31.   Lubecore conducts its business in the United States and interstate commerce.

32.   Groeneveld has sold its EP-0 system in interstate commerce in the United States since 1980.

Burke - Cross

1      33.  Lubecore has sold its EP-0 system in interstate

2  commerce in the United States since 2009.

3      34.  Lubecore and Groeneveld attend many of the same

4  trade shows.

16:13:41  5      35.  Lubecore and Groeneveld are direct competitors in

6  the ALS business.  Those are the stipulations, your Honor,

7  that and jurors that the parties agreed are established

8  facts in this case.

9              THE COURT:  Thank you.

16:13:54 10              MS. MICHELSON:  Uncontested.

11              THE COURT:  That means folks you know I told

12  you probably don't remember but when we first started one

13  way you get evidence is by way of stipulation.  That means

14  the parties agree that certain fact or facts are true.  You

16:14:05 15  may accept those facts and no other evidence is necessary on

16  that point.  It's up to you to decide.

17      Okay. Is there anything further?

18              MS. MICHELSON:  Your Honor, our -- of course

19  the request for Brendon Cane as we discussed.  We can handle

16:14:21 20  that how you like and other than that, we are prepared --

21              THE COURT:  Are you reading off your hand.

22              MS. MICHELSON:  I -- you see how I lost those

23  other notes.  I was so afraid I was going to lose another

24  piece.

16:14:32 25              THE COURT:  You and Sara Palin.

Burke - Cross

 1              MS. MICHELSON:  Does she do that too.

 2              THE COURT:  I guess that's what they say.

 3              MS. MICHELSON:  I don't put the easy stuff on

 4      my hand.  The hard stuff is -- we are prepared to rest our

16:14:43  5      case, subject to moving our exhibits into evidence and we

 6      can do that at the course.

 7              THE COURT:  Thank you.  That means you've

 8      heard all the testimony that will be offered on behalf of

 9      the Plaintiff in their case-in-chief.

16:14:54 10          Generally, there's a mandatory recess at this time but

11      because of the late hour, we'll go ahead and proceed and see

12      if the defense has anything to offer and we'll do the legal

13      and exhibit materials out of your hearing tomorrow morning

14      before we start.

16:15:10 15          So without waiving anything.

16              RIGHT1: Without prejudice to Rule 50 motion.

17              THE COURT:  Without prejudice to anything,

18      even Melissa.  Is there anything you'd like to tell Melissa

19      don't have a hard attack.

16:15:24 20              MR. ANASTOS:  She is.

21              THE COURT:  I know she is.

22              THE COURT:  Call your first witness.

23              MR. ANASTOS:  It's a videotape.

24              THE COURT:  Makes it easy.

16:15:35 25              MR. ANASTOS:  Our first witness is Mr. Martin

Burke - Cross

1    Vermeulen by videotape trial deposition, Mr. Vermeulen in

2    Korea.  I hope you can -- I hope you can follow it.  As good

3    as we could possibly do.

4              MS. MICHELSON:  And just for the record we

16:15:51  5    reassert our objection to the Mr. Vermeulen.

6              THE COURT:  Okay.  It's overruled.  How long

7    is this?

8              MR. ANASTOS:  A couple hours.

9              THE COURT:  Okay.  We'll go until about 5:00

16:16:04 10   and then we'll stop.  Chris, you'll let me know.

11              THE CLERK:  All right.  Five to 5:00.

12              (Videotape of Martin Vermeulen played.)

13              THE COURT:  Can would he stop here?  Okay,

14    folks, we'll stop for the day.  Again, you haven't heard

16:49:40 15   everything so keep in mind the admonition.  It's important

16    and even though you may have heard a lot of the testimony,

17    you don't know what the law is that applies in the case.

18    Believe me it's important that you keep an open mind.  Do

19    not form or express any opinion or answer to what you think

16:49:55 20   your ultimate decision is going to be until everything is

21    submitted to you.  Have a good night and see you same time

22    same place, 8:15, L-1.

23         (Proceedings in the absence of the jury:)

24              THE COURT:  A couple things.  One is I'll meet

16:50:35 25   you all here 8:00 tomorrow morning.  If I expect you to go

1    overt exhibits tonight or before tomorrow morning, however

2    you do it and any exhibit that you object to, I'll address.

3    If there's in objection, I don't need to address it.  You

4    understand that, Melissa.

16:50:53  5              MR. ANASTOS:

6                   MS. ZUJKOWSKI:  I do.

7                   THE COURT:  What did I say.

8                   MS. ZUJKOWSKI:  If there's no objection you

9    don't need us to express that.

16:50:58  10             MR. ANASTOS:  8:00, right.

11                  THE COURT:  Right, right.  Okay.  And then you

12   want to talk about Brendon Cane go ahead.  Have a seat.

13                  MS. MICHELSON:  Thank you, your Honor.

14        Yes, especially in light of the cross-examination of

16:51:11  15   Ms. Wilson concerning activity of the companies overseas, it

16   had -- our position is that defense has opened the door as

17   to competitive activities and occurrences overseas as well.

18   And I believe that was the basis for the -- at least as I

19   heard it for the Court's rulings.  We also in addition to

16:51:40  20   that, we would like to proffer and make a part of the record

21   his transcript, in the event that you decline to change your

22   mind on that and let us play Brendon Cane, we do want to

23   make a proffer on the record of the transcript and the video

24   of his testimony and we have actually marked it as an

16:52:02  25   exhibit, and.

Burke - Cross

1          THE COURT:  You can do that.

2          MS. MICHELSON:  Just so there's a record of

3    it.  And we have provided opposing counsel with a copy as

4    well.  We've marked it PX-142-1 through -- well it's the

16:52:23  5    entirety of the trial transcript of the deposition that we

6    took along with the disk itself which is 142.

7          THE COURT:  Okay.

8          MR. ANASTOS:  Your Honor, we on today

9    Mr. Cane's testimony on two grounds.  One was that there's

16:52:36 10    nothing in it that identifies the pumps he was talking about

11    and between the Groeneveld and Lubecore pumps we don't know

12    which one that proven already Lubecore makes separate pumps.

13    Secondly and perhaps more importantly is the issue that this

14    Court's jurisdiction is does not extend outside the United

16:52:53 15    States foreign company, CPL is a Canadian company -- excuse

16    me lube-S a Canadian company could certainly be enjoined

17    from certain practice in the United States if the Court so

18    desires, but the testimony of someone outside the United

19    States in territory where this Court did not enjoin Lubecore

16:53:12 20    from doing anything is totally irrelevant as a matter of

21    law.

22          Secondly, we do did not open the door to overseas

23    testimony with are our examination with Ms. Wilson.  We

24    intending to -- to continue that line a little bit tomorrow.

16:53:27 25    The fact that the Plaintiff has registered the Lubecore name

Burke - Cross

1    overseas goes to our unclean hands defense.  They're asking

2    for preliminary injunction, doesn't go to confusion.

3                   THE COURT:  Permanent.

4                   MR. ANASTOS:  Permanent at this point it goes

16:53:44  5    to unclean hands on the part of Plaintiff.

6                   MS. MICHELSON:

7                   THE COURT:  Here we don't need to hear

8    anything.

9        As I read cane's testimony, he said that the pumps

16:53:53 10    looked alike.  I mean you can say that right now.

11                   MR. ANASTOS:  We didn't say what pumps.

12                   THE COURT:  Know didn't.  That's the other

13    part of it, but the relevance of his testimony is -- I don't

14    see it.  He said the pumps look alike he never identified

16:54:07 15    the pumps that are in question in this case, so.

16                   MS. MICHELSON:  Well, your Honor, I believe we

17    submit additional materials on that and I won't repeat --

18    really.

19                   THE COURT:  You don't have to you got it, you

16:54:18 20    have your proffer.

21                   MS. MICHELSON:  Right, anything I said in the

22    objections, but the fact that counsel just said that they

23    have this unclean hands defense that includes activity

24    overseas, I think that strengthens and corroborates the

16:54:33 25    argument that activity overseas is indeed relevant here, and

Burke - Cross

1    the reason we're --

2                    THE COURT:  Okay, but you didn't listen to me.

3    I said I read his testimony, and he said that the pumps

4    looked the same.  Okay, we already know that.  So that's --

16:54:48  5    redundant, and then Number 2, he didn't identify which pumps

6    he was talking about.  So there's nothing to do with

7    overseas.

8                    MS. MICHELSON:  Well, your Honor, there was

9    additional evidence submitted to the Court and I -- I'm not

16:55:02  10   going to repeat it for you because it is part of the record

11   and we did submit test a part of our response to their

12   objections and we are prepared to offer certified records of

13   that as well to accompany his testimony concerning the

14   specific products that he was.

16:55:19  15                   THE COURT:  Right, but you wanted to

16   supplement the deposition because -- in your response to the

17   motion in limine you said they didn't ask the right

18   question, we can supplement that and correct it.  It's too

19   late.  All right.  See you in the morning.

16:55:33  20                   MS. MICHELSON:  Thank you.

21        (Proceedings adjourned at 4:55 p.m.)

22

23

24

25

1    DIRECT EXAMINATION OF GAIL WILSON              504

2    CROSS-EXAMINATION OF GAIL WILSON               543

3    REDIRECT EXAMINATION OF GAIL WILSON            592

4    RECROSS-EXAMINATION OF GAIL WILSON             612

5    DIRECT EXAMINATION OF JOHN BURKE               617

6    CROSS-EXAMINATION OF JOHN BURKE                650

7

8                    C E R T I F I C A T E

9            I certify that the foregoing is a correct

10   transcript from the record of proceedings in the

11   above-entitled matter.

12

13

14

15   s/Shirle Perkins
     _____
16   Shirle M. Perkins, RDR, CRR
     U.S. District Court - Room 7-189
17   801 West Superior Avenue
     Cleveland, Ohio 44113
18   (216) 357-7106

19

20

21

22

23

24

25