1          IN THE DISTRICT COURT OF THE UNITED STATES
              FOR THE NORTHERN DISTRICT OF OHIO
2                      EASTERN DIVISION

3   GROENEVELD TRANSPORT            )
    EFFICIENCY INC.,                )
4                                   )    Judge Nugent
                 Plaintiff,         )    Cleveland, Ohio
5                                   )
          vs.                       )    Civil Action
6                                   )    Number 1:10CV702
    LUBECORE INTERNATIONAL,         )
7   INC.,                           )

8               Defendant.
                                 - - - - -
9            TRANSCRIPT OF PROCEEDINGS HAD BEFORE

10          THE HONORABLE DONALD C. NUGENT

11                JUDGE OF SAID COURT,

12           ON THURSDAY, OCTOBER 20, 2011

13                    **VOLUME 6**
                   - - - - -
14   APPEARANCES:
     For the Plaintiff:          DEBORAH J. MICHELSON, ESQ.,
15                               DAVID A. KUNSELMAN, ESQ.,
                                 Miller Goler Faeges
16                               27th Floor
                                 100 Erieview Plaza
17                               Cleveland, OH 44114
                                 (216) 696-3366
18
     For the Defendant:          THOMAS L. ANASTOS, ESQ.,
19                               JILL COEN, ESQ.,
                                 Ulmer & Berne - Cleveland
20                               1100 Skylight Office Tower
                                 1660 West Second Street
21                               Cleveland, OH 44113
                                 (216) 583-7184
22
     Official Court Reporter:    Shirle M. Perkins, RDR, CRR
23                               U.S. District Court
                                 801 West Superior, #7-189
24                               Cleveland, OH 44113-1829
                                 (216) 357-7106
25   Proceedings recorded by mechanical stenography; transcript
     produced by computer-aided transcription.

1          <u>THURSDAY SESSION, OCTOBER 20, 2011, AT 8:27 A.M.</u>

2               (Proceedings in the absence of the jury:)

3                    THE COURT:  Well, how was your search last

4     night.

08:27:52 5               MS. MICHELSON:  I'm sorry?

6                    THE COURT:  I said how was your search last

7     night?

8                    MS. MICHELSON:  I think you'll be pleased,

9     your Honor.

08:27:52 10                   THE COURT:  Not me.

11                   MS. MICHELSON:  Your Honor, we did -- we did

12    look carefully at the testimony of Mr. Van der Hulst and we

13    also looked at the Sixth Circuit authority on the issue, and

14    there is -- there are a number of relevant cases here.  Not

08:27:52 15   just Antioch and its progeny which is essentially a core

16    functional component out of which everything else, including

17    the exterior shape design and appearance flowed.

18         In the case -- in our case, we are talking about

19    obviously the overall appearance and presentation of the

08:27:52 20   product, but also the unique and distinctive shape, whether

21    the shape is Dick fated by that core component, and the

22    evidence is that it is not.  And Mr. Van der Hulst's

23    testimony, I have specifics, but then taken into the context

24    of the whole of his testimony, I will -- I will read it to

08:27:52 25   you.

1     And there's a little bit to put the fullness of it in

2     context, just about less than a page.

3         "Question:  Were the commercial people and the sales

4     people at Groeneveld involved in the design of the EP-0

08:27:52  5   Groeneveld pump?

6         "Answer:  Of course.  We make -- we make art

7     impression at that time.  We make some sketches.  How it

8     would look like.  I think we made even another model to show

9     the pump to the people to management because there was money

08:27:52 10   involved and we need to show what we are going to do.  So

11    they had an idea of the shape and the function is only yeah,

12    telling how it will function, that's not too easy but the

13    shape we have to show it.  Yeah.

14        "Question:  Does the shape or outline of the pump

08:27:52 15   affect the way the thing performs, the 28 delivers grease

16    throughout the system?

17         "Answer:  No.

18        "Question:  Explain there to the jury.  It might be

19    obvious, but I'm sorry, I will ask you to explain.

08:27:52 20        "Answer:  It's like a car.  No, the car go from A to B

21    and they're all different.  The shape has nothing to do with

22    the function of the moving from A to B.  And it's the same

23    as the lubrication system.  The only thing we have to do is

24    create energy and that there's an outlet where grease is

08:27:52 25   coming out.  How you do that, you can do it in many, many

1        many ways."

2            Additional testimony that he gave along with this

3        specifics, a reasonable jury can infer from this testimony

4        and the totality of Mr. Van der Hulst's testimony and

08:27:52  5        understanding of course that he is speaking in English and

6        trying to convey his eye December in a language that isn't

7        his first tongue, that there was separate, independent

8        thought given by Groeneveld when it created its ultimate

9        product to how the thing would look, and how to present it

08:27:52 10        to the market.  And that it was not dictated by what's going

11        on inside the functional part, and that the shape and the

12        silhouette and the outline of that pump is independent of

13        what's going on inside and the functioning parts that make

14        it work.

08:27:52 15            THE COURT:  Okay.

16            So I guess what you're saying is that would be -- the

17        outside appearance -- I'm trying to put a -- wouldn't that

18        include the color and the logo?  If that's what you're

19        saying is the trade dress, is the appearance of it, doesn't

08:27:52 20        that include the logo and the color as well?

21            MS. MICHELSON:  The shape and the silhouette

22        do not include the logo and the red --

23            THE COURT:  You're saying the look of it.

24        Trade dress has to include the logo and the color, doesn't

08:28:17 25        it?  But, if it was all -- it was a blue bottom?

1    MS. MICHELSON:  If -- okay.  I'm going to try

2    to address what you're asking me.  In terms of functionality

3    and nonfunctionality, the --

4        THE COURT:  No, no, no, no.  I asked you.

08:28:17  5    MS. MICHELSON:  Okay.

6        THE COURT:  Specific question.  You're now

7    telling me that your claim in this case that the trade dress

8    is the appearance of the outside appearance or the shape of

9    the pump, am I right?

08:28:17  10    MS. MICHELSON:  The shape -- the shape then,

11    the silhouette.

12        THE COURT:  What it looks like.

13        MS. MICHELSON:  That I --

14        THE COURT:  What it looks like.

08:28:22  15    MS. MICHELSON:  Yeah.

16        THE COURT:  When somebody looks at it.

17        MS. MICHELSON:  Yes.

18        THE COURT:  That's what you're saying, you

19    have a distinctive shape, am I right.

08:28:22  20    MS. MICHELSON:  Yes, I think that is the

21    testimony.

22        THE COURT:  Okay.  So when you look at it,

23    that would include the logo and the color, is that true?

24        MS. MICHELSON:  It -- well, it does but not

08:28:22  25    for purposes of the nonfunctionality analysis.

1           THE COURT:  How do you separate it?  Because

2    that's how it appearance.

3           MS. MICHELSON:  Because the -- the logo and

4    the color has no impact on the shape or the silhouette of

08:28:26  5    the pump.

6           THE COURT:  You just read to me something that

7    they take it to the marketing people, that would include the

8    color and the logo, what it looks like, how you present it

9    to the public.

08:28:26 10           MS. MICHELSON:  Yes.

11           THE COURT:  So it would include those two

12    things.

13           MS. MICHELSON:  That's part of it, but --

14           THE COURT:  Include means part, doesn't it.

08:28:28 15           MS. MICHELSON:  It's part of it but not for

16    nonfunctionality analysis.  Yes, there were thoughts that --

17    there are -- there are I know I'm not answering your

18    question and aim trying to.

19       The logo is not part of the shape.  It is not part of

08:28:28 20    the -- and it has nothing to do with the functionality or

21    nonfunctionality of the item.

22           THE COURT:  You're trying to claim trade dress

23    and I guess -- I guess you can't exclude the logo and the

24    color if you're trying to do the appearance of the pump as

08:28:32 25    your trade dress.

1          MS. MICHELSON:  We are -- I do not believe

2     that we've made a claim that the logo and the green is part

3     of the trade dress.

4               THE COURT:  Your.

08:28:32  5          MS. MICHELSON:  That the shape --

6               THE COURT:  Your confusion claim is if

7     somebody looks at it they wouldn't know what it is.

8               MS. MICHELSON:  They're different pieces of

9     evidence are relevant -- our position is different pieces of

08:28:35 10   evidence are relevant to different elements of the number of

11    claims that we have asserted here.

12              THE COURT:  Okay.  Let me hear from you, Tom.

13    BY MR. ANASTOS:

14    Q.   What I heard the plaintiff say they called out of

08:28:35 15   Mr. Van der Hulst's testimony was that the shape does not

16    affect the way it delivers the grease, and you can deliver

17    the grease many, many ways.  This goes back to the same

18    thing they were saying yesterday.  There are different ways

19    you can do this.  Had that is not the test of functionality.

08:28:38 20   There was no evidence that they came back with that

21    addressed the inward test of functionality in terms of

22    different costs or ornamentation or the way it looks or the

23    fact it's somehow not influenced by engineering in terms of

24    how it came into existence.  Magistrate Baughman found the

08:28:38 25   evidence in this case shows all the elements of Groeneveld

1    pump are there for some practical benefit or reason.   In

2    other words, Groeneveld has not presented its pump in any

3    way the equivalent of an automotive tailspin, a purely

4    ornamental figure that contributes no demonstrable benefit

08:28:42  5    to the operation or efficiency of the designed product.

6          That is as true today as it was at the preliminary

7    injunction hearing.  There is nothing about that pump that

8    is ornamental, nothing that is fanciful, nothing that is

9    arbitrary at all about the look of it.  It is 100 percent as

08:28:45 10    I argued yesterday, 100 percent the result of engineering

11    issues from the way the base looks, to the way the reservoir

12    looks, to the size of the reservoir to the cap on the

13    reservoir to the follower plate in the reservoir.

14    Everything about the look of that pump is the result of

08:28:45 15    engineering influence.  And then they put the label on it,

16    and the only reason they put the label on it is because

17    that's the only way anyone can tell it's a Groeneveld pump?

18                    THE COURT:  You can respond to that.  I --

19                    MS. MICHELSON:  I --

08:28:54 20                    THE COURT:  There is -- I'm asking you, and

21    this is what I asked for yesterday.  Is there any evidence

22    at all of -- that the design is nonfunctional?  And you

23    still haven't offered me any evidence.

24                    MS. MICHELSON:  The evidence is that the shape

08:29:10 25    of it doesn't make it work and pump grease and Mr. Eissis

1       himself.

2                       THE COURT:  Where is that?  See I think you're

3       missing the point of the definition of function is what the

4       requirement of trade dress is.  You -- this is -- at least

08:29:27 5    what I didn't hear much what the design of the pump is the

6       design of the pump.  All right, that's basically what we

7       heard from the plaintiff in your case in chief.

8           And you decided to design it this way and it works

9       this way.  Okay.

08:29:43 10                     MS. MICHELSON:  The inside, and then he

11      layered on -- then they -- the commercial people came in and

12      they layered on the way it would be presented on the

13      outside, and -- and there's -- the placement of specific

14      parts that create this shape and this silhouette is --

08:30:08 15   there's in reason for them to be in those specific places.

16                      THE COURT:  Where do you say that?  Where is

17      the evidence of that?

18                      MS. MICHELSON:  Your Honor, I mean Mr. Van der

19      Hulst did testify that he -- that he would not make it this

08:30:47 20   same way today because it is more expensive to make it look

21      this way today, to have this particular shape and design

22      today.  Why is Groeneveld still making the pump, its own

23      pump exactly this way if it's harder and more expensive to

24      do so?  Because it's our pump, we went on the market with

08:31:07 25   this pump.  Everyone knows this pump."

1      THE COURT:  That's not answering the question.

2            MS. MICHELSON:  I'm looking, I'm looking for

3  some --

4            THE COURT:  I listened to the Defense's

08:31:19 5  testimony.  Mr. Vermeulen.  He said it's 100 percent

6  functional.  Every aspect the pump how it was designed, how

7  he designed it is 100 percent functional and I guess I'm

8  asking is there anything that the plaintiff put on that said

9  that it's not.  Is there any part of the design that's

08:31:35 10  nonfunctional?

11            MS. MICHELSON:  I think when Mr. -- when

12  Mr. Van der Hulst describes how the shape and the silhouette

13  and the outline and the way it was put together was not --

14  was how do I say this right?

08:31:57 15      THE COURT:  You see, there's not.

16            MS. MICHELSON:  That it didn't --

17            THE COURT:  Just because you can make it a

18  different way doesn't make it nonfunctional.  The question

19  is how is this made and the reason this was made.  Now,

08:32:09 20  maybe they went and got a design from sales people and said

21  could you do it this way and said yeah we could, that's

22  okay, but still doesn't mean it's nonfunctional.  You got to

23  have somebody testify.

24            MS. MICHELSON:  It's non -- I'm sorry.

08:32:21 25      THE COURT:  You have to have somebody testify

1   that there's something on that.  That it's done just for the

2   sake of art, not for the sake of utility.

3               MS. MICHELSON:  I think he did, your Honor,

4   respectfully did talk about we -- about there's art

08:32:34  5   impressions on the sketches that they made for the outside

6   of it that would -- that in order -- you know, how they

7   would present the guts of it, that actually of the things

8   that make the pump operate in the system.  And he did

9   testify to that artistic impression and that that -- that --

08:33:06 10              THE COURT:  Anyway.

11              MS. MICHELSON:  I -- somebody just handed me

12   something.  Thanks for helping me out here.

13       "Question:  Why did you want to make your pump look

14   different than anybody else's?  It's a challenge of the

08:33:16 15   designer, and each let's say you want to make something

16   different than anybody else.  Yeah, you want to do that.  So

17   we want to give it a groove look so this has to be our pump

18   for many, many years and it has to be good and nice."

19       I think from the totality -- this testimony and.

08:33:33 20              THE COURT:  See, that doesn't answer the

21   question about functionality.  That talks about appearance.

22              MS. MICHELSON:  It talks -- esthetics correct.

23   It's separate from functionality and that the esthetics was

24   a separate and distinct consideration that would -- that

08:33:50 25   Groeneveld undertook --

1          THE COURT:  But you're missing the whole point

2     of what functionality is, what part of that -- where is

3     there evidence to show they put a gas -- a grease port in

4     one location versus another for esthetics and it has nothing

08:34:07  5     to do with functionality?  Or that they used the clear

6     plastic for esthetics and not for functionality?

7          MS. MICHELSON:  The -- there's testimony in

8     the record that the shape of it is for the aesthetics and

9     the presentation and the and the look and how --

08:34:25 10          THE COURT:  Who testified in your case they

11     got the clear plastic it was just invented and they came in

12     long sheets and cut it up because they wanted to be able to

13     see through?

14          MS. MICHELSON:  Your Honor, we are not -- we

08:34:34 15     are not claiming that specific -- that the individual

16     components, in and of themselves do not perform some sort of

17     function.  We're --

18          THE COURT:  Then your case is over if you're

19     not claiming that.

08:34:47 20          MS. MICHELSON:  I don't -- I respectfully

21     disagree, your Honor, because the fact that component parts

22     have a function does not -- is not dispositive on the issue

23     of nonfunctionality.  If -- in a products configuration

24     case, if they are put together in a way that is not

08:35:07 25     essential to the use and purpose of the article, and there

1    are shape cases and configuration cases and over all

2    appearance cases, and each of these cases is really when you

3    read the authority, they --

4                    THE COURT:  Tell me what evidence and where is

08:35:25  5    the evidence is in this case that shows -- tell me what part

6    of your pump is nonfunctional?

7                    MS. MICHELSON:  The shape of it and the

8    silhouette and outline of it.

9                    THE COURT:  That's nonfunctional?

08:35:36 10                    MS. MICHELSON:  Yes.

11                    THE COURT:  Where's the evidence of that?

12    Every part of it works, doesn't it?  Could you take the

13    bottom off and could it still pump -- I don't -- that

14    doesn't make any sense to me at all.

08:35:52 15                    MS. MICHELSON:  Well, it needs a housing, yes.

16                    THE COURT:  Right.

17                    MS. MICHELSON:  But the housing doesn't have

18    to be shaped particularly in this way in alignment.

19                    THE COURT:  But the housing was shaped like

08:36:01 20    that and it serves a function to hold the grease, right?

21                    MS. MICHELSON:  And it doesn't have to be put

22    together with the reservoir and the cap and the beveling and

23    all these distinctive things.

24                    THE COURT:  See that's where you're missing

08:36:15 25    the point because on trade dress, to have a unique trade

1   dress usually is logo or color or something like that.  But,

2   if you go to the shape, okay, that's -- if you're claiming

3   that they used your same color or something like that,

4   that's a different an argument, but you're not arguing that.

08:36:31   5   You're arguing the shape, and all I'm asking you is where is

6   there any evidence that the way it's shaped is knot

7   nonfunctional?  Because the way we have it now that you have

8   a holder for the grease on the top and it's clear, it was

9   done to hold the grease and so they could see the grease.

08:36:52 10   That's functional.  It that's not appearance.

11            MS. MICHELSON:  And the question to the

12   witness was.

13       "Question:  Does the shape or outline of the pump

14   affect the way the thing performs, the way it delivers

08:37:01 15   grease throughout the system -H and he answered no and

16   explained the shape has nothing to do with the function of

17   the moving from A to B, that witness testified to that.

18            THE COURT:  Who is that van der Hulst?

19            MS. MICHELSON:  Yes.

08:37:17 20            THE COURT:  All right.  What do you think

21   about that, Tom?  I mean that maybe enough to get it to the

22   jury on that issue, but I -- it is breath taking.

23            MR. ANASTOS:  Just a couple of points, your

24   Honor.  They're making it sound like there is an outside to

08:37:37 25   this, that was made to look nice, and we talked about this

1    with Mr. Van der Hulst.  This is not an automobile that has

2    a shell to it that you can design in different fashions to

3    cover up all of the interior components.  This is one of the

4    interior components.  So there's nothing malleable about the

08:38:03 5    outside that can be done to make it artistic.  It's not the

6    Mona Lisa.  It's a grease pump.  Secondly, there's a

7    thousand different reasons why Groeneveld could still be

8    selling this pump as this pump after 30 years, not the least

9    of which is it's a good pump.  It functions well, and it

08:38:23 10    functions well because of the design.  And the design is

11    entirely functional.  Every component is there for

12    functionality and the overall design is functionality.

13        They testified in -- that Ms. Michelson just argued

14    that Mr. Van der Hulst testified that they wanted to make

08:38:42 15    something different.  Different does not equal

16    nonfunctional.  We've been over that a thousand times.

17             THE COURT:  I know.  That's why this is like

18    arguing a negative and you can't do it.

19             MR. ANASTOS:  And I mean I could -- the law is

08:38:58 20    that we're engineering necessity influences the

21    configuration of the functional components, the resulting

22    design is functional.  And that's from Abercrombie by one of

23    the Sixth Circuit cases, where the -- where the -- a

24    combination of functional elements has been configured in

08:39:16 25    such a matter to be protected.

1          THE DEFENDANT:  Courts hold such functional

2     figures must be configured in a quote, arbitrary, fanciful,

3     or distinctive way in order to be entitled to protection.

4     That's a quote from Antioch.  There's No evidence whatsoever

08:39:30  5     that anything about that shape is arbitrary or fanciful or

6     distinctive.  It's a grease pump that was put together

7     because of the way they wanted it to look.  That's 100

8     percent of the evidence in this case.

9          THE COURT:  Okay.

08:39:45 10     Let's continue with the testimony.  I'll keep this

11     under advisement.

12          (Proceedings resumed in the presence of the jury:)

13          THE COURT:  Good morning, ladies and

14     gentlemen.

08:41:39 15          THE JURY:  Good morning.

16          THE COURT:  Mr. Eissis, you can continue.

17          CROSS-EXAMINATION OF JAN EISSIS

18     BY MS. MICHELSON:

19     Q.   Hello, Mr. Eissis.

08:42:47 20     A.   Good morning.

21     Q.   I'm going to show you what has been marked as Defense

22     Exhibit in the case, Defendant's Exhibit I.  Ma'am, excuse

23     me.

24          And can you confirm for us please these are pictures

08:43:17 25     of the Lubecore pump that were taken at the Toronto trade

Eissis - Cross

| | |
|---|---|
| 1 | show that you testified about in your direct examination |
| 2 | that it was in April of 2008.  Can you confirm that that is |
| 3 | a -- that those are pictures of the Lubecore pump, your |
| 4 | pump, that was at the Toronto trade show in April, 2008? |
| 08:43:52 5 | It's -- |
| 6 | **A.**   Can you show them one more time? |
| 7 | MS. MICHELSON:  Sure.  Can I just walk them up |
| 8 | to him, your Honor? |
| 9 | THE COURT:  Sure. |
| 08:44:05 10 | MR. KUNSELMAN:  Thank you. |
| 11 | THE WITNESS:  Yeah, I believe this is at the |
| 12 | Toronto trade show.  I think I remember gluing the stickers |
| 13 | on the side of the trailer there. |
| 14 | **Q.**   Okay.  And, in fact, I now have on the overhead we |
| 08:44:20 15 | marked those same pictures as Plaintiff's Exhibit 56.  Can |
| 16 | you confirm that, please, these are the same photographs, |
| 17 | correct? |
| 18 | **A.**   Yeah, probably, yeah. |
| 19 | **Q.**   Do you need to take a closer look? |
| 08:44:33 20 | **A.**   Yeah, it's correct, yeah. |
| 21 | **Q.**   Okay.  Thank you.  And this is where you debuted your |
| 22 | pump in Canada at the Toronto trade show? |
| 23 | **A.**   Yes. |
| 24 | **Q.**   And I see a black cap on the filler.  Is that the |
| 08:44:52 25 | filler coupling this -- |

Eissis - Cross

1   **A.**    That's correct.

2   **Q.**    And that's a black cap there?

3   **A.**    Yeah, that's correct.

4   **Q.**    Okay.  And I see that they are -- you are in -- this

08:45:05 5   picture depicts the use of the color green, the grease is

6   green in this picture that you --

7   **A.**    This pump is green grease, yes.

8   **Q.**    Mr. Eissis, we were talking, I think, about the

9   Lubecore warranty program and when we broke yesterday.  Do

08:45:25 10   you recall?

11   **A.**    Excuse me?

12   **Q.**    We were -- I'm directing your attention to where we

13   left off yesterday.  I believe we were talking about the

14   Lubecore warranty program and I have a few questions about

08:45:37 15   that.

16   **A.**    Okay.  Oh, and --

17   **Q.**    Before we get there, I have a question about this

18   Defense Exhibit you talked about.  Defense Exhibit L, it's

19   hard to see because of the light, but it says here

08:46:09 20   component, Groeneveld fact, Lubecore fact, and then benefits

21   for Lubecore customers.

22   **A.**    Yeah.

23   **Q.**    It's hard to see because of the shading, but you agree

24   that this was a fact benefit analysis or a product

08:46:29 25   comparison sheet that Lubecore put together to distribute to

1    customers and users of the product?

2    **A.**    Yes, all to distributors, yeah.

3    **Q.**    Yeah.

4          And directing your attention to -- here we go.  The

08:47:03 5    first page of it, this says grease piston seal?

6    **A.**    Yes.

7    **Q.**    Okay.  And under the Groeneveld fact, you put overing,

8    O-ring with backup ring?

9    **A.**    Yes.

08:47:17 10    **Q.**    Under the Lubecore fact, you identified as a benefit

11    that you instead use a quad ring?

12    **A.**    Yeah.

13    **Q.**    Okay.  And in the column here, you tout the supposed

14    benefits of using a quad ring?

08:47:33 15    **A.**    Yeah.

16    **Q.**    Instead of the O-ring?

17    **A.**    That's correct.

18    **Q.**    Okay.  And I believe -- and your testimony was that

19    the quad ring, in fact, had to be replaced with an O-ring

08:47:45 20    because it was defective and did not perform as well as the

21    O-ring, right?

22    **A.**    Yes, this analysis was made before we knew of the

23    issue with the quad ring, and after that, also had to be to

24    an O-ring to make it work.

08:48:02 25    **Q.**    In fact, sir, you brought with you to court and

1    provided to you before your counsel did, right before your

2    testimony some additional product comparison sheets that

3    were marked as, I think that says Defense Exhibit DD,

4    Defense Exhibit DD?

08:48:27  5    **A.**    Okay.

6    **Q.**    And you testified about these product comparison

7    product comparison sheets during your direct testimony?

8    **A.**    Yeah.

9    **Q.**    And turning to the product comparison sheets relating

08:48:47 10    to the Groeneveld product -- I want to just identify it for

11    the record.  It is the third substantive page of the

12    exhibit, your company continues to represent to customers

13    that the quad ring that Lubecore uses has a benefit to the

14    O-ring that Groeneveld uses.  Do you see that here?

08:49:22 15    Groeneveld fact, O-ring with backup ring, Lubecore fact,

16    quad ring, and the benefits you still list there are

17    benefits to a customer using the lube product instead of the

18    Groeneveld because of the incorporation of this quad ring

19    that you testified was a big problem and a big mess.  Just

08:49:46 20    says that there, right?

21    **A.**    If this document is produced and used after we change

22    from quad ring to O-ring, that's a mistake in our behalf.

23    **Q.**    And this is a document, this exhibit that you all

24    brought to court today, I mean --

08:50:20 25    **A.**    This document was obviously made before we changed

| | |
|---|---|
| 1 | from O-ring to quad ring.  I'll bring it out again.  If we |
| 2 | used this document, that's a mistake on our behalf.  We |
| 3 | shouldn't be using that anymore because the new pumps no |
| 4 | longer have quad rings. |
| 08:50:38  5 | **Q.**    The pumps are hermetically sealed, correct? |
| 6 | **A.**    Excuse me. |
| 7 | **Q.**    The pumps are hermetically sealed, correct? |
| 8 | **A.**    What do you mean by the term "hermetically sealed"? |
| 9 | **Q.**    They are sealed to the outside world.  The inside is |
| 08:50:54 10 | sealed off from the outside elements, right? |
| 11 | **A.**    I would say so.  It's not hermetically sealed.  It is |
| 12 | fenced. |
| 13 | **Q.**    There are valves that prevent air from the outside |
| 14 | from getting in? |
| 08:51:11 15 | **A.**    No, this fence, venting holes in the pumps. |
| 16 | **Q.**    Is it your testimony that the Lubecore pump is not |
| 17 | hermetically sealed, and that air from the outside world |
| 18 | gets into the pump, into the reservoir of the pump? |
| 19 | **A.**    Above the follower plate, yes, air from the outside |
| 08:51:34 20 | has to get in.  Otherwise, the follower plate can't go down. |
| 21 | **Q.**    Above the follower plate? |
| 22 | **A.**    Yeah. |
| 23 | **Q.**    Not below the follower plate? |
| 24 | **A.**    Below the follower plate is grease. |
| 08:51:43 25 | **Q.**    And not inside the housing of the pump, right? |

1    **A.**    Excuse me?

2    **Q.**    Not inside the housing?

3    **A.**    Inside the housing of the pump, the air is supplied

4    through the air supply of the truck, and that air is cleaned

08:51:59 5    through the air dry of the truck through a Descon filter so

6    the air that goes into the pump on the bottom is filtered by

7    the air system on the torque before it goes into the pump.

8    **Q.**    That occurs below the grease piston?

9    **A.**    Below the grease piston, the air goes in through the

08:52:36 10    filtering system on the truck, correct, through the

11    solenoid.

12    **Q.**    Above the grease piston it is sealed, correct?

13    **A.**    Above the grease piston, there's a special valve we

14    put in what we call an O-pressure valve that goes into the

08:52:54 15    side of the pump.

16    **Q.**    Yeah, I don't think so.  I -- I'm sorry.  I don't

17    think I got an answer to the question.  So -- I'm sorry.

18    Can you read my question back to me, ma'am?

19         (Thereupon, the record was read back by the Court

08:53:20 20    Reporter.)

21    **Q.**    That's my question.

22    **A.**    Above the grease piston, yeah, above the grease piston

23    it is -- we are creating an over pressure.  It is not -- I

24    would have to explain that to you, the way it works is.

08:53:31 25    **Q.**    Can you just answer the question?  It's sealed, right?

1      MR. ANASTOS:  Objection.

2      THE WITNESS:  It is sealed.

3      THE COURT:  Overruled.

4      THE WITNESS:  Sealed to the degree there is a

08:53:39  5  5 PSI overpressure left.

6  **Q.**   Okay.  And the --

7  **A.**   Air cannot go from -- air from the atmospheric

8  condition, cannot go into that pump from any other way, into

9  my pump below the piston or above the air piston.  It cannot

08:53:54 10  go in there without going through the air system of the

11  truck.

12  **Q.**   And the PSI that's delivered to the pump is like a

13  thousand PSI, correct?

14  **A.**   No, incorrect.

08:54:04 15  **Q.**   What is it?

16  **A.**   Excuse me?

17  **Q.**   What is it?

18  **A.**   The air pressure being delivered to the pump is 120

19  PSI.

08:54:13 20  **Q.**   Okay.  That's a lot greater than 5 PSI, right?

21  **A.**   Yes, that's correct.

22  **Q.**   Okay.

23      I'm showing you now what we've marked as Defense

24  Exhibit 86.  There are a number of pictures, and we would

08:54:43 25  like you to -- the Defense Exhibit -- I'm sorry.  Did I say

Eissis - Cross

1    Defense Exhibit?  It's Plaintiff's Exhibit 86.  And I'd like

2    you to please confirm that this is Lubecore's warranty,

3    Lubecore Warranty Process.  This is your warranty plan?

4    **A.**    This is a warranty plan, yes, a very old one.

08:55:07 5   **Q.**    This is the only one that you're -- that Lubecore

6    produced to us in this case in response to our written

7    discover requests for all information regarding the product

8    and warranty information, right?  This is the one you

9    produced to us, correct?

08:55:23 10   **A.**    That is possible.

11   **Q.**    If I represent to you that there's nothing in your

12   document production regarding Lubecore warranty manuals and

13   booklets and information, other than this document and this

14   document that we've marked Plaintiff's Exhibit 85, you will

08:56:08 15   not dispute that, would you?

16                    MR. ANASTOS:  Objection.

17                    THE COURT:  Sustained.

18   **Q.**    Are you aware of any additional warranty information

19   regarding your product that your company produced in this

08:56:21 20   litigation?

21   **A.**    Actually, it's a long time ago.  I cannot answer that

22   question truthfully, so.

23   **Q.**    Your warranty -- your warranty basically provides that

24   if customers used Lubecore 's grease in the Lubecore ALS,

08:56:48 25   you will warrant the products and the parts for a specified

Eissis - Cross

1    period of time, right?

2    **A.**    That's correct.

3    **Q.**    I believe -- is it three years?

4    **A.**    We've made some changes, but I believe that it's a one

08:57:04  5    or two-year warranty on the pump normally on the system, and

6    if you use our grease, it goes up to six years.  So it's an

7    additional four or five years.  I think one year plus five,

8    one plus five or two plus four, something like that.

9    **Q.**    Reading from Page 86-6, Plaintiff's Exhibit 86-6, it

08:57:27 10    indicates, "If you are an existing CPL Groeneveld customer,

11    with the use Steadylube grease, we will honor your existing

12    extended warranty.  This means Lubecore will extend your

13    current Groeneveld grease warranty from five years to the

14    Lubecore six years.  Lubecore will honor the replacement of

08:57:48 15    parts under the Groeneveld warranty from the original date

16    of purchase."

17         So your Lubecore warranty program warrants Lubecore

18    EP-0 ALS systems, right?

19    **A.**    That's correct.

08:58:06 20    **Q.**    And extends the warranty to customers who use the

21    Lubecore product?

22    **A.**    That's only if -- only if a customer uses our grease

23    to the Steadylube grease.

24    **Q.**    Correct.

08:58:18 25         And also provides the same warranty for Groeneveld

1    customers, people who are using Groeneveld Products?

2    **A.**    Yeah, if a Groeneveld customer, if we are dealing with

3    a Groeneveld customer, and the customer uses Groeneveld's

4    Green Lube grease, that was a warranty that would extend the

08:58:40    5    standard factory warranty to five years.  In the market, we

6    had, my sales people, a problem with that and our

7    distributors because our customers, for example, would not

8    want to switch to two different greases.  So we came up with

9    the plan to rebuild that because they were buying already

08:58:59  10    the special grease.  So now, for example, this happened at

11    Town of Chondriomere, they bought Groeneveld Systems, and

12    they had Green Lube grease in the system.  With that grease,

13    they would get an extended warranty.

14    **Q.**    Sir, my --

08:59:14  15    **A.**    An objection that they had was that because of the use

16    of the grease, they would have to use a special grease with

17    my system as well.  So then they would say well, it would be

18    difficult for them to administer.  They have it all over the

19    city and have to have two different greases in all the

08:59:31  20    locations.  And when a truck would come in with a Groeneveld

21    system, they would have to use a Groeneveld Green Lube

22    grease and if a truck would come in with the Lubecore

23    system, they would have to use the down Steadylube grease

24    from Lubecore.

08:59:45  25    **Q.**    And so, sir, my question --

Eissis - Cross

1    **A.**    Basically made a commercial position to say okay, then

2    we will also honor that warranty so that we would take the

3    objection away from the customer to have to buy two

4    different greases.  That is what the warranty program is all

5    about.

6    **Q.**    Right.

7        And if there are system failures because Groeneveld

8    customers -- Groeneveld users -- let me -- let me rephrase

9    this.

10       Lubecore tells Groeneveld customers if you use our

11   grease in a Groeneveld product, we warrant the Groeneveld

12   pump and product, right?

13   **A.**    Yeah, a customer.

14   **Q.**    It's just a yes answer.  You gave the whole

15   explanation.  So we can kind of get to it if you just --

16   **A.**    Customer --

17   **Q.**    -- answer my questions.

18   **A.**    I'm doing that.

19   **Q.**    No.  The answer I believe was yes.  And so what

20   happens then?

21              THE COURT:  He didn't give -- excuse me.

22              THE WITNESS:  Actually, I'd like to give the

23   answer instead of you giving it for me.

24   **Q.**    Well, it's cross-examination.

25   **A.**    So when the Groeneveld customer uses Lubecore grease

1    and the Groeneveld system, we will extend their warranty.

2    Q.    Right.  And so that means if something happens with

3    the Groeneveld part in a pump, Lubecore people will go out

4    and fix it or repair it or replace it with a Lubecore part,

09:01:09  5    right?

6    A.    No.  We would typically end up putting a whole new

7    pump on.  Typically what we would need to do then is just

8    swap the pump out, and if it's a reservoir glass, we could

9    fix it with a reservoir or something, but if it's -- I would

09:01:24 10    be on the hook for another pump if that -- if that were to

11    happen.  That's a risk I'm taking in order to get the rest

12    of their business or their new business and their grease

13    business because I would start selling all the grease to the

14    customers then.

09:01:37 15    Q.    So you market your grease as compatible with the

16    Groeneveld pump because if people use your specialty grease

17    with the Groeneveld pump, you will provide them with

18    additional warranty benefits?

19    A.    Yeah, I -- my Steadylube grease can also be used in a

09:01:55 20    Groeneveld pump and Groeneveld grease can be used in my

21    pump.

22    Q.    The only competitor that you mention in your warranty

23    materials is Groeneveld, not anybody else, right?

24    A.    That is very obvious because other competitors do not

09:02:17 25    have such programs.  Only Groeneveld has.

Eissis - Cross

1    **Q.**    But, you could give a warranty to other competitors

2    who use your grease in their systems if they're compatible,

3    if you were only -- if you were not only targeting

4    Groeneveld users?

09:02:31  5    **A.**    If the customer does not have a Groeneveld system and

6    does not enjoy the extended warranty, it is not an objection

7    that I have to deal with.  So I'm not going to give it away

8    if I don't have to give it away to get the business.

9    **Q.**    Repairs and replacements are made by Lubecore

09:02:48 10    personnel and representatives, distributors and installers

11    if there are breakdowns in the pump or the Groeneveld system

12    if the customer is using Lubecore grease?

13    **A.**    Yeah.

14    **Q.**    Correct?

09:02:59 15    **A.**    We will repair any greasing system if we get a service

16    call or the distributors get a service call, they will try

17    to fix anything that a customer ask them to fix in order to

18    sell labor and components, correct.

19    **Q.**    So Lubecore people go out to work on Groeneveld

09:03:17 20    systems, right?

21    **A.**    That would happen if the customer asked us to do that,

22    yes, for sure.

23    **Q.**    And if part -- I'm not going to say it again.

24    Lubecore has no employees in the United States, right?

09:04:16 25    **A.**    No, there's no current employees of Lubecore in the

Eissis - Cross

1    United States, correct.

2    **Q.**    And there weren't any back about a year ago either,

3    were there?

4    **A.**    No, that's correct.

09:04:29 5   **Q.**    The distributors and the installers do all of the

6    actual work in the servicing in the United States?

7    **A.**    Actually, currently, we also deal with some customers

8    direct in the United States, and we would actually go in

9    from Canada to do some work.  We have done the work in the

09:04:48 10  United States as well.

11   **Q.**    So that changed in the last year?

12   **A.**    Yeah, that actually did, yeah.

13   **Q.**    Yeah, okay.

14        So it could either be a Lubecore employee or

09:05:00 15  technician or a Lubecore distributor or installer who goes

16   out and does the servicing and the work, right?  That's what

17   you just said?

18   **A.**    The Lubecore technician would be, a Canadian that

19   would go into the United States, to perform the service at

09:05:16 20  this moment or we would use the services of one of our

21   distributors.

22   **Q.**    And so those services could then, under a warranty

23   issue as we -- you just testified about, those services on

24   Groeneveld systems or pumps could be provided by actual

09:05:34 25  Lubecore employees, not just the distributors, right?

1          MR. ANASTOS:  Objection, your Honor.  We are

2   way beyond the scope of my --

3          THE COURT:  Really I don't even understand how

4   this is relevant to this case, but the objection is

09:05:44 5   sustained.

6   BY MS. MICHELSON:

7   **Q.**     You provide technical training to the distributors

8   here in the U.S.?

9   **A.**     The ones that need it, yes.

09:05:54 10   **Q.**     And sales tools and promotional materials?

11   **A.**     As well, yeah.

12   **Q.**     Extend credit to them?

13   **A.**     Yeah.

14   **Q.**     You educate them about the different systems, the lube

09:06:04 15   systems?

16   **A.**     When it's needed, yes.

17   **Q.**     You gave them talking points to use during sales

18   presentations?

19   **A.**     I call it sales tools, yeah.

09:06:12 20   **Q.**     You are involved in the sales presentation personally

21   and in the preparation of promotional materials that they

22   use to distribute to end users, right?

23   **A.**     Can you repeat that one?  You had a whole bunch in

24   there.  Can we do it one point at a time?

09:06:27 25   **Q.**     You actively participate in sales presentations with

1    your distributors in the U.S.?

2    **A.**    I on occasion when asked, I'm in the area or they have

3    something that they feel is important that I could assist, I

4    would, yes.

09:06:40 5    **Q.**    You provide -- I may have asked that one already.  You

6    join them at trade shows where Lubecore products are

7    displayed?  Talking about in the United States.

8    **A.**    Yes, I will in the United States do that, yes.

9    **Q.**    In fact, you always try to join them at the trade

09:06:55 10    shows, right?

11    **A.**    Yeah, I always try to make a point of being there, but

12    I can make it to all shows.

13    **Q.**    You pay for a portion of their attendance at trade

14    shows?

09:07:04 15    **A.**    I do assist in that as well.  Not always.  When asked,

16    then we would give financial support.

17    **Q.**    And you actually get involved in making sales calls to

18    end user customers on occasion?

19    **A.**    On occasion, yeah.

09:07:19 20    **Q.**    Okay.  Including to a company called Millis Transport?

21    **A.**    I've been at Millis Transport I believe once, yeah.

22    **Q.**    You knew them to be a Groeneveld customer, correct?

23    **A.**    Yes.

24    **Q.**    You have the right to control your U.S. distributors'

09:07:43 25    dissemination of information about your products?

1    **A.**    I don't know anything about my rights, really.

2    **Q.**    You agree that you probably have the right to control

3    their dissemination of information about your products?

4                    MR. ANASTOS:  Objection.

09:07:59 5                    THE COURT:  Overruled.

6                    THE WITNESS:  I do not know what my rights are

7    as far as dissemination of my information, of how they use

8    my information.

9                    MS. MICHELSON:  Can I get that overhead for

09:08:23 10   me?

11   **Q.**    Page 288 of your testimony.

12        "Question:  You could" -- from Line 1, you could --

13   "you control the right, you have the right to control the

14   dissemination of information about your products by your

09:08:40 15   United States distributors, correct?

16        "Answer:  Actually, I don't understand your question.

17   Do I have the right to control what they say?

18        "Question:  Yes.

19        "Answer:  I don't know if I have the right.  I give

09:08:51 20   them information to help them sell the product.  I probably

21   have that right, yeah."

22   **A.**    Well --

23   **Q.**    I read that correctly?

24   **A.**    Yeah, I was confused then and I'm confused now.

09:09:05 25   **Q.**    You care what your distributors say about your product

Eissis - Cross

1    and how they market your product all over, right?

2                    MR. ANASTOS:  Beyond the scope, your Honor.

3                    THE COURT:  Yeah.  Objection sustained.

4    Q.    You promote your products in the United States by

09:09:22  5    supporting and promoting your distributors here, right?

6    That's how you do it?

7                    MR. ANASTOS:  Objection.

8                    THE COURT:  Sustained.

9    Q.    You previously testified that people read on the

09:09:34 10    Internet and that what appears on the Internet is important

11    to business, to businesses images and to customer

12    perceptions, correct?

13                    MR. ANASTOS:  Objection.

14                    THE COURT:  Objection sustained.  Move on to

09:09:49 15    something else.

16    Q.    Have you taken any corrective action regarding the

17    U.S. distributors' web site information as we've gone over

18    in earlier testimony in the case?

19                    MR. ANASTOS:  Objection.

09:10:04 20                    THE COURT:  Sustained.

21    Q.    Do you continue to supply your products to United

22    States distributors notwithstanding what appears on the web

23    sites?

24                    MR. ANASTOS:  Objection.

09:10:16 25                    THE COURT:  You can ask -- do you continue to

 1    distribute your products?  Don't have to throw in the

 2    editorial.

 3                    THE WITNESS:  Yes, I continue to distribute my

 4    products.

09:10:26  5   **Q.**    You knew FSI had been a Groeneveld distributor for

 6    many years?

 7                    MR. ANASTOS:  Objection.

 8                    THE COURT:  Overruled.

 9                    MS. MICHELSON:  You may answer.

09:10:37 10                   THE WITNESS:  Sorry.  I don't understand in

 11   what context this question.  Can you please repeat the

 12   question?

 13   **Q.**    Okay.  You know that FSI was --

 14   **A.**    Okay.  I didn't hear FSI.  Sorry.

09:10:48 15   **Q.**    Sometimes the --

 16   **A.**    Yeah.  Go ahead.  The question, please.

 17   **Q.**    You know that FSI was a Groeneveld distributor for

 18   many, many, many years?

 19   **A.**    Yes, I was aware that Groeneveld was a Groeneveld

09:11:01 20   distributor.

 21   **Q.**    And you actually came into contact with FSI as part of

 22   your job with Groeneveld?

 23   **A.**    Yes, I met -- I met the people at FSI before I was

 24   with Groeneveld and during I was with Groeneveld.

09:11:16 25   **Q.**    What do you mean before?  You mean when you were

1    distributing?

2    **A.**    When I was distributing the products in the period

3    from 1988 to, I guess, 2001, when I sold the first shares,

4    and I've met them then, and I also have actually any

5    dealings with them.  Sometimes we work together a little bit

6    on some jobs, but then in -- after 2004, when I was director

7    of North American operations, then I actually visited them

8    and I had a few visits there where they had contact with

9    FSI, correct.

10   **Q.**    Okay.

11         In direct examination, you talked about the Bijur

12   pump, B-I-J-U-R, pump.  In fact, you've never seen installed

13   Bijur pump in the United States, have you?

14   **A.**    I have not seen one.  I've only seen it in trade

15   shows, have not seen them on trucks, correct.

16   **Q.**    Yeah.

17         And, in fact, Bijur is in the industrial automated

18   lubrication application while Groeneveld is primarily in the

19   transportation mobile and heavy equipment applications,

20   right?

21   **A.**    That is incorrect.

22   **Q.**    It is?

23   **A.**    Yeah.  You go to the Bijur web site, it says Bijur

24   goes mobile.  Just think of the Bijur web site.  It says

25   Bijur goes mobile.  That means the mobile industry.  Trucks

1    and mobile heavy equipment.

2    **Q.**    The Bijur products are not the Bijur product line, you

3    determine that that is not a suitable product line for the

4    intended applications either yours or Groeneveld, right?

09:12:55 5    **A.**    Incorrect.

6    **Q.**    They're not in different fields?

7    **A.**    The pump that we are talking about.

8    **Q.**    Are Bijur and Groeneveld in different fields?

9    **A.**    No, they're not, especially not today.

09:13:18 10    **Q.**    This is from testimony you gave under oath previously.

11    "Question:  What does Bijur do?

12    "Answer:  Bijur is in the automated lubrication

13    systems business.

14    "Question:  And that's exactly what Groeneveld does?

09:13:39 15    "Answer:  In a different field, though.  They are in

16    the industrial automated lubrication and Groeneveld is in

17    transportation, mobile, heavy."

18    And heavy equipment I read that correctly?

19    **A.**    When was this document --

09:13:53 20    **Q.**    Did I read that correctly?

21    **A.**    From this document because --

22    **Q.**    Well, does your testimony change, depending on what

23    proceeding you're involved in?  Did I read that correctly?

24    THE WITNESS:  Yes, very much so.

09:14:03 25    MR. ANASTOS:  Objection.

1          THE COURT:  Excuse me.  Tell him the date that

2    was given.

3          MS. MICHELSON:  January of '08.

4          THE WITNESS:  Oh, that explains it because

09:14:13 5    Groeneveld just bought a company.  It has -- went into a

6    company that's called Volner, and they are in the industrial

7    lubrication and Groeneveld also does industrial lubrication

8    in the Netherlands.  Bijur, within the last two years, came

9    out with a product line, the Maxi-flow, and they got after

09:14:34 10   that in the two years they got into on the web site.  Now,

11   they promote I go mobile -- Bijur is going mobile.  So

12   January, 2008 is -- how long ago is that?  Anyway today, I'm

13   answering this correctly and then I answered it correctly as

14   well.

09:14:49 15   Q.   Did you -- Lubecore did no independent testing on its

16   EP-0 single-line system before releasing it to the market?

17   A.   The only testing that was done by somebody you got

18   from Martin in Korea where he said he had cycles made on the

19   pump.  We did not do field testing before we went into the

09:15:33 20   market.

21   Q.   You just put them on the trucks?

22   A.   Yeah, that's right, yeah.

23   Q.   You did no independent assessment of any testing Tae

24   Sung may have done on the pumps either, right?

09:15:49 25   A.   No, I believed Martin.  I did not certify what he

1    said.

2    **Q.**    Those are the same pumps, though, that ended up with 7

3    to 800 recalls?

4    **A.**    Yeah.  That was the issue here.  It wasn't like Martin

09:16:15  5    said, it wasn't 7 to 800.  I can explain what the difference

6    in the numbers come from.

7    **Q.**    The 7 to 800 is what you testified to, correct?

8    **A.**    That's correct.

9    **Q.**    Right?

09:16:23 10    **A.**    Yeah.

11    **Q.**    Okay.

12    **A.**    We ended up doing more than necessary because we

13    didn't know exactly where the cut off on the sale numbers

14    was, so.

09:16:30 15    **Q.**    All of them had that quad ring, right?

16    **A.**    Yeah, Martin testified that only the first 500 had

17    quad ring.  However, we replace more in the field.  So we

18    probably replaced some that were not necessary.

19    **Q.**    You recalled at least 7 to 800 pumps?

09:16:48 20    **A.**    No, we did not recall the pumps.  I explained that

21    very clearly already before, but if you want, I can do it

22    again.  We basically would switch pumps out when necessary.

23    A lot of customers, we would send them a piston or an O-ring

24    that they want to get into, like Bill from Fuel Systems, for

09:17:05 25    example.  He went in, and he took the pumps apart and

Eissis - Cross

1    repaired it on the spot in the weekend for the customers.

2    Another customer wouldn't want to do that, then we would

3    swap a pump out, and we would take a pump back and clean it

4    up and make it ready to be used for somebody else.

09:17:21 5    **Q.**    299 of your hearing testimony and date of that is just

6    about a year ago.

7    **A.**    Yeah.

8    **Q.**    "Question:  So you didn't do" -- Line 1, "Oh.  So you

9    didn't do any test on the grease in the field before you

09:17:35 10    made claims about its quality, right?

11        "Answer:  That is correct.

12        "Question:  Okay.  You do have a number of warranty

13    claims on your ALS system?

14        "Answer:  Yes, we do.

09:17:45 15        "Question:  I believe you told me about 7 or 800 pumps

16    have been recalled thus far?

17        "Answer:  Yes, we had to recall a pump, correct.

18        "Question:  Seven to 800 of them, right?

19        "Answer:  Yeah, that's about it approximately --

09:18:04 20    that's about approximately it, yeah, correct."

21        I read that correctly?

22    **A.**    I think it's very similar to what I just told you.

23    **Q.**    So you did no independent tests on the Lubecore grease

24    either before putting that in the market and telling people

09:18:22 25    to use it in their existing Groeneveld systems?

 1          MR. ANASTOS:  Objection.

 2          THE COURT:  Overruled.

 3   BY MS. MICHELSON:

 4   **Q.**   You may answer the question.

09:18:31  5   **A.**   Okay.  Can you please repeat what it was?

 6   **Q.**   I can.

 7   **A.**   Please do.

 8   **Q.**   I will.  So you did no independent testing on the

 9   Lubecore grease either before making claims about its

09:18:43 10   quality, did you?

11   **A.**   Grease is very -- has very specific specifications and

12   we did not field test the grease before we sold it.  That's

13   correct.

14   **Q.**   And you did not evaluate independently anybody else's

09:18:56 15   tests on the Lubecore grease before release -- making claims

16   about its quality to the market, right?

17   **A.**   Like buying gasoline in a store.  Sales like octane

18   89.  I'm not doing an octane test when I buy gas.

19   Specifications for the grease, Timken okay load, full layer,

09:19:17 20   base or viscosity.  When a company that's -- makes grease

21   everyday tells me this is what's in the grease, I indeed did

22   not do any further independent testing to verify whether

23   those specifications that they gave me are correct.  It's

24   my --

09:19:31 25   **Q.**   You put your label on it and you released it to the

Eissis - Cross

1    market, right?

2    **A.**    That's correct.

3    **Q.**    Okay.

4        And you did so and told people if they use it in the

09:19:42 5    Groeneveld system, you would also warrant those products,

6    right?

7    **A.**    When they use the Steadylube grease in the Groeneveld

8    system and they have an extended warranty program, we'll

9    honor that.  Correct, yeah.

09:21:10 10   **Q.**    Showing you what we've marked as Plaintiff's Exhibit

11   61-2, this is a pump that's a Lubecore reservoir or at least

12   a reservoir with the Lubecore labeling, and a Groeneveld

13   base, correct?

14   **A.**    That's correct.

09:21:40 15   **Q.**    Exhibit 55, that's an installed Lubecore pump?

16   **A.**    Correct.

17   **Q.**    Exhibit 60-1 and 60-2, that's an installed Lubecore

18   pump?

19   **A.**    This one here, yes.  The other one, can you show me

09:22:10 20   that again?

21   **Q.**    Sure.  It's -- I think it's the same but different

22   angles.

23   **A.**    Okay.  Good enough.  They're both Lubecore pumps?

24   **Q.**    Yes, sir.

09:22:17 25   **A.**    Yes.

1  **Q.**  Sorry, I just need to see something for one minute.

2     So, sir, when we asked you in the case for Lubecore

3  financial information long, long ago, you finally gave us

4  something during your deposition.  Do you recall that?

09:23:43 5  **A.**  I don't recall it, but if you show me, then we can

6  take a look at that.

7  **Q.**  Okay.  This is what was handed to me right before

8  your -- or in the middle of your deposition.  We've marked

9  it Exhibit 103.  Do you recognize this?

09:23:58 10  **A.**  Yeah, I recognize this document, yeah.

11  **Q.**  And this is what you handed us?

12  **A.**  Actually, Pierre LaBelle of our company made that.

13  **Q.**  You did not make this, create this document?

14  **A.**  No, I did not.

09:24:13 15  **Q.**  You did not verify any of the numbers?

16  **A.**  Yeah, I would have.

17  **Q.**  You did?

18  **A.**  Yeah.

19  **Q.**  And this indicates that it's 2010 sales figures, year

09:24:27 20  to date, as of the date of your deposition which was

21  September of 2010, and then what you projected for the rest

22  of 2010?

23  **A.**  Says from the top 2010 sales, year to date, and then

24  2010 sales projections, what date was this given?  Can you

09:24:50 25  tell me?

1    **Q.**    What date did we give you this?  On September 20,

2    2011?

3    **A.**    September 20th.

4                    MR. ANASTOS:  That's --

09:25:02 5              MS. MICHELSON:  20 or 21st, 20th, 2010, sorry.

6                    THE WITNESS:  September 20, 2010, we gave you

7    this.  Okay.

8    **Q.**    Okay.

9    **A.**    Yeah, and there was no backup, no support, no

09:25:13 10   supporting documentation, no financial records, nothing like

11   that, just this summary, right?

12                   MR. ANASTOS:  Objection.

13                   THE COURT:  Sustained.

14   **Q.**    When you handed this to us, you didn't give me anyone

09:25:22 15   else, did you?

16                   MR. ANASTOS:  Objection.

17                   THE COURT:  The objection was sustained.

18   **Q.**    And these were your projections and your sales

19   figures, Lubecore's?

09:25:32 20   **A.**    Projections would be, more or less, by Pierre and

21   myself.  I would have to look at it, yeah.

22   **Q.**    Okay.  And there's nothing about 2009 on there at all,

23   correct?

24   **A.**    That's correct.

09:25:45 25   **Q.**    Are any 2009 sales reflected in this document, not

1    withstanding the dates here, the 2010 and 2011 dates?

2    **A.**    I think that in this document, from a reason, there's

3    no 2009 figures.

4    **Q.**    I didn't really hear what you said.

09:26:14  5    **A.**    It appears there's no 2009 figures.

6    **Q.**    That's not my question.  It does appear there are no

7    2009 figure, but I want to clear this up because there was a

8    suggestion that maybe there were.  Are there any 2009 sales

9    figures in this document, Exhibit 103?

09:26:31 10    **A.**    Can I see it here?  Because it's a little fuzzy to

11    read.

12            MS. MICHELSON:  Yeah, can we give him another

13    copy?  You can leave this here.

14            THE WITNESS:  There's the green one we looked

09:26:46 15    at yesterday that looks a lot like it.

16            MR. KUNSELMAN:  May I, your Honor?

17            THE COURT:  Sure.

18            THE WITNESS:  Okay.  Okay.  Okay.

19        Now, I understand.  I think there's a typo here.  Can

09:27:14 20    you go back to the other one?

21    **Q.**    This is the same thing, just has my handwritten notes

22    from Gail's testimony on it.  But, it's the same document,

23    Exhibit 103.  Are there 2009 numbers reflected in here,

24    despite the dates or the dates here, correct?

09:27:29 25    **A.**    Yeah, I think what the issue here is that the 2010

Eissis - Cross

1    year to date is actually probably the 2009 sales and the

2    2010.  I think it's a typo.  Says 2010 year to date.  That

3    might be the 2009, and then 2010 projected annual, that

4    would make sense then and 2011 projected annual.  So it's

09:27:57  5    possible that 2010 sales year to date, there's a typo in the

6    top there, but I would have to verify that.

7    Q.    So is there a typo or not, is it --

8    A.    I would now have to go back because it seems that if

9    you ask me for numbers in 2010, that that was correct,

09:28:16 10    right?  That we would have the 2009 numbers.  So in

11    September, it would seem logical to me that the 2010 sales

12    year to date, that should be 2009 or something, 2009, 384,

13    and then the --

14    Q.    I'm just trying to figure out if -- it's your

09:28:38 15    testimony now that this column where it says 2010 sales year

16    to date should have said 2009, that this column, 2010 sales

17    projected annual should have been full 2010, and the 2011

18    sales projected annual are your projections for 2011?  I

19    just want to know if this column here, 1, 2, 3, 4, 5, this

09:29:09 20    column pertains to 2009 sales because there was a suggestion

21    in the earlier testimony that it did, and that there was a

22    problem with Groeneveld calculating their damages based on

23    this being 2010 sales.  And I want to -- I'm just asking.

24            MR. ANASTOS:  Objection.

09:29:29 25            THE COURT:  Objection sustained.

1  **Q.**    Are these -- is this supposed to be for 2009 or is it

2  2010?

3  **A.**    You know, I am confused right now.  I would really

4  have to go back to the bookkeeping and get this verified

09:29:42  5  because I'm confused at this point.

6  **Q.**    Okay.  Well, the issue actually --

7  **A.**    So I cannot answer that question.

8  **Q.**    Okay.  The issue actually came up at your deposition,

9  and we'll refresh your recollection if I read your testimony

09:29:58  10  about this.  Because I asked you about it, and you -- you

11  said there was no typo.

12  **A.**    Okay.  Then -- when was the deposition?

13  **Q.**    September 20, 2010.  I'm going to hand you a document

14  that was handed to me this morning for the first time.  It's

09:30:17  15  Exhibit 23.  That's what we marked it during your

16  deposition.  Can you please tell us what that is?  This is

17  Lubecore International, Inc. 2010, USA, actual sales in 2011

18  sales projections.  Okay.  Who created this document, Pierre

19  LaBelle.

09:30:36  20      So Lubecore did -- your company produced this

21  document?

22      "Answer:  Yeah.

23      "Question:  And what is -- what is this, are these the

24  different distributors in the U.S. that are identified here?

09:30:49  25      "Answer:  Yeah, that's correct.

1        "Question:  Okay.  There might be -- this is my

2    question to you during your deposition, okay, there might be

3    a typo here, but this is 2010 sales, there are two columns

4    for 2010 sales, maybe it isn't a typo.  I don't really

09:31:04  5    understand what these columns mean.  Can you explain the

6    differences?

7        "Answer:  Yeah, the 2000 -- 2010 sales would be year

8    to date.  Yeah, so it -- so it says year to date below that.

9    Uh-huh, I say.

09:31:24  10        "Answer:  Year to date."

11        So that means until this was taken, until this moment

12    in time, so by now it would be accurate if taken as of last

13    week.  Okay.  Then we move on.

14        Then there's the 2010 sales, this is your answer,

09:31:42  15    "2010 sales so what we project to do for the end of the

16    year."

17        Does this refresh your recollection that there's no

18    typo on this document?

19    A.    Actually, you know what?  It doesn't refresh my

09:31:52  20    recollection at all.

21    Q.    Do you recall testifying during your deposition that

22    there was no typo and that there were no 2009 sales on the

23    summary that Lubecore provided at your deposition?  Did you

24    testify that late in your degrees?

09:32:10  25    A.    Can I see the deposition myself?  Can I read it?

1   **Q.**   I just read it, but we can do it again.  Maybe we

2   should get bigger so people can read it this way.

3       "Question:  Okay.  Page 237, I'm going to hand you a

4   document that was handed to me this morning.

09:32:48  5       "Answer:  Okay.

6       "Question:  For the very first time it's Exhibit 23?

7       "Answer:  Okay.

8       "Question:  Can you please tell us what this is?"

9   **A.**   This is the one you gave me, is 103.

09:32:59 10   **Q.**   Yeah.  It's marked for trial as 103.  At your

11   deposition, it was Exhibit 23.

12       And if you need to see your deposition exhibit with

13   the sticker on it that says 23 --

14   **A.**   Yeah, I'd like to see that.

09:33:12 15   **Q.**   -- I can bring that up, too.

16   **A.**   I'd like to see that.

17           MS. MICHELSON:  Can you get that for me,

18   somebody?  But, I'll keep going so we don't interrupt.

19           THE WITNESS:  Actually, I would first like to

09:33:21 20   see that.

21       Can I get maybe get a bit of water?  My mouth is

22   getting quite dry.  I have a bottle of water in my bag

23   there, Tom.

24           MS. MICHELSON:  Counsel, will you stipulate

09:34:29 25   that this is what the document was marked, Exhibit 23,

1        during the witness' deposition.

2                    MS. ZUJKOWSKI:  Yeah, we'll stipulate it's the

3        exact same document.

4                    MS. MICHELSON:  Will you stipulate it was part

09:34:50  5        of Lubecore's document production, please?

6                    MS. ZUJKOWSKI:  Yes, Debbie.

7                    MS. MICHELSON:  Thank you.

8                    THE WITNESS:  For what purpose?

9                    MS. ZUJKOWSKI:  Also stipulate to the typo.

09:35:02 10                    MS. MICHELSON:  There is no typo.  There is

11        no -- all right.  I'm going to read from here.

12        **Q.**    Page 237, Line 16.

13             "Question:  I'm going to hand you a document that was

14        handed to me this morning.

09:35:21 15             "Answer:  Okay.

16             "Question:  For the first time, it's Exhibit 23.

17             "Answer:  Okay.

18             "Question:  Can you please tell us what it is?

19             "Answer:  This is Lubecore International Inc.'s 2010

09:35:33 20        USA actual sales and 2011 sales?

21             "Question:  Okay.  Who created this document?

22             "Answer:  Pierre LaBelle.

23             "Question:  So lube -- from -- so Lubecore did,

24        Lubecore your company, produced this document?

09:35:53 25             "Answer:  Yeah.

1          "Question:  And what is -- what is -- are these the

2     different distributors in the U.S. that are identified here?

3          "Answer:  Yeah, that's correct.

4          "Question:  Okay.  And then -- and there might be a

09:36:11 5     typo here, but this is 2010 sales.  There are two columns,

6     two columns for 2010 sales.  Maybe it isn't a typo.  I don't

7     really understand what those columns mean.  Can you explain

8     the differences?

9          "Answer:  Yeah, yes.  The 2010 sales would be the year

09:36:34 10    to date.  Yeah, so it says year to date below that.  Can you

11    read that?

12         "Question:  And I say uh-huh and you say --

13         "Answer:  Year to date.  So that means until this was

14    taken, the moment in time.  So by now, it will be accurate

09:36:53 15    if it was taken last week.  The next --

16         "Question:  Wait.  What did you just -- this was

17    created last week?

18         "Answer:  Yeah.  This would have been created whenever

19    it was created by Pierre.

09:37:08 20         "Question:  Well, I'm asking you when was it created

21    by Pierre?

22         "Answer:  Within the last few weeks.

23         "Question:  Created within what?  I had trouble

24    hearing, understanding you during the --

09:37:20 25         "Answer:  The last few weeks.

1    "Question:  The last few weeks?

2    "Answer:  I've been on the road.  I do not know

3    exactly when Pierre created it.  Then there's the 2010

4    sales.  So what we project to do for the end of the year,

09:37:34 5    the 2010 projections.  So the --

6    "Question:  So the year to date sales will be current

7    through -- what month is this, is this September?  So what?

8    "Answer:  Probably August or so.

9    "Question:  The end of --

09:37:51 10    "Answer:  End of August, probably, probably, yeah.

11    "Question:  And that's gross sales of $384 and change?

12    "Answer:  Correct, yeah, correct.

13    "Question:  And you think between September and the

14    end of the year -- and we were in 2010 at the time?

09:38:09 15    "Answer:  We're going to bring that to a million,

16    yes."

17    That was your answer.  I read that correctly?

18    **A.**    Actually that's quite helpful.  That refreshes my

19    memory.

09:38:21 20    **Q.**    Right.  So there are no 2009 sales figures in Exhibit

21    103?

22    **A.**    I think -- I think that is correct, yeah.

23    **Q.**    Okay.  And then no additional financial information

24    from Lubecore was provided until I guess a day and a half

09:38:44 25    before trial, right?

Eissis - Cross

```
         1    A.    I think my lawyers could answer that better.

         2    Q.    And this was what was provided in your exhibit book,

         3    what's marked DX-X, meaning Defendant's Exhibit X-1, 2, 3,

         4    4, correct?  This comes from your Exhibit book, right?

09:39:20 5    A.    That's possible.  I mean -- I have -- I've never gone

         6    through the exhibit book, but I'm sure --

         7             MS. MICHELSON:  Counsel, will you stipulate

         8    that this was in your exhibit book provided to us two days

         9    before trial?

09:39:34 10            MS. ZUJKOWSKI:  We'll stipulate that it was in

        11    our exhibit book.  I think you're wrong on the date

        12    actually.  But, we're looking for the transmittal e-mail if

        13    you need it.  I don't see how it's relevant.

        14             MS. MICHELSON:  It appeared in the exhibit

09:39:44 15   book.  All right.

        16    BY MS. MICHELSON:

        17    Q.    And these figures are not the same as those in Exhibit

        18    103, right?

        19    A.    Put it beside them so I can answer that.  I couldn't

09:40:02 20   see as quick as you went so --

        21    Q.    The numbers in Exhibit 103 in your exhibit book are

        22    not the same as those in Exhibit -- sorry.

        23    A.    I'm staring at a blank paining here.

        24    Q.    I'm just asking you if you know.

09:40:25 25   A.    Actually I'm staring at a blank page.  If you could
```

1   show me both beside each other, I can take a look and see if

2   they're the same or not.

3   **Q.**   You testified about it on direct exam.  I'm just

4   asking you.

09:40:37   5   **A.**   Show me that.

6   **Q.**   I'm just -- I'll -- I'll show you in a minute if I

7   decide to do that.  But, I'm just asking you your sales

8   figures in Defense Exhibit X are not the same as the numbers

9   in Plaintiff's Exhibit 103, right?

09:40:53   10   **A.**   Actually, I'm looking at a blank page and I do not

11   know without seeing those pieces of paper in front of me.  I

12   cannot answer your question.  I'm sorry.  I'm looking at a

13   white piece of paper.

14   **Q.**   I heard you say that.  You did not prepare Defense

09:41:18   15   Exhibit X?

16   **A.**   What is Defense Exhibit X?  Actually I can't read the

17   numbers either right now.  It's very blurry.  No, I did not

18   prepare this myself.  That's correct.

19   **Q.**   There are no financial statements attached to Defense

09:41:38   20   Exhibit X, right?

21   **A.**   That's correct.

22   **Q.**   There are no tax returns attached to Defense Exhibit

23   X, correct?

24   **A.**   That seems to be correct, yeah.  I don't know whether

09:41:52   25   they were or not, but -- it wouldn't make any sense that the

Eissis - Cross

1    tax returns -- because we're Canadian company and this is

2    only about business in the U.S., so this would have to be

3    singled out as U.S. sales only, like we're talking about

4    U.S. sales.

09:42:16  5    **Q.**    Are you -- did you just say that your tax --

6    **A.**    Financial activities in the U.S.  So my tax returns

7    would not have separate columns in there about activity in

8    the USA.  It would just be total revenue that we sent to

9    revenue Canada that would have no impact on activity in the

09:42:34 10   USA.

11   **Q.**    There are no financial statements attached to the

12   document, right?

13                    MR. ANASTOS:  Objection.

14                    THE WITNESS:  That's correct, yeah.

09:42:40 15                   THE COURT:  We've gone over this.

16                    MS. MICHELSON:  Okay.  I just have --

17   **Q.**    I just have to ask you a couple questions more about

18   this document, Defendant's Exhibit X, and I'll wrap up soon.

19   You claim all of these figures here in this Exhibit X relate

09:43:37 20   to the sales of your single-line zero grease EP-0 ALS

21   products?

22   **A.**    Can you move the page over a little bit?  Just give me

23   the page so I can take a look at it so I can see the whole

24   thing all at once.

09:43:50 25   **Q.**    We can do both.  Do we have an extra copy for him to

look on at the stand? Can somebody bring to him, please?
A. Now, I can't read it, yeah.
Q. We want the jurors to see it as well.
A. I can't read those numbers.
09:44:01 Q. We're going to bring a copy so you'll have it in your hand.
MR. KUNSELMAN: May I, your Honor?
THE WITNESS: Okay.
Q. Here's my question. My question is --
09:44:16 A. Page DX-X.
Q. You claim all of these figures in DX-X relate to sales of your single-line zero grease EP-0 ALS products, right?
A. 2009 to 2010 financials summary 2009 to 11. Total revenue. Yeah, I believe that this is -- oh, yeah for sure. 09:44:54 Yeah, the sales here, revenue EP-0 single-line, the fourth column over, yeah.
Q. Okay.
Lubecore also sells related products to the same customer -- are you with me?
09:45:09 A. Yeah.
Q. I'm not going to ask the document right now.
A. Excuse me?
Q. Are you with me?
A. Yes, I'm listening.
09:45:16 Q. Okay.

Eissis - Cross

1    **A.**    You're asking questions.

2    **Q.**    Lubecore also sales related products to the same

3    customers that it sells these EP-0 products to, right?

4    **A.**    What do you mean related products?

09:45:28  5    **Q.**    Related -- other ALS products?

6    **A.**    Yes, we do, yeah.

7    **Q.**    Okay.  And there's no indication in Defense Exhibit X

8    that anyone to whom you sold the related products are not

9    also Groeneveld customers, right?  There's no indication in

09:45:45 10    this document to the effect I just described, is there?

11          MR. ANASTOS:  Objection.  Not Groeneveld

12    customers?  I didn't understand.

13          THE COURT:  I didn't understand it either.

14          MS. MICHELSON:  I can rephrase it.  I'm

09:45:55 15    trying.

16    BY MS. MICHELSON:

17    **Q.**    There's no indication in the exhibit that anyone to

18    whom you sell EP-0 products are not also Groeneveld

19    customers, is there?

09:46:15 20          MR. ANASTOS:  Objection.

21          THE COURT:  Sustained.

22    **Q.**    You don't dispute that people to whom you -- Lubecore

23    sells EP-0 products have also have been or are Groeneveld

24    customers, do you?  You don't dispute that, do you?

09:46:29 25    **A.**    Actually, can you please tell me what you'd like to

Eissis - Cross

| | |
|---|---|
| 1 | know instead of going so difficult?  Like -- what would you |
| 2 | like to know? |
| 3 | **Q.**    You admit that Lubecore customers of EP-0 products are |
| 4 | also Groeneveld customers of the same line of products? |
| 09:46:52 5 | **A.**    The list of distributors that we have on here, on |
| 6 | this -- these people, I thought there was one earlier, yeah |
| 7 | on this document here.  These people bought automatic |
| 8 | greasing systems from me. |
| 9 | **Q.**    And from Groeneveld, and from Groeneveld, correct? |
| 09:47:07 10 | **A.**    Not all of them, but -- |
| 11 | **Q.**    And from Groeneveld, right? |
| 12 | **A.**    Some of these people buy -- well, some of these people |
| 13 | used to buy, maybe still buy some parts from Groeneveld |
| 14 | today, but some of these -- I sell greasing systems to those |
| 09:47:21 15 | companies there, except for Frank's.  Only got a demo once |
| 16 | and so -- |
| 17 | **Q.**    And the end users of Lubecore's EP-0 products are -- |
| 18 | it's the same target as Groeneveld? |
| 19 | MR. ANASTOS:  Objection. |
| 09:47:38 20 | THE COURT:  Overruled. |
| 21 | THE WITNESS:  So you're -- first you ask me |
| 22 | about these customers. |
| 23 | **Q.**    It's another question.  It's a different question. |
| 24 | **A.**    You're talking about two different customers.  The |
| 09:47:47 25 | first question was -- |

1  **Q.**   I know I am.

2  **A.**   The first customer -- well, it's very unclear to me

3  the way you ask your question.  Okay?  The way you ask your

4  question.  These customers here are people that are

09:47:57  5  distributors that I sell to, and those people sell to other

6  people again that I don't sell to, and I have some knowledge

7  of, but I don't know their customer base.  I don't know

8  Bill's customers.  I know a few of them, but that's about

9  it.  So --

09:48:12  10  **Q.**   Well, you told us already you know about at least

11  Millis Transport, and they were -- so the question -- this

12  is my question to you.

13  **A.**   Yeah.

14  **Q.**   You don't dispute that end users of your products,

09:48:23  15  your EP-0 products, are also end users of Groeneveld's

16  similar products, right?

17  **A.**   They can be, yeah.

18  **Q.**   Okay.

19  **A.**   Yeah.

09:48:32  20  **Q.**   Okay.

21      Mr. Eissis, you testified quite a bit about the

22  technical aspects of the various -- of the -- well, the two,

23  ALS pumps, correct?

24  **A.**   The technical aspect of --

09:49:04  25  **Q.**   You testified about the technical parts of your pump.

1    My question to you is this.

2         You instructed Martin Vermeulen to make a pump for

3    Lubecore, right?

4    A.    Yeah.

09:49:18  5    Q.    You told him to make a system for Lubecore, right?

6    A.    Pardon me, yeah.

7    Q.    Okay.  You told him what you wanted, right?

8    A.    I gave him the features that I wanted my pump to have,

9    correct.

09:49:36 10    Q.    And you told him what you liked in the Groeneveld and

11    the few things that you wanted different, right?

12    A.    I told him what I like about the Groeneveld pump and

13    other pumps in the industry as well.

14    Q.    And the Lubecore pump doesn't look like the other

09:49:55 15    pumps in the industry, doesn't look like the Ecostar, does

16    it?

17    A.    We went there yesterday.  I -- I'm -- I'm testifying

18    that my -- that the Lubecore pump looks more like Groeneveld

19    pump than Ecostar pump looks like a Groeneveld pump or like

09:50:11 20    my pump.

21    Q.    You agree that the Lubecore pump looks like the

22    Groeneveld?

23    A.    Yes.

24    Q.    Okay.

09:50:16 25         And that's okay with you because you know that

1    Groeneveld has an international reputation for quality,

2    right?

3                    MR. ANASTOS:  Objection.

4                    THE COURT:  Objection sustained.

09:50:31  5    **Q.**    You voiced no objection at any time to it looking so

6    similar to the Groeneveld pump, did you?

7    **A.**    No, I didn't.

8    **Q.**    You would not want your pump to look like a product

9    that had a bad reputation, right?

09:50:51 10                    MR. ANASTOS:  Objection.

11                    THE COURT:  Overruled.

12                    THE WITNESS:  See when you talk about a bad

13    reputation, it depends on who you talk to.

14    **Q.**    Well, I'm talking to you.  I'm asking you the

09:51:01 15    question.  My question to you, Mr. Eissis?

16                    THE COURT:  Excuse me.  Let him answer the

17    question.

18                    MS. MICHELSON:  Well --

19                    THE WITNESS:  When you talk to a customer that

09:51:08 20    have Groeneveld pumps fall off in front of the wheels and

21    drove over it and splatter it all over the road, Groeneveld

22    does not have a good reputation.  So in a case like that,

23    you know, it's probably a disadvantage.  In other

24    advantages -- other areas where they are happy with it, it

09:51:23 25    doesn't really matter.  So really it can go both ways, also

| | |
|---|---|
| 1 | people that are not happy with the Groeneveld systems.  So |
| 2 | it goes both ways. |
| 3 | **Q.**   You would not want your pump to look like something |
| 4 | that had a bad reputation in the marketplace, would you? |
| 09:51:46 5 | **A.**   Preferably not, no. |
| 6 | **Q.**   And you say in your web site that you understand how |
| 7 | long it takes to build a reputation in the marketplace, 20 |
| 8 | years to build a reputation and only five minutes to ruin |
| 9 | it, right? |
| 09:52:01 10 | **A.**   Yeah, that's -- that's true. |
| 11 | **Q.**   And you've testified that you wanted to forge an |
| 12 | independent corporate image and identity for Lubecore? |
| 13 | **A.**   Yeah. |
| 14 | **Q.**   And you -- and for that reason, you want your pump to |
| 09:52:14 15 | look distinctly different than the Groeneveld? |
| 16 | **A.**   Can you show me where it says that? |
| 17 | **Q.**   Can you say it now? |
| 18 | **A.**   No, I'd like to show -- I'd like you to show me in |
| 19 | what context and where you find that information. |
| 09:52:32 20 | **Q.**   So I'm asking you a question. |
| 21 | **A.**   You're reading from something there and I like to know |
| 22 | where you read from. |
| 23 | **Q.**   I am reading from my outline and I'm not going to show |
| 24 | that to you.  My outline.  I'm asking you the question.  And |
| 09:52:44 25 | I can find the testimony if I need to but my question to you |

1    right now, sir, is --

2    **A.**    You said something to the extent that I --

3    **Q.**    And for that reason, you wanted your pump to look

4    distinctly different than the Groeneveld because you wanted

09:52:57 5    to build your own make and model and develop your own brand,

6    right?

7    **A.**    I want to develop my own brand.

8    **Q.**    And for that reason, you want your pump to look

9    distinctly different from the Groeneveld?

09:53:13 10    **A.**    I do not understand where you're going with this.

11    Where are you getting this?

12    **Q.**    Do you want it to look exactly the same as the

13    Groeneveld?

14    **A.**    I never said it before.  So show me where I said that.

09:53:22 15    You talk to me for ten hours, asked me thousands of

16    questions, if not 100,000.  So if you say that I said that,

17    and I'd like to say when did I say that, verify that, yeah,

18    and what context is that and ask me a question.

19    **Q.**    You wanted your pump to look just like Groeneveld's,

09:53:47 20    didn't you?  You can't answer the question because you

21    wanted your pump to look exactly like Groeneveld?

22                        MR. ANASTOS:  Objection.

23                        THE COURT:  Overruled.

24                        THE WITNESS:  No.  I did not instruct that my

09:53:58 25    pump had to look like a Groeneveld.

Eissis - Cross

1    **Q.**    I didn't ask if you instructed that because you

2    certainly didn't instruct him to the contrary.  My question

3    is you wanted your pump to look exactly like Groeneveld's,

4    didn't you, and that's why it does?

09:54:10  5    **A.**    It doesn't matter to me.

6    **Q.**    Well, it would matter to you.  We just established if

7    Groeneveld had a crummy reputation, it would matter to you

8    then, wouldn't it?  You just said it would?  You just said

9    that?

09:54:26 10    **A.**    Yeah, that's correct, I said that.

11    **Q.**    Okay.  So it does matter to you, doesn't it?

12    **A.**    Yeah, if it would look like -- the Groeneveld pump had

13    a really bad reputation, I would not like that, correct.

14    **Q.**    You know they have a good reputation.  You carried

09:54:42 15    that product line from 1988 to 2007, right?  You know they

16    have a good reputation?

17    **A.**    Yeah, different versions of it, I did, yeah.

18    **Q.**    You know that they're recognized in all over the place

19    among people who were involved in the ALS industry?  You

09:55:00 20    know that, don't you?

21    **A.**    Yeah, Groeneveld is recognized in -- you know,

22    especially with the customers, yeah.

23    **Q.**    You can -- you can identify a pump as a Groeneveld by

24    the shape of it, can't you?  You worked with the thing for

09:55:17 25    all those years, you can identify it, you recognize it as a

Eissis - Cross

1    Groeneveld when you see it, right?

2    **A.**    Yes, I do.

3    **Q.**    Because of the shape of it, right, the silhouette, the

4    outline, the way it looks, you recognize it on sight?

09:55:31  5    **A.**    And also because the name and the labeling on it.

6    **Q.**    Is it your testimony here in court that you would not

7    recognize that as a Groeneveld pump if you couldn't read the

8    label that says Groeneveld?

9    **A.**    Drove by it 100 kilometers an hour on the highway,

09:55:46 10    yeah.  Actually, I would still say it's a Lubecore pump,

11    yeah, because of the red colors.

12    **Q.**    So, sir, you wanted it to look like the Groeneveld

13    because you knew about Groeneveld's reputation, market

14    presence, and place in the industry, didn't you?

09:56:07 15    **A.**    I have no objection with it looking like a Groeneveld.

16    **Q.**    In fact, you like that, and you like enjoying the

17    benefits of that, don't you?

18    **A.**    It's a good pump.

19    **Q.**    Otherwise, you would make it differently, wouldn't

09:56:22 20    you?

21    **A.**    It would have been up to Martin.

22                MS. MICHELSON:  I have nothing further at this

23    time.

24                THE COURT:  Any redirect?

09:56:36 25                MR. ANASTOS:  We have no questions for

1    Mr. Eissis.

2             THE COURT:  Thank you, Mr. Eissis.  You can

3    step down.  You may call your next witness.

4             MR. ANASTOS:  Your Honor.

09:56:54  5             THE COURT:  Sure.

6             MR. ANASTOS:  We're only calling the witness

7    to authenticate the trade registration form pulled off the

8    Internet.  If there's no dispute about the authentication

9    then we don't have to call this witness.

09:57:06  10             MS. MICHELSON:  I mean I'm happy to talk to

11    this person and see if I have any issue.

12             THE COURT:  Here, take a minute.  You want to

13    stand up and stretch, be my guest.

14             (Counsel conferring.)

10:01:03  15             THE COURT:  You should take a break since they

16    took a break you might as well.

17             A JUROR:  Amen.

18             THE COURT:  Chris will take you in.

19        (Thereupon, a recess was taken.)

10:17:59  20             THE COURT:  Go ahead.

21             MR. ANASTOS:  Lubecore calls Ms. Susan Coker.

22    Step over here if you will.  Raise your right hand for me.

23

24

25

Coker - Direct

1                      SUSAN COKER,

2        of lawful age, a witness called by the DEFENSE,

3              being first duly sworn, was examined

4                  and testified as follows:

10:18:28  5        DIRECT EXAMINATION OF SUSAN COKER

6            THE COURT:  Could you tell us your full name

7    and spell your last name.

8            THE WITNESS:  My full name is Susan

9    Draeger-Coker, C-O-K-E-R.

10:18:36 10           THE COURT:  Thank you.

11   BY MR. ANASTOS:

12   **Q.**   Good morning, Ms. Coker.

13   **A.**   Good morning.

14   **Q.**   Ms. Coker what is your occupation?

10:18:42 15   **A.**   I'm a paralegal.

16   **Q.**   How long have you been a paralegal?

17   **A.**   Going on 25 years.

18   **Q.**   Where are you currently employed?

19   **A.**   Ulmer and Berne.

10:18:50 20   **Q.**   And you work with me at Ulmer and Berne?

21   **A.**   Yes, I work in the department that you are in.

22   **Q.**   Which is the business litigation department?

23   **A.**   Yes, and I also assist occasionally on intellectual

24   property matters.

10:19:04 25           MR. ANASTOS:  Can we have the screen, your

1    Honor?

2    **Q.**    Ms. Er, I've got on the screen document in this case

3    that's been marked as Defendant's Exhibit Z?

4                    THE COURT:  Speak up a little bit.

10:19:26  5    **Q.**    I have on the screen document that's been marked as

6    Defendant's Exhibit Z, do you see that.  Z as in zebra?

7    **A.**    Yes.

8    **Q.**    Are you familiar with this document?

9    **A.**    Yes.

10:19:34 10    **Q.**    Did I ask you to find this document?

11    **A.**    Yes, you did.

12    **Q.**    What did you do?

13    **A.**    I went on the web site for the -- it's called WIPO,

14    it's the World Intellectual Property Organization, and from

10:19:49 15    there, you can search for various trademarks in multiple

16    countries in the world, and that search led me to the

17    Benelux Office of Intellectual Property, and that would be

18    Belgium, Belgium, the Netherlands, and Luxembourg, and at

19    their web site, I did a web search for Lubecore, and came up

10:20:16 20    with this finding.

21    **Q.**    And then you printed it out?

22    **A.**    Printed it out, e-mailed it to you.

23    **Q.**    Do you have any dispute that the document you're

24    looking at is the document you e-mailed to me?

10:20:29 25    **A.**    No.

Coker - Cross

1          MR. ANASTOS:  No further questions.

2          THE COURT:  Thank you.  Cross-examination?

3          MS. MICHELSON:  Very quickly.  Your Honor,

4    thank you.

10:20:43  5          CROSS-EXAMINATION OF SUSAN COKER

6    BY MS. MICHELSON:

7    **Q.**    Hi.  How are you, Ms. Coker?

8    **A.**    Good.

9    **Q.**    Ms. Coker, you have no personal knowledge as to why

10:20:52 10   this registration was made, the one that's in the exhibit?

11   **A.**    No, ma'am.

12   **Q.**    And you have no knowledge of the lawfulness of the

13   registration under European laws or regulations, or those

14   that govern the three places?

10:21:08 15          MR. ANASTOS:  Objection, beyond the scope.

16          THE COURT:  Yeah, the objection is sustained.

17   **Q.**    You did other searches as well for additional

18   information and this is the only thing you could find,

19   correct?

10:21:17 20  **A.**    Correct.

21          MS. MICHELSON:  Nothing further, your Honor.

22          THE COURT:  Thank you.  Ms. Coker, thank you

23   ma'am.  That was easy, huh?

24          THE WITNESS:  Yes, it was.

10:21:24 25          THE COURT:  Your first time testifying.

```
 1                    THE WITNESS:  Yes, sir.

 2                    THE COURT:  In all those years.

 3                    THE WITNESS:  Yes.

 4                    THE COURT:  Wasn't so bad.

 5                    THE WITNESS:  Usually I'm one of those people

 6      out there, so.

 7                        (Laughter.)

 8                    THE COURT:  All right.  Thanks.  Anything

 9      further?

10                    MR. ANASTOS:  Your Honor, we have no more

11      witnesses at this time.  We'll be prepared to move our

12      exhibits.

13                    THE COURT:  Okay.  The Defense has rested.  Is

14      there anything further on behalf of the Plaintiff?

15                    MS. MICHELSON:  There is going to be, your

16      Honor.  Yes, our -- we have a rebuttal witness that is due

17      to be here I think around 1:15 or so.

18                    THE COURT:  Looks like we missed him.

19                    MR. ANASTOS:  Dr. Rashidi.  This is the

20      Cleveland State University guy.

21                    THE COURT:  Hang on.  We'll -- since they

22      rested, we'll take our -- I say short, but you know what

23      that means now, I'm sure.  Don't you?  When I say short,

24      like a lawyer, I just have two questions and an hour later,

25      you're going what.  Okay.
```

1    We'll have a short recess because they rested.  We'll

2    go through their exhibits a little bit, and we'll be ready

3    to go to conclude the case and you'll be getting it fairly

4    quickly.  So keep in mind the admonition.  It's still

10:22:21  5    important.  You may or may not have heard all the testimony

6    you're going to hear.  Fair enough?  Okay.  Chris, could you

7    take them back.

8         (Proceedings in the absence of the jury:)

9              THE COURT:  Okay.  What about this witness?

10:23:06 10              MR. ANASTOS:  I believe he's being called as a

11   rebuttal expert under Rule 26, and we didn't put any expert

12   on.

13              MS. MICHELSON:  He's been called -- is an

14   expert, and he's being called to rebut testimony that was

10:23:17 15   put in in the Defense's case-in-chief of Mr. Eissis and also

16   of Mr. Vermeulen, who was -- whose testimony was presented

17   on functionality issues and technical issues, and he speaks

18   to all of those, including frankly, your Honor,

19   Mr. Vermeulen's lack of basic knowledge that would have --

10:23:45 20   his demonstration of a lack of basic knowledge about

21   engineering principles, such that there's no way he even

22   designed the Lubecore pump.

23              MR. ANASTOS:  These questions --

24              MS. MICHELSON:  More as well, your Honor, but

10:23:58 25   given that they've -- they've offered -- they've offered

expert like testimony through Mr. Vermeulen.  And it is

appropriate for -- and we are seeking in a rebuttal case to

demonstrate that the expert opinions and knowledge and

testimony or the expert like testimony offered by

Mr. Vermeulen should be -- should be considered in the --

should be evaluated with Dr. Rashidi's input.  They put him

on as their expert like person on these issues to talk about

functionality and all sorts of things, and Dr. Rashidi is

prepared to discuss it.  We did have him promptly prepare a

report.  As soon as we got the testimony with Mr. Vermeulen

in the deposition, which was on a Tuesday, we -- we got

doctor -- because we didn't know what he was going to say

before.  We got Dr. Rashidi on board to evaluate the

testimony.  When the transcript became available, we ordered

it expedited for that purpose and provided them a report, I

believe on the Sunday, and they've had it since then, and

that is our intent.

THE COURT:  So he can testify as to the

Groeneveld product because that's at issue in the case,

isn't it?  Whether the Groeneveld product is functional or

not, not whether Lubecore is functional or nonfunctional,

right?

MS. MICHELSON:  He testified --

THE COURT:  Could you answer my question?

MS. MICHELSON:  Okay.

1          THE COURT:  Isn't that the issue in the case?

2          MS. MICHELSON:  Yeah, it's one of them, yes.

3          THE COURT:  Okay.

4          MS. MICHELSON:  On functionality, yes.

10:25:46   5          THE COURT:  Of the Lubecore pump -- excuse me,

6   of the Groeneveld pump, not Lubecore?

7          MS. MICHELSON:  Right.

8          THE COURT:  So is it -- how is it relevant

9   then?  What are -- what is he going to testify about the

10:25:56  10   Lubecore?

11          MS. MICHELSON:  Mr. Vermeulen gave lots of

12   testimony and says that he's the one who designed both

13   systems, created both systems independently, including that

14   he created the Lubecore independent of the Groeneveld, and

10:26:10  15   Dr. Rashidi says that is not possible.  That is --

16          THE COURT:  Okay.

17          MS. MICHELSON:  -- discredits his testimony.

18          THE COURT:  All right.

19          MR. ANASTOS:  May I speak, your Honor?

10:26:21  20          THE COURT:  Yeah.

21          MR. ANASTOS:  First of all, one of the key

22   points is expert like.  Secondly, Mr. Vermeulen testified

23   100 percent from his personal experience in terms of the

24   development of the pumps.  If there was cross-examination

10:26:35  25   with respect to that issue, it should have been done during

1    cross-examination of Mr. Vermeulen. Thirdly, if they're

2    going to put on evidence of functionality at this point,

3    that should have been done in their case-in-chief. It's not

4    a rebuttal issue. It's an issue on which they had the

10:26:48  5    burden of proof to begin with.

6              THE COURT: No, I -- right. Is he going to

7    testify about the functionality of the Groeneveld pump?

8              MS. MICHELSON: No.

9              THE COURT: Okay.

10:26:59 10              MS. MICHELSON: His testimony is that --

11    well --

12              MR. ANASTOS: Going to discredit

13    Mr. Vermeulen's testimony.

14              THE COURT: Understand.

10:27:09 15              MS. MICHELSON: Your Honor, whether, whether

16    this is an intentional copy or not, whether it's a copy at

17    all, I mean they have said -- Lubecore has said that it is

18    not a copy, not a copy. It's not identical, not even an

19    intentional copy.

10:27:24 20              THE COURT: Your witness -- I actually wrote

21    it down. Mr. Wapenaar said, "I do not need to have 20/20

22    vision to see that there are differences."

23              MS. MICHELSON: For him because he, after he

24    studied it, he could see it.

10:27:38 25              THE COURT: He looked at it on the table.

1    That's what he was saying he looked at it on the table.

2    That's your guy.

3                    MS. MICHELSON:  Your Honor, also when he first

4    saw it and didn't know what was going on, he had a very

10:27:46  5    different reaction.  Now, the Court a year or a year and a

6    half later, he can see --

7                    THE COURT:  The objection is sustained.

8                    MS. MICHELSON:  Well, I will -- I will just

9    proffer --

10:27:57 10                    THE COURT:  Okay.

11                    MS. MICHELSON:  -- his --

12                    THE COURT:  All right.  Now, you have any

13    other motions?

14                    MR. ANASTOS:  I don't know if -- are there any

10:28:06 15    more witnesses?

16                    THE COURT:  You rested.  So let's hear what

17    you have to say.

18                    MR. ANASTOS:  Yeah.  I'd like to move my

19    exhibits first or --

10:28:11 20                    THE COURT:  You can do that, but you guys can

21    do that on your own.  I'd like to listen to --

22                    MR. ANASTOS:  I absolutely renew the motion

23    for judgment, as a matter of law, upon the completion of the

24    whole case.  Now, you may take into consideration, your

10:28:22 25    Honor, all the testimony that you've heard in this case,

1    Mr. Vermeulen's and Mr. Eissis', especially, in reaching a

2    determination that there's not enough evidence to go to the

3    jury on functionality, let alone any of the other issues.

4        Mr. Vermeulen testified and Mr. Eissis.  They've

10:28:38  5    explained in detail how these pumps came about, what the

6    engineering principles are that go into their design, and

7    again, there's no basis that anybody could determine that

8    engineering necessity did not influence the design of the

9    Groeneveld pump.  And there's also no basis for -- in the

10:28:56 10    Plaintiff's testimony for any conclusion that the design is

11    somehow arbitrary or fanciful or in any way not dictated by

12    engineering necessity.

13            THE COURT:  How about the other counts?  You

14    should talk at the podium, Tom, to make sure -- talk from

10:29:15 15    the podium to make sure that Shirle can get everything.

16        The second count.

17            MR. ANASTOS:  The second count I believe is

18    for unfair competition, also in violation of 15 U.S.C.

19    1125(a).  They would have to prove that the -- that we have

10:29:55 20    made false designations of origin, false or misleading

21    descriptions of fact or false or misleading representations

22    of fact, which is likely to cause confusion or uncertainty

23    or to cause mistake or to deceive as to either the

24    affiliation connection or association of --

10:30:13 25            THE COURT:  Slow down, slow down.

1          MR. ANASTOS:  Of Lubecore with Groeneveld or

2     as to the origin, sponsorship or approval of Lubecore's

3     goods, services, or commercial activities by Groeneveld.

4          There's been absolutely -- the same confusion issue

5     we're talking about with respect to the original trade dress

6     claim.  There's no testimony whatsoever that anybody has

7     been deceived by anything we have, that Lubecore has done

8     with respect to the origin of the Lubecore pump.  No

9     testimony that anybody has affiliated the Lubecore pump with

10    the Groeneveld pump, connected it with the Groeneveld pump,

11    associated it with the Groeneveld pump, or done anything

12    false or misleading in terms of unfair competition.

13         In terms of false designation of origin, false or

14    misleading descriptions of fact, I don't know what we're

15    going to hear on that.  I suppose we're going to hear that

16    the O-ring in the product description that Mr. Eissis -- the

17    product comparison sheet that you saw of Mr. Eissis'

18    testimony compared an O-ring to a quad ring, and Lubecore no

19    longer uses the quad ring in its pump.  It uses an O-ring,

20    and somehow that's false and misleading.

21         First of all, we have no idea.  There was no date on

22    those things.  We don't know when they happened.  Second of

23    all, I don't believe that that's false and misleading and

24    sufficient to go to a jury.

25         And it wasn't -- the next claim for false advertising,

1    in violation of 15 U.S.C. 1125(a), I'm frankly not sure

2    there's been any evidence in this case whatsoever of

3    advertising that Lubecore does.  The distribute -- the

4    brochures that are distributed at trade shows or the sales

10:31:57  5    material that are handed to prospective customers, I'm not

6    sure they even qualify as advertising in terms of

7    advertising to the public.  There's been no evidence of

8    trade journals or anything where we have said anything.

9    That aside, I don't think there's any -- there was no

10:32:12 10    evidence in this case of any false or misleading statement.

11        The -- they're going to say that the next generation

12    of pumps is somehow false and misleading, and it's going to

13    be false or misleading because there was one greasy pump and

14    we had to do a recall.  That's no basis for saying that a

10:32:29 15    slogan like next generation of automated lubrication systems

16    is somehow false or misleading.  Mr. Eissis described

17    in minute detail the reasons he believes that the Lubecore

18    pump is, in fact, the next generation over all the competing

19    systems in the market today.

10:32:52 20        We have not made any -- there's no evidence that

21    Lubecore made any statements to deceive anyone.  There's no

22    statements that it made any statements to -- material

23    statements that influence the -- a deceived customer's

24    purchasing decisions.  And there is no evidence that if

10:33:15 25    there were any such statements, that there's some causal

1  link between those statements and any possible harm to

2  Groeneveld.

3      The next claim is under the deceptive trade practices,

4  in violation of the Ohio Revised Code.  This is primarily

10:33:37  5  treated the same way as the Lanham Act.  And for all the

6  reasons that we've stated already in terms of no evidence of

7  confusion, no evidence of any connection being tried to be

8  asserted between Groeneveld and Lubecore, and everything I

9  just said, there is insufficient evidence to go to the jury

10:33:57  10  on that point.

11      The next point for tortious interference with

12  contractual and business relationships.  They have to prove

13  a contract, that Lubecore knew of the contract, that we

14  intentionally acted to procure the breach without

10:34:15  15  justification, and that Groeneveld was injured.  There's

16  been no testimony in this case that we breached any --

17  caused anyone to breach a contract.  The only thing they

18  could possibly be referring to would be their, Groeneveld's

19  relationship with Fuel Systems's, Inc., which there's no

10:34:34  20  distribution agreement.  Somehow they're claiming there was

21  a 25-year oral distribution agreement which in a million

22  years couldn't be enforceable.

23      Mr. Koppelman, I believe, testified that he didn't

24  think he had any kind of a contract with Groeneveld.  And

10:34:47  25  furthermore, Mr. Koppelman testified that he severed his

1    relationship with Groeneveld for his own business reasons,

2    and then started doing what -- doing business with Lubecore

3    independently.

4         I would also like to say that despite even if by some

10:35:09  5    chance any of these claims go to the jury on damages,

6    there's not a scintilla of evidence in the record to support

7    that any purchaser of a good from Lubecore has done so as a

8    result of any of the alleged conduct in violation of the

9    Lanham Act or the Ohio Deception Trade Act or unfair

10:35:40 10    competition under common law, whatever they have.

11         All they have is Lubecore made some sales, and they

12    want to say that all of those sales should be attributed to

13    Groeneveld as Dr. Burke testified, absent any proof that any

14    of those sales were made as a result of the infringing

10:36:00 15    activity.  Their damages are zero.

16         And I submit that there has been zero evidence that

17    any sale has been made by Lubecore as a result of anything

18    that could be described as infringing activity.  I go back

19    and, you know, renew.  We could discuss, I suppose, forever

10:36:23 20    the original trade dress claim.  I think your Honor kind of

21    hit it on the head with respect to what is the trade dress

22    of the pump, and as you heard in my opening, my belief is

23    that if there's any protectable trade dress on that thing,

24    it's the green label and that's all.

10:36:38 25         It's a functional piece of equipment.  It does not

1    have any secondary meaning, and there's been absolutely no

2    zero testimony of any confusion in the marketplace as

3    between the origin of the Groeneveld pump and the origin of

4    the Lubecore pump.  Thank you.

10:36:57  5            THE COURT:  Thank you.  Ms. Michelson.

6            MS. MICHELSON:  Thanks.

7            MR. MILLER:  First, Steve Miller for

8    Groeneveld for just a few moments.  Ms. Michelson is better

9    equipped to argue the fine points of this, but you've asked

10:37:10 10   a question to which you've not received a full answer, and

11   Groeneveld wants you to have the full answer.

12        The question has to do with whether a Rule 50 motion,

13   giving all reasonable inferences in favor of the Plaintiff,

14   would be a proper outcome based on the evidence.  Here's the

10:37:31 15   testimony from Willem.

16            THE COURT:  From who?

17            MR. MILLER:  Willem.

18            MS. MICHELSON:  Van der Hulst.

19            MR. MILLER:  Can I get the screen?  I want to

10:37:46 20   show it to you.  It's very easy to --

21            THE COURT:  Took you guys 24 hours to find it.

22            MR. MILLER:  It's either in the record or it's

23   not.  Okay.

24        So remember we're dealing with a witness whose first

10:38:10 25   language is not English.

1          THE COURT:  No, no, no, please.  Steve,

2     please.

3          MR. MILLER:  No problem, your Honor.  Here's

4     what he testified.

10:38:16  5     "Why did you want to make your pump different looking

6     than everybody else's that was on the market?  Yeah, it's

7     just a challenge.  It's a challenge of designer, and each --

8     let's say you want to make something different than

9     everybody else.  This is in -- yeah.  You want to do that.

10:38:36 10    This is, I think everybody you want to do something

11    different than somebody else.  So we want to give it a

12    groove look.  So this has to be our pump for many, many

13    years and it has to be good and nice.

14    "Question:  And was the Groeneveld EP-0 pump different

10:38:53 15    looking than everybody else's on the market?

16    "Answer:  At that time, yes.  Yes, of course.

17    "Question:  Over the last 30 years, did anybody else's

18    pump look like Groeneveld's, other than what we have here on

19    the table now?

10:39:11 20    "Answer:  No, no.

21    "Question:  Did new products come on the market, ALS

22    pumps, over the last 30 years?

23    "Answer:  Yes.  There's a lot of product of

24    lubrication pumps.  Your lubrication system, Japanese

10:39:25 25    Chinese, also Europe, different producers, smaller ones, but

1    they all have their one system -- their own system in a way,

2    and they all look different, all different."

3        Next.

4        "Question:  Did Groeneveld have to make its pump look

5    this way on the outside because of the way it works on the

6    inside?

7        "Answer:  No, no.  Of course not.  No, no.

8        "Question:  Well, again, you say of course not --

9        "Answer:  You can't -- the pump wasn't made in this

10   way, but you can put the valves inside.  You can make out of

11   the pistons, horizontal or vertical, make it horizontal.

12   You can change the shape of the reservoir round.  You can

13   make also reservoirs which are square so you can change very

14   easily the same pump if you thinking the same way.

15       "Further, yet, you can make it different, of course.

16   You can say, okay, reservoir I make -- you can make all in

17   plastic.  Only inside you can make from aluminum.  You can

18   make the cylinder where the piston is inside steel bushing

19   that you screw in and you see it.  There are -- the pump is

20   different and in the end" -- and he refers to the Sterk pump

21   is different, but it do the same, meaning it do the same

22   thing.

23       Further, "Question:  Could you today make this pump

24   look different and it would still work and function as part

25   of the ALS?

1          "Answer:  Yes, of course.

2          "Question:  Well explain how.

3          "Answer:  It's not so difficult, so difficult.  To

4      produce it later on, this is another story, but you can

10:41:13  5      make -- you can imagine everything.  As I told, this piston

6      is a vertical piston.  Lincoln United States producer has a

7      lot of horizontal pieces, and you can make the piston also

8      horizontal because the grease is not coming in the chamber

9      by gravity or whatever.  When the piston goes back, it gives

10:41:35 10      the grease in the piston, and you can make it in this way.

11      So if the reservoir, the piston, poof, it's the same.

12          "Question:  Does gravity have an impact on the way

13      your pump works?

14          "Answer:  No, no nothing.

10:41:51 15          "Question:  Does the follower plate have to be round

16      to function in the way that you described?

17          "Answer:  No, of course not.

18          "Question:  I know you said of course not.  Can you

19      explain to the jury why not?

10:42:06 20          "Answer:  Because -- because this is a round

21      reservoir, automatically the follower has to be round, but

22      you can make a square follow the square.

23          "Question:  And if it's -- if it's an oval shape, is

24      that a possibility as well or --

10:42:24 25          "Answer:  A round, of course, is the most easy shape.

1   This is more natural, but you can make different shapes, of

2   course.

3      "Question:  Is it difficult to produce or more costly

4   to produce a square reservoir shape?

10:42:38  5      "Answer:  To produce, no, because the amount of nylon

6   in the end makes the price of the reservoir then at the

7   bottom, the material has to be better than when you make it

8   round.

9      "Question:  If you were making this pump today, would

10:42:56  10   you make it the same way and use the same materials?

11      "Answer:  No, I will not make it the same way,

12   absolutely not.

13      "Question:  So why is it Groeneveld still making the

14   pump, its own pump, exactly this way if it's harder and more

10:43:09  15   expensive to do so?

16      "Answer:  Because it's our pump.  We went to the

17   market with this pump.  Everybody knows this pump.  I make

18   already more than 650,000 of these pumps.  Further, and it's

19   a very nice pump.  As long as we sell it, we will keep it

10:43:30  20   probably.  We will keep it probably.  Yeah."

21      Next, "Question:  Would you have wanted to design and

22   create and make something that looks like this?"  Referring

23   to Exhibit 42, a different pump?

24      "Answer:  No, they'd fire me probably.

10:43:44  25      "Question:  And why?  If it works, what does anybody

1    care what it looks like?

2         "Answer:  You see nowadays, the cars, even trucks,

3    nowadays, a new truck is nicer than a personal car inside.

4    The shape on the cars, the wheels, the tire protection, the

10:44:02  5    tanks, the air tanks, it's unbelievably nice.  Not only a

6    car would go from A to B, no, they want also to make

7    something nice.  So when you put something on a chassis of

8    an owner of a truck with truck for a lot of money, he bought

9    all kinds of chrome, insulation, lights, and nice things and

10:44:23 10    then you put this on the chassis, it's terrible.  Huh?"

11         Next, "Question:  Referring to Exhibit 44, would you

12    want Groeneveld's product looking something like this one?

13         "Answer:  No.

14         "Question:  Why?

10:44:38 15         "Answer:  Because we have another philosophy in

16    lubricating systems."

17         Further, "Answer:  We make -- we make art impression

18    at that time.  We make some sketches, how it would look

19    like.  I think we made even another model to show the pump

10:44:53 20    to the people, to management, because there was money

21    involved.  And we needed to show what we are going to do.

22    So they had an idea of the shape and the function is only --

23    yeah, telling how it will function.  That's not too easy,

24    but the shape, we have to show it, yeah.

10:45:11 25         "Question:  Does the shape or outline of the pump

1    affect the way the thing performs, the way it delivers

2    grease throughout the system?

3         "Answer:  No.

4         "Question:  Explain this to the jury.  It might be

5    obvious, but I'm sorry.  I'll ask you to explain.

6         "Answer:  It's like a car.  No?  The car go from A to

7    B, and they're all different.  The shape has nothing to do

8    with the function of the moving from A to B.  And it's the

9    same as the lubrication system.  The only thing we have to

10   do is create energy and that there is an outlet where grease

11   is coming out.  How you do that?  You can do it in many,

12   many, many ways."

13        Last one.  Later, "Answer:  The outside look is only

14   the look."  And further, "So we have a lot of possibilities

15   to make the outside the same and the inside completely

16   different.

17        "Question:  And are there a lot of possibilities to

18   make the inside the same and the outside completely

19   different?

20        "Answer:  I think I already mentioned that.  That's

21   possible, yes.

22        "Question:  And I just -- is it more than just

23   possible?  Is it -- how easy is it or how difficult is it to

24   do such a thing?

25        "Answer:  It's not -- let's say not difficult for

1    someone -- not an expert and not working in this field,

2    probably it's very difficult, but we have a team.  I have a

3    lot of nice, good, clever designers.  And when I say

4    tomorrow okay, we are going to change this pump in another

10:46:45  5    shape, we can -- we will make a design and we will find it

6    out.  Yeah."

7        I've only one comment about it.  This is the evidence

8    from which a reasonable jury reasonably could infer that

9    that design which predated by a long shot the Lubecore

10:47:05 10    design that mimics, it was fully arbitrary and fanciful in

11    its silhouette appearance.

12                THE COURT:  When you say silhouette, you're

13    talking about the base, the reservoir, the top, where the

14    plugs are?  You're talking about all that?

10:47:23 15                MR. MILLER:  Talking about the outline of the

16    total shape, and the answer is I believe Groeneveld's

17    position is that that excludes the label and the color; that

18    you could take any color you want and put it on the Eiffel

19    Tower, it's still going to be the Eiffel Tower, take any

10:47:35 20    label you want.

21                THE COURT:  All right.

22        What evidence do you have that it's not -- the

23    reservoir is not functional?

24                MR. MILLER:  Sorry.  I didn't hear the first.

10:47:43 25                THE COURT:  What evidence is there that the

1    reservoir is nonfunctional?

2                MR. MILLER:  I didn't say the reservoir is

3    nonfunctional.

4                THE COURT:  I am asking you.  That's the test,

10:47:51  5    isn't it?

6                MR. MILLER:  No, I don't believe that is the

7    test.  I think the question is, is the totality of the trade

8    dress not nonfunctional or functional, and I believe --

9                THE COURT:  Okay.  And that one sentence where

10:48:01 10    he says that we just designed it this way and, ergo, it's

11    nonfunctional, that's what you say is the evidence?

12                MR. MILLER:  No, not one sentence.  It's all

13    these sentences, and all these sentences -- no.  And all

14    these sentences taken together -- remember the Court's job

10:48:18 15    isn't to weigh which witnesses but --

16                THE COURT:  You didn't have to tell me what my

17    job is.

18                MR. MILLER:  Fair enough.  All these sentences

19    taken together are a reasonable jury reasonably could

10:48:29 20    conclude either of two things.  A reasonable jury could

21    conclude you know what; I think that cylinder is functional.

22    I think it grows organically out of the base.

23                THE COURT:  No, that's being silly, Steve.

24    It's not -- they designed it in this way.  That's why I

10:48:47 25    kept -- we kept going through this during the whole course

1    of the trial.  This was designed in a specific way.  And

2    that's why I asked Ms. Michelson several times what exactly

3    is your claim the trade dress is.

4        Now, I think we have an idea.  It's the appearance.

10:49:01  5    Well, when it goes out into the marketplace, the appearance

6    includes the labels and the coloring.  That's part of it.

7    You can't -- if that's what your trade dress is, just the

8    outward appearance of it.  So you can't exclude the color

9    and the -- and the label if that's what your trade dress

10:49:20 10    claim is because it doesn't go out in the marketplace

11    without it.  There's no evidence of it anyway.

12            MR. MILLER:  Okay.

13        First of all, I don't intend to be silly at all, and I

14    certainly don't mean to come through that way.  Second of

10:49:29 15    all, I believe that when I get in the courtroom, I heard Ms.

16    Michelson answer by saying that the trade dress is the

17    outward appearance of the silhouette and shape of the item.

18            THE COURT:  Okay.  Fair enough.  I got it.

19            MR. MILLER:  Thank you.

10:49:46 20            THE COURT:  You want to argue the other ones

21    or no?

22            MS. MICHELSON:  Okay.

23        Your Honor, on the unfair competition claims, there

24    indeed has been testimony and evidence from which --

10:50:16 25    actually on all of them -- a reasonable jury could conclude

1    and find in favor of Groeneveld.

2        On the Lanham Act, unfair competition claims, you

3    know, the issue -- the issue, the statute basically says any

4    word, term, make, symbol or device or combination thereof

10:50:38  5    that is likely to cause confusion, and the statute itself is

6    not limited to confusion of end user consumers, and

7    legislative history and the case law makes clear that it is

8    not limited to point of sale confusion on the part of end

9    user customers.  And I believe that's what Defense counsel's

10:51:04 10    argument is on the likelihood of confusion.  And that is not

11    the test at all.

12        It is not limited that way by the statute, by the

13    legislative history or by any other case law.  And in this

14    case, there is substantial evidence of a likelihood of

10:51:19 15    confusion.  There indeed is evidence of actual confusion.

16    There is evidence.

17        Dean Osborn, a guy who buys these things in Wisconsin,

18    basically said that when he sees the Groeneveld -- when he

19    saw the Lubecore, he thought -- he immediately thought oh,

10:51:39 20    it's a Groeneveld with a Lubecore label.  He recognized the

21    shape like that on sight.  He immediately associated the

22    Lubecore pump with the Groeneveld, notwithstanding the

23    label.  He bought it because he thought oh, because the

24    outside of the thing looks the same, then the inside must

10:51:57 25    work just as well.  Product -- quality confusion is as

1    actionable under the Lanham Act as the -- as any other kind

2    of confusion.  The statute does not limit it in the way the

3    Defense counsel urges here, and there's ample authority that

4    supports it.

5        So there is evidence of actual confusion, and there's

6    more.  There's -- there is -- the law says that people in

7    the industry, besides end user customers who are confused

8    upon seeing the two, who are uncertain upon seeing the two,

9    who find the two confusingly similar and, therefore, have to

10   go embark on some sort of investigation to figure out what

11   the heck is happening in the marketplace, that counts.  That

12   is actual confusion.  And not only is it actual confusion of

13   them, it's evidence of the likelihood of confusion that

14   others in the marketplace, including an end user of the

15   product, will also experience the same kind of confusion.

16       Intentional copying is one element and, your Honor, I

17   am not going to pretend that the label isn't one factor that

18   a jury can consider.  The point is it's not the only factor,

19   and it is not dispositive of the issue here, especially when

20   witness after witness after witness, including defense

21   witnesses, that they see the Lubecore and think of a

22   Groeneveld, and that the label, especially in this industry,

23   means so little.

24       Bill Koppelman, Defense witness, said that the label

25   is the last thing that he and, therefore, people in his

1    place, in his industry, would look at to identify a pump.

2    And the fact that -- you know, we have pumps with all

3    different kinds of names on them and you cannot tell by

4    looking at that label where it was made, who made it, who

10:53:59  5    created it, where it came from, what the relationship is.

6    So the label doesn't do it.  It's not the be all and the end

7    all.

8         We have evidence of actual confusion, and we have

9    compelling evidence of intentional copying, notwithstanding

10:54:18 10    their dispute of it.  There is compelling evidence that that

11    thing would not look exactly like Groeneveld's thing unless

12    there was a concerted intentional effort to make it so.

13              THE COURT:  I mean if it's nonfunctional,

14    that's okay, isn't it?  Or if it's functional, it's okay?

10:54:40 15              MS. MICHELSON:  Copying a functional --

16    copying the inside -- okay.  I won't say it's okay.  I will

17    say we don't have a claim for it.  We're not claiming that

18    that is unlawful.  Okay.  I agree with you.

19              THE COURT:  I mean you're making it sound like

10:54:56 20    if it's -- the jury finds that it's functional, then there's

21    a problem.

22              MS. MICHELSON:  No.

23         Well, I don't mean to articulate it that way because

24    as I did say before --

10:55:05 25              THE COURT:  Just let me only ask you one last

1    question.

2                MS. MICHELSON:  -- different parts of evidence

3    applies to different pieces in different ways.

4                THE COURT:  With you on that.

10:55:12  5        On the damages issue, what evidence -- is there any

6    evidence here that anybody bought the Lubecore pump in lieu

7    of a Groeneveld pump?

8                MS. MICHELSON:  Well, I will -- I will say

9    one, it's not legally required for us to get damages in the

10:55:28 10   way they've structured our jury instructions and in our

11   briefing, but two, yes, Dean Osborn said he bought it

12   because he thought, looking at it, that it was the same

13   thing, except somebody else was selling it, that it was a

14   Groeneveld product with a Lubecore label being peddled by

10:55:51 15   Groeneveld people, made by Groeneveld people, same

16   technology, same source and origin.

17                THE COURT:  Okay.  Whoa.  Take a breath.

18        That means if there is damages, you could be awarded

19   damages for that purchase.  But, how about the other?  How

10:56:04 20   do you then extrapolate out that anybody who want a Lubecore

21   pump, if they didn't buy the Lubecore pump, they would have

22   bought a Groeneveld pump?

23                MS. MICHELSON:  I understand your question,

24   and I'm going to answer it in this way.

10:56:15 25        It is not the law that we must prove a connection

1    between each sale to a customer who is confused.  The law

2    is -- does not require that we prove -- we prove

3    infringement or unfair competition, we prove liability, and

4    we are entitled to recover the actual damages, Groeneveld's

5    actual damages from sales of the infringing product or the

6    unfair product, however you want to describe it; the

7    competing product, disgorgement of Lubecore's profits,

8    and/or corrective costs.  They -- the statute -- the law

9    doesn't require us to establish the link in the way that the

10   Defendant is urging here.  And I do have some law, and I can

11   find it if you want --

12                THE COURT:  You don't need to.  You don't need

13   to.

14                MS. MICHELSON:  I believe we did brief the

15   issue, and I am prepared to find it if you'd like those

16   citations.

17                THE COURT:  You don't need to.

18        You want to respond, Tom, and then we're ready to go.

19   I'm ready to go.

20                MR. ANASTOS:  I listened to all the testimony

21   read by Mr. Miller from Mr. Vermeulen's -- Mr. Hulst's

22   testimony, and Mr. Miller's summation was that this is the

23   evidence of nonfunctionality.  None of that was any evidence

24   of nonfunctionality.  It was that they wanted to make

25   something different.  Different is not the definition of

1    nonfunctionality.  That you could make other pumps that

2    would function the same way and look different is not the

3    issue of nonfunctional versus functional.

4        All of this is entirely irrelevant to the question of

5    whether or not the pump that they made is nonfunctional.

6    They have to prove that the pump that -- the look of that

7    pump is nonfunctional, not that you could do it other ways

8    at all.  And different does not mean nonfunctional.  Nice

9    looking does not mean nonfunctional.  Nonfunctional means it

10   was arbitrary in the design.  There's no engineering basis

11   for how it looks.

12       And actually, I want to bring you back to one last

13   point, your Honor.

14       Mr. Van der Hulst was testifying about which pump,

15   which one of these was the one that they tried to make look

16   nice.  Mr. Van der Hulst was talking to a pump -- about a

17   pump that they designed in the early 80's.  We know from

18   Mr. Eissis' testimony that the testimony that we're talking

19   about here didn't even come on the market until the 90's.

20       So Mr. Van der Hulst's testimony that they were trying

21   to make something look distinctive would mean the one you

22   look at right there on the end with the black cap on it is

23   the distinctive looking one that they put all this effort

24   into to look nice.

25       Now, if that one is nonfunctional, then almost by

1    definition in their scheme of things, the next one is

2    nonfunctional in its design, and the next one is

3    nonfunctional in its design.  So that means every pump,

4    every automated -- every single stroke, EP-0 piston-driven

5    pump on the planet is nonfunctional according to Groeneveld

6    because they've captured all of these.

7        They -- according to them, they could see somebody

8    who's using -- whose pump looks like Mr. Eissis' based on

9    the first one they made there because it's a distinctive

10   design, which Mr. Van der Hulst said hasn't changed in any

11   major respect since the early 1980s.  Well, look at them.

12   It's changed in significant respects since the early 1980s.

13       I listened to Mr. Osborn testify.  I don't remember

14   Mr. Osborn testifying in any way, shape, or form that he

15   purchased the Lubecore pump because he thought it would be a

16   good pump based on its look.  He was 100 percent aware of

17   who he was purchasing it from.  He was 100 percent aware of

18   what product he was purchasing.  He testified that he likes

19   both pumps.  He likes the people he's dealing with, he might

20   consider to keep buying both of them.  It was absolutely

21   zero testimony that he was confused or that he relied on the

22   look of the Groeneveld -- the Lubecore pump in making the

23   purchase, relied on it in terms of having dictated that it

24   must be a reliable piece of equipment because it looks like

25   a Groeneveld pump.

1        Of course, Mr. Koppelman can recognize the look of the

2    Groeneveld pump without having to look at the label.  The

3    man has sold thousands of them.  He was -- he's Fuel Systems

4    Industries.  They were a Groeneveld distributor for how many

11:01:15  5    years?  Why wouldn't he be able to?  That's not the issue

6    here.  It's whether the more common Joe, the more common

7    truck purchaser would look at that silhouette and say that's

8    a Groeneveld, and there's no testimony about that at all in

9    this case.

11:01:30 10        I disagree, and I can bring the law out in terms of

11    what they would need to prove in order to make a causal link

12    between any infringing activity and damages.  They have

13    failed to do so whatsoever.  It's not a general assumption

14    that if there's any form of infringement, that the party is

11:01:51 15    entitled to willy-nilly damages.  They still have to prove

16    to a degree of certainty that there's a causal link between

17    the alleged -- or even if it's found infringing activity in

18    the lost sales.

19              THE COURT:  Okay.

11:02:06 20        I've listened to everything, believe me.  I looked at

21    everything.  There's insufficient evidence to go forward

22    with Counts 2 through 6.  The motion is granted.  As to

23    Count 1, I'm going to reserve ruling and let you go ahead

24    and argue.  So I'll give you a 15-minute break, get your

11:02:19 25    charge up here, and we're ready to go.

1        MR. ANASTOS:  Thank you, your Honor.

2        THE COURT:  And you have to get your exhibits

3    together.  I don't think you have.

4        MR. ANASTOS:  I think we're ready to --

11:02:27  5        MS. ZUJKOWSKI:  I can tell her the rest of the

6    list now.

7        THE COURT:  Do it and I have another thing to

8    do and let Shirle take a break.

9        (Thereupon, a recess was taken.)

11:16:05 10        MS. ZUJKOWSKI:  Your Honor, the Defense moves

11    to include in the record Exhibits -- Defendant's Exhibit A,

12    DX-A, DX-B, DX-E, DX-K, DX-L, DX-X, DX-Y, DX-AA, DX-BB,

13    DX-CC, DX-DD, and DX-EE.

14        I did just communicate this list to Mr. Kunselman

11:16:44 15    before the break so I'm not aware yet whether or not there

16    are objections.  I'll let them speak to them.

17        THE COURT:  Okay.

18        MS. MICHELSON:  I'm just looking at this --

19    what's DX-E?

11:16:58 20        MS. ZUJKOWSKI:  E.

21        MR. KUNSELMAN:  Exemplar.

22        MS. ZUJKOWSKI:  With Greco -- we'll withdraw

23    that.

24        MS. MICHELSON:  Okay.  And I just have to look

11:17:19 25    and see which is A and I know is this the A?  Just so --

1    that's A and that's B.  Okay.  No objection to A or B.  K,

2    no objection.  L, no objection.  And what else you have, X?

3                    MS. ZUJKOWSKI:  Yes.

4                    MS. MICHELSON:  I object to X.  I object to --

11:18:06  5    hold on one second.  I have to think.  I object to Y.  I

6    object to Z, I object to AA.  I have to see which one is BB.

7                    MR. ANASTOS:  The smaller Lubecore.

8                    MS. MICHELSON:  Oh.  No objection to BB.  I

9    object to CC, I object to DD, and to EE.

11:19:22  10                    MS. ZUJKOWSKI:  Your Honor, would you like me

11    to respond to the objections?

12                    THE COURT:  No.

13        I don't know what -- I don't have -- I don't think I

14    have it.  I have X, the exhibit X, tell me what Y is.

11:19:44  15                    MS. ZUJKOWSKI:  Y is the one -- the first one

16    these earlier pumps.

17                    THE COURT:  All right.  Z is what?

18                    MS. ZUJKOWSKI:  Z is the trademark

19    registration from Belgium Netherlands that Ms. Coker

11:20:00  20    indicated.

21                    THE COURT:  AA?

22                    MS. ZUJKOWSKI:  AA is this pump.  So.

23                    THE COURT:  Got it.  That's all right.  I'm

24    with you.  CC.

11:20:09  25                    MR. ANASTOS:  The family grouping pictures of

931

1    pumps.

2                    THE COURT:  DD?

3                    MS. ZUJKOWSKI:  The fact comparison sheet with

4    different -- between.

5                    THE COURT:  Let me see that.  And this is

6    what?

7                    MR. ANASTOS:  Mr. Eissis testified to them.

8    The fact comparison sheets used in sales between Lubecore

9    and various other brands of pumps.

10                    THE COURT:  EE.

11                    MS. ZUJKOWSKI:  That's just the O-ring that

12    Mr. Eissis testified that they suit out in of the recall

13    warranty issue.

14                    THE COURT:  Okay.  The objection to X, Y, Z,

15    AA, CC, DD, are overruled.  All the other exhibits then will

16    be received.

17        You want me to give the instructions first or you want

18    to argue first?

19                    MS. ZUJKOWSKI:  I think we prefer the

20    instructions.

21                    MS. MICHELSON:  Yes, your Honor we do need to

22    also make our proffer for Mr. Rashidi's testimony that we

23    would have --

24                    THE COURT:  We can do that when we're on a

25    break.

1          MS. MICHELSON:  Okay.  Okay, Chris, I guess we

2   can get the jury.

3          THE CLERK:  Okay.

4          MR. MILLER:  Your Honor, so far I see two

11:21:44 5   things in the instructions.

6          THE COURT:  That's all right.  You can object

7   after I do it.

8          MR. KUNSELMAN:

9          MR. MILLER:  No may I say one thing.

11:21:50 10       One of them will be a source of objection because I

11   don't think it will change your mind.  One of them may be a

12   typo.

13          THE COURT:  Yeah, I can --

14          MR. MILLER:  Wan.

11:21:58 15          THE COURT:  Do it quick.

16          MR. MILLER:

17          THE COURT:  This is why I'm doing you a favor

18   you can argue the law.

19          MR. MILLER:  Page 9, four lines up from the

11:22:10 20   bottom, supposed to be -- is it supposed to be singular

21   issue or multiple plural issue with an S on the end.

22          THE COURT:  Oh, geez.  As I read it, I --

23   sometimes I edit it a little bit.

24          MR. MILLER:  Okay.

11:22:48 25       (Proceedings resumed in the presence of the jury:)

1          THE COURT:  We are in session again.  You may

2     have to sit back and relax a little bit because we're going

3     to go straight until we're finished if that's all right with

4     everybody rather than break for lunch have you come back and

11:23:16  5     go over it.  But, each side has rested their case.  That

6     means you've heard all the testimony that you're going to

7     hear during the course of the trial.

8          The next order of business will be the -- I'll give

9     you some of the instructions every law so you can understand

11:23:31 10     what the law that applies in the case.  Then each side gets

11     a chance to argue their case.  The Plaintiff goes first

12     because the Plaintiff has the burden of proof.  The

13     Defendant is then given an opportunity to argue its case,

14     then the Plaintiff concludes or makes the final argument,

11:23:49 15     and then I will give you some concluding instructions about

16     your conduct in the jury room and other kind of procedural

17     matters like that.  What I'm going to do is ask you to --

18     yeah, to take all the instructions together, I may sit down

19     as we do this I may keep standing, I don't know, but because

11:24:12 20     this has to be recorded as well, that's why I moved over and

21     done it like this.

22          But, let me say this as we go through the process.

23     Take each instruction together and make sure that you follow

24     the instructions I give you and I'll tell you that about ten

11:24:32 25     times during the course of these instructions.  But, I will

1    tell you this, that I read the instructions out of an

2    abundance of caution to ensure or make sure that I don't

3    misstate the law to you.  And they're all of equal

4    importance.

11:24:49  5                    CHARGE OF THE COURT

6                   THE COURT:  Ladies and gentlemen of the jury,

7    we now come to the part of the trial where the Court gives

8    the jury the law in the case, and before I start or as I

9    start, I want to tell you something about the charge to the

11:24:58 10   jury.

11         As I told you several times, the jury, you are the

12   triers of the fact and the Court makes all the

13   determinations of law.  So to help you understand this

14   charge and simplify it, I've divided it into basically three

11:25:13 15  parts.  The first portion of the charge deals with the

16   general law that applies in almost every civil case.  It

17   defines what evidence is, the burden of proof, credibility

18   of witnesses, and the function of the Court and the jury in

19   other matters like that.

11:25:33 20       The second area discusses the law that applies to the

21   specific claim or claims in this case.  So I will review

22   with you the law that applies in this case and the various

23   elements of that law.  I will also define for you terms that

24   require definition.  Some of the terms are common and

11:25:51 25  generally understood and, therefore, do not require any

1    additional definition or explanation by me.  I will then

2    instruct you on your duties in regard to your findings and

3    your verdict.  After I tell you the law applicable in the

4    case, I will give you instructions about your deliberations.

11:26:10  5    This will include any questions or considerations I may

6    submit for your consideration and the verdict forms that I

7    give you for your final determination.

8         Now, you have heard the evidence in the case and you

9    are about to hear the arguments of the lawyers.  It is now

11:26:26 10    the duty of the Court to instruct you on the law which

11    applies in this case.  Remember again, that the Court and

12    the jury have separate functions.  You decide the disputed

13    facts and the Court provides you the instructions of law.

14    It is your sworn duty to accept these instructions and to

11:26:42 15    apply the law as it is given to you by me.  Therefore, you

16    are not permitted to change the law nor to apply your own

17    conception to what you think the law ought to be, given the

18    facts in this case.  So in keeping with your oath, you will

19    not be swayed or influenced by considerations extraneous to

11:27:02 20    the law and the evidence, such as sympathy, bias, or

21    prejudice for or against any party to this lawsuit while it

22    is your duty to follow and apply to this case the law as the

23    Court now gives it to you.  You and you alone are the judges

24    of the facts.  And in this respect, you are to exercise your

11:27:20 25    own judgment without regard to anything which the Court may

1    have said or done during the course of the trial.

2        You know, during the course of this trial the Court

3    has been requested to rule upon objections made by

4    Plaintiffs and Defendant's counsel.  These objections, as I

11:27:39  5    told you at the beginning, raise legal questions, and the

6    Court in deciding them has endeavored to follow the law.  So

7    you will draw no inference of any kind from the manner in

8    which the Court has ruled upon any question of law, nor will

9    you because of any expression or other act of the Court

11:27:53 10    infer that the Court entertains any motion whatsoever as to

11    the facts in this case.  The Court must not, and then,

12    therefore, does not, seek to invade the province of the jury

13    in determining the issues which you are called upon to

14    decide.  And as far as you're concerned, the Court has no

11:28:10 15    opinion whatsoever on the matters which it is your

16    responsibility to decide.  I'm going to give you an overview

17    statement of what I think the law is, but again, you have to

18    rely on what the evidence is.

19        The Plaintiff here, Groeneveld Transport Efficiency,

11:28:26 20    Inc., Groeneveld, asserts that the design features and

21    overall appearance of Defendant, Lubecore International,

22    Inc.'s, Lubecore's automated truck lubrication system is so

23    similar to the design features and overall appearance of

24    Groeneveld's EP-0 pump as to confuse buyers and harm

11:28:46 25    Groeneveld.  As such, Groeneveld asserts that Lubecore

1    committed infringement of the trade dress of Groeneveld's

2    product in violation of the Lanham Act.  That's 15, United

3    States Code, Section 1125(a).

4         This is not a patent case as neither Groeneveld's pump

11:29:04  5    itself nor any of its components parts are protected by a

6    patent.  Thus, there is no prohibition against copying the

7    functional design of Groeneveld's pump; rather, Groeneveld

8    will only be entitled to relief if you find that Groeneveld

9    is entitled to trade dress protection under the Lanham Act.

11:29:23 10         In this case, Groeneveld asserts that the trade dress

11    of its EP-0 pump is the external shape and appearance of the

12    pump, which would include all aspects of its external

13    appearance, including its logo and color.  I will describe

14    the elements of Plaintiff's trade dress claim later in these

11:29:42 15    instructions.  The Defendant Lubecore denies the Plaintiff's

16    claim.

17         At the commencement of this trial, counsel for the

18    Plaintiff and counsel for the Defense each addressed you in

19    what we have referred to as opening statements.  And in

11:29:56 20    those opening statements, they sought to outline for you

21    what they expected the evidence to show as the trial

22    progressed.  Now, when we conclude here or when I conclude

23    with these instructions, there'll be a closing arguments,

24    and I'll have some comments about closing arguments right

11:30:11 25    immediately before they give them.  But, remember this

1    again.  Opening statements and closing arguments are proper

2    in an effort to assist the jury, but you are instructed that

3    they do not constitute evidence in this case.  And,

4    therefore, will not be so considered by you, nor are you --

5    will you consider as evidence any testimony or any other

6    information which the Court has either withdrawn from your

7    consideration or has instructed you to disregard.

8        So whenever reference is made to evidence by which

9    this case is to be decided, the jury will understand that

10   the evidence includes all of the testimony that you heard

11   from the mouths of the several witnesses who appeared and

12   testified here during the trial, either by in person or by

13   written or oral deposition, any exhibits that have been

14   offered and received into evidence, and you'll have with you

15   when you retire in your deliberation and any stipulations,

16   which you heard the stipulations were read during the course

17   of this trial.

18       Now, evidence may be either direct or circumstantial

19   or both.  Direct evidence is a recital of facts by witnesses

20   who have actual knowledge as to what transpired.  It's the

21   testimony given by a witness who has actually seen or heard

22   the things concerning which that witness has testified.

23       Now, circumstantial evidence, on the other hand, is

24   the proof of facts or circumstances from which the jury may

25   infer other connected facts or related facts which naturally

1   and logically follow according to the common experience of

2   mankind.

3        And remember, you are permitted to make any logical

4   and immediate inference from the facts which you have found

5   to be established here in the evidence.  Now, there's always

6   confusion, almost always confusion, by jurors or some jurors

7   as to the circumstantial evidence or the weight of it.

8   First of all, no type of evidence, either direct or

9   circumstantial, is any better or any worse than any other.

10  And it's up to you to decide what you believe and what you

11  don't believe.  But, the best example I can think of, first

12  of all, direct evidence you know we talked about that in the

13  jury selection process.  You actually see something or you

14  hear something, and you testify about that.  That's pretty

15  simple.  And the other thing is circumstantial evidence.

16  Now, an example of that would be this.  You're all watching

17  me right now.  And if you saw me and I took my index finger

18  and put it there, you all saw that, right?  So you could

19  come here and testify at a later date that you saw me put my

20  right index finger on that piece of wood.  That would be

21  direct evidence that I touched that piece of wood.  Fair

22  enough?  If the fact finder believed you, then that would be

23  sufficient to prove that I did that.

24       On the other hand, if there's nobody here, go back to

25  that example.  And I did the exact same thing, put my finger

1    on that, then how would you -- how would a person prove that

2    I put my index finger on that piece of wood?  Well, as you

3    probably know, there are such things as fingerprints, right?

4    And if you were told by an expert that there are no two

5    fingerprints alike in the world, and every individual -- my

6    right index finger are unique, that they could come in here,

7    and then they would dust this, and it's a dark piece of wood

8    use white powder -- you've seen that on TV -- and the

9    technician would dust it with a white powder and take a

10   piece of latex and tape and put it on -- on it, and it

11   lifts.  That's called a latent fingerprint lift.  And you

12   could look at it and you could see the ridges of my right

13   index finger, but it would take more testimony by the

14   technician to say okay, I run it, I counted the ridges,

15   whatever they do, to determine and identify an identifiable

16   print.  They would compare it with all the known prints in

17   the world and come up with me.  Then the technician could

18   come in here and say yeah -- yep, Don Nugent's right index

19   finger was found right here on that piece of wood.

20        Now, if you believed that technician, then that would

21   be sufficient for you to find that at some time, I put my

22   right index finger on that piece of wood.  Sound fair?  Now,

23   that's drawing an inference right from circumstantial

24   evidence.  The latent print and the officer's testimony was

25   all direct evidence, but the inference you draw that I put

1        my right index finger comes from all the direct evidence

2        that you heard.  Fair enough?

3            Now, when we say you can't draw one inference on

4        another inference, you can say I can draw the inference that

11:34:30  5        the Judge put his right index finger on that piece of wood,

6        but you couldn't draw the inference of when I did it, right?

7        Because nobody saw it.  Nobody testified about it.  So you

8        can't draw one inference from another.  So that's what we

9        call circumstantial evidence.

11:34:43 10            Sometimes -- now this is more appropriate I think in a

11       criminal case, but sometimes circumstantial evidence is a

12       lot better than direct evidence because the fingerprint

13       doesn't lie and somebody may be mistaken.  Don't worry.  It

14       won't fall.  Just the higher we are, the more they sway.

11:35:01 15       And if you start seeing me go like that, that's when you

16       have to worry.

17                    (Laughter.)

18                    THE COURT:  So an inference is a reasonable

19       deduction of fact which logically follows from other facts

11:35:12 20       established by the evidence which you may but are not

21       required to make.  And here's what we talk about.  However,

22       you may not build one inference upon another inference, but

23       you may make more than one inference from the same set of

24       facts or circumstances.  Those are issues or decisions for

11:35:27 25       you to make.

1          So having considered all the evidence, you must then

2     determine whether the parties have met their respective

3     obligations to prove their claims.  Generally, the party

4     asserting a proposition to be true has the burden of proof

11:35:42  5     as to that proposition.  The burden of proof means the duty

6     of producing evidence to lead you to believe that the facts

7     are as that claimant contends.  So when a particular party

8     has the burden of proof on a particular issue, that party

9     must prove facts material to that issue by a preponderance

11:36:02 10     of the evidence.

11          The burden of proof then rests upon the Plaintiff in

12     this case to prove by a preponderance of the evidence the

13     essential and material allegations of their complaint which

14     are denied by the Defendant.

11:36:17 15          These affirmative allegations denied by the Defendant

16     constitute the issues of fact which the Plaintiff has the

17     burden to prove by a preponderance of the evidence.  The

18     Defendant bears the burden of proving any affirmative

19     offense, but I don't think there are any in this case.

11:36:34 20          Preponderance of the evidence, what is that?

21     Preponderance of the evidence is the greater weight of the

22     evidence; that is, evidence that you believe because it

23     outweighs or overbalances in your minds the evidence that's

24     opposed to it.  A preponderance means evidence that is more

11:36:49 25     probable, more persuasive, or of a greater probative value.

1    Remember it is the quality of the evidence that must be

2    weighed.  Quality is not necessarily identical to quantity

3    or the greater number of witnesses produced.  In determining

4    whether an issue has been proved by evidence, you should

11:37:12   5    consider all the evidence regardless of who produced it.

6            Now, if the weight of the evidence is equally balanced

7    or if you are unable to determine which side of an issue has

8    the preponderance, the party who has the burden of proof

9    then has not established that issue by a preponderance of

11:37:27  10    the evidence.

11           I know evidence in lawsuits is not always clear and

12    unquestionable.  I do not expect you to decide the issues on

13    certainties.  Injustice could easily result if you awarded

14    the verdict to a party who is only possibly entitled to it.

11:37:45  15    You cannot be satisfied with mere possibilities.  Your

16    answers to the issues must be based on probability; what is

17    probably the truth, what is more likely the truth than not.

18    And another way of expressing this or your function is that

19    you are to decide the issues according to the preponderance

11:38:02  20    of all the evidence, regardless of who produced it.

21           So if you find the Plaintiff has proved its claim by a

22    preponderance of the evidence, in that event, your verdict

23    would be for the Plaintiff.  On the other hand, if you find

24    the Plaintiff has failed to prove any one or more of the

11:38:17  25    elements of the Plaintiff's claim by a preponderance of the

1 | evidence, your verdict would then be for the Defendant.

2 |     Now, as the sole judges of the facts, you are also the

3 | sole judges of the credibility of the witnesses and the

4 | weight to be given to every person's testimony.  Now, to

11:38:34 5 | weigh the evidence, you must consider the credibility or the

6 | believability of each person who testified.  To do this, you

7 | apply the test of truthfulness that you all apply in your

8 | own daily lives.  And in determining the credibility of any

9 | witness, you should consider the interest or bias the

11:38:51 10 | witness may have in the outcome of the verdict, if any, the

11 | witness' appearance, manner and demeanor while testifying

12 | here before you, the witness' candor and frankness or lack

13 | of candor or frankness, the consistency of that witness'

14 | testimony with all the other known facts in the case, the

11:39:10 15 | witness' accuracy of memory, the witness' intelligence or

16 | lack of it, the reasonableness or unreasonableness of the

17 | witness' testimony, in light of all the other facts and

18 | circumstances presented in the case, and the probability

19 | that the witness knows the truth of the facts and

11:39:27 20 | circumstances established by the evidence, which, in your

21 | judgment, would either add or detract from that witness'

22 | credibility, and weigh their testimony, and which will

23 | enable you to determine what degree of credibility you

24 | assign to the testimony of any witness.

11:39:44 25 |     Now, you are instructed that one way of impeaching a

1    witness is by showing that the witness has made different

2    and contradictory statements on the same point on a former

3    occasion.  If you find from the evidence that any witness

4    has been impeached in this manner, you may take that into

11:40:00  5    consideration in determining that person's credibility and

6    the weight you give to that person's testimony.

7            You are instructed that you are not bound to believe

8    something to be a fact simply because a witness has stated

9    it to be a fact.  If you believe from all the evidence that

11:40:14 10    such witness is either mistaken or has testified falsely

11    concerning any such alleged fact, you may believe or

12    disbelieve any witness as you see fit.  You are not then

13    required to believe what a witness has testified to, merely

14    because the witness -- or the statement was made on the

11:40:30 15    witness stand and/or under oath.  You may believe all or

16    part or none of what any witness has said in accordance with

17    the credit to which you feel it is entitled in the exercise

18    of your honest and impartial judgment.  As a matter of law,

19    then you may believe a portion of the testimony of any

11:40:48 20    witness and disregard the rest of that person's testimony or

21    you may disbelieve all the testimony of a particular witness

22    or you may believe all the testimony of a particular

23    witness.  Those are evaluation and judgments for the jury to

24    make.

11:41:00 25            Now, I told you this before, too, but some testimony

1      here was presented by video.  This evidence is to be

2      considered according to the same tests that apply to all

3      other witnesses.  Now, if statements in a deposition differ

4      from the testimony given by the same witness in the

11:41:15   5      courtroom, you may consider them to test the believability

6      of such witness.  And again, along this line, sometimes when

7      I talk about impeachment and about giving a different

8      statement on former occasion on the same issue, stuff like

9      that, you can use those impeachment techniques to determine

11:41:31  10      whether you believe a person's testimony or not, but whether

11      you do that, do you it like you do in your own life, make a

12      decision whether the mistake or the difference was about

13      some important fact or some unimportant detail or was the

14      result of intentional -- intentionally trying to mislead you

11:41:48  15      or not.  It is a mistake or accident.  Those things are

16      possible when things like that happen.  You understand the

17      context of what goes on in the trial of a lawsuit.

18          The Rules of Evidence ordinarily do not permit

19      witnesses to testify about their opinions or conclusions.

11:42:04  20      An exception to this rule exists for expert witnesses.  An

21      expert witness is a person who, by their education and

22      experience, has become an expert in some art, science,

23      profession, or calling.  Expert witnesses may state their

24      opinions as to matters in which they profess to be an expert

11:42:22  25      and may also state their reasons for their opinions.  You

1    should consider each expert opinion received in this case in

2    evidence and give it such weight as you think it deserves.

3    If you should decide that the opinion of an expert witness

4    is not based upon sufficient education and experience or if

11:42:40    5    you should conclude that the reasons given in support of the

6    opinion are not sound, or if you feel that it is outweighed

7    by other evidence, you may disregard the opinion of an

8    expert entirely.  Just because a person is a witness does

9    not entitle them to be given more or less weight than any

11:42:55   10    other witness who appears before you.  You judge their

11    testimony of any witness.

12         You must also not draw any inference for or against

13    any party from questions which the Court did not permit to

14    be answered.  The Court alone as I've told you rules upon

11:43:12   15    the admission of evidence.  Since you do not know the answer

16    to such questions, to guess what the answers might have been

17    would be improper.  And you are not permitted to consider

18    for any purpose questions which the Court did not allow to

19    be answered, nor to consider any suggestions in questions of

11:43:27   20    counsel by reasons of such repetition.  You may consider

21    only such evidence as the Court has admitted and give it

22    such weight and credibility as you think is appropriate.

23         Now, there were some demonstrative evidence.  You'll

24    have some to go back with you.  I'm not sure some of the

11:43:44   25    things on the writing board go back or not.  I don't think

1    they do.  They're used for demonstrative purposes.  So don't

2    worry bring that.  So certain models, diagrams, devices and

3    animations may have been shown to you.  Those are used for

4    convenience to help explain the facts in the case and not

11:43:59  5    themselves proof of any fact.  Certain charts and summaries

6    may have been received into evidence to illustrate

7    information brought out in the trial.  Charts and summaries

8    are only as good as the underlying evidence that supports

9    them.  You should, therefore, give them only such weight as

11:44:13 10    you think the underlying evidence deserves.  Again, this is

11    all logical and make, I think, perfect common sense.

12        Now exhibits.  There have been several or a number of

13    exhibits offered and received into evidence during the

14    course of the trial.  Both by the Plaintiff and the

11:44:27 15    Defendant.

16        Now, when you go back in the jury room and you're

17    reviewing these exhibits, they may or may not follow

18    consecutively.  There are a couple reasons for this.  One,

19    the party that marked the exhibit may not have offered it

11:44:39 20    into evidence; two, for some legal reason or procedural

21    ruling, the Court may have decided not to admit that piece

22    of evidence into evidence.  And so you don't have it with

23    you.  So just take it -- trust me, you have -- you will have

24    all the evidence that was properly offered and properly

11:44:59 25    received into evidence during the course of the trial.  And

1    you won't be given any others during the course of your

2    deliberations.

3         One other comment on that and sometimes jurors ask

4    this question and say well, will the Court Reporter be able,

11:45:13  5    permitted to read back any portion of any of the testimony

6    if we need it?  The general answer is no.  And the reason

7    for that is it used to be in the old days, it was too hard

8    to find that testimony through all the many bits of evidence

9    that we have during the course of the trial.

11:45:31 10         It's a little easier now with the modern technology

11    that we have, but it's -- generally the answer is no,

12    because to -- if you wanted to know the answer like to three

13    questions put to one witness, that may unduly highlight that

14    portion of the testimony and may be others in context.

11:45:48 15         That being said, if you come to a point where you say

16    look, we simply can't make a decision unless we hear certain

17    testimony or something, if we come to that and you can't

18    reach a verdict without doing it, then you just address a

19    question to me, and I'll answer the question.  And there is

11:46:05 20    a good likelihood you might be able to hear maybe all the

21    testimony, not just that one part of it.  Okay?

22         Now, I am now going to instruct you on the law as to

23    the specific claims in this case.  When I say in these

24    instructions a party had the burden of proof in the

11:46:24 25    proposition or use the expression if you find or decide, I

1    mean you must be persuaded considering all the evidence that

2    the proposition is more probably true than not.

3        Now, the claims at issue.  Trade dress violations

4    under the Lanham Act, 15, United States Code, Section

5    1125(a).  Plaintiff claims that Defendant has infringed

6    Plaintiff's trade dress.  Trade dress refers to the

7    nonfunctional physical detail and design of a product or its

8    packaging, which identifies the product source and

9    distinguishes it from the products of others.  In this case,

10   Plaintiff states that its trade dress is the external

11   appearance and shape of its EP-0 pump, which would include

12   its logo and color.  To recover on a claim of trade dress

13   infringement, Plaintiff must demonstrate by a preponderance

14   of the evidence:

15       1.  That his trade dress, the external appearance,

16   shape, logo and color is primarily nonfunctional; and 2.

17   That the trade dress, the external appearance, shape, logo,

18   and color in question is distinctive in the marketplace and

19   has acquired secondary meaning; thereby, indicating the

20   source of the goods; and 3.  That the trade dress of the

21   competing good is confusingly similar.

22       I will define each of these elements in turn.

23   Nonfunctional.  In order to be protected, a Plaintiff's

24   trade dress must be nonfunctional.  Functional elements

25   cannot be protected as trade dress.  Indeed, where a

1    product, design, or feature is functional, and not otherwise

2    protected by patent, it is expected and even deemed

3    beneficial that they be copied.  A product feature is

4    functional and so ineligible for protection if it is

11:48:31  5    essential to the use or purpose of the item or if it affects

6    its costs or quality.

7        Trade dress is considered functional if it performs

8    some function other than identifying the products that the

9    party produces.  The test for determining trade dress

11:48:52 10    functionality provides that if the particular feature is an

11    important ingredient in the commercial success of the

12    product, the interest in free competition permits its

13    imitation in the absence of a patent or copyright.  On the

14    other hand, where the feature, or more aptly, design, is a

11:49:15 15    mere arbitrary embellishment to the product, a form of dress

16    for the goods primarily adopted for purposes of

17    identification and individual alternate and hence unrelated

18    to basic consumer demands in connection with the product,

19    imitation may be forbidden where the requisite showing of

11:49:33 20    secondary meaning is made.  Under such circumstances, since

21    effective competition may be undertaken without imitation,

22    the law grants protection.  Trade dress may also be

23    considered functional if it puts a competitor at a

24    significant nonreputation related disadvantage.  The

11:49:52 25    Defendant here contends that Plaintiff's EP-0 pump is

1    comprised of component parts, all of which serve a purpose

2    and all of which are located where they are for an

3    engineering reason.  The Defendant contends this is

4    sufficient to render the component parts and the overall

5    shape of the pump functional, such that they cannot be

6    considered protectable trade dress.  Plaintiff contends that

7    the external shape and appearance was assembled as they are

8    to look nice and to identify the source of the EP-0 pump as

9    Groeneveld.  In order to receive trade dress protection for

10   the overall combination of functional or seemingly

11   functional features, those features must be configured in an

12   arbitrary, fanciful, or distinctive way.  Conversely,

13   engineering necessity, influence is the configuration of the

14   functional components.  The design is functional.

15        The availability of alternate designs does not render

16   a design nonfunctional.  If you agree with the Defendant

17   that there is nothing arbitrary, fanciful, or distinctive

18   about Groeneveld's pump other than the Groeneveld logo and

19   green coloring, and that every component of the pump

20   performs a function and is part of the pump for a reason,

21   you must find for the Defendant, and it will not be

22   necessary to consider the other elements of this claim.

23   However, if you find that Plaintiff's trade dress, the

24   external appearance, shape, logo and color, is

25   nonfunctional, that is arbitrary, fanciful, or distinctive,

1    you should continue to the next element needed to establish

2    a trade dress claim.  Only nongeneric configurations that

3    have acquired distinctiveness through the attachment of

4    secondary meaning satisfy the distinctiveness requirement of

11:51:42  5    the Lanham Act.

6         Secondary meaning occurs when in the minds of

7    prospective purchasers, the primary significance of the

8    trade dress, the external appearance, shape, logo, and

9    colors is to identify the source of the product, rather than

11:51:57 10    the product itself.

11         You should consider the evidence relating to the

12    following factors to determine whether the trade dress, the

13    external appearance, shape, logo, and color of Plaintiff's

14    EP-0 pump has acquired secondary meaning.

11:52:13 15         1.  Direct consumer testimony.

16         2.  Consumer surveys.

17         3.  Exclusivity, length and manner of use.

18         4.  Amount and manner of advertising.

19         5.  Amount of sales and number of customers.

11:52:29 20         6.  Established place in the market.

21         7.  And proof of intentional copying.

22         Groeneveld need not put on evidence of all of these

23    factors and no single factor is determinative.  So if you

24    find that the trade dress, the external appearance, shape,

11:52:49 25    logo, and color of Plaintiff's EP-0 pump has not acquired

1    secondary meaning, you should then consider whether a

2    secondary meaning should be inferred as described in the

3    next instruction.

4         If you find that Plaintiff's trade dress has acquired

11:53:04  5    secondary meaning, then you must go on to consider whether

6    the final element of Plaintiff's trade dress claim has been

7    established.

8         You may consider whether Plaintiff has established a

9    rebuttable presumption of secondary meaning only if you find

11:53:18  10    that Groeneveld's trade dress, the external appearance,

11   shape, logo, and color is nonfunctional as I have previously

12   instructed.  When it is established that a market newcomer

13   has intentionally copied an existing product's trade dress,

14   a presumption arises that the intent in such intentional

11:53:39  15   copying was to benefit from the good will of the

16   competitor's customers by getting them to believe that the

17   new product is either the same or originates from the same

18   source as the product whose trade dress was copied.

19        In essence, if the evidence shows that Lubecore

11:53:55  20   intentionally copied Plaintiff's trade dress, the external

21   appearance, shape, logo, and color, it may then be presumed

22   that Plaintiff's trade dress, the external appearance,

23   shape, logo, and color is distinctive.  However, even a

24   finding of intentional copying does no more than raise a

11:54:13  25   rebuttable presumption of secondary meaning.

1       Lubecore may rebut the presumption with evidence of

2   some logical reason for copying other than to capitalize on

3   pre-existing reputation.  Where there is no evidence that

4   copying was done with an intent to deceive purchasers, and

5   thus, derive a benefit from another's name and reputation,

6   but rather was done to avail the copying party of a design

7   which is attractive and desirable, there is no presumption

8   of secondary meaning.  Indeed, where elements are

9   nonfunctional and not otherwise protected by patents, it is

10   expected and even deemed beneficial that they be copied.

11       So if you find that Groeneveld has proven by a

12   preponderance of the evidence that Lubecore intentionally

13   copied Groeneveld's trade dress, the external appearance,

14   shape, logo, and color, and you find that Lubecore has not

15   rebutted the presumption with evidence that its copying was

16   for a reason other than to deceive purchasers, and thus

17   derive a benefit from another's name and reputation, then

18   you may draw an inference that Groeneveld's trade dress, the

19   external appearance shape, logo and color, has secondary

20   meaning, and thus, is distinctive.

21       So if you find that Groeneveld has not proven by a

22   preponderance of the evidence that Lubecore intentionally

23   copied Groeneveld's trade dress or if you find that Lubecore

24   has provided sufficient rebuttal evidence that its copying

25   was not to deceive purchasers, and thus, derive a benefit

from another's name and reputation, then you will not draw
an inference of secondary meaning based on Lubecore's
intentional copying.

Now confusingly similar, even if Plaintiff's trade
dress, the external appearance, shape, logo, and color is
determined to be both nonfunctional and distinctive, it is
acquiring secondary meaning.  In order to prevail on a trade
dress infringement claim, Plaintiff must establish the
existence of a likelihood of confusion in the minds of
consumers as to the source or origin of the two parties'
products.  Essentially, what the law forbids is one party
passing off its goods as those of another.

In determining whether a likelihood of confusion
exists, the following factors should be considered:

1.  Strength of Plaintiff's trade dress -- again,
external appearance, shape, logo and, color.

2.  Relatedness of the goods.

3.  Similarity of the trade dress, the external
appearance, shape, logo, and color.

4.  Evidence of actual confusion.

5.  Commonality or similarity of marketing channels
used.

6.  Likely degree of purchaser care.

7.  Defendant's intent in selecting the trade dress --
the external appearance, shape, logo, and color.

1          And 8.  Likely expansion of the product line.

2          Now, again, no single factor is dispositive.  Rather,

3     the factor serve as a guide to determine whether there is a

4     likelihood of confusion.  So if you find that there is not a

5     likelihood that a reasonable consumer of automated truck

6     lubrication system products would be confused as to the

7     source of Defendant's EP-0 pump, then you must find for the

8     Defendant.

9          If you find that there is a likelihood of confusion,

10    and that Plaintiff's trade dress, the external appearance,

11    shape, logo, and color has acquired secondary meaning, and

12    is nonfunctional, then you should enter a verdict in favor

13    of the Plaintiff on its trade dress infringement claim.

14    Now, I'm now going to -- that covers the instructions of the

15    legal principles on the claim in the case.

16         I'm now going to instruct you on the issue of damages

17    that may be awarded if you find that Groeneveld has proved

18    its claims bay preponderance of the evidence.

19         Now, remember this, too.  The fact that I will give

20    you instructions on the issue of damages does not mean that

21    I think you should or you should not rule in favor of a

22    particular party, nor does it mean that you should or should

23    not award damages.  The instructions are given so that if

24    you do award damages, you will have guidance in how to make

25    such an award.

1          If you find that Lubecore committed the acts of trade

2     dress infringement, in violation of federal law, then you

3     must determine Groeneveld's damages as a result of

4     Lubecore's conduct as proved by a preponderance of the

5     evidence.

6          Compensatory damages consists of the amount of money

7     required to compensate Groeneveld for the injury caused by

8     Lubecore.  In determining compensatory damages, the

9     difficulty or uncertainty in ascertaining the precise amount

10    of damages does not preclude recovery.  Instead, you should

11    use your best judgment in determining any amount of such

12    damages.  You may not, however, determine damages by

13    speculation or conjecture.  You must determine the amount of

14    money that will reasonably and fairly compensate Groeneveld

15    for any injury you find was caused by Lubecore's conduct.

16    Groeneveld must prove its compensatory damages by a

17    preponderance of all the evidence.  You should consider

18    whether any of the following exists; and if so, to what

19    extent in determining Groeneveld's damages.

20         1.  Any injury to Groeneveld's reputation; any injury

21    to Groeneveld's good will, including any injury to

22    Groeneveld's general business representation; any loss of

23    Groeneveld's sales as a result of Lubecore's conduct; and

24    any loss of Groeneveld's profits, any expense of preventing

25    customers from being deceived, any cost of future corrective

1    advertising reasonably required to correct any public

2    confusion caused by Lubecore's conduct; and seven, any other

3    factors that bear upon Groeneveld's actual damages.

4        The reputation and good will of a company is an

5    intangible business value that reflects the basic human

6    tendency to do business with a company that offers products

7    of the type and quality the consumer desires and expects.

8    The reputation and good will associated with a particular

9    product or business may be symbolized by consumers'

10   acceptance and recognition of trade dress.  The good will

11   attached to a product is often part of overall company -- or

12   company's overall good will.  It is possible, therefore,

13   that the general good will of a company may be damaged by

14   the loss of good will for a particular product.  Whether

15   this has occurred in this case is a question of fact that

16   you have to answer.

17       If you find that Groeneveld's good will has been

18   damaged either by injury to his general business reputation,

19   or by injury to the good will of his product, you may award

20   whatever compensatory damages you find justified by the

21   evidence presented.  The measure of Groeneveld's loss of

22   good will is the difference between the value of such good

23   will before and after Lubecore's infringing activities.

24       Now, I'm almost finished.  Better for me than you.  In

25   addition to compensatory damages, if you find that Lubecore

committed acts of trade dress infringement under federal

law, then Groeneveld is also entitled to any profits earned

by Lubecore that are attributable to Lubecore's infringing

conduct.  However, you may not include any award or profit

any amount that you included in determining compensatory

damages.  Profits are determined by deducting all expenses

and production costs from the gross revenue associated with

the infringing conduct.

Gross revenue is all of Lubecore's receipts from using

the infringing trade dress in the sale of its product.

Expenses are all costs incurred in producing the gross

revenue.  Groeneveld has the burden of proving by a

preponderance of the evidence the gross revenues and

Lubecore has the burden of proving by a preponderance of the

evidence the expenses and costs.

If the actual sales by Lubecore cannot be precisely

determined, you may resolve any doubts against Lubecore in

calculating profits, particularly, if you find that the

uncertainty is due to Lubecore's inadequate record keeping

or failure to produce documentary evidence to Groeneveld.

So now the other thing is if you're -- if you are

considering an award of damages, you cannot consider

attorney fees, court costs, or what we call punitive damages

because they're not applicable.  You put that aside.  The

only damages you can consider are those I've enumerated here

1    in the instructions.

2         Now, the lawyers have a chance to argue their case to

3    you.  In contrast to opening statements, you heard testimony

4    and you've seen the evidence.  When a lawyer gets up before

5    you to go over what they think the evidence has shown,

6    they've heard that, too.  As I told you at the beginning,

7    they've also had a chance to talk to these witnesses on

8    other occasions and read documents and transcripts and other

9    things.  So if a lawyer says something that you don't

10   remember from the evidence or that you remember differently,

11   believe me, I don't think any of these lawyers will ever try

12   to intentionally mislead you.  They may be confused or your

13   memory may be short on that issue.

14        At the end of the day, though, you have to decide what

15   you recall the evidence to be, not what a lawyer says or

16   anybody else tells you.  It's your recollection that

17   controls.  Same thing with a lawyer.  They're really not

18   permitted to comment on the things that it is your duty to

19   decide.  That means the credibility of any witness and

20   whether -- what verdict that you should return.  And if a

21   lawyer makes a comment, improper kind of in the heat of the

22   battle, disregard that because ultimately you have to decide

23   what evidence you believe, if any, whether the Plaintiff

24   proved its claim by a preponderance of the evidence; and if

25   they did, what amount of damages should be awarded.

1       So sit back, relax, accept the arguments of the

2   lawyers in the spirit with which it's intended, and when we

3   come back, when I come back, I'll give you a little bit

4   about your conduct in your deliberations and in the jury

12:04:14  5   room.  And again, since the Plaintiff has the burden of

6   proof, they go first, then the Defense has a chance to argue

7   and then the law requires the Plaintiff to conclude or make

8   the final argument.

9               MS. MICHELSON:  Your Honor, can we be heard on

12:04:25 10   the jury instructions?

11               THE COURT:  No.  Go ahead.

12               CLOSING ARGUMENTS ON BEHALF OF THE PLAINTIFF

13               MS. MICHELSON:  Thank you, your Honor.

14   Counsel, and ladies and gentlemen of the jury.  Thank you,

12:05:31 15   first of all, so much for paying attention and listening

16   through our case.  It's a so important that we have people

17   who are willing to perform this function in our system.  And

18   I know that you have paid attention and we appreciate that.

19       Ladies and gentlemen, you have heard all the testimony

12:05:57 20   that you've received and the evidence that you've received,

21   and I told you at the beginning of the case in opening

22   statements that we would show that Lubecore intentionally

23   copied the Groeneveld EP-0 ALS automatic lubrication system

24   and the system, but the case is about the pump in order to

12:06:29 25   piggy back on the good will of what Lubecore and its

1    founder, Mr. Jan Eissis, knows is a 30-plus year established

2    reputation in the United States and overseas of a company

3    that invested significant resources, significant time,

4    significant effort into creating its own unique and

12:06:57  5    distinctive product and selling it to the public of people

6    who use it.

7         They intentionally copied it.  He intentionally copied

8    it and that is an intentional copy of the Groeneveld pump,

9    in order to -- in order to take advantage of that

12:07:25 10   reputation, take advantage of industry personnel, immediate

11   recognition and association of what the Groeneveld thing

12   looks like with the tried, true, and tested marketplace

13   player.

14        Defendant, Mr. Eissis, testified that he wanted to

12:07:53 15   forge his own identity, his own corporate image, and his own

16   unique place in the market.  He says he wants to do so and

17   made effort, an effort was made, to make his thing look

18   different than Groeneveld's thing.  So that his pump that he

19   says is better would not be associated with Groeneveld.

12:08:24 20        Ladies and gentlemen, you have your own eyes and you

21   have your own ears, and you have your common sense.  His

22   thing, triggers in the minds of people who work in this

23   world and live in this world, an immediate association with

24   Groeneveld.  They all say I look at the Lubecore and I think

12:08:46 25   it's a Groeneveld, with a Lubecore label.  They think it's a

1    Groeneveld with a Lubecore label.  The shape, the

2    silhouette, the outline, the way the thing looks, the way

3    it's presented, triggers in their mind this association.  A

4    person who is looking to forge his own and establish his own

5    corporate individual identity in the marketplace is not

6    going to appropriate virtually every single thing that looks

7    identical to someone whose product, he says, he's trying to

8    disassociate himself from.

9        There is -- it is not possible that the Lubecore pump

10   is anything other than an intentional imitation.  Not only

11   does it look the same, the dimension -- the nominal

12   dimensions of the component parts inside and out, the

13   nominal dimensions are the same.  The pieces are the same.

14   Nobody -- I mean use your common -- this is just common

15   sense.  Nobody starts with a piston that looks like the

16   piston on this easel that Mr. Eissis drew and we had one

17   when he testified, nobody starts with that and working

18   backwards comes up with 50-plus component parts as part of a

19   pump that measure the same and put them together in

20   practically the same exact way without it being a purposeful

21   thing.  To pretend otherwise is disingenuous.  It's not

22   credible.  And to pretend otherwise leads to the conclusion

23   that the intention was not -- the intention was to piggy

24   back the reputation of the established market player by the

25   newcomer on the market.

1    The witnesses all testified that the Groeneveld is

2   recognizable.  The Groeneveld pump is recognizable to them

3   on sight, they know it when they see it, and when they saw

4   the Lubecore, they thought it was a Groeneveld with a

12:11:35  5   Lubecore label.  The label is not the thing that makes it

6   visually dissimilar from the Groeneveld.  The thing that

7   pops out at you, especially when you look at all the other

8   competing pumps, all of them, none of them look exactly like

9   the Groeneveld, none of them except the Lubecore.  The thing

12:12:06 10   that pops out at you when you look at them and now that

11   you've had some experience looking at a few of them, you see

12   that the thing that pops out at you is its shape, its

13   silhouette, because that's when people are in the

14   marketplace and looking at these products, that's the thing

12:12:31 15   that makes it distinctive and unique.  That's the -- that's

16   the trade dress.  And that's what Groeneveld is seeking to

17   protect, the trade dress that it has used since the pump was

18   designed 25, 30 years, 30 plus years, and in the market,

19   here and overseas during that time period.

12:12:52 20    And I did -- I know they brought in last minute ambush

21   thing with these other two pumps that were --

22              MR. ANASTOS:  Objection.

23              MS. MICHELSON:  Predecessors.

24              THE COURT:  Objection sustained.

12:13:02 25              MS. MICHELSON:  To the pump at issue in this

1    case, but if you -- if you look at the three generations,

2    the overall visual impression that the three create is the

3    same, the overall shape is the same.  It's been consistent

4    through the history.  The test is not whether you

5    side-by-side can find differences in pumps and products,

6    whether if you take a look at something and study it you can

7    find.  So there's an angle here instead of here.  It's a --

8    the test is not the side-by-side comparison.

9        I don't know if any of you read People Magazine.

10   Sometimes I do when I'm coming back from trips on an

11   airplane, some kind of mind candy treat I give to myself.

12   You turn to the back, and they have these pictures of find

13   the differences.  The two pictures are exactly alike and

14   you're there studying them to find the differences.  When

15   you study them, you can find differences, but the overall

16   impression that is created is that they are the same.

17       The overall impression that the Lubecore pump gives is

18   the same impression of this Groeneveld pump.  The shapes are

19   identical.  I mean you could layer them over on top of each

20   other and they would match.  In fact, Mr. Willem van der

21   Hulst testified about how Groeneveld broke down the Lubecore

22   and measured the parts and fed the data into a computerized

23   program and showed how they layer on to each other.

24       It is an intentional copy.  To pretend otherwise is

25   not credible and the reasonable logical inference from

1  pretending otherwise is that the intent was not innocent but

2  rather was to piggy back on somebody else's reputation and

3  position in the marketplace.

4      The confusion and the uncertainty in the marketplace

5  that's created, that is actionable here, that we contend

6  that Groeneveld is actionable here is that when people look

7  at it, they will think it's the same inside; same quality,

8  works the same, same recipe, same formula, same drawings, it

9  emanates from the same source, same origin, maybe the same

10 factory, maybe the same tooling.  The confusion is,

11 according to Mr. Eissis and Vermeulen, their witnesses, it's

12 not true because there are differences -- and Mr. Van der

13 Hulst -- there are differences in tolerances, differences in

14 materials, there are differences in the way the parts

15 interact with each other internally.  But, when you see it,

16 you don't know that.

17     Mr. Vermeulen said, he said you can't tell it by

18 looking at it.  That's the confusion.  That's the

19 uncertainty.  That's the -- as it is the Defendant's

20 position that the internal components, notwithstanding what

21 the 3-D drawings and the break down in internal components,

22 that they are -- that they are measuring the same and almost

23 all the same with some slight variation, notwithstanding

24 that testimony, it's the -- which are meaningful variation

25 by the way, according to everybody, meaningful in that they

1    do affect the quality and performance of the system,

2    notwithstanding that, Defendant says it's different on the

3    inside.  Ours is different, different, different.  It's

4    different.  But, people in the industry don't know that by

12:18:17    5    looking at it.  They can't tell that by looking at it.  And

6    they look at it and think it's got to work as well as the

7    Groeneveld because I know the Groeneveld for 30 years or 10

8    years or 20 years, whatever their particular experience is,

9    and it's the same.

12:18:39   10        Dean Osborn, he testified by video.  He was the guy in

11    Wisconsin whose, I guess, great-great-granddad started the

12    company, he testified that he -- when he saw it, when it was

13    pitched to him, he was comfortable with the product, with

14    the Lubecore.  Why?  Because it imitated, it looked exactly

12:19:03   15    like the Groeneveld to him and he actually said it's a

16    Groeneveld with a Lubecore pump.  He didn't care about the

17    label.  He cared that he recognized the product as a quality

18    product because it -- he associates it with the Groeneveld.

19    He was comfortable with it for that reason.  He bought it

12:19:27   20    because of that comfort.  He had options to buy something

21    besides Groeneveld and something besides Lubecore.

22    You'll recall that his testimony was that, you know, when

23    Groeneveld lost Fuel Systems as the distributor in

24    Wisconsin, there was some concern -- there was some concern

12:19:54   25    as to whether he would be able to get Groeneveld product,

1    based on things that had been told to him.  And so Jim

2    Garvins from FSI came around and pitched him the product,

3    and he didn't go with any other system.  He didn't even

4    investigate any other system.  He talked about how he had --

5    you know, there was a -- his gas man or oil man has a

6    Lincoln and been trying to sell them on the Lincoln for a

7    long time, but no, he wasn't interested in that product.  He

8    wasn't interested in it.  He didn't go look for other

9    options besides the Groeneveld.  No.  He bought the Lubecore

10   because he -- it was to him the Groeneveld.  It was to him

11   the Groeneveld.

12        It was a significant factor in his purchasing

13   decision, the fact that it looked to him identical to the

14   Groeneveld product.

15        The Judge has instructed you that on likelihood of

16   confusion, there are a number of factors you can consider in

17   addition to others that you may deem relevant, and to

18   consider them and think about them and weigh them and sort

19   of evaluate where you come out.  And I want to address some

20   of these factors.

21        The strength of the Plaintiff's trade dress, you know,

22   people -- people know it when they see it.  They know the

23   Groeneveld product when they see it because of the shape and

24   the overall appearance and design of the thing.  They know

25   it when they see it.  And nothing else looks like it,

1    exactly like it.  I mean other than the Lubecore.

2         The relatedness of the Defendant's goods and the

3    Groeneveld goods, there's -- I submit there's really no

4    issue.  That the goods are related.  How do you know that?

12:22:12  5    Because they do the same thing and they're sold in the same

6    industry.  The goods are related.  They are both automatic

7    lubrication systems.

8         The similarity of the trade dress.  This in our case,

9    of course, is hugely an important factor.  Hugely relevant.

12:22:33 10    Nothing else is so similar, nothing even comes close to

11    imitating the Groeneveld product except for the Lubecore.

12    The similarity of them is undeniable despite, despite some

13    attempts to point out little differences.

14         Evidence of actual confusion.  Well, there is evidence

12:23:02 15    of actual confusion.  And by the way, sometimes people don't

16    know they're confused.  People think they understand things

17    perfectly well.  They don't know they're confused.  So the

18    fact that 8 billion people aren't running around saying "I'm

19    so confused" is not the dispositive issue here.

12:23:20 20         There is evidence of actual confusion here and

21    evidence of some actual confusion is meaningful in that it

22    shows the likelihood of other people being confused and the

23    fact that people can run around and investigate and figure

24    out what's up with the Lubecore, same thing, different

12:23:44 25    thing, is the technology the same, should we break down --

1    the people fact that people can go ahead and investigate it

2    and figure it out doesn't eliminate the likelihood of

3    confusion that's created by the Defendant's infringing

4    product.

5    Marketing channels.  Well, I mean I think the

6    testimony's undisputed that they market their product the

7    same way.  They both -- both companies use distributors to

8    distribute the product.  They use the same kind of -- go to

9    the same trade shows, the same end user, all truck drivers,

10   people who have national fleets, people with smaller fleets,

11   people who are self-employed, you know, own their own

12   trucks, owner operators, marketing channels, and the likely

13   degree of purchaser care, well, you know it's interesting.

14   Maybe it takes four or five sales visits for someone who's

15   brand new to the system, but somebody who knows the

16   Groeneveld and who sees the Lubecore, the testimony of

17   Mr. Osborn for instance shows it didn't take anywhere near

18   the kind of effort.  Nowhere near the kind of thoughtful

19   sophisticated, careful analysis of all the systems that

20   maybe new users might engage in.  Mr. Osborn saw that it

21   looked like the Groeneveld, and guess what?  That was all he

22   needed to really know.  He did not investigate further.

23   This I submit to you is relevant evidence on degree of

24   purchaser care.

25   Interestingly, and this is common sense too, people --

1     sometimes people who are -- have been involved in the

2     industry for a long time and are more familiar with the

3     products that are available out there, will be even less

4     careful, just like Mr. Osborn was, because they recognize

5     the product as coming -- as coming from a Groeneveld source,

6     of Groeneveld design, a Groeneveld manufacturing facility.

7     They recognize it because they've been involved in the

8     industry for so long.  They don't have to go do rocket

9     science analysis of it because when they see it, that's all

10    they need to know.  Just like Mr. Osborn.  The Defendant's

11    intent in selecting the trade dress, well we've -- we've

12    gone through that.

13         And likelihood of expansion of product lines.  You

14    know, there isn't -- there's territory out there.  There is

15    a market out there that's bigger in the United States,

16    bigger than the current base of users, active users of the

17    systems.  This factor weighs also in favor of a likelihood

18    of confusion and uncertainty in the marketplace.

19         I would like to talk to you a little bit about

20    nonfunctionality.  You know, look.  It's a pump, a pump in

21    an automatic lubrication system.  It's supposed to do

22    something.  It's supposed to deliver grease to greasing

23    points, and it's supposed to work.  That doesn't mean that

24    the shape of it is essential to the use or purpose of the

25    product, that it has to be this particular way to carry out

1      its purpose.  It -- the shape is not, the appearance is not

2      essential to the use or purpose, delivery of grease.  The

3      way it's all put together is not essential to the use or

4      purpose.  The silhouette that is created by the way it's put

12:28:18  5      together is not essential to the use or purpose of the

6      product.  And there was testimony about that, not only from

7      Mr. Van der Hulst but also from the Defendant himself, who I

8      will concede, demonstrated quite a bit of knowledge about

9      these products, products that he said he didn't give

12:28:44 10      Mr. Martin Vermeulen any instruction on what to do,

11      whatsoever, except give me a grease output of such and such.

12           Even Mr. Eissis says the shape, the shape is not

13      essential to the use or purpose.  It could be a different

14      shape and carry out its function.

12:29:16 15           Secondary meaning.  Secondary meaning is a -- when

16      people in the industry see it, do they think Groeneveld?

17      That's what that means.  And guess what?  Everybody said

18      yeah.  Everybody said yes.  It is unique.  It is

19      distinctive.  I know it when I see it.  I know it's a

12:29:40 20      Groeneveld when I see it.  When I said what about you see a

21      Lubecore, you see a Lubecore label on the Lubecore, come on.

22      And they said I -- that shape, that silhouette that design,

23      that overall appearance, that triggers in their mind an

24      immediate association with Groeneveld, and associations like

12:30:01 25      that can be conscious, but they are not always conscious.

1    Exposure to a particular product over years and years and

2    years creates a familiarity, a comfort just like Mr. Osborn

3    testified about that he has, a comfort and familiarity so

4    that they night not know I'll, I think somebody -- somebody

12:30:32  5    said they can't pronounce -- oh, Mr. Marcum, they can't

6    pronounce the name, but they recognize it as something

7    that's been around for years and years and years.  Something

8    that's tested and tried and true.  So what are the factors

9    on secondary meaning?  Direct testimony.  Do they know it

12:30:56 10    when they see it?  Yeah, they do.  There's customer

11    testimony about it.  Mr. Osborn, Mr. Orville White, gosh it

12    seems like we've been here a long time.  That probably seems

13    a long time ago to you.  He was the gentleman who spoke

14    really, really quickly, Sentinal Transportation, the

12:31:16 15    national fleet out there.  He's a customer, he buys the

16    things.  He recognizes it on sight.  This is relevant

17    evidence on this inquiry.

18         We don't have a consumer survey because okay, we don't

19    but that's just one.  I expect there will be argument about

12:31:38 20    that, but that's one factor and I'll grant that to you,

21    ladies and gentlemen.  They didn't run around asking

22    thousands of customers questions that -- who -- that answers

23    to which probably would have been challenged anyway;

24    exclusivity, length, and manner of use.  Has Groeneveld used

12:32:03 25    the design, used its trade dress, exclusively and

1    continuously for the last several decades?  The testimony is

2    undisputed that yes, they have, that that overall shape,

3    that overall design, that overall way the thing is put

4    together and presented to the market, they have.  We have

5    evidence about the amount and manner of advertising.  By the

6    way, the fact that -- that the advertising expenses are

7    incurred by more than just the Brunswick Groeneveld office,

8    that doesn't matter.  Why is that relevant?  The fact is

9    advertising is being done to create that association, money

10   dollars are being spent on fostering that recognition,

11   putting the name out there, and putting the image of the

12   pump out there.  And, you know -- it's relevant, and

13   Groeneveld people have testified consistently how important

14   the image of the pump is to them.  Yeah, their name is

15   important too, the Groeneveld name, the G, that's important

16   too.  Yeah they incorporate those branding identifiers,

17   those brand identifiers in their advertising as well.  And

18   doesn't sound like a bad idea.  The fact that that's part of

19   it doesn't mean that the shape and the image of the pump

20   isn't part of it, too.  It is part of it, too, and it is the

21   shape that has been consistent throughout the overall

22   presentation of it.  Amount of sales and numbers of

23   customers, well, they're a lot of them.  You heard testimony

24   about it.  I mean they're all over the United States.  They

25   are all over Canada.  They're all over the world.  They -- I

1    can't remember the numbers exactly now, but we're talking

2    about millions and millions of dollars in Groeneveld these

3    items for decades, established place in the market.  Well, I

4    mean -- I don't -- I can't -- there's real -- no real

12:34:29  5    serious dispute that they are one of the players in the

6    market.  There's no real dispute that Lubecore doesn't have

7    any independent brand recognition of its own.  And so,

8    ladies and gentlemen, it's -- the label doesn't tell the

9    people that these are two different entities, that the

12:34:55 10    designs are different, that the sources are different people

11    see it and they think it's the same.

12        And additional layered on evidence as Mr. Osborn

13    explained of the same people making them, the same people

14    selling them, and as Ms. Wolfe explained, the layered-on

12:35:19 15    advertising similarities, marketing channels, all these

16    things, you know, cloak it in this appearance, cloak the

17    Lubecore in the appearance that notwithstanding what someone

18    says to you, they must be coming from the same design, the

19    same source, the same recipe.

12:35:44 20        You know, it's -- the -- Coca-Cola, somebody gave you

21    a bottle of Coca-Cola, the Coca-Cola iconic shape, Coca-Cola

22    bottle, if it looks like a brown carbonated cola liquid

23    substance inside there, the guy selling it to you used to

24    sell you what's called Coke.  The people making it made

12:36:07 25    Coke.  The guy who was president of Coke now has this new

1   company, and on his Coca-Cola bottle, he puts the label

2   Ed's, Ed's Cola, it's -- it's the wink-wink, nod-nod

3   defense.  It's not just for what people say.  It's the

4   impressions that they create that contributes to a

5   likelihood of confusion.

6       I mean Dean Osborn basically said yeah, that they said

7   Lubecore was a competitor and they were different, but yeah,

8   I figured -- I figured the technology came along with

9   Lubecore because it looks exactly the same as the

10  Groeneveld.

11      Proof of intentional copying is also relevant on this

12  secondary meaning factor.  And the Judge instructed you on

13  various presumptions that you can make, draw, and various

14  inferences you can draw relating to secondary meaning and

15  uncertainty in the marketplace or likelihood of confusion,

16  based on the intentional copying.

17      You can reasonably infer secondary meaning, and you

18  can likewise as to likelihood of confusion, based on if you

19  find that the copying here was intentional.  And I

20  believe -- not what I believe, and the evidence supports

21  that finding.

22      Groeneveld carried a Grease Jockey pump -- can I have

23  87, please?  Groeneveld carried this Grease Jockey pump.  It

24  put its Groeneveld label on it.  Mr. Vermeulen said you

25  can't tell anything about a product Groeneveld, whether

1   makes it or where it comes from, from the label.  Remember

2   that testimony.  Nevertheless, here's the pump Groeneveld

3   carried and sold.  Grease Jockey TSI.  Do you see -- do you

4   remember all the testimony in this case, people referring to

12:38:42 5   different pumps by different names, notwithstanding whatever

6   labels they are on them.  Nevertheless -- and this goes to

7   the likelihood of confusion, by the way, because the label

8   is there, the explanation for all of this.

9        They carried this, didn't like it.  It wasn't good

12:39:01 10   enough.  Everybody said it wasn't good enough.  By the way,

11   this looks nothing like any of the three Groeneveld pumps

12   you see on the table before you.  They decided to make their

13   own product.  They went into a project with another company,

14   Sempress, they made a couple -- did that for awhile.  They

12:39:19 15   didn't like that either.  Mr. Van der Hulst testified that

16   he and his team developed this generation.  The PX-143 and

17   the six-liter is PX-1 when Mr. Vermeulen wasn't even there.

18   1981, 1982, by the way, the fact that some of the older

19   versions might have still been around, so Mr. Eissis had

12:40:44 20   some to sell in Canada when he joined the company, I guess

21   six, seven years later.  That doesn't mean that the new

22   generation was not developed and designed by Groeneveld as

23   Mr. Van der Hulst testified in that case, 1981 and '82.  It

24   was on the market.  They start selling it in 1982 and 1983,

12:41:13 25   and they start selling it in North America in 1985.

1          Mr. Vermeulen says he joined the company in Groeneveld

2     1984.  Well, he wasn't there in 1981 or '82 when the product

3     that's at issue in this case was designed and developed.

4     And by the way, he never worked where production took place

5     in the factory, in Italy.  And he testified to that.  And

6     you heard no testimony from him identifying either one of

7     those two earlier pumps as the things that existed before he

8     got there.

9          Mr. Van der Hulst's testimony was not challenged on

10     this issue during cross-examination.  He was not shown these

11     predecessor pumps when he came to testify.  Those only came

12     out when he was back on the plane to Italy.

13          Ladies and gentlemen, I figured this out, the dates,

14     the dates as Mr. Vermeulen has testified to when he was

15     employed by Groeneveld.  They don't make sense.  The

16     testimony doesn't make sense, and I'm going to show you how.

17          First of all, Groeneveld's employment records, as you

18     heard Ms. Wilson testify about, show that he worked for the

19     company November, 1986, to 1995.  There's been no challenge

20     to the validity of these records.  That's one.  So even --

21     so if he joins Groeneveld in November of 1986, even by his

22     own testimony, the new system was already developed before

23     he even got there.  That's one.

24          Two, Mr. Vermeulen's dates are just all wrong.  They

25     just don't add up.  He says he was there until 1997.

1   Mr. Vermeulen testified that he was with Groeneveld until

2   1997 even though the records show him gone in 1995.  I have

3   a transcript of his trial testimony.  I'm moving this.

4        "Question:  How long have you been affiliated with Tae

12:44:43  5   Sung?

6        "Answer:  This month, 20 years."

7        This month, he gave the testimony October 4, 2011.

8   2011 minus 20 years is 1991.  He says he was with Groeneveld

9   in 1991.  But, he also says he was with Tae Sung in 1991.

12:45:16 10   That's one.

11       He says he was hired and started at Groeneveld in

12   1984, and that he completed that project pretty quickly

13   after that.  Mr. Eissis testified that the system wasn't

14   even available, and he didn't start selling it until 1990.

12:46:05 15   He says he didn't even start selling it until two years

16   after he, Mr. Eissis, joined Groeneveld.  Mr. Eissis says he

17   joined Groeneveld in, I think, he says 1988.  Yeah, so

18   Mr. Eissis says the old system was the one that was being --

19   was -- that the new system hadn't come out yet in 1988.

12:46:36 20   But, according to Mr. Vermeulen's testimony, he would have

21   done that in 1984 and 1985.  This is inconsistent.  There's

22   one more.

23       Mr. Vermeulen testified about the generational gap

24   between his purported design of the Groeneveld pump at issue

12:47:15 25   in this case, and his purported design and engineering of

1    the Lubecore pump that is at issue in this case.  He said

2    there is a 30-year generational gap.  Thirty years.  He says

3    he designed it in 2008.  Thirty years from that, 1981.  It

4    doesn't add up.

5         In addition to these dates not adding up, I submit to

6    you that Mr. Vermeulen's testimony was not worthy of your

7    belief that he is the designer of the system.

8         He -- it is simply not credible that someone starts

9    with a measurement, makes a piston and has to create

10   something around it that ends up looking exactly like the

11   Groeneveld pump.  It's just not credible.  It's not credible

12   that he didn't use reverse engineer pump or use a Groeneveld

13   pump or a Groeneveld drawing.  It's not credible.  He didn't

14   say yeah, we came, we broke down the Groeneveld pump, and we

15   measured everything and made our own drawings from that and

16   made it -- he didn't say that.  He said absolutely not.  He

17   said he independently designed it from scratch, from a

18   calculation we did on a piece of paper on a plane ride back

19   to Korea from Amsterdam, and then a couple months later, he

20   had to work a prototype, and then the thing is on the market

21   without even, I guess, doing much testing because he sure

22   got to market pretty quickly.

23       Well, you don't have to test it if somebody else has

24   done all the testing for the last 30 plus years.  You don't

25   have to do any testing.  Although, maybe they should have

1    because you, as you know, they end you said with some pumps

2    that didn't work out so well.  That leaked, had O-rings that

3    had quad rings instead of O-rings, nothing that you could

4    see but things that were meaningful, meaningful differences.

12:50:17  5      You are also going to be asked to evaluate the

6    credibility of the witness that we put forward to you,

7    whether you believe them or not, whether you thought they

8    were telling you the truth, whether you thought they were

9    playing games with you, whether not only the witnesses we

12:50:39  10   put forward on this but Defense witnesses as well, who do

11   you believe.  Who played games?  Who tried to answer

12   questions and cross-examination questions in a straight

13   forward, helpful way?  Who wanted to do a dance to confuse

14   things?

12:50:56  15                MR. ANASTOS:  Objection.

16                THE COURT:  Overruled.

17                MS. MICHELSON:  No dancing is needed if the

18   truth is on your side.

19       I have to talk about damages and damages numbers.  By

12:51:50  20   the way, ladies and gentlemen, here's the confusion, here's

21   the confusion.  Customers think you can put part

22   interchangeably together.  Exhibit 61-2.

23                MR. KUNSELMAN:  Can we get the Elmo on,

24   please?  Thank you.

12:52:16  25                MS. MICHELSON:  If parts aren't

1    interchangeable, if they aren't used as well when put

2    together, then people are confused, customers are confused

3    if they think otherwise and if they act otherwise.  People

4    are confused when a warranty program says if you use our

12:52:36  5    grease, then we'll -- you got your warrant, your extended

6    warranty.  If you're using the Lubecore, if you're using the

7    Groeneveld -- and by the way, if your Groeneveld pump has

8    any problem because you're using our Lubecore grease, we'll

9    come out and our people will fix it, our people will put our

12:52:55  10    parts in if any needs to be replaced or repaired.  Our

11    people will warrant the Groeneveld product.  Our product,

12    the next generation, the next generation in ALS, we warrant

13    that product.

14         So was there some actual confusion that we proved

12:53:32  15    where somebody thought it was the same thing or just as good

16    or the technology was the same when they bought it because

17    that's what they thought, they were comfortable with it?

18    Yes, there is evidence in the case before you, and you can

19    reasonably conclude from all of what you've heard and all

12:53:49  20    that you see, and using your own common sense, which the

21    Judge has charged you is infinitely appropriate for you to

22    do in this case.

23         But, there is a likelihood of confusion and

24    uncertainty in the marketplace.  Always all he's got to do

12:54:04  25    is change the way the thing looks on the outside.  That's

1    it.  That's it.  That's it.  Why wouldn't he do it if he

2    doesn't want it to look different?  He says he wants it to

3    look different.  He says he wants it to be distinguished

4    from the Groeneveld.  Well, we heard of so many witnesses

12:54:25   5    saying that they don't distinguish it from the Groeneveld.

6    They think they're the same thing.  If he really wanted it,

7    people could think otherwise, why wouldn't he just change

8    something about the shape of it, the silhouette, something?

9    And it's not because he doesn't have to.  Because he also

12:54:41  10    said that he could.  He also -- he, Mr. Eissis, said well

11    yes, the shape can be different, notwithstanding the

12    internal working, mechanical components of the system.

13         Now, the Judge charged you on damages.  He told you

14    about who's got to show what and who's got to peel things

12:55:10  15    away and those sorts of things, and that you can consider

16    when you decide which calculations to accept -- can I see --

17    can I see that?  I don't want to misstate that.  Can I see

18    that chart?

19         Here's what we got, ladies and gentlemen.  When the

12:55:30  20    question -- when the request for information was made a long

21    time ago, more than a year ago, we got a chart, a summary,

22    these are Lubecore's numbers, these are Mr. Eissis' numbers

23    showing gross revenues in 2010, gross revenues projected in

24    2011.  It was almost year end in 2010.  So any projections

12:55:58  25    in 2010 should have been reasonably accurate.  This is what

1   we got.  And we didn't get anything on 2009, by the way,

2   nothing except some testimony from Mr. Eissis that he sold

3   200 of the systems in the United States in 2009.

4       And by the way, you know, I heard something along the

5   lines that oh, there was just a projection or that it was --

6   you're not projecting at the end of 2010 what you did in the

7   past in 2009.  That's just nonsense.  His testimony under

8   oath was 200 pumps, 200 systems were sold in the United

9   States in 2009, and no contrary information was provided

10  until two days before trial, in a document, Defendant's

11  Exhibit X, please.

12              MR. KUNSELMAN:  It's here.

13              MS. MICHELSON:  No, Defendant's Exhibit X.

14  Has no backup supporting documents.  It's not any reference

15  to any -- Mr. Eissis didn't prepare it himself.  There's no

16  testimony that he verified personally the accuracy of any of

17  the information in here.  I submit to you, ladies and

18  gentlemen, based on what you heard, and what you saw in this

19  courtroom, it is reasonable and appropriate and compelling

20  to use these numbers that he presented and it was

21  appropriate when Groeneveld gave you its damages

22  calculations for Groeneveld to rely on what he said, what he

23  said under oath.  You know, he swore to the accuracy of this

24  under oath when he testified about it during his deposition

25  a year ago.  Which one is it?  Which testimony is true?

1   Which one isn't true?  Which -- which one maximizes the

2   numbers when there's an interest in maximizing them, and

3   then two days before trial, minimizes or tries to minimize

4   them when there's an interest in minimizing them?

12:58:46  5   Is this credible?  Are these, Defendant's Exhibit X,

6   can you rely on these as real numbers?  Why should you and

7   why would you?  Why would anybody?  And so -- by the way,

8   the damages aren't what profit is left when you take all

9   kinds of expenses out that have no proper place in a damages

12:59:29  10   calculation for the kind of claim that we have here.

11   The Judge very specifically told you in his jury

12   instruction what Defendant's expenses are, the appropriate

13   expenses to offset against gross revenues.  You -- you --

14   you can't tell from looking at this what the appropriate

12:59:53  15   expenses are.  And you can tell from looking at this that a

16   number of -- this, meaning Defendant's Exhibit X -- that a

17   number of them that he tries to patent there and include in

18   there are not within the Court's definition of what an

19   appropriate deduction or offset or expense is.

13:00:11  20   And by the way, the Judge also told you that it's

21   their burden to show what those offsets are.  To give you

22   competent credible evidence, reliable evidence, so that --

23   to offset it, and if they don't, you are entitled to -- and

24   if they don't, Groeneveld is entitled to an award of the

13:00:48  25   gross revenues and as Lubecore's profits because

1    Groeneveld's entitled to the compensatory -- its own actual

2    damages, including its lost sales damages, which we'll go

3    through that in a second.  It's entitled to Defendant's

4    profits on sales of the infringing product, and it's

5    entitled to damages for corrective -- corrective expenses

6    that Groeneveld had to incur to sort of try and -- try and

7    correct the misperceptions and the confusion going on in the

8    marketplace.  And you'll recall testimony from Ms. Wilson on

9    that point that she estimated between 18 to $20,000.  And so

10   Groeneveld does request that you include that in your

11   damages award.

12        So Ms. Wilson, Gail Wilson, the CFO of Groeneveld, who

13   you -- I'm sure when you do your job of deliberating will

14   consider her demeanor on the stand, the way she carried

15   herself, her attempt to answer questions the best way that

16   she could, her forthcomingness when you evaluate whether you

17   believe what she told you.  And by the way, there's no

18   evidence that she has any personal financial interest in the

19   outcome of this case, unlike the Defendant.

20        She relied on Lubecore's number when she made her

21   calculations.  First, the 2009 sales of 200 units, 200 ALS

22   sales that Mr. Eissis testified he made in the marketplace.

23   And an average selling price of 1500 per unit when it goes

24   through distributors, more by the way when they go to end

25   users, but we're not asking for that.  We're not even asking

1    to go that far.  We're not asking for every single dime.

2    This is a conservative estimate based on information that

3    they provided; 200 products times 1500, $300,000 with the

4    margin of 41.3 percent, $123,900.  I want you to write these

5    down, and I'm going to add them up.  She went through with

6    how she calculated her contribution margin, the steps she

7    took, the care that she took.  The conservative approach

8    that she took.  The records she relied on, her personal

9    knowledge of Groeneveld's records, her personal involvement

10   with creating and maintaining them.  That's $123,900.  Based

11   on Defendant's reported gross sales of its infringing

12   product in the United States in 2010, $1,042,088.01 that

13   Lubecore reported were its gross sales, projected would be

14   its gross sales and never until the 11th hour when trial's

15   going to start, try to say something differently.  Their

16   reported gross sales, she -- she took out sales that

17   wouldn't have gone through the Brunswick office.  She took

18   that out.  We took that out and came up with a gross sales

19   figure in this amount, multiplied it, came out with $367,000

20   in 2010, went through the same -- better write that one

21   down -- went through the same process on the 2011 reported

22   numbers by Lubecore and came up with $734,727.

23       I submit to you, ladies and gentlemen, that your

24   damage award to Groeneveld for amounts incurred to date or

25   through 2011, based on Lubecore's reported sales figures to

1    which they have not adequately demonstrated or credibly

2    demonstrated, they are entitled to any setoffs or deductions

3    or offsets whatsoever, is -- oh, I think I did it --

4    $1,225,627.

13:06:32  5         There was additional testimony from Dr. Burke as to

6    his regression analysis of going forward, damages caused by

7    the infringement.  Based on his experience and statistical

8    analysis, his reliance on Groeneveld's financial data, all

9    of which he had access to.  And Lubecore's reported figures

13:07:02 10   and his going forward, and there was testimony from Ms.

11   Wilson of a five-year -- a five-year time period for the

12   market to adjust itself, meaning for the damage caused by

13   the infringing product to sort of settle down, five years

14   his five-year figure of total -- his five-year figure of

13:07:41 15   Groeneveld's lost sales damages is this number.

16              MR. ANASTOS:  Is this an Exhibit, your Honor?

17              MS. MICHELSON:  I thought this was in.  And

18   we're -- look, he did calculations all the way out for ten

19   years.  Groeneveld isn't even asking you to go that far.

13:08:02 20   They're conservatively asking you for $2,806,326 to correct

21   the marketplace for the five years.

22        I did -- plus the 18 to $20,000, and I'll leave it to

23   you to decide whether you want to do 18 or 20, for the

24   corrective action that Ms. Wilson talked about.  And there's

13:08:37 25   one more piece of it as we explained on Lubecore's profits,

1    the law allows for disgorgement of profits if you find that

2    there is infringement.

3        Lubecore's profits are its gross sales minus what

4    Lubecore demonstrates are appropriate credible and reliable

13:08:56  5    offsets.  Lubecore has not demonstrated any such thing, that

6    there are any.  So the numbers we ask you to return on that

7    item are their reported figures, their gross revenues in

8    2010, 2011, and the numbers are here.  And you can take them

9    with you when you go into the jury room.

13:09:45  10        So, ladies and gentlemen, I do thank you for your

11    patience.  I probably talked a long time.  I'm doing my

12    best.  Here the issue is simple for you.  It really is.  Is

13    it an intentional copy?  Is it nonfunctional?  Is the trade

14    dress that Groeneveld is claiming, does the shape of the

13:10:13  15    thing make it work?  Is it essential to the use or purpose

16    of the product?  Is the shape of it the thing that makes it

17    work?  The silhouette of it, the overall appearance, the

18    testimony before you is it's not.

19        Is there secondary meaning?  Do people look at it and

13:10:34  20    go wow, it looks like a -- it's a Groeneveld, I recognize it

21    on sight because it's a Groeneveld?  I do recognize it on

22    sight as a Groeneveld, notwithstanding the label there, the

23    label not being there, whether it's dirty, whether it's

24    clean, whether it's on a truck.  The evidence before you is

13:10:49  25    yes, they do.  And is there evidence that there's a

1    likelihood, a likelihood, we don't have to prove actual

2    confusion to prevail, is there a likelihood of confusion or

3    uncertainty in the marketplace caused by Defendant's

4    intentional imitation of the Groeneveld trade dress and?

5    The evidence before you is there is.

6        So we will ask you to return a verdict in favor of

7    Groeneveld on its trade dress infringement claim and award

8    damages to Groeneveld in the amounts I have identified, that

9    these calculations appear on the exhibits you will take with

10   you.  And I thank you once again sincerely.

11           THE COURT:  Thank you.  All right, folks.  I

12   will let you go to lunch.  So keep in mind the admonitions.

13   It's really important now that you've heard a lot of stuff,

14   you haven't heard it all.  2:15 we'll meet downstairs.  Will

15   that be good, Chris?

16           DEPUTY CLERK:  Um-hum.

17           THE COURT:  Can't see if Mr. Yarger's awake.

18   If he is, tell him 2:15.

19       (Thereupon, a luncheon recess was had.)

20

21

22

23

24

25

1    Thursday Session, October 20, 2011, at 2:15 P.M.

2         THE COURT:  Okay, Mr. Anastos.  You may

3    proceed.

4         CLOSING ARGUMENTS ON BEHALF OF THE DEFENSE

14:23:16  5         MR. ANASTOS:  Good afternoon, ladies and

6    gentlemen.  When I started my opening statement last

7    Thursday, when we all first met for the first time, I asked

8    you to look at the two pumps at issue in this case and ask

9    yourself without raising your hand or otherwise indicating

14:23:29 10   if you can tell the difference between the Groeneveld pump

11   and the Lubecore pump.  I'm going to ask you that again

12   without any -- don't raise your hands.  Don't indicate.

13   But, can you tell the difference between the Groeneveld pump

14   and the Lubecore pump?  And I'm sure the answer is yes, and

14:23:43 15   we all can, because it's distinguished.

16        There's been -- Ms. Michelson's argument, she says

17   what jumps out at people about these pumps is the shape.

18   And ask yourself when you look at the Lubecore pump, what

19   jumps out at you as identifying it's a Lubecore pump is the

14:23:59 20   shape or the Lubecore red label, the Lubecore trademark on

21   it in red, the red follower plate, and the Lubecore logo

22   down lower on the identification plate?  Is it the shape or

23   is it all the red stuff and the Lubecore name that you use

24   to identify it as the Lubecore pump?

14:24:18 25        You've been instructed that the Plaintiff needs to

1    prove three things in order to win their case.  And the

2    first item on the list is what's called nonfunctionality.

3    They have to prove that there's something nonfunctional

4    about the design of their pump, something that is an

14:24:41  5    arbitrary embellishment to this, something that's

6    ornamental, something that's there for some reason other

7    than engineering reasons, other than engineering influences.

8        The first thing I think I want you to ask yourself is

9    which pump was Mr. Van der Hulst talking about when he

14:25:05 10    testified that a new pump came into existence by Groeneveld

11    in -- I don't know.  I think he said the early 1980s, they

12    moved from the one they were using and selling to Grease

13    Jockey.  I think it should be pretty transparent by now that

14    it was not the pump that we're talking about in this case.

14:25:26 15    The pump we're talking about in this case was not introduced

16    to the market until the 1990s, and the reason we know that

17    is that Mr. Eissis, who nobody disagrees first became a

18    Groeneveld distributor in 1988, was not selling the pump

19    that was at issue in this case.  He was selling the second

14:25:44 20    pump in the lineup there, the one with the all plastic lid

21    and the screw downs for the screw ins's for holding down the

22    reservoir.

23        Ms. Michelson said in her -- in her closing that we

24    really don't have to believe Mr. Eissis -- no.  We can

14:26:06 25    believe Mr. Eissis that he was selling the pump there in

1    1988, but that doesn't prove that the pump that is at issue

2    in this case really didn't exist in 1988.  It somehow

3    existed in '81 or '82, but Mr. Eissis was selling the

4    earlier version in 1988.  Now, does that make any sense to

14:26:27  5    you?  That would be like walking onto a Ford dealer lot

6    today and when the 2011 models are out, and that Ford dealer

7    selling 2004 models because they were left over and Ford

8    wants to sell them, selling them as new on his lot.  That

9    makes absolutely no sense.  When the new models come out,

14:26:46 10    every manufacturer wants that new model to be sold.  So the

11    current model when Mr. Eissis was selling them in 1988 was

12    Pump Number 2 and the new pump was not made until -- or

13    wasn't released to the public until the 1990s.  These things

14    are grease pumps.  Mr. Vermeulen and Mr. Van der Hulst both

14:27:11 15    testified unequivocally that it would cost more to

16    manufacture these in a different way.  And that only makes

17    sense from a manufacturer perspective.

18         You -- someone who is selling a Groeneveld pump wants

19    to acquire it, have it made, have its cost of goods be as

14:27:32 20    low as possible, the testimony here from Mr. Van der Hulst

21    and Mr. Vermeulen is that the basis of these pumps optimize

22    the amount of aluminum necessary to enclose the working

23    parts and to make room to have the valves and other things

24    screwed into it.  No more material is used than needs to be

14:27:57 25    used and no less material is used than needs to be used.  If

1   you use less, you risk the thing blowing up because of the

2   air pressure inside.  If you use more, it costs more.

3       If someone wants to make something ornamental, they

4   put more into it.  They make it cost more because they want

5   it to be nice and people to buy it because it looks nice.

6   We all know these things could have been made to look nicer.

7   The base could have been rounded off with aluminum, but if

8   you added another round of aluminum on the whole outside of

9   the diameter of that base, consider it, how much would it

10  have added to the cost of the item and would that have put

11  the seller at a disadvantage because they would have had to

12  pay more to acquire their product and would not have been

13  making as much profit in the end?

14      With respect to Mr. Van der Hulst's testimony, look at

15  the first three pumps in line.  You have to ask yourself

16  which pump was he talking about when he testified that he

17  wanted, or Groeneveld wanted to make a pump that looked

18  distinctive.  Now, if it's the first pump in line there,

19  which I think the time line demonstrates was the pump that

20  Mr. Vermeulen was talking about, then that's their

21  distinctive pump.  Is it distinctive?  Looks like a grease

22  pump like all the grease pumps we have seen in this case so

23  far.  Is it the second pump?  Is that the one that's

24  supposed to look distinctive?  Which one of those was

25  Mr. Van der Hulst talking about when he said that he was

1    ordered -- they drew designs and wanted to make something

2    that looked nice?  It has to be that first pump.  So that's

3    the one they wanted to make look nice, then Mr. Van der

4    Hulst's testimony is utterly irrelevant to this case.  The

5    testimony for Mr. Vermeulen and actually from Mr. Van der

6    Hulst was that all of these things are made out of

7    functional pieces that are put together to make a functional

8    unit.  The base is larger than it has to be.  The size of

9    the base is driven by the internal components, and the other

10   things that need to be attached to it, the check valves, the

11   pressure valves, the input of the hydraulic from below,

12   all -- the main line going out.

13        The base is made so that it can accommodate a grease

14   pump and accommodate the air pressure that drives the grease

15   pump and accommodate all of the things that are needed to

16   work that pump and test the air pressure.  Where does the

17   reservoir come from?  We talked about that in detail with

18   Mr. Van der Hulst.  You start with a certain -- you start

19   with a certain circumference to the -- to the -- excuse me.

20   Certain area to the base of the reservoir.  How is that area

21   determined?  It's determined by the size of the base.  You

22   don't want the reservoir to be bigger than the size of the

23   base because then you'd have to expand the base with more

24   material which would cost more.  So you make the area of the

25   bottom of the reservoir to fit nicely on top of the base,

1    and then how tall is that base?  How tall is that reservoir?

2    That reservoir height is dictated by the amount of grease

3    that that unit holds to last a certain interval in a truck's

4    service life.  So that when a trucker goes out on the road

5    and drives X-thousand miles, he'll use up all the grease in

6    it, come back and have it filled up at his next service

7    stop.  It's not fancy.  It's not ornamental.  The size is

8    dictated by engineering reasons entirely.

9        The follower plate is dictated by engineering reasons

10   entirely.  That's not ornamental.  We all know what that

11   does.  It just goes up when the grease gets pumped in and

12   comes down and assists the grease in, coming out, when it's

13   being sucked out and pumped through the greasing systems.

14       So now we have the final pumps that are at issue in

15   this case which are actually the second -- excuse me, the

16   third and fourth in that line there, the third fourth and

17   fifth with just the different size, the different size

18   reservoirs, which again the different size reservoirs are

19   dictated by how much grease.  One of them is -- one of them

20   is the size correlated with X-thousands of miles of a truck

21   driving between one service level and another, and the

22   larger one is correlated with Y-number of miles for a truck

23   to drive between service levels.  So, you know, if someone

24   really wanted to make one of these things ornamental and

25   start with all of the engineering principles that go into

1    why that reservoir is the same shape it is, they could have

2    made it like eight feet tall or three feet tall or some

3    height totally unnecessary to the amount of grease, that it

4    holds no one has done that and a reason no one has done that

14:32:50 5    because there's nothing whatsoever ornamental or arbitrary

6    or fanciful about the design of any of these pumps.  They're

7    all designed by engineering necessity.

8         Oh, yeah, there was insinuation in the opposing

9    party's closing that we ambushed them with the earlier

14:33:15 10   versions of the Groeneveld pump.  I guess I ask you folks

11   did we ambush them with those earlier versions of the pump

12   or did they hide them from you because they destroyed

13   Mr. Vermeulen's testimony -- excuse me, destroyed Mr. Van

14   der Hulst's testimony because in 1980, Mr. Van der Hulst did

14:33:37 15   not make the pump that is at issue in this case in the early

16   80's.  He made Number 1.  Somewhere there was a change along

17   the way to make Number 2.

18        Number 2 is still in existence in 1988, and -- because

19   we know that because Mr. Eissis was selling it in 1988.  He

14:33:53 20   was buying it from Groeneveld and selling it in 1988.  And

21   Pump Number 3, according to Mr. Eissis, came out in the

22   early 90's.  That is entirely consistent with

23   Mr. Vermeulen's testimony.  I don't care about, you know,

24   did Mr. Vermeulen get his years of employment with

14:34:11 25   Groeneveld off by a little bit.  Does that matter a lick in

1    this case?  What matters is the testimony that he was part

2    of the team.  No one has said Mr. Vermeulen was the one who

3    designed anything.  He was the part of the team that created

4    the version of the pump, who engineered the version of the

5    pump that's at issue today, the one that has the follower

6    plate, the one that has the engineering gusto that -- that

7    is there in the Pump Number 3.  He testified that everything

8    about it is functional.  He testified that they were under

9    no orders whatsoever from the company to make anything nice.

10   They were under orders to make a good pump at the optimal

11   price, and that's exactly what they did.  Let's face it,

12   folks.  These are grease pumps and nothing more then that.

13   Mr. Van der Hulst wanted them to be automobiles, something

14   with an outside form to them that covers up all the nice

15   inside stuff or the -- or the bad inside stuff, something

16   that, you know -- we all know you peel away the outer shell

17   of an automobile and what looks -- underneath it is the guts

18   of the -- the guts of the thing, the thing that makes it

19   run.  But, all of those have covers on them.  What you do

20   with the body is to put your distinctive design on it and

21   make it look like whatever BMW wants to make it look like or

22   Ford wants to make it look like or what Buick wants to make

23   it look like or whoever wants to make it look like.  There's

24   no outside show on this covering up of the guts.  The thing

25   is itself, and it is itself only because of the engineering

1    influences.

2         Let's move on to secondary meaning.  Groeneveld has to

3    prove that in the eyes of the public, the relevant public,

4    when somebody looks at the Groeneveld pump, they associate

14:36:25  5    it with Groeneveld based solely on its shape.  And I'm

6    getting the feeling from listening to the Plaintiff's

7    closing that Steve Osborn is the only person who

8    testified -- who testified -- Dean Osborn is the only person

9    who testified in this case, and that their case hinges 100

14:36:46 10    percent on one person's testimony.  Frankly, I'm not sure

11    his testimony even was as represented.  My recollection of

12    Mr. Osborn's testimony was that he knew and understood

13    entirely that he was purchasing Lubecore pumps.  He knew and

14    understood entirely he was purchasing them from one

14:37:06 15    distributor and that he had purchased Groeneveld pumps from

16    a different distributor.  He basically said I kind of like

17    both these guys, and I'm trying to give each of them a

18    little business.  There was no evidence that he was confused

19    whatsoever as between the two pumps.

14:37:26 20         Mr. White's testimony on secondary meaning was that

21    the look of this pump was iconic in the trucking industry.

22    It reminded him -- can we switch?  -- reminded him of the

23    '57 Chevy Bellaire.  It was -- it's that important.

24    Everybody in the world recognizes it just like they

14:38:06 25    recognize the '57 Chevy Bellaire.  He also said it's as

1    iconic as the '67 Mustang.  Now, I got to wonder if there's

2    any trucking people sitting around the truck stop over a cup

3    of coffee and saying boy, "Do you all remember when that

4    Groeneveld pump came out in 1990?  I sure would like to have

5    one of those now.  I hope that I can get one at a convention

6    of historical convention of grease pumps."

7        No one's doing that.  The look is not iconic.  It's a

8    grease pump.  The people who -- many of the people who

9    testified that they associate the Groeneveld pump with the

10   secondary meaning of the Groeneveld pump, meaning the look

11   of it itself identifies it with Groeneveld, are people who

12   had been around the pump for a thousand years.  I would

13   expect -- in fact, I would be shocked if the outcome was

14   otherwise -- that every Groeneveld employee who's been

15   working the last ten, 15 years, two years, five years, who

16   cares, that every Groeneveld employee who's been around that

17   pump for any period of time recognizes it by the shape.

18   There's no surprise there.  So that's Mr. Wapenaar, Ms.

19   Wilson, Mr. Van der Hulst.

20       Mr. White testified that he recognizes the shape as a

21   Groeneveld, but he's a fleet truck owner.  I can't remember

22   if it was Conoco or something, and how many thousands of

23   trucks he has and how many thousands of Groeneveld pumps

24   he's bought.  Boy, I hope he does recognize the pump by the

25   look of it, but those are aren't the people we're talking

1    about here.  We need to find people, and there are none of

2    them presented to you at all that are consumers or potential

3    consumers of this pump in the trucking industry who would

4    have come to you and said yeah, I recognize that pump by the

5    look.

6        The fact that there was none of those put in front of

7    you should tell you something.  The people who testified

8    about the look other than Mr. Osborn -- who also had been

9    buying Groeneveld pumps for a number of years, so he

10   probably very much should recognize it by the look.  There's

11   nobody who came in here not 100 percent familiar and

12   saturated with the look of the pump who came in and

13   testified that I have -- I recognize that pump just by its

14   silhouette, whether it's dirty or clean, whether it has the

15   label on it or not.

16       Let's talk about the label.  The testimony in this

17   case from a number of Groeneveld people is that this pump is

18   their flagship.  It appears everywhere.  It is Groeneveld.

19   It is the symbol of Groeneveld.  Well, as we looked at some

20   of the marketing materials, that just isn't true.  This is

21   Plaintiff's Exhibit 6.  This is a brochure for a Groeneveld

22   pump.  It's not the EP-0 pump.  It's the Compalube, and

23   that's why the picture is on the brochure.  So when you go

24   back and look at the Plaintiff's Exhibits that have the EP-0

25   pump at issue in this case on them, please remember

1    Mr. Wapenaar's testimony.  All of those pictures, all of

2    those exhibits are sales literature for that particular

3    pump.  But, when we expand a little bit beyond that

4    particular pump, the whole story starts to crumble.

14:41:56  5    Remember this one.  This is Groeneveld's service truck.  On

6    one side -- and I can't even see.  Is that the EP-0 or the

7    other one?

8                    MS. ZUJKOWSKI:  That's the other one.

9                    MR. ANASTOS:  One side of the truck, there's

14:42:08 10    not the EP-0 pump.  There's a different pump.  And on the

11    other side of the truck, there's the EP-0 pump.  So which

12    one's the flagship, which one are they trying to attract

13    attention to?  And by the way, which one has ever been shown

14    without a label on it?  None of them have ever been shown in

14:42:28 15    any sales literature or even to you, which is kind of odd,

16    even to you without a label on it.  The reason you recognize

17    those pumps sitting before you today is because of the

18    label.

19         Remember this one?  They were some kind of a trailer

14:42:43 20    used at trade shows or going to be used at trade shows.

21    What's the lineup of pumps on the side of it?  There's a

22    bunch of them and nothing at all that attracts any attention

23    to the EP-0 pump that is supposed to be the flagship and

24    supposed to be infused with Groeneveld's secondary meaning.

14:43:08 25         Remember this?  Another piece of sales literature.

1    When they're trying to tell the EP-0 pump, of course, they

2    focus on that.  When they're trying to sell their products

3    generally, what do we see?  Six pumps.  No particular

4    attention being attracted to the one EP-0.  And, of course,

5    again, they all have the big green Groeneveld label on them.

6    We showed you the web page.  Now, there's an interesting

7    piece of advertising.  There was a policy that the EP-0

8    serve as the image for Groeneveld.  I think Ms. Wilson

9    testified to that.  Then we went to the web page, and what

10   do we find in the web page?  The first page of the web page

11   didn't have the EP-0 number anywhere.  I don't know if you

12   notice it, something in the corner or the side that

13   Groeneveld was celebrating 40 years, some kind of a 40-year

14   anniversary.  If it was a 40-year anniversary and they were

15   trying to tout their image that has supposedly been their

16   corporate image for the last, I don't know what they're

17   testifying, 30 years, I guess I would have expected to have

18   seen that pump on the front page of the web page.  It wasn't

19   there.  And when we dug into the truck greasing pumps, there

20   were a couple of them available there, not just the EP-0,

21   the twin.  I think it was the other one.  And again, there

22   was no particular attention brought whatsoever to the EP-0

23   pump, and again, it's being sold with its label on it.

24       So if this pump has so much secondary meaning because

25   of its silhouette, why don't they show it with its

1    silhouette and not the name on it?  If the whole world is

2    supposed to be able to recognize it by the way it looks in

3    its silhouette, then you think you'd see it someplace in

4    literature without the label on it.

14:45:06    5        You can put the advertising of that one.  One of the

6    factors that you may consider in the secondary meaning

7    element here is the amount of advertising dollars that

8    Groeneveld spends on -- or the amount of dollars Groeneveld

9    spends on advertising.

14:45:26    10       Now, in 2009, the total expenditures for advertising

11   in the U.S. was about $18,000.  You see that?  Is that odd;

12   $18,000 for the whole United States for the whole year?

13   Divide that by the number of months.  How much is it?  It's

14   not very much.  And then you look at those advertising

14:45:59    15   dollars, and besides being insignificant, think of two more

16   things.  First, you have no idea looking at those

17   advertising dollars what percentage or even if one dollar

18   was actually used to advertise the EP-0 pump.  Second, you

19   have no idea -- probably have a pretty good idea by now that

14:46:20    20   none of those advertising dollars were used to advertise the

21   pump without the label on it.  So Groeneveld is making no

22   effort to convince the public to rely on its label in --

23   excuse me -- to rely on its silhouette of its pump to

24   identify that pump as a Groeneveld product.  In fact, it's

14:46:41    25   patently obvious what they're doing is wanting the public to

1    rely on the green label on the pump to identify it as the

2    Groeneveld pump.

3         You can -- I invite you to assess the evidence of

4    intentional copying in this case.  Please.  I mean --

5    consider everything Ms. Michelson said and everything you've

6    heard in this case.

7         The words from Mr. Vermeulen were that he was under no

8    instructions to copy the Groeneveld pump.  The words from

9    Mr. Eissis were the testimony was that he did not instruct

10   Mr. Vermeulen to copy the Groeneveld pump.  What these

11   guys -- what Mr. Eissis wanted, as testified by him and as

12   by Mr. Vermeulen, was a pump that was a good working pump

13   that had design features that were incorporated from many

14   different pumps.  Mr. Eissis testified at length as to --

15   and so did Mr. Vermeulen, as to what design features were

16   changed and added to his pump the Lubecore to make it what

17   he considers a superior product.  I won't go through all of

18   them, but the reservoirs are different material.  The base

19   is a different material.  It's more corrosion proof

20   material.  The mounting bracket on the back has bushings in

21   it and an insulation thing to help make sure it doesn't fall

22   off of trucks.  The follower plate is made of a different

23   material.  The outside of the follower plate is made of a

24   different material.  The guide rod that holds the follower

25   plate is made of a different material.  There were different

1    performance things that Mr. Eissis identified that it came

2    out to look like it did is no surprise.  Why is it no

3    surprise?  Because Groeneveld set about to do the same thing

4    when it made its pump, to make a good pump.  And the same

5    guy who was involved in making a good pump for Groeneveld

6    years before, a guy who then spent the next 20 years or more

7    of his life working in the automated lubrication system

8    business and who testified that he makes parts and pumps and

9    designs things for all sorts of people, he was involved in

10   the design of this.  It should come as no shock that the

11   first thing he would have thought was well they want a good

12   pump, I better start with -- start my thinking where would I

13   begin to make a good pump and that something that looks like

14   the Groeneveld pump was the end result of it.  And even if

15   you want to find -- even if you find that there's

16   intentional copying, the presumption of intentional copy is

17   rebutted by evidence that the copying was done for a reason

18   other than to piggy back off the reputation of -- in this

19   case of Groeneveld.  There was ample evidence in this case

20   that Mr. Eissis has no desire whatsoever to piggy back off

21   the reputation of Groeneveld.  And there was ample evidence

22   that the pump was designed the way it was in order to be a

23   good functioning grease pump, and I guess I'll go back to

24   something I said in the very -- in my opening.  Mr. Eissis

25   would have to be an idiot to have intentionally copied their

1    pump and then to have trimmed in red, put the red Lubecore

2    label on it, stamped his trademark into it in a number of

3    different places.  If he wanted to piggyback back off

4    Groeneveld's reputation, I think he maybe would have chosen

5    a different shade of green or something for all of the trim

6    on there, and especially the follower plate would have been

7    black because Groeneveld's pump is black.  I mean he

8    distinguished his pump, which means he didn't want to piggy

9    back off of any reputation of Groeneveld.  And, in fact, he

10    testified that some people probably don't think the

11    Groeneveld has a great reputation and some people do.

12    That's fine.  He took the risk even going with the way this

13    looks.

14        Moving on to likelihood of confusion -- hold on --

15    there's -- there was -- there was absolutely no testimony

16    whatsoever that anybody, any purchaser at any time of an

17    automated lubrication system has been confused when making a

18    purchasing decision about the look of the Lubecore pump and

19    the Groeneveld pump.  All you heard was -- and this should

20    come as no surprise either.  The first time people saw the

21    pump, they didn't know what it was.  Yes, it looks like the

22    Groeneveld pump.  No one's standing up here and saying it

23    doesn't.  But, as soon as they looked at the label, even

24    Mr. Wapenaar said you can tell what it is from, you know, 50

25    yards away.  You look at the label, and it identifies what

1       it is.  In the Groeneveld world, we need to suspend belief

2       in labels.  Labels don't matter I think is what the

3       testimony was.  We can't trust labels.  We better not trust

4       labels.  We need to verify what everything is inside the

14:51:59  5   label.  So the next time you go to your pharmacy and pick up

6       your prescription, and it says that this is drug X on the

7       outside, don't trust it.  It's a label.  Go home, find

8       someone who can make an independent analysis that the item

9       inside is the chemical compound it claims to be and don't

14:52:18 10   take it until you've got that analysis because we can't

11      trust labels.  They don't tell us anything about anything.

12      Come on.  This is common sense.  The label tells you

13      as much as the label tells you.  The label tells you here

14      that that's a Lubecore.  The label on your prescription says

14:52:34 15   it's whatever -- you know, whatever prescription item you're

16      taking, the label on the can of green beans tells you what

17      it is.

18      The Groeneveld world makes believe somehow, get to

19      some notion that labels don't mean anything.  Apply your

14:52:51 20   common sense to that notion.  As far as the likelihood of

21      confusion is concerned also, wouldn't you have expected if

22      there was confusion in the marketplace that there would have

23      been some testimony from somebody even inside Groeneveld who

24      said we've had customers calling up and saying can I have

14:53:14 25   that neat red pump of yours?  Was there any testimony of any

1    kind like that?  Was there any testimony of anybody

2    approaching Groeneveld and saying boy, that new red pump of

3    yours, what's that, is that -- is that a cheaper version of

4    your green pump, is that a better version of your green pump

14:53:33  5    or you're trying to do some brand differentiation here and

6    have a green one and a red one, what's the difference?

7    Nothing like that.  Because they understand and know that

8    the one pump is the Lubecore pump manufactured by a

9    different company entirely, and that it has no association

14:53:48 10    whatsoever with Groeneveld.  If that evidence was out there,

11    surely we would have heard it.

12         The fact that that evidence isn't out there sort of

13    demonstrates that Mr. Eissis has and Lubecore have made a

14    successful effort in differentiating their brand from

14:54:12 15    Groeneveld's brand.  The expert that you heard testify seem

16    to think that it hadn't, that Lubecore hadn't achieved that,

17    but since there's no testimony from anyone of confusion, one

18    would think that actually means they have successfully

19    differentiated their brand such as not to cause confusion.

14:54:31 20    Look at the pump.  Look at the red on the pump.  Look at the

21    logo on the pump.  The trademark logo.  Look at the logo

22    stamped into the housing.  Look at the fact benefit analysis

23    when you're back in the other room, the fact benefit

24    analysis the Groeneveld does to explain how its pumps

14:54:52 25    differ -- how its pump is different and better than other

1    competitors' pumps.

2         Let's see P-64.  Look at the sales literature.  Go

3    back and look at the sales literature.  The red Lubecore

4    trim, the red Lubecore teardrop trademark logo, the red

5    band, the red writing.  Switch to the -- go back and look at

6    the web page of Lubecore.  There's a version of it in the

7    exhibits.  I think it might be old, but again, the Lubecore

8    teardrop logo, the red stripe, no effort whatsoever to piggy

9    back off of Groeneveld.

10        The second reason there's no confusion whatsoever is

11   the customers who are buying these items are sophisticated

12   customers.  You've heard testimony about the number of sales

13   calls it takes to sell someone a system, and that only makes

14   sense.  These are not cheap items.  Like I said before,

15   these are not impulse items that you grab off the counter --

16   the front of the counter when you're at the CVS buying some

17   other things.  People sit down, first they evaluate whether

18   or not they even want to go with an automatic lubrication

19   system, and then they decide if they want to make the

20   investment, is it worth it, how much does it cost, how good

21   does it work.  Mr. Wapenaar testified that it took a number

22   of visits to make a sales call, four or five.  Mr. Eissis

23   testified the sales process is complex.

24        The only counter that the other side had to that was

25   again in Osborn, who is the linchpin of their case

1    apparently.  Mr. Osborn, apparently, didn't take five visits

2    to buy the Lubecore pump.  Okay.  It didn't take five visits

3    because he's been -- he's already overcome the issue of

4    whether or not he wants to purchase these systems.

14:57:07 5        Interchangeability.  I'm not sure what this really has

6    to do with this case, but you heard the testimony from

7    Mr. Eissis.  There is a level of interchangeability and a

8    level of non-interchangeability in these items.  You can

9    swap out one pump for another person's pump in certain

14:57:32 10   systems.  There are pieces, parts of the Lubecore system

11   itself -- injectors, blocks, lines -- that would be

12   compatible with other people's systems, EP-0 systems, and it

13   may even be some pieces off the Lubecore pump that are

14   compatible with Groeneveld's pump and perhaps others.  Maybe

14:57:52 15   the reservoir works.  Mr. Eissis testified that the

16   reservoir is not -- the reservoir on the taller version is

17   not one-to-one interchangeable because they're actually not

18   exactly the same height.  So if someone wants to use it on a

19   Groeneveld pump, they have to get a change kit.  But, so

14:58:12 20   what?  I mean it's an issue that's a non-issue.  Just

21   because some parts are interchangeable and some aren't

22   doesn't say anything.  It's not relevant to any of the

23   issues in this case.

24        If you get to the point of considering damages in this

14:58:42 25   case -- and I don't believe you should -- first of all, I

1   think it's interesting that the Plaintiffs have gone with,

2   in terms of their contribution margin, that number that they

3   multiply by something else to come up with the lost profits.

4   They are using the 43 percent from Ms. Wilson, rather than,

5   I think it was 36 percent from the guy they paid $30,000 to,

6   to derive a contribution margin.  That's not hard to

7   understand, now is it?  The $30,000 guy, either he got it

8   wrong or they really rather use the higher contribution

9   margin because that would give them higher lost profits if

10  you get to that point.

11        This document here, which the other side keeps harping

12  on is what you would have to base your damages calculations

13  on, as it says is just sales revenues and sales projections.

14  There are no costs whatsoever taken out of that.  Now,

15  please go to the other one.  This is our Defendant's Exhibit

16  X, and it shows the relevant costs being deducted from the

17  sales revenue in order to come up with the profit or loss

18  that -- excuse me -- Lubecore has achieved on selling these

19  pumps in the United States.  Go back and look at this

20  carefully, and you will see that in the three years that

21  it's been selling these pumps, it's all at a loss.  No

22  profit yet whatsoever.  So -- there's no profits for

23  Lubecore to disgorge on its sales of EP-0 pumps and systems

24  in the United States.  As a matter of fact, look at how many

25  pumps it has sold in the United States.  What is it?  It's

1    less than 500 pumps when you add up the three numbers?  Did

2    you really believe that Groeneveld has been damaged in any

3    sort of way whatsoever by the sale of 500 pumps by Lubecore

4    in the United States?  How many trucks are there out there

15:00:56  5    on the road?  Many, many, many, many orders of magnitude

6    more than 500.

7        And also remember what Dr. Burke -- what Dr. Burke

8    testified to.  If there is no evidence that any sale of --

9    that Lubecore made of Lubecore system was as a result of the

15:01:27 10    alleged infringe activity, meaning that someone was confused

11    as between Lubecore and Groeneveld and actually thought they

12    were buying something that was associated somehow with

13    Groeneveld, then there are zero damages for this element of

14    damages, and I submit to you there has been zero testimony

15:01:44 15    on that.

16        Now, I asked you last Thursday to consider very

17    carefully who's competing carefully and who's competing

18    fairly in this case, and who's not competing fairly.

19        Is Groeneveld competing fairly for filing this

15:02:18 20    lawsuit?  Is Groeneveld competing fairly for registering the

21    Lubecore name in three countries in Europe so that Lubecore

22    and its distributors cannot use that name overseas?  Is that

23    fair competition?  Is that a nice thing to do?  They've

24    gotten up here in front of you and made it sound like

15:02:37 25    they're the good guys.  Does that signify the good guys?

1015

1       In my opening I said that I would -- the other side

2   would not be able to prove to you that Mr. Eissis has horns.

3   There's nothing sinister about what Mr. Eissis is doing.  He

4   started a business, and he wants to compete in the

15:03:02  5   marketplace.  He's competing fairly, and if his pump is bad,

6   if people don't want to buy his pump, the market will sort

7   that out.  There's no need to preclude him in any shape,

8   way, shape, or form from selling his systems.

9       On behalf of myself and my trial team, Ms. Zujkowski,

15:03:28 10   I would like to say it has been an honor and a privilege to

11   try this case to you.  Someday you can tell your children

12   and grandchildren that you got to take part in the grease

13   pump trial of the century.

14                   (Laughter.)

15:03:40 15                   MR. ANASTOS:  As I said in my opening, I hope

16   you take something away from this positive.  I hope you've

17   learned something; if nothing else, about automated

18   lubrication systems.  I hope you enjoyed yourself, and I

19   thank you very much for your attention.

15:03:52 20                   THE COURT:  Thank you.  You may conclude.

21                   MS. MICHELSON:  Thanks, your Honor.

22

23

24

25

1    CLOSING ARGUMENTS ON BEHALF OF THE PLAINTIFF

2              MS. MICHELSON:  The current design, overall

3    appearance, and shape and the way Groeneveld pump looks and

4    has looked for years, years and years, indisputably years --

15:04:36  5    Mr. Van der Hulst's testimony is it actually costs more to

6    make it look this way.  It would cost him less to make it a

7    different way.  The -- there is no cost benefit of making it

8    look exactly the same way that it looks now, either

9    Groeneveld itself or the Lubecore imitation.  In fact, the

15:05:06 10    only evidence here is that making it look exactly this way

11    costs more.  It is not functional.

12         Mr. Eissis' testimony is that it doesn't have to be

13    this shape.  It does not have to look this way to perform

14    the function, the use, the purpose for which it is intended.

15:05:33 15    It is also not functional for those reasons.

16         Mr. Vermeulen's testimony just doesn't hold up.  He

17    can't -- you know, he's -- he's off a little on dates.  I

18    mean come on.  This is the guy who said that he remembered

19    measurements and tolerances of the 50-plus Groeneveld pump

15:05:59 20    component parts from when he worked there in the 1990s.

21    But, he doesn't remember a date?  And what is his testimony

22    about the dates?  He says there was a 30-year generation gap

23    between the Groeneveld pump design of the pump that's at

24    issue in this case and the Lubecore -- the Lubecore being

15:06:27 25    the next generation.  I guess that makes it the fourth

1    generation of the Groeneveld; 30-year generation gap.  2011,

2    minus 30 is 1981.  2008 minus 30 is 1978.

3        Even if you believe that Vermeulen was at Groeneveld,

4    as he says, in '84, again his dates, they just don't add up.

15:07:01  5    And these are dates -- these are numbers of an engineer who

6    claims to have designed not one, but two systems with a

7    30-year generation gap between them.

8        Mr. Vermeulen did not say a word to you about those

9    two -- those two pumps.  The first type two.  I have to look

15:07:30 10    at the Exhibit Number for the record because I can't

11    remember them.  DX-AA and DX-Y.  Mr. Vermeulen did not

12    testify that these were the pumps that were in existence

13    until he came to Groeneveld and saved the day and then, I

14    guess, went off to Korea.  He did not tell you that.

15:07:59 15        And Mr. Willem van der Hulst -- the names are a bit of

16    a tongue twister for me -- he testified which one his team

17    designed in the 1980s and has been on the market for the 30

18    years that Mr. Vermeulen confirmed as its entry into the

19    market.

15:08:27 20        By the way, the implication that I somehow or that

21    Groeneveld somehow hid these two early pumps from you is --

22    let me just say I -- I will let you reach your own

23    conclusions on that.

24        Defense complains about the people we call to testify,

15:08:58 25    including by the way, their own Defense witnesses, I

1  suppose, the witnesses that somehow they were -- they're

2  saturated in the industry about which this case is involved

3  in, but we didn't just bring in Groeneveld people.  There

4  was an end user customer out in Wisconsin, Mr. Osborn,

15:09:25  5  Orville White, national fleet customer out on the east

6  coast, they were distributors.  Mr. DeCleene, Mr. Koppelman

7  who testified.  You had testimony from Scott Marcum, a

8  Defense witness on these issues.  And yes, you did have

9  people who are involved in Groeneveld.  There was an array

15:09:48 10  of different people who participated and are involved in the

11  ALS world, which is what this case is about.  That's the

12  relevant population.  That is the relevant population.

13       You want 8,000 people to come in and say the same

14  thing.  I don't know.  I thought this trial was long enough.

15:10:09 15  You had a cross section of people who told you that they

16  recognized that Groeneveld pump on sight because of the way

17  it looks and those people include Mr. Koppelman and

18  Mr. Marcum, both of whom are actually Defense witnesses.

19       The label -- the label thing about the pharmacy, you

15:10:40 20  know, these are not -- these are -- the testimony in this

21  case is that the label is not the dispositive issue.  It's

22  not the dispositive identifier.  It's not the predominant

23  brand identifier.  Every single person said it's the shape.

24  Mr. Koppelman -- again, their own -- their own guy said the

15:11:08 25  label's the last thing he would look at.  And Mr. Vermeulen,

1       he actually said in his testimony you can't tell anything

2       about a product or its source or its origin by looking at

3       the label.  Defense witness said that.

4            There was some insinuation on our damages that about

15:11:43 5    the -- that because Gail Wilson came up with a 40 percent

6       contribution margin -- and I read you the exact one because

7       I don't want to be accused of misrepresenting any of that to

8       you -- hers was 41.3 percent over a three-year period of

9       time, and Mr. Burkes' was 36.53 percent over a six-year

15:12:10 10   period of time that Mr. Burke told you himself does not have

11      statistical relevance.  It's not -- it's within the range.

12      So you know what?  The Defense doesn't want you to go with

13      Ms. Wilson's numbers of the $1,225,627.  They want --

14      they're complaining about that.  Fine.  You want to go with

15:12:40 15   Dr. Burke's numbers, we'll take the -- we'll take his

16      calculation of $2,856,326, which by the way, doesn't even

17      include the 2009 sales because Dr. Burke didn't have that

18      information because we didn't have that information because

19      it wasn't included in the original materials the Defendant

15:13:07 20   gave us.

21           Five hundred pumps, 500 pumps, taking sales of 500

22      pumps is no damage.  It's meaningless, it's nothing.  Well

23      guess what?  Five hundred pumps times the conservative $1500

24      per system, per system that Ms. Wilson told you they -- is

15:13:48 25   for their distribution charge, the normal price they get

1    from when they sell it to distributors, that's $750,000.  I

2    don't know.  I think that's damage.  I think that means

3    something.  Even if you believe it's only 500 pumps, which

4    you have to deem credible, 100 percent credible, the new

15:14:16  5    exhibit that they brought in two days before trial,

6    Defendant's Exhibit X, that's meaningful.  That's harm.

7         It's no profit whatsoever.  Guess what?  Those numbers

8    are not verified in the new exhibit, Defendant's Exhibit

9    numbers.  They're not independently assessed.  They're not

15:14:41 10    authenticated.  The person who did them aren't here.  There

11    was nobody even checked to make sure they're accurate.

12    There were dates wrong in there.  I -- and there are

13    deductions included in there that are not even permissible

14    under the law as the Judge gave it to you.  And you can't

15:15:01 15    even tell that on the face of the document itself.  That

16    being said, the Defendant has not demonstrated what it needs

17    to demonstrate in order to get the benefit of those claimed

18    deductions and expenses and costs.

19         You know, I've got to tell you something.  No one

15:15:42 20    thinks Mr. Eissis is an idiot.  Nobody, nobody thinks he is.

21    He's smart.  He put a band of red in his pump.  That's not a

22    red pump.  That's a thin band of red and a sticker on

23    something that looks exactly like somebody else's product.

24    He's smart, but guess what?  It doesn't make -- it doesn't

15:16:15 25    make -- it doesn't sufficiently distinguish the overall look

1    of his thing from the overall look of Groeneveld's thing,

2    and that's what a label needs to do to overcome the

3    predominant impression that you get when you see those

4    things because the label is not the predominant brand

5    identifier, and that band of red isn't either.  It's the

6    shape.  And every single witness told you that, including

7    Defense witnesses.

8        Ladies and gentlemen, Mr. Eissis knows very well

9    because he puts it in his marketing materials that it takes

10   20 years to build a reputation and five minutes to ruin it.

11   Time is up.  Nobody enters the marketplace with a supposedly

12   improved product and makes it look that much like the

13   existing predominant product, exactly like the last

14   generation if they are truly trying to establish an

15   independent corporate identity and image, and they don't do

16   it in this industry for sure, and you know that because you

17   met a lot of people in this industry, and you know how they

18   identify pumps when they look at them and encounter them in

19   their industry and in their marketplace.

20       I never came here to prove to you that Mr. Eissis has

21   horns.  I make no -- we make no character judgments here.

22   It's not about a bad person, a good person.  That is not

23   what the case is about.  When I heard it in opening

24   statement, it -- it -- it was such a discord in me because

25   it's not about horns or devils or bad morality; it's about

1    if the product confuses the marketplace.

2         I ask you -- we ask you, Groeneveld asks you to use

3    your common sense.  I know you will.  Look at the products.

4    Think about the real world, the real marketplace world in

15:18:54  5    the ALS industry, not when you go to a store and pick an

6    item, a can of beans off a shelf.  Okay.  I'm talking about

7    the marketplace that is at issue here, and the totality of

8    the evidence, the credibility of the witnesses, and your own

9    life experiences and common sense, and ask you to return a

15:19:15 10    verdict in favor of Groeneveld.  Thank you.

11              THE COURT:  Thank you.  Almost finished.

12         Now, ladies and gentlemen, the verdict in this case,

13    and the answers to the interrogatories that I submit to you

14    have to be -- the considered judgment of each member of the

15:20:01 15    jury.  So in order to return a verdict or an answer to any

16    interrogatory, all 12 of you must agree.  In other words,

17    the answer to the interrogatory or interrogatories and the

18    verdict must be unanimous.  So it's your duty as jurors to

19    consult with each other, to deliberate with a view to

15:20:19 20    reaching an agreement if you can do so without doing

21    violence to your individual conscience and good judgment.

22         But, you must each decide the case for yourself and do

23    that only after an impartial consideration of all the

24    evidence in the case with your fellow jurors.

15:20:33 25         In the course of your deliberations, of course, do not

1    hesitate to reexamine your own views and change your opinion

2    if you're convinced it's erroneous.  However, do not

3    surrender any honest conviction as to the weight or affect

4    of any evidence solely because of the opinion of another

15:20:49  5    juror or your fellow jurors or for the sake of reaching an

6    agreement or a verdict.

7         Remember, at all times you're not partisans.  You are

8    judges, judges of the facts as presented during the course

9    of this trial.

15:21:02  10         For your convenience, in order to assist you in

11    reaching a proper decision, I'm submitting to you a set of

12    written questions.  They're called interrogatories.  What

13    I'll do is display and read them to you, and I think once

14    you look at them and hear me give the description, they'll

15:21:17  15    be self-explanatory.

16         Interrogatory Number 1, you see the caption's on top

17    of each page.  I say do you find that Plaintiff Groeneveld

18    proved by a preponderance of the evidence that its trade

19    dress, the external shape and appearance of the pump,

15:21:35  20    including logo and color, are nonfunctional?  And there is a

21    blank space right there.  I said in bold print insert in ink

22    either yes or no according to your findings.  There are 12

23    signature bars located below that.  So each of you sign in

24    the appropriate signature bar, and the juror that you

15:21:53  25    selected as foreperson signs on the first.  The other 11

1   concurring jurors sign in whatever order you want.  And then

2   the date that you do that, you insert here's the date.  You

3   put the date here.

4       Down below I say if your answer to Interrogatory

5   Number 1 is yes, then you proceed to Interrogatory Number 2.

6   If your answer is no, do not answer Interrogatory Number 2

7   and enter a verdict in favor of the Defendant.  Okay.  I

8   think that's self-explanatory on that, but if your answer is

9   yes, then you go to Interrogatory Number 2, which says, "Do

10  you find that Plaintiff Groeneveld proved by a preponderance

11  of the evidence that its trade dress, the external shape and

12  appearance of the pump, including logo and color, is

13  distinctive in the marketplace, then it has acquired

14  secondary meaning," but again, your answer there, either yes

15  or no, according to your findings with the 12 signature

16  bars, and then the same dated line down below.

17      It says below that, if your answer to Interrogatory

18  Number 2 is yes, that means you've answered yes to both 1

19  and 2, proceed to Interrogatory Number 3.  If your answer is

20  no, do not answer Interrogatory Number 3 and enter a verdict

21  in favor of the Defendant.  Again, I think that's

22  self-explanatory.

23      Interrogatory Number 3 says, "Do you find that

24  Plaintiff Groeneveld proved by a preponderance of the

25  evidence that there was a likelihood of confusion in the

1       minds of consumers of EP-0 pumps as to the source of

2       Defendant Lubecore's EP-0 pump?" I think we spelled

3       Lubecore wrong, but maybe not. If I did, forgive me. And

4       then there's a blank space there. Either say yes or no;

15:23:31  5   again, according to your findings, the signature bars and

6       the date line.

7           At the bottom of that, it says, "If your answer to

8       Interrogatory Number 3 is yes, enter a verdict in favor of

9       the Plaintiff. It your answer is no, enter a verdict in

15:23:45 10   favor of the Defendant."

11          And then the verdict form. It says, "We, the jury,

12      being duly impaneled and sworn, find by a preponderance of

13      the evidence in favor of the Plaintiff Groeneveld on

14      Plaintiff's claim of trade dress infringement under the

15:24:00 15   Lanham Act, 15, United States Code, Section 1125(a), and

16      against Defendant Lubecore, and award damages, if any, in

17      the amount of," there's a blank space. I say next to it,

18      "Insert an amount from zero dollars to whatever you think

19      the evidence and the law requires." Twelve signature bars,

15:24:17 20   and a date form on the bottom. And then there's another

21      verdict form. If you find in favor of the Defendant, it

22      says, "We, the jury, being duly impaneled and sworn, find by

23      a preponderance of the evidence in the favor of," shouldn't

24      be that. Find -- got to change that. Where are you, Betsy?

15:24:32 25   Yeah, you don't find by a preponderance of the evidence in

1    favor of the Defendant.  It just -- you find in favor of the

2    Defendant on the Plaintiff's claim.  We'll change that

3    because the Defendant has no burden of proof as we told you.

4    Okay.  I'll fix that, and then we'll get that to you at the

15:24:47  5    appropriate time.

6         Now, it's proper to add this caution -- and I am when

7    I give these instructions -- that is, nothing I said in the

8    instructions nor in any manner of presenting the

9    interrogatories to you or the verdict form is to indicate in

15:25:02 10    any way how I feel you should decide the case or what the

11    verdict should be.  That's a decision that you make.

12         Now, immediately upon your retirement, you should

13    proceed to select one of your members as the foreperson.

14    Now, the foreperson has no greater authority nor any greater

15:25:18 15    responsibility than any other Members of the Jury, except

16    the Court charges the Foreperson with the responsibility:

17    One, of confining the discussions in the jury room to the

18    evidence and the law in this case; two, to making sure that

19    the interrogatory or interrogatories and verdict form are

15:25:34 20    signed and dated in ink according to the instructions that

21    I've given you; and three, that if there is to be any

22    communication with the Court, your foreperson has to sign

23    the note that's communicated to the Court and date it.

24    Otherwise, the foreperson has no greater authority nor any

15:25:51 25    greater responsibility than any other member of the jury.

1           Just as a kind of a caveat here, don't spend two days

2      arguing about who the foreperson is going to be because you

3      watched TV and you see that the Judge makes the foreperson

4      disclose the verdict because when you come back here in open

15:26:06 5      court, I will read the interrogatory answer or answers and

6      the verdict.  So you don't have to worry about that.

7           Now, regardless of any opinion that you may have as to

8      what the law is or what the law ought to be, given the facts

9      in this case, remember as I've told you repeatedly, it would

15:26:22 10      be a violation of your sworn duty to base any interrogatory

11      answer or any verdict on any law other than the law that I

12      have given in the instructions in this case or the facts as

13      they have been presented during the course of the trial.

14           Now, I do hope that these instructions have been

15:26:38 15      sufficiently clear to enable each one of you to perform your

16      duties.  Now, if you decide that you need to address a

17      communication to the Court, you must first reduce that

18      communication to writing, have it signed and dated.  Signed

19      and dated.  Okay?  And then you can contact the Court by

15:27:01 20      using the push button located in the jury room, and then

21      I'll get the question and endeavor to answer it.  All right?

22           And then after you have reached a decision in the

23      case, the final decision, you contact the Court, as I said,

24      by using the push button located in the jury room.  We'll

15:27:17 25      bring you back here in open court and I will read the answer

1    or answers and the verdict form.

2         Now, let me say this that when you commence your

3    deliberations, again as I've said, this is America.  Each

4    side or each person in an American jury has the right to

15:27:35 5    give his or her opinion about what you think the state of

6    the evidence has been during the course of the trial, and

7    each juror should give the courtesy to your fellow jurors

8    and listen to what they have to say; and then at the

9    conclusion of which, you can come up with a fair and

15:27:49 10    responsible decision.

11         Now, are there any objections, modifications, or

12    deletions to the instructions by the Plaintiff or the

13    Defense?

14              MS. MICHELSON:  We have some.

15:27:58 15              THE COURT:  Okay.  Come up to the side.  All

16    right.  You can stand and stretch.  This will take about a

17    minute or two.

18         (Discussion at side bar off the record.)

19              THE COURT:  Okay.  We're all set.

15:33:43 20         Now, we're going to -- you are going to deliberate in

21    our jury room, which is on 15.  So somebody will take you

22    down there.  Either Jeanie or Megan or Betsy or a

23    combination of all three, will take you down there and take

24    you the back way.  And so you do the right thing, and then

15:34:07 25    we'll get the exhibits down to you.  So I repeatedly

1    suggested to the lawyers they get everything ready in order

2    to go down so you can commence.

3         And let me say this; that as we begin, as you begin --

4    I did it again.  As you begin your deliberations, you take

15:34:25  5    whatever time you think is necessary in order to reach a

6    fair decision.  I've been in trials that lasted for months,

7    and the jury came back in five minutes.  I had one case that

8    lasted two months.  Not too long ago, I didn't even leave

9    the bench, I was talking to the Court Reporter, we got a

15:34:42 10    buzz there was a verdict.  So other times you have a case

11    that lasted a day and the jury deliberates for five or six

12    days.  The point of -- the moral of this story is you take

13    whatever time you think the evidence and the law requires.

14    There's no set amount of time.  Long time, short time.

15:35:01 15    That's one thing.

16         The second thing is the nature of your deliberations.

17    Everybody has agreed that if you want to go on a break or

18    smoke break or go home tonight, and you haven't reached a

19    decision, that you can do so without me giving this

15:35:14 20    additional instruction, and that is this:  That you may

21    discuss the case only when all 12 of you are together in the

22    confines of your jury room.  So one or more people leave for

23    one reason to use the restroom, something like that, kind of

24    suspend your discussions and certainly don't disclose to

15:35:31 25    anybody the nature of your deliberations or the extent of it

1    until it's over.  And then when you do that -- when you have

2    reached a decision, you come back here in court.  As I said,

3    I will read the verdict.  I say this in every case as well

4    because we don't know what goes on with, you know, people

15:35:46  5    watching TV and what's in your mind, but we have a court

6    rule that says nobody -- that means nobody has any right to

7    have any contact with any member of any jury without the

8    Judge first giving permission, and I don't give that

9    permission.

15:36:07 10         So you commence and conduct your deliberations secure

11    in the knowledge that no one will have any contact with any

12    Members of the Jury, nor will anybody look behind your

13    verdict for any reason.  When your verdict comes out in open

14    court, that's it and your responsibility has concluded.  So

15:36:22 15    you -- I say this, and I say it emphatically as I can

16    because, you know, you watch TV shows and you see jurors

17    being interviewed on the front steps of the newspaper or

18    lawyers chasing them down the street or something like that.

19    That's California.

15:36:35 20         We're in Ohio, and this is federal court, and so, and

21    we have our ways to enforce those rules, believe me when I

22    tell you.  So it's not breached.  It hasn't been breached in

23    my experience.  So don't worry about that.  All right.

24    Really goes more for a case that involves unbelievable

15:36:50 25    violence or something like that.  People -- jurors have a

1    tendency -- my only story I'll tell you before you leave,

2    and that is you know I spent nine years as a Prosecutor

3    trying all kinds of murders and this, that, and the other

4    thing.  Never throughout for a second the jurors would be

5    concerned about their safety.  Never even dawned on me.  My

6    first case as a Judge I walked in after the jury reached a

7    verdict, they all wanted to know who are all the people

8    coming in and out of the courtroom.  They were all afraid.

9    You know, I was unsympathetic and didn't think about that,

10   that jurors are concerned with who the people are watching.

11   And then I made it a point to say like this in every case,

12   those are people on other cases.  Some have an interest in

13   the case, most don't.  Most people you see coming in or out

14   have other cases with me, just trying to figure out when I'm

15   going on break so they can talk to me.  So don't be

16   concerned about that.  That's really what that's all about.

17        So if you -- and then Jeanie doesn't like this

18   comment.  We've had jurors here as late as 2:00 in the

19   morning.  I'm not suggesting you stay here that way, but you

20   take the time you think the evidence and the law require.

21   So if you want to go home at our regular time, then you --

22   and you haven't reached a decision, let us know and you can

23   go home, and you'll resume and tell us what time you want to

24   start in the morning.  If you want to go past then because

25   you think you may be able to reach a decision today without

1    coming back tomorrow, you do that, too.  But, what I'm

2    telling you is no one is going to influence the course of

3    your deliberations.  That's your decision to make.  Okay?

4    So good luck.  Oh, I should say this:  You'll have a copy of

15:38:24  5    these instructions, the corrected verdict form, and the

6    spelling on Lubecore in the one verdict form, and you'll

7    have all the exhibits brought down to you very quickly, but

8    Jeanie, I think, will take you -- don't go out that door.

9    You walk in the closet.  You can -- you can go out that way

15:38:41 10    and Jeanie will take you down.

11         (Proceedings in the absence of the jury:)

12              THE COURT:  There were several objections made

13    to the jury instructions, and basically, basically it

14    involved the description of the trade dress claim, and the

15:40:19 15    Plaintiff doesn't want the logo and the colors included.

16    That's why I kept asking what the trade dress claim actually

17    was.  And then it was the appearance of the pump.  And so I

18    think that's proper.  The objection is overruled.

19         Then we had, let's see, on Page 23, generic

15:40:43 20    configurations.  The Plaintiff wanted generic designs.  I

21    think configurations is enough synonymous of a word.  And

22    then on Page 27, let's see.  Here, I'm not sure what your

23    objection to 27 was.

24              MS. MICHELSON:  On Page 22, our objection was

15:41:10 25    that the instruction regarding engineering necessity is

1          configuration.

2                     THE COURT:  That's right.

3                     MS. MICHELSON:  That that is only in cases

4          where there is a single core functional component, and that

15:41:22  5     our objection is that this -- that is not the evidence in

6          this case.  Also on Page 22, your Honor, in the last

7          paragraph where it says distinctive about Groeneveld's pump,

8          other than the Groeneveld logo and green coloring, and that

9          every component of the pump performs a function and goes on,

15:41:43 10     and we think the correct -- we're objecting to the word, and

11         because we think that the correct word should be "or."

12              And we -- our further objection is as follows.  We

13         think it should read as follows, totality of it.  If you

14         agree with the Defendant that there's nothing arbitrary,

15:42:01 15     fanciful, or distinctive about Groeneveld's pump other than

16         the Groeneveld logo and green coloring, or that every

17         component of the pump performs a function and is part of the

18         pump for a reason and that their arrangement is functional,

19         you must find for the Defendant and it's not necessary to

15:42:19 20     continue.

21                     THE COURT:  I can change the word "and" to

22         "or."  I don't know if that's a big --

23                     MS. MICHELSON:  Because I don't think we have

24         to prove both.  And so I -- that was the basis of that

15:42:32 25     objection.

1          THE COURT:  But, your -- I shouldn't say that

2    because your claim is the appearance of looking at it.

3          MS. MICHELSON:  We don't have to prove both.

4    We prove one or the other.

15:42:43  5          THE COURT:  You can prove -- you can prove the

6    logo is?  All right.  I'm not going to get into a debate

7    with you.  Go ahead.  What's on Page 23?  I said the

8    configurations.  So the objection is overruled on 22.  23,

9    configuration is the correct statement.  27, I'm not sure

15:43:00 10    what the --

11          MS. MICHELSON:  Yes, I'll just articulate it

12    quickly.  The instruction reads, jumping down one, two --

13    one, two, three, four, to the fifth line, "In the minds of

14    consumers."  Our position is that the better statement of

15:43:16 15    the law is a likelihood of confusion or uncertainty in the

16    relevant market as to the source or origin of the two

17    parties' products.  On Page 20 -- I don't know if you want

18    to rule or if I should just continue.

19          THE COURT:  Go ahead.  You had consumer in a

15:43:36 20    couple places.  I think consumer is the right word.

21          MS. MICHELSON:  Yeah, and it appears you are

22    correct, your Honor.  On Page 28 where it says, "If you find

23    that there's not a likelihood that a reasonable consumer."

24    Our objection is that it's not just a reasonable consumer.

15:43:53 25    It's a reasonable person involved in the ALS industry would

1035

1     be confused or uncertain as to the source or origin or

2     quality of the Defendant's EP-0 pump.

3                 THE COURT:  Okay.  I don't think that's the

4     correct statement of the law.  I think the consumer is the

15:44:08   5     correct statement.  Okay.

6          Would you get the exhibits, if they're altogether,

7     when they come up with the --

8                 MR. ANASTOS:  How do we get the pumps down

9     there?

15:44:22  10                 THE COURT:  They're coming up with a carrier.

11                 MS. MICHELSON:  Your Honor, one other thing.

12    An exhibit, we marked an additional exhibit, additional pump

13    during Mr. Eissis' cross-examination, and we would like that

14    to be moved into evidence as well.  I believe -- Melissa, I

15:44:36  15    don't think there's an objection.

16                 THE COURT:  No, there isn't.

17                 MS. ZUJKOWSKI:  There's no objection to the

18    pump.

19                 THE COURT:  Just mark it.

15:44:42  20                 MR. KUNSELMAN:  143, your Honor.  Plaintiff's

21    Exhibit 143.

22                 THE COURT:  Okay.

23                 MS. MICHELSON:  And then, your Honor, we're

24    going to mark as 144 the -- there's an exhibit on the

15:44:55  25    witness box.

1       MS. ZUJKOWSKI:  Thank you, your Honor.  This

2   is a marked version.

3           MR. ANASTOS:  They're all marked.

4           MS. MICHELSON:  We're going to mark and offer

15:45:03 5   as an exhibit as part of a proffer for Dr. Rashidi.  We'll

6   mark his curriculum vitae and his report as Exhibit 144 as

7   part of the proffer.

8           THE COURT:  All right.  You can do that, yeah.

9           MS. MICHELSON:  Then I -- it's 141 there

15:45:29 10  indeed then, not 144.

11          THE COURT:  That's all right.

12          MR. ANASTOS:  Your Honor, we do renew the Rule

13  50 motion.

14          THE COURT:  All right.  I'm still keeping it

15:45:39 15  under advisement.

16          MR. ANASTOS:  Thank you.

17

18

19

20

21

22

23

24

25

1        THURSDAY SESSION, OCTOBER 20, 2011, AT 6:34 P.M.

2                  THE COURT:  Mr. Moizuk, has the jury reached a

3        decision, sir?

4                  THE FOREPERSON:  Yes, your Honor.

5                  THE COURT:  Would you hand everything to

6        Jeanie.

7             For those of you old enough to remember Johnny Carson,

8        when I do this, I say that.  Not too many people remember it

9        anymore.  Okay.

10            Interrogatory Number 1, "Do you find the Plaintiff

11       Groeneveld proved by a preponderance of the evidence that

12       its trade dress, the external shape and appearance of the

13       pump, including logo and color, are nonfunctional?"  The

14       answer is yes.  Signed in ink by all 12 jurors, dated

15       today's date.

16            Interrogatory Number 2, "Do you find that Plaintiff

17       Groeneveld proved by a preponderance of the evidence that

18       its trade dress, the external shape and appearance of the

19       pump, including logo and color, is distinctive in the

20       marketplace, that it has acquired secondary meaning?"  The

21       answer is yes, and signed in ink by all 12 jurors and dated

22       today's date.

23            Interrogatory Number 3, "Do you find that Plaintiff

24       Groeneveld proved by a preponderance of the evidence that

25       there's a likelihood of confusion in the minds of consumers

1  of EP-0 pumps as to the source of Defendant Lubecore's EP-0

2  pump?"  The answer is yes, signed in ink by all 12 jurors,

3  dated today's date.

4      Verdict, "We, the jury, being duly impaneled and

18:45:16  5  sworn, find by a preponderance of the evidence in favor of

6  the Plaintiff, Groeneveld, on Plaintiff's claim of trade

7  dress infringement under the Lanham Act, and against

8  Defendant Lubecore, and award damages, if any, in the amount

9  of $1,225,000.  Signed in ink by all 12 jurors and dated

18:45:33 10  today's date.

11      Now, the single question I'm going to ask each one of

12  you is have I correctly read the interrogatory answers and

13  your verdict?  Juror Number 1?

14          JUROR NUMBER 1:  Yes, you have, your Honor.

18:45:43 15          THE COURT:   Number 2?

16          JUROR NUMBER 2:  Yes, you have, your Honor.

17          THE COURT:   Number 3?

18          JUROR NUMBER 3:  Yes, you have, your Honor.

19          THE COURT:   4?

18:45:46 20          JUROR NUMBER 4:  Yes, you have.

21          THE COURT:   5?

22          JUROR NUMBER 5:  Yes.

23          THE COURT:   6?

24          JUROR NUMBER 6:  Yes, your Honor.

18:45:49 25          THE COURT:   7?

1          JUROR NUMBER 7:  Yes, your Honor.

2          THE COURT:  8?

3          JUROR NUMBER 8:  Yes, your Honor.

4          THE COURT:  9?

18:45:52  5          JUROR NUMBER 9:  Yes, your Honor.

6          THE COURT:  10?

7          JUROR NUMBER 10:  Yes, your Honor.

8          THE COURT:  11?

9          JUROR NUMBER 11:  Yes, your Honor.

18:45:55 10          THE COURT:  And 12?

11          JUROR NUMBER 12:  Yes.

12          THE COURT:  Thank you.

13     The verdict forms and -- the verdict form is correct

14     and the interrogatories are correct in form, and so I'm

18:46:02 15     going to accept each of the interrogatory answers and the

16     verdict.  That will conclude any further service that you

17     have as jurors.

18          Is there anything further on behalf of the Plaintiff?

19          MS. MICHELSON:  Your Honor, we do need to take

18:46:13 20     a matter up at side bar before you discharge the jury, in

21     light of the verdict.

22          THE COURT:  Okay.  Hang on.  I know what

23     you're going to --

24          MS. MICHELSON:  Yeah.

18:46:22 25          THE COURT:  We'll deal with that at another

1    time.  Maybe tomorrow morning.

2                   MS. MICHELSON:  It is --

3                   THE COURT:  There's another claim here of a

4    different type of damage that has to be litigated.  And so

18:46:34 5    what that would mean is -- you probably didn't know this.  I

6    couldn't tell you before -- you'll have to come back before

7    then.  I know.  I'll give you a choice.  Come back tomorrow

8    or come back Tuesday morning.  Shaun, you speak for the

9    crowd.

18:46:49 10                   THE FOREPERSON:  Tomorrow.

11                   THE COURT:  Same time, same station.  Is that

12   fair?

13                   THE JURY:  Fair.

14                   THE COURT:  Thanks very much.  See you at

18:47:29 15   8:15.

16        (Proceedings adjourned at 6:47 p.m.)

17

18

19

20

21

22

23

24

25

1    CROSS-EXAMINATION OF JAN EISSIS                     846

2    DIRECT EXAMINATION OF SUSAN COKER                   897

3    CROSS-EXAMINATION OF SUSAN COKER                    899

4    CHARGE OF THE COURT                                 934

5    CLOSING ARGUMENTS ON BEHALF OF THE PLAINTIFF        962

6    CLOSING ARGUMENTS ON BEHALF OF THE DEFENSE          992

7    CLOSING ARGUMENTS ON BEHALF OF THE PLAINTIFF       1015

8

9                    C E R T I F I C A T E

10          I certify that the foregoing is a correct

11   transcript from the record of proceedings in the

12   above-entitled matter.

13

14

15

16   s/Shirle Perkins
     Shirle M. Perkins, RDR, CRR
17   U.S. District Court - Room 7-189
     801 West Superior Avenue
18   Cleveland, Ohio 44113
     (216) 357-7106
19

20

21

22

23

24

25